# EXHIBIT D

# Connectus, LLC vs.
# Ampush Media, Inc., et al.

## Videotaped Deposition of
## DANA TREXLER SMITH
## December 05, 2016
## ***CONFIDENTIAL***

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 3 of 127 PageID 9274

**Dana Trexler Smith**

Confidential

**Connectus, LLC vs.
Ampush Media, Inc., et al.**

Page 1

1      UNITED STATES DISTRICT COURT

2      MIDDLE DISTRICT OF FLORIDA

3        TAMPA DIVISION

4 -------------------------------------------------

5   CONNECTUS LLC D/B/A

6   EDEGREE ADVISOR,     Action No.

7      Plaintiff,   #8:15-CV-02778-

8      vs.     VMC-JSS

9   AMPUSH MEDIA, INC., AND

10   DGS EDU, LLC,

11      Defendants.

12 -------------------------------------------------

13

14        CONFIDENTIAL

15   VIDEOTAPED DEPOSITION of DANA TREXLER SMITH

16     PHILADELPHIA, PENNSYLVANIA

17      December 5, 2016

18

19

20

21

22

23 Reported By:

  S. Arielle Santos,

24 RPR, CSR, CLR

25 Job No.: 10028980

Page 2

1      APPEARANCES:

2 FOR PLAINTIFF:

3 BY - CLEMENT ROBERTS, ESQ.

4 DURIE TANGRI LLP

5 217 Leidesdorff Street

6 San Francisco, California 94111

7

8 FOR DEFENDANT:

9 BY - MICHAEL SULLIVAN, ESQ.

10 ASHCROFT LAW FIRM, LLC

11 200 State Street, 7th Floor

12 Boston, Massachusetts 02109

13

14 BY - STEVEN AARON, ESQ.

15 DENTONS US LLP

16 4520 Main Street, Suite 1100

17 Kansas City, Missouri 64050

18 Steven.aaron@dentons.com

19

20 BY - WILLIAM K. WHITNER, ESQ.

21 PAUL HASTINGS LLP

22 1170 Peachtree Street, NE, Suite 100

23 Atlanta, Georgia 30309

24

25     CHRIS WEISS-CALHOUN, Legal Videographer

Page 3

1

2       INDEX

3 DANA TREXLER SMITH

4   BY MR. ROBERTS       5

5

6     EXHIBITS MARKED - ATTACHED

7 Exhibit 150, Plaintiff's Notice of    4

8   Deposition of Dana Trexler

9   Smith

10 Exhibit 151, expert report     4

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1      (Exhibit 150 is Marked.)

2      (Exhibit 151 is Marked.)

3     THE VIDEOGRAPHER: The time on

4 the record is 9:29 a.m., on Monday,

5 December 5, 2016.

6      My name is Chris

7 Weiss-Calhoun, CLVS, of Aptus Court

8 Reporting.

9      The court reporter today is

10 Arielle Santos of Aptus Court

11 Reporting, located at 600 West

12 Broadway, Suite 300, San Diego,

13 California.

14      This begins the video

15 deposition of Dana Trexler Smith

16 testifying in the matter of

17 Connectus, LLC versus Ampush Media,

18 et al., in the pending court of

19 U.S. District Court of Middle

20 District of Florida, Tampa

21 Division, Case Number

22 8:15-CV-02778-VMC-JSS.

23      It's being taken at the Regus,

24 One International Plaza,

25 Philadelphia, Pa.

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 4 of 137 PageID 9272

Confidential

Dana Trexler Smith                                         Connectus, LLC vs.
                                                           Ampush Media, Inc., et al.

Page 5

1        Will the attorneys please
2   state their appearance for the
3   record.
4        MR. ROBERTS:  Good morning.
5   Clem Roberts, from Durie Tangri,
6   for the plaintiff.
7        MR. SULLIVAN:  Michael
8   Sullivan on behalf of DGS EDU, LLC.
9        MR. AARON:  Steven Aaron on
10  behalf of Ampush.
11       MR. WHITNER:  William K.
12  Whitner on behalf of DGS EDU.
13       THE VIDEOGRAPHER:  And the
14  court reporter will now administer
15  the oath.
16
17  DANA TREXLER SMITH, having been duly
18  sworn, testifies as follows:
19
20         EXAMINATION
21  BY MR. ROBERTS:
22   Q    Good morning.
23   A    Good morning.
24   Q    Can you please state your full
25  name for the record.

Page 6

1    A    It's Dana Trexler Smith.
2    Q    And, Ms. Smith, in what city and
3   state do you reside?
4    A    I live in Radnor, Pennsylvania.
5    Q    Thank you, Ms. Smith.
6        In front of you, you will see
7   exhibit -- what's been marked as
8   Exhibit 150, which is the Plaintiff's
9   Notice of Deposition of Dana Trexler
10  Smith.
11       Do you see that, ma'am?
12   A    I do, yes.
13   Q    Do you understand you are
14  appearing here today pursuant to that
15  subpoena?
16   A    Yes, I do.  I just will point out
17  my middle name is spelled incorrectly on
18  this.
19   Q    Thank you very much.
20   A    It's T-R-E-X-L-E-R.
21   Q    Very good.  We stand corrected.
22  Thank you.
23       In front of you as Exhibit 151, I
24  believe I have a copy of your expert
25  report in this matter; is that correct?

Page 7

1    A    (Reviewing.)  This appears to be
2   a copy of my expert report, yes.
3    Q    Is there anything in here that
4   you see that is missing from this copy?
5    A    (Reviewing.)  This appears to be
6   complete based on my cursory review of it.
7    Q    Thank you.
8        If I ask you to turn to page 35
9   of the report, is that your signature,
10  ma'am?
11   A    Yes, it is.
12   Q    Did you sign this on or around
13  November 22, 2016?
14   A    I did.
15       MR. AARON:  Can I interrupt
16  for a second?
17       (Whereupon a Discussion is
18  Held Off the Record.)
19       MR. AARON:  Thank you.
20  BY MR. ROBERTS:
21   Q    Sitting here today, are you aware
22  of any errors in your report that's been
23  marked as Exhibit 151?
24   A    (Reviewing.)  Not to my
25  knowledge.  There may have been a

Page 8

1   reference here -- here or there that
2   needed to be updated, but other than that
3   I believe this should be correct, to the
4   best of my knowledge.
5    Q    When you say there may have been
6   a reference that needs to be up --
7   updated, are you aware of any specific
8   reference that needs to be updated, or
9   it's just human fallibility is such that
10  you believe there might be something
11  that's incorrect?
12   A    I may have seen a notation that
13  my staff caught something after the fact,
14  that we referenced an incorrect exhibit or
15  Bates number.
16   Q    Okay.
17       Do you know what that is sitting
18  here today, or you've just seen that from
19  one of your staff?
20   A    I don't know what it is sitting
21  here today.  I could get you that
22  information.
23   Q    Are there any assumptions that
24  you have made in this report that as you
25  sit here today that you now believe are

**Dana Trexler Smith**                                    Connectus, LLC vs.
                                                  **Ampush Media, Inc., et al.**

Page 9

1  incorrect?
2    A    No.
3    Q    Is there anything at all other
4  than this incorrect reference to an
5  exhibit that you would like to change
6  about your report?
7    A    No.
8    Q    You understand that the plaintiff
9  is relying on this report to know what
10  you're planning to say at trial?
11    A    Yes, I do.
12    Q    And you understand that it's
13  important for the plaintiff to have a
14  complete understanding of the opinions you
15  intend to offer in this case; is that
16  correct?
17    A    Yes.
18    Q    Did you disclose all of the
19  opinions that at this time you intend to
20  offer at trial in the report that's been
21  marked as Exhibit 151?
22    A    Yes, as of the date of my
23  November 22nd report.  I understand there
24  has been some additional discovery since
25  the issuance of this report, and to the

Page 10

1  extent there's anything in there that
2  would update my report and I am asked to
3  revise this report, this -- that this is
4  my opinion as of November 22nd.
5    Q    Okay.
6        Speaking as of November 22nd, did
7  you hold or withhold any opinions back
8  that you had and you didn't put them in
9  the report?
10        MR. SULLIVAN:  Objection to
11    the extent it doesn't invade the
12    attorney-client privilege, the
13    attorney work product.
14        MR. ROBERTS:  Let me rephrase
15    the question.
16  BY MR. ROBERTS:
17    Q    Did you withhold from
18  Exhibit 151, as of November 22, 2016, any
19  opinions that you otherwise intend to
20  offer at trial?
21    A    No.
22    Q    So if an opinion or analysis
23  isn't in the exhibit that's 151, it's
24  because at least at the time you drafted
25  the report you weren't intending to offer

Page 11

1  it for trial, correct?
2    A    That is correct.
3    Q    Between the -- November 22nd and
4  today, have you generated any additional
5  opinions in this case?
6        MR. SULLIVAN:  Objection.  I'm
7    going to instruct the witness not
8    to answer to the extent it -- it
9    discusses any attorney-client
10     privileged communication or
11    attorney-client work product.
12  BY MR. ROBERTS:
13    Q    Okay.
14        Can you answer that question
15    without revealing any attorney-client
16  communications?
17        THE WITNESS:  May I answer or
18    are you instructing me not to
19    answer?
20        MR. SULLIVAN:  Well, just can
21    we put the question again before
22    the witness?
23        MR. ROBERTS:  Sure.
24  BY MR. ROBERTS:
25    Q    Between the November 22nd date

Page 12

1  that you signed this report and today,
2  have you generated any additional opinions
3  in this case?
4        MR. SULLIVAN:  That -- that
5    she intends to offer?
6        MR. ROBERTS:  Just my question
7    the way it is, sir.
8        I understand you are
9    instructing her not to answer with
10     respect to the privilege piece of
11    it, and I'm asking if other than
12    the privilege piece, she has
13    objected -- she's developed any
14    additional opinions in this case.
15        MR. SULLIVAN:  If there are
16    any others besides what's been
17    privileged communication between
18    counsel, you can answer.
19        MR. AARON:  That you intend to
20    offer at trial.
21        THE WITNESS:  No.
22        MR. ROBERTS:  No, sir.  Excuse
23    me.  That was not my question.
24  BY MR. ROBERTS:
25    Q    My question wasn't whether you

Page 9..12

**Confidential**                                              Connectus, LLC vs.

**Dana Trexler Smith**                                       Ampush Media, Inc., et al.

Page 13

1  intended to offer them.
2        Leaving aside any attorney-client
3  privileged communications, have you
4  developed any opinions in this case
5  between November 22, 2016, and today?
6        MR. AARON:  I guess -- if I
7     can interrupt.
8        I wasn't instructing the
9     witness.  I was helping understand
10    Mr. Sullivan's objection, which was
11    subject to the attorney-client
12    privilege, and so without divulging
13    any attorney-client privilege, I
14    put that admonition in there to
15    fully explain what the objection
16    was about.
17       That's all.
18 BY MR. ROBERTS:
19    Q    Ms. Smith, can you answer my
20 question?
21    A    Okay.  I developed no further
22 opinions.  I -- there is some additional
23 information, though, that has been
24 produced since the issuance of my report,
25 which I have yet to review.

Page 14

1    Q    Okay.
2        What additional information is
3  that?
4    A    There have been depositions that
5  were taken, and I believe there may have
6  been some additional documents that have
7  been produced.
8    Q    From the plaintiff or from the
9  defendant?
10    A    I am unsure.
11    Q    Do you have a work plan with
12 respect to those documents and deposition
13 transcripts?
14    A    Can you clarify what you mean by
15 "work plan"?
16    Q    Yeah.
17       Do you have a plan to take some
18 action with respect to them?
19    A    As I sit here today, I may look
20 through some of the deposition
21 transcripts, and I will have to understand
22 what additional information has been
23 produced.
24    Q    Is it fair to say, as you sit
25 here today, Exhibit 151 is a complete

Page 15

1  record of the opinions you currently hold
2  about the matters at issue in this case?
3        MR. SULLIVAN:  Objection.  I
4     think it misstates the witness's
5     prior testimony.
6        MR. ROBERTS:  It was a
7     question, so I wasn't misstating
8     anything.
9        Let me repeat my question.
10 BY MR. ROBERTS:
11    Q    Is it fair to say that as you sit
12 here today, Exhibit 151 is a complete
13 record of the opinions you currently hold
14 about the subject matters at issue in this
15 case?
16    A    This is the opinion that I had as
17 of November 22, 2016, and as I said,
18 there's additional information that I may
19 consider looking through that's become
20 available subsequent to the issuance of
21 this report.
22    Q    And that wasn't quite my
23 question, so let me ask my question again
24 and ask you if you can give me a precise
25 answer to my question, which is, as of

Page 16

1  today's date, is Exhibit 151 a complete
2  record of the opinions you hold as of
3  today?
4        Are there other opinions other
5  than what is in 151 that you hold as of
6  today?
7    A    No, not as of today.
8    Q    So, yes, 151 is a complete record
9  of the opinions you hold as of today?
10    A    Yes, that is correct.
11    Q    Thank you.
12       If we look at the back of
13 Exhibit 151, there is a Federal Rule 26,
14 Disclosure of Testimony.  It's right after
15 your resume.
16       Do you see that?
17    A    Yes.
18    Q    Other than what is shown here,
19 have you testified in any other matters?
20    A    Yes, I was deposed last week in
21 another matter.
22    Q    What matter was that?
23    A    I am unable to say.  It's under
24 protective order.
25    Q    Can you tell me the general

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 7 of 137 PageID 9275
Confidential                                                    Connectus, LLC vs.
Dana Trexler Smith                                              Ampush Media, Inc., et al.

Page 17

1  nature of the matter?
2      A    It is a patent infringement case.
3      Q    And in what district is it
4  pending?
5      A    The Eastern District of Virginia.
6      Q    And were you representing
7  plaintiff or defendant in that case?
8      A    Plaintiff.
9      Q    When were you retained in this
10 matter?
11     A    I would say it was a few weeks
12 before the issuance of my report.  I don't
13 recall the exact date of my engagement
14 letter.
15     Q    Was it sometime in November?  Do
16 you recall?
17     A    I believe it was early November.
18 It could have been late October, but I
19 believe it was early November.
20     Q    By whom were you engaged?
21     A    So I was engaged -- I was engaged
22 by IMS Services on behalf of the Ashcroft
23 Law Firm on behalf of the defendant DGS
24 EDU.
25     Q    At any point, have you been

Page 18

1  engaged by Ampush Media, Inc.?
2      A    I do not have an engagement
3  letter with Ampush Media, Inc.  I
4  understand there's a joint defense
5  agreement, and that my report will be used
6  by both parties.
7      Q    Who is paying for your work in
8  this matter?
9      A    I believe it is DGS EDU as set
10 forth in the contract?  I am unsure if
11 there's any shared -- shared payment
12 between Ampush and DGS, if they have a
13 separate agreement.
14     Q    So you do not know whether or not
15 and to what extent, if any, Ampush Media
16 is responsible for your fees and expenses
17 in this matter; is that correct?
18     A    As I sit here today, I believe it
19 is DGS EDU.
20     Q    What specifically were you asked
21 to do when you were retained?
22         I don't want to get into
23 privileged communications, but I want to
24 understand the scope of the project that
25 you were given.

Page 19

1      A    (Reviewing.)  So I was asked to
2  perform and -- to form an opinion of
3  damages should liability be found, as well
4  as evaluate the expert report of Douglas
5  Kidder dated November 8, 2016.
6      Q    Do you know whether you were
7  retained before or after Mr. Kidder's
8  report was issued?
9          MR. SULLIVAN:  Objection.
10     Asked and answered.
11         THE WITNESS:  I believe I was
12     retained before the issuance of his
13     report.
14 BY MR. ROBERTS:
15     Q    How much are you being paid?
16     A    My hourly rate in this matter, I
17 believe, is $460 per hour.
18     Q    Did you see that in any of your
19 reports?
20     A    Yes, on page 3, just above Roman
21 Numeral III, background section.
22     Q    Thank you.
23         You mentioned earlier people on
24 your team.  Are there other people on your
25 team working on this matter?

Page 20

1      A    Yes, there are.
2      Q    Who are they?
3      A    Nicole Zakowicz.  It's
4  Z-A-K-O-W-I-C-Z.  She is a director who
5  has worked on this matter.  And then Adam
6  Karasick, K-A-R-A-S-I-C-K.  He's a senior
7  associate who helped me with some of this
8  analysis.  And then I had some other
9  members of the team who helped with some
10 fact checking.
11     Q    What are there -- I apologize.
12 Did you finish your answer?
13     A    Yes.
14     Q    What are their hourly rates?
15     A    They range from -- I am going to
16 ballpark here.  Off the top of my head, I
17 would say it's about $175 up through about
18 $400 per hour.
19     Q    How many hours have you
20 personally, prior to this start of today's
21 deposition, put into this case?
22     A    I would say somewhere in the
23 range of 80 to 95 hours.
24     Q    Prior to the issuance of your
25 report on November 22nd, what would you

Page 21

1 have said your total hours were in this
2 case?
3    A    I would say approximately 80.
4    Q    Has your firm issued any invoices
5 yet?
6    A    We did, yes.
7    Q    Have you seen that invoice?
8    A    I saw it the other week.
9    Q    What is your memory of how large
10 the total invoice for your firm's work has
11 been thus far?
12    A    I actually don't remember what
13 the total dollar value was.  I think we
14 had approximately 300 hours in that
15 invoice, which was a mix of everybody who
16 worked on the case, at their varying
17 hourly rates.
18    Q    As of today, about how many hours
19 has your firm put into this matter in
20 total?
21    A    I would say around 320ish.  I am
22 ballparking.
23    Q    Interesting.  Best estimates are
24 all you can do.
25        Is any portion of your or your

Page 22

1 firm's compensation dependent on the
2 outcome of this matter?
3    A    No.
4    Q    In drafting your report that's
5 been marked here as Exhibit 150, were
6 there any materials that you asked to see
7 but that you were not provided with?
8    A    I don't believe so.
9    Q    Were there any kinds of data that
10 you requested and which the defendants did
11 not provide?
12    A    No, I don't believe so.
13    Q    So as -- as we go through your
14 report today, if we don't have a
15 particular type of data, that would be
16 because you didn't ask for the data; is
17 that correct?
18    A    That I would have to tell you as
19 we get through.  I am just generally
20 saying, I believe I received everything I
21 asked for.
22        You know, if I identify something
23 as we go through that I recall that we
24 asked for and was unavailable, I will
25 certainly point that out.

Page 23

1    Q    As you sit here today or right
2 now, you can't think of any pieces of data
3 that you wanted but were unable to get?
4        MR. SULLIVAN:  Objection.
5    Asked and answered.
6        THE WITNESS:  As I said,
7    sitting here, I believe I got
8    everything I asked for.  If there
9    is anything I am unable -- or if
10    there is anything I identify that I
11    asked for that was not provided, I
12    will certainly point that out to
13    you.
14 BY MR. ROBERTS:
15    Q    Okay.
16        In your answer, you said you
17 believe that you got most everything.
18        Is there anything that you can
19 specifically identify that you wanted that
20 you didn't get?
21    A    No, not specifically at this
22 moment.
23    Q    Of the approximately 80 to
24 90 hours that you spent working on this
25 case, how many of them were spent drafting

Page 24

1 the report that's in Exhibit 151?
2        MR. SULLIVAN:  Objection.  I
3    think misstates her prior
4    testimony.
5        She said 80 to 95 hours.
6        MR. ROBERTS:  Excuse me.
7 BY MR. ROBERTS:
8    Q    Of the approximately 80 to
9 95 hours that you spent prior to today,
10 how many, approximately, were spent
11 drafting the report that's Exhibit 150
12 [sic]?
13    A    I would say about 80 of those
14 hours relate to drafting the report,
15 looking at underlying documentation and
16 performing analyses.
17        It would be difficult for me to
18 split out which piece of that relates to
19 the writing versus the analysis versus
20 looking at underlying documentation.
21    Q    Within your team, can you give me
22 a high-level description of how your team
23 works when drafting the report such as the
24 one in Exhibit 150 [sic]?
25    A    Sure.  I mean, generally, we

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 9 of 137 PageID 9277

Dana Trexler Smith

Confidential                                    Connectus, LLC vs.
                                                Ampush Media, Inc., et al.

Page 25

1   have, you know, people that go through and
2   review the documents, trying to understand
3   what type of information has been produced
4   in the matter by both plaintiff and
5   defendant.
6          We have individuals who we will
7   assign to perform certain pieces of the
8   analysis, and then it's a joint effort to
9   write the reports.  Certain people may
10  take certain sections of the report to
11  draft.  Others put together an overall
12  portion of the draft.  I am drafting the
13  report -- certain sections of the report,
14  looking at certain pieces of the analysis
15  while overseeing the overall analysis
16  that's being performed.  So we work
17  together very much as a team.
18    Q    Who wrote the draft or the first
19  draft of what's now Exhibit 150 [sic]?
20         MR. SULLIVAN:  Objection.
21  Assumes evidence -- assumes facts
22  not in evidence.
23  BY MR. ROBERTS:
24    Q    You can answer my question.
25    A    Okay.

Page 26

1          So the report that was written,
2   it was written by me, by Adam Karasick and
3   by Nicole Zakowicz and then I also had
4   another individual, Jeff Buchakjian,
5   B-U-C-H-A-K-J-I-A-N, that I had read it to
6   perform a concurring review, and he gave
7   me some thoughts and inputs as well.  I
8   don't believe he drafted anything.
9     Q    When was the first draft, if
10  there was one, produced?
11    A    What do you mean "produced"?  I
12  don't believe it was produced in this
13  case.
14    Q    Sorry.  The final copy of this
15  was signed on November 16th, correct --
16  sorry, November -- November 22nd, right?
17    A    It was -- yes, the final.
18    Q    Many people -- they produce an
19  initial draft.  By "produce," I mean
20  create.
21    A    Okay.
22    Q    And then subsequently they create
23  a final draft.
24         When did you create, if you can
25  recall, the first draft of this report?

Page 27

1     A    So it's really an ongoing
2   process.  We start writing until we are
3   finished and ready to sign, and, you know,
4   we overwrite, I guess, what you would call
5   draft as -- as it's in process.
6     Q    Did you get redline comments from
7   counsel at any point?
8     A    I believe I received some
9   comments.  I can't recall if they were
10  verbal, if we just talked about things or
11  if they sent any redlines.  I just don't
12  recall.
13    Q    Let's look at Exhibit B to your
14  report, if we can.
15         (Reporter Clarification.)
16  BY MR. ROBERTS:
17    Q    I believe it is a list of
18  documents considered.
19         Did you personally review all the
20  documents listed in Exhibit B?
21    A    (Reviewing.)  I would say that I
22  reviewed many of them -- the majority of
23  them.  To say I personally reviewed every
24  single one of these, I would be unable to
25  say sitting here today, but I looked at a

Page 28

1   vast majority of them.
2     Q    About how much time just
3   reviewing these documents did you spend?
4     A    I would be unable to estimate
5   that.
6     Q    Did you read Mr. Darwal's depo?
7     A    Yes, I did, both his November 3rd
8   and November 4th deposition.
9     Q    You read them all the way
10  through?
11    A    I did, yes.
12    Q    I notice that on this list
13  there's no deposition transcripts from any
14  of the plaintiff's witnesses.
15         Did you see that?
16    A    (Reviewing.)  Yes, it appears
17  there are not.
18    Q    Why not?
19    A    These are the depositions that I
20  reviewed as of the date of my report.
21    Q    Why didn't you review any of the
22  depositions from the plaintiff's
23  witnesses?
24         MR. SULLIVAN:  Objection.  To
25  the extent that it calls upon the

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 10 of 137 PageID 9278
Confidential
Dana Trexler Smith                                                   Cornelius, LLC vs.
                                                                Ampush Media, Inc., et al.

Page 29

1    witness to testify as to
2    attorney-client privileged
3    communication, I instruct the
4    witness not to answer.
5        To the extent you can answer
6    without divulging attorney-client
7    privileged communication, she can
8    answer.
9        THE WITNESS:  I understand
10   that these depositions were the
11   most relevant depositions to my
12   analysis.
13   BY MR. ROBERTS:
14   Q    Was that a determination you made
15   or a determination that was made by
16   counsel?
17       MR. SULLIVAN:  Objection.
18   Same objection with regards to
19   attorney-client communication.
20       To the extent you can answer
21   without divulging attorney-client
22   communication with counsel, she can answer.
23       THE WITNESS:  I -- I asked for
24   certain information that I thought
25   would be useful to my analysis, and

Page 30

1    I believe I received that
2    information.
3    BY MR. ROBERTS:
4    Q    Did you ask for any of the
5    transcripts of any of the plaintiff's
6    witnesses?
7    A    I can't recall if I specifically
8    asked for any particular ones.  I am sure
9    we discussed what depositions were taken
10   and made a determination as to which we
11   thought would be the most relevant to our
12   analysis.
13   Q    Is it your usual practice not to
14   read the transcripts of the other side in
15   performing your damages analysis?
16   A    My practice is to look at the
17   information that's relevant to my
18   analysis.  There are certain deposition
19   transcripts that are deemed less relevant
20   to my analysis.
21   Q    If you didn't look at it, how
22   would you know whether or not any of the
23   plaintiff's witnesses are relevant or not
24   relevant?
25       MR. SULLIVAN:  Again,

Page 31

1    objection to the extent it asks the
2    witness to testify as to
3    attorney-client privileged
4    communication.
5        Instructing the witness not to
6    answer that question.
7        THE WITNESS:  I am unsure that
8    I can answer that question for you.
9    BY MR. ROBERTS:
10   Q    Let me ask you this:  You didn't
11   make a determination that Mr. Marinucci's
12   deposition transcript was not relevant,
13   correct?
14       MR. SULLIVAN:  Again,
15   objection to the extent that it
16   calls upon the witness to divulge
17   attorney-client communication, I am
18   instructing the witness not to
19   answer.
20       And if her determination was
21   based on a privileged
22   communication, I am instructing the
23   witness not to answer.
24       THE WITNESS:  No.
25       MR. ROBERTS:  I am not asking

Page 32

1    her to answer any communication.
2    BY MR. ROBERTS:
3    Q    I'm just saying, you personally
4    did not make that determination, correct?
5        MR. ROBERTS:  If she did,
6    that's not -- that doesn't divulge
7    any communications.
8        MR. AARON:  It does if there
9    was a discussion about --
10       MR. ROBERTS:  I am not asking
11   about what discussions were had.
12   I'm asking whether you personally
13   made that decision.
14   BY MR. ROBERTS:
15   Q    Did you make that decision,
16   ma'am?
17       MR. SULLIVAN:  Well,
18   objection.  Assumes facts that is
19   not in evidence.  It -- to the
20   extent that it would call upon her
21   to essentially divulge
22   attorney-client communication by
23   default, then I am instructing the
24   witness not to answer.
25   BY MR. ROBERTS:

Page 33

1   Q   Ma'am, are you going to answer
2   that question or not?
3   A   No, not if I am being instructed
4   by counsel not to answer.
5   Q   Did you understand that counsel
6   was instructing you not to answer the
7   question whether or not you made a
8   determination personally as to whether Mr.
9   Marinucci's testimony would be relevant?
10      MR. SULLIVAN:  No.  The
11   instruction to the witness was not
12   that.  The instruction to the
13   witness was to the extent that
14   answering that question would
15   divulge an attorney-client
16   communication or divulge litigation
17   strategy.  I am instructing the
18   witness not to answer.
19      MR. ROBERTS:  I am trying to
20   understand, ma'am, whether you
21   understood your counsel's objection
22   to be an instruction not to answer.
23      THE WITNESS:  I think if I
24   would answer that question, I would
25   be divulging attorney-client

Page 34

1   privileged communication.
2   BY MR. ROBERTS:
3   Q   Okay.
4      It's fair to say you've never
5   seen Mr. Marinucci's deposition
6   transcript?
7   A   I have not looked at that yet.
8   Q   Do you not know what is in Mr.
9   Marinucci's deposition transcript?
10      MR. SULLIVAN:  Objection.
11      THE WITNESS:  I seen some
12   discussion of that transcript.  I
13   have seen discussions that were
14   cited in Mr. Kidder's report, and I
15   did read Mr. Kidder's deposition
16   transcript, which references Mr.
17   Marinucci.
18   BY MR. ROBERTS:
19   Q   And despite that, it was not your
20   opinion that it might be useful to
21   understand what Mr. Kidder was citing to
22   and what the context was?
23      MR. SULLIVAN:  Objection.
24   It's been asked and answered.
25      THE WITNESS:  I did not read

Page 35

1   Mr. Marinucci's deposition
2   transcript.
3   BY MR. ROBERTS:
4   Q   I understand that.  I am trying
5   to find out why, ma'am.
6      Can you tell me why?
7      MR. SULLIVAN:  Same
8   objections.  I think we have
9   already gone down this path.  I
10   think the witness has made it clear
11   that by answering the question she
12   will be divulging attorney-client
13   communication or litigation
14   strategy.
15      MR. ROBERTS:  I don't think
16   so.  You can instruct her not to
17   answer.
18      MR. SULLIVAN:  We have
19   instructed her not to answer the
20   same question.
21      MR. ROBERTS:  Mike, I'd ask
22   that you to keep the objection
23   short, please.
24      Thank you.
25   BY MR. ROBERTS:

Page 36

1   Q   Did you read Mr. Marinucci's
2   deposition transcript?  The answer was no.
3      I am trying to find out whether
4   it was your view -- as you sit here today,
5   as the expert, it's your view Mr.
6   Marinucci's deposition transcript is
7   irrelevant to forming opinions relating to
8   damages?
9      Is that your opinion, ma'am?
10   A   I am unable to answer that
11   question because it would divulge
12   discussions I had with counsel.
13   Q   So you do not intend to say one
14   way or the other at trial -- to offer an
15   opinion as to whether or not the
16   plaintiff's testimony in this case is
17   relevant, correct?
18      MR. SULLIVAN:  Objection.
19   That misstates the witness's
20   response.
21      MR. ROBERTS:  It's a question.
22   I am not misstating the witness's
23   response at all.
24      MR. SULLIVAN:  When you say
25   "correct," I mean, essentially

Page 37

1  you're misstating the witness's
2  response.
3        MR. ROBERTS:  No, it's a
4  cross-examination question,
5  Mr. Sullivan.  You know that very
6  well.
7        MR. AARON:  It's also beyond
8  the scope of --
9        MR. ROBERTS:  It's not beyond
10  the scope.
11        MR. AARON:  Let me finish.
12  It's beyond the scope of
13  expert testimony whether a witness
14  is going to offer testimony --
15  opinion about the validity or the
16  relevancy of another witness's
17  testimony.
18        That's not what an expert is
19  engaged for in the rules.
20        MR. SULLIVAN:  And she has
21  already testified that she has not
22  read his deposition.
23        MR. ROBERTS:  Stop.  Really,
24  you guys have to stop with the
25  speaking objections.  Let's move

Page 38

1  through this depo, or we going to
2  be here all day, and you are going
3  to miss your train.
4        I understand your objections.
5  Make your objections.  Let the
6  witness answer or not and then
7  let's move on.
8        Okay?
9  BY MR. ROBERTS:
10    Q    Ma'am, is it your opinion that
11  Mr. Marinucci's deposition transcript is
12  irrelevant to the calculation of damages?
13    A    I have no opinion on Mr.
14  Marinucci -- the relevance of Mr.
15  Marinucci's deposition transcript.
16    Q    And you don't know, for example,
17  whether Mr. Marinucci's deposition
18  testimony would reveal that certain of the
19  assumptions you made in your report are
20  wrong, because you haven't read it,
21  correct?
22        MR. AARON:  Objection.
23  Assumes facts not in evidence.
24        THE WITNESS:  I have not read
25  Mr. Marinucci's deposition

Page 39

1  transcript.
2  BY MR. ROBERTS:
3    Q    And therefore, among other
4  things, you don't know whether or not Mr.
5  Marinucci provided information that would
6  show that some of the assumptions you made
7  are incorrect?
8        MR. AARON:  Objection, form.
9  Assumes facts.
10        THE WITNESS:  I am unaware of
11  Mr. Marinucci's deposition
12  testimony, other than what I have
13  seen in Mr. Kidder's report and in
14  Mr. Kidder's deposition testimony.
15  BY MR. ROBERTS:
16    Q    In your experience, have you ever
17  issued a report before in a case where you
18  had read none of the transcripts of any of
19  the other side's witnesses?
20    A    Yes.
21    Q    How often do you do that?
22    A    The case that I worked on last
23  week, there were no deposition transcripts
24  available for me to read.
25    Q    Okay.

Page 40

1        In a case where there were
2  deposition transcripts from the other side
3  available to you to read, have you ever
4  before issued an expert report on damages
5  without reading them?
6    A    I am unsure.  I would have to go
7  back through it.  I have worked on a lot
8  of cases over the years, and it would be
9  fact-specific to that particular matter as
10  to whether or not those transcripts were
11  relevant to the work that I was
12  performing.
13    Q    How do you know if they are
14  relevant if you don't read them?
15    A    I get information from people who
16  are knowledgeable.
17        (Reporter Clarification.)
18  BY MR. ROBERTS:
19    Q    Did anyone on your staff read
20  those deposition transcripts?  And
21  "those," I mean, the plaintiffs.
22    A    Not to my knowledge.
23    Q    Did you ask to see those
24  transcripts?
25    A    I can't recall.

Page 41

1    Q    Does that seem like a sound
2  practice to ignore the transcripts from
3  the other side in forming an opinion about
4  damages in this case?
5        MR. SULLIVAN:  Objection,
6  form.
7        THE WITNESS:  I think that is
8  a blanket statement.  I think it is
9  fact-specific as to what is
10   included in those deposition
11   transcripts, and there have been
12   depositions that were taken
13   subsequent to the issuance of my
14   report that I -- I do intend to
15   look at.  I just have not been able
16   to do so as I sit here today.
17 BY MR. ROBERTS:
18   Q    And there were depositions that
19  were taken of the plaintiff's witnesses
20  before the issuance of your report,
21  correct?
22   A    I would need to see when the
23  depositions were taken.  I haven't
24  memorized your deposition schedule in this
25  case.

Page 42

1    Q    So you don't know one way or
2  other which depositions were taken before
3  the issuance of your report -- which of
4  the plaintiff's depositions were taken?
5        MR. SULLIVAN:  Objection.
6  Asked and answered.
7        THE WITNESS:  Yeah.  I don't
8  recall when the depositions were
9  taken of the various witnesses.  I
10   know some depositions were taken
11   prior to the issuance of my report.
12   Some were taken subsequent.  I
13   couldn't tell you who and when.
14 BY MR. ROBERTS:
15   Q    Do you intend to go back and
16  review the depositions that were taken
17  prior to the issuance of your report?
18        MR. SULLIVAN:  Objection.
19        THE WITNESS:  Yeah, I need to
20   sit down with counsel and figure
21   out which depositions I will be
22   looking at, which ones have come
23   in, and I will be taking a look at
24   those at a later date.  I can't
25   answer that question right now.

Page 43

1  BY MR. ROBERTS:
2    Q    Okay.
3        As you sit here today, do you
4  have any current intent to go back and
5  read the deposition transcripts that were
6  available as of the time that you issued
7  your report shown in Exhibit 150 [sic]?
8        MR. SULLIVAN:  Objection,
9  form.
10        THE WITNESS:  Again, I would
11   need to see if there is additional
12   information that becomes relevant
13   when I look at the new information
14   that's come in since November 22,
15   2016, to see if that's warranted.
16 BY MR. ROBERTS:
17   Q    It's not my question.  The
18  question you answered was whether in the
19  future you might decide to do so.
20        I'm asking whether you as you sit
21  here today in this chair, you have a
22  current intent to go back and review the
23  deposition transcripts that were available
24  at the time that you issued your
25  deposition -- your expert report?

Page 44

1        MR. SULLIVAN:  Objection.
2  Asked and answered.
3        THE WITNESS:  To the extent
4   that information becomes relevant,
5   as I see new information come in
6   from the deposition transcripts and
7   additional information that's been
8   produced subsequent to my
9   November 22nd report, I will
10   consider going back and -- and
11   looking at that information.
12 BY MR. ROBERTS:
13   Q    Okay.
14        The question you just answered,
15  ma'am, was what you would consider in the
16  future.  I'm asking, actually, a question
17  about what you intend to do as you sit
18  here today.
19        And I understand that you intend
20  to think more and if you make a decision
21  later to go back and read them, that you
22  would go back and do that.  But I'm asking
23  whether, as you sit here today, you made a
24  decision that you should go back or will
25  go back and read those deposition

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 14 of 137 PageID 9282

Confidential

Dana Trexler Smith                                                    Connectus, LLC vs.
                                                                      Ampush Media, Inc., et al.

Page 45

1  transcripts.
2       MR. SULLIVAN:  Objection.
3   Asked and answered.
4       THE WITNESS:  I believe I -- I
5    have answered that question based
6    on my intent as I sit here today.
7  BY MR. ROBERTS:
8    Q    Right.
9        As you sit here today, do you
10  have a current intent to go back -- not
11  what you might decide to do tomorrow.
12       As you sit here today, do you
13  intend to?
14       MR. SULLIVAN:  Objection.
15   Asked and answered.
16       THE WITNESS:  Yeah.  I can't
17   give you a different answer than
18   what I have already given you.
19  BY MR. ROBERTS:
20   Q    So you can't answer that
21  question, ma'am?
22       MR. SULLIVAN:  Objection.
23       THE WITNESS:  I did answer
24   that question.
25       MR. SULLIVAN:  Objection.

Page 46

1   Argumentative.
2  BY MR. ROBERTS:
3    Q    The record will show that you did
4  not answer the question, but we can take
5  that up with the judge.
6       MR. SULLIVAN:  Objection,
7   argumentative.  Asked and answered.
8  BY MR. ROBERTS:
9    Q    Let's take a look at your resume.
10       And specifically, I would like to
11  look at the education section.
12   A    (Reviewing.)
13   Q    You did an MBA at Wharton, ma'am;
14  is that correct?
15   A    I did, yes.
16   Q    You graduated in 2001?
17   A    I did, yes.  Excuse me.
18   Q    What classes did you take at
19  Wharton that are relevant to the report
20  you issued in Exhibit 150 [sic]?
21   A    Well, it's a master's in business
22  administration.  There are, you know,
23  accounting classes, business law classes.
24  You know, my underlying education and --
25  and business experience is all relevant to

Page 47

1  the work that I have performed in this
2  matter.
3    Q    Are there any specific aspects of
4  your training as part of your MBA that you
5  are relying on for this report?
6    A    I would say I collectively rely
7  on my training as -- you know, in my MBA
8  program.
9    Q    You're a certified public
10  accountant?
11   A    I am, yes.
12   Q    When did you take that test?
13   A    I took it in either '90 -- 1994
14  or 1995.
15   Q    You do not attempt to use any
16  accounting methodologies in this report,
17  correct?
18   A    What do you mean by "accounting
19  methodologies"?
20   Q    Are you familiar with GAAP?
21   A    I am, yes.
22   Q    Do you intend to use any GAAP
23  methodologies in this report?
24   A    Yes.
25   Q    Which GAAP methodologies did --

Page 48

1  did you use in this report?
2    A    Well, there's matching principle,
3  when you match revenues with expenses to
4  name one.
5    Q    What else?
6    A    Let me take some time to go
7  through my analysis, if you would like.
8       (Reviewing.)  General revenue
9  recognition principles, analysis of
10  incremental costs, an understanding of
11  what flows into coming up with profits,
12  defendants' profits, general understanding
13  of overall financial statements, which
14  encompasses GAAP, the flow of underlying
15  accounting records, which support the
16  financial records of a company and the
17  financial statements, the flow of
18  information between underlying records and
19  the financials, revenues, cost.
20       Understanding of contractual
21  relationships between parties and how --
22  how and when costs and revenues are
23  recorded.  General economic principles,
24  among others.
25   Q    Are you offering this report as

Page 49

1   an accounting analysis?
2      A    I think you need to clarify the
3   question.
4      Q    You don't know what that would
5   mean?
6      A    I don't.
7          MR. SULLIVAN:  Objection.
8          THE WITNESS:  I need to know
9      what you mean by it.  It's a very
10     broad term.
11  BY MR. ROBERTS:
12     Q    Okay.
13         Do you consider your report to be
14  an accounting analysis?
15         MR. AARON:  Objection.  Asked
16     and answered.  Same question.
17         THE WITNESS:  Yeah, I need to
18     understand specifically what you
19     mean by an "accounting analysis."
20  BY MR. ROBERTS:
21     Q    Do you have an understanding of
22  that term?
23     A    I don't.
24         MR. SULLIVAN:  Objection.
25     Asked and answered.

Page 50

1          THE WITNESS:  It's a very
2      broad term.
3   BY MR. ROBERTS:
4      Q    Right.
5          In any sense of the broad term as
6   you understand it, are you issuing your
7   report as an accounting analysis, as you
8   use that term in your daily life?
9      A    I would say there's an analysis
10  of the underlying accounting that goes
11  into my report.  So if that's what you
12  mean by an accounting analysis, yes, I
13  perform an analysis, excuse me, of the
14  underlying accounting.
15     Q    You have never worked in a --
16  strike that.
17         Your entire career, you have
18  worked as an accountant or doing
19  litigation consulting, correct?
20         (Reporter Clarification.)
21     A    Yes, I performed as a CPA.
22     Q    Did you ever work in an operating
23  business that made and sold goods or
24  services?
25     A    I worked on behalf of a

Page 51

1   membership organization that provided
2   services to its members.
3      Q    Which one was that?
4      A    The Pennsylvania Institute of
5   Certified Public Accountants.
6      Q    What was your job there?
7      A    I was responsible for the
8   accounting entries, recording the
9   collection of dues from members.  I was
10  responsible for accounts payable.  I
11  did -- I did other work in the accounting
12  department so I understand the flow of the
13  information, invoices, purchase orders,
14  receipts.
15     Q    So you worked in the accounting
16  department of an accounting membership
17  organization?
18     A    Yes.
19     Q    And you started doing litigation
20  consulting in 2012; is that correct?
21     A    No.  I would say it was around --
22  let me look here, so I don't have to
23  guess -- 1997, and I had an internship
24  when I was -- I think it was between my
25  sophomore and junior year in college in

Page 52

1   the forensic services department of
2   Coopers & Lybrand, prior to my college
3   graduation.
4      Q    What does "assurance" mean?
5      A    Assurance is another way of
6   saying the audit practice.
7      Q    When was the first time that you
8   worked as an expert witness?
9      A    When I served as the expert or
10  when I worked on an expert case that
11  involved expert witnesses?
12     Q    It's a good distinction.  Let's
13  start with the latter.
14     A    I would say it was probably in
15  1993 when I was interning for Coopers &
16  Lybrand in their forensic services
17  department.  That was probably my first
18  exposure to working on dispute-type cases.
19     Q    And when was the first time you
20  served as an expert yourself?
21     A    I would say that was probably
22  around -- I think it was around early
23  2000, 2001 time frame.
24     Q    Why does the word "litigation"
25  and "valuation" first come into your

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 16 of 137 PageID 9284
**Confidential**
Dana Trexler Smith                                                    Cornelius, LLC vs.
                                                                     Ampush Media, Inc., et al.

Page 53

1  resume in 2012?
2     A     That's because that's what
3  Parente Beard referred to as their
4  forensic services practice.
5        Each of the various firms give
6  them different names, and the names of the
7  department changes over time based on --
8  you know, everybody is always trying to
9  come up with something new, cutting edge,
10  so...
11    Q     Looking at your professional
12  experience, my impression was that mostly
13  what you work on is patent analysis; is
14  that correct?
15    A     No.
16    Q     How would you divide your time
17  between patents, trademarks, copyrights
18  and contracts?
19    A     Well, I would say that it really
20  varies.  You know, I do complex commercial
21  litigation work, and I do fraud and
22  forensic investigation work.  And it
23  really just depends on -- on the current
24  case mix.
25        Sometimes it's, you know, 60/40,

Page 54

1  intellectual property.  Other times it's,
2  you know, 30/70, complex commercial
3  disputes.  You know, sometimes there's
4  more fraud and forensic investigations
5  thrown in there.  So it's difficult -- you
6  know, it varies, depending on whatever my
7  current caseload is.
8     Q     If you had to give me your best
9  estimate over the last five years taken in
10  total, what percentage of the time would
11  be trade secret matters?
12        MR. SULLIVAN:  Objection,
13  vague.
14        THE WITNESS:  I would say
15  maybe 5 to 10 percent of the time
16  working on theft of trade secret
17  matters.
18  BY MR. ROBERTS:
19    Q     And what percentage of your time
20  are commercial contract damages?  Again,
21  using the same -- I understand it's not
22  precise, but I am just looking for an
23  estimate.
24    A     I would say 40 to 50.
25    Q     Let me ask you to turn to page 4

Page 55

1  of your report, if we may.
2        You say -- you have a heading
3  that says, B, "Relevant History" -- I'm
4  sorry, "Relevant Industry"?
5     A     I do, yes.
6     Q     What is the relevant industry?
7     A     I understand that it is the lead
8  generation for educational opportunities
9  to match prospective students to
10  universities through an opt-in program.
11    Q     Prior to the beginning of
12  November, had you ever worked on a matter
13  involving that industry?
14    A     No, I had not.
15    Q     Other than what you have learned
16  in connection with the case, do you have
17  any understanding of that industry or the
18  way it functions?
19    A     Just what I have learned through
20  working on this case.
21    Q     Turn to page 5.  You see the
22  bullet point that says "qualified in lead
23  revenue" at the top of page 5?
24    A     I do, yes.
25    Q     And part of that says -- in the

Page 56

1  middle there it says, "And the prospective
2  students agrees to be contacted by the
3  university.  Then the matching party pays
4  for the prospective student's contact
5  information."
6        Do you see that?
7     A     Yes, I do.
8     Q     Is that true, as far as you
9  understand it?
10        Is that statement correct?
11        MR. SULLIVAN:  Objection.
12  Calls for a legal opinion.
13        MR. ROBERTS:  I am not asking
14  for a legal opinion.
15  BY MR. ROBERTS:
16    Q     I'm asking if that's factually
17  correct.
18        MR. SULLIVAN:  Same objection.
19        THE WITNESS:  So I will give
20  you my -- my non-legal
21  understanding of this.  That when
22  you have qualified -- when there's
23  a match between a prospective
24  student and a university program,
25  that the information is provided to

Page 57

1    the university and to the extent
2    that they accept that student's
3    information, that a payment is made
4    and that's when -- that's what is
5    deemed as a qualified lead.
6        I do understand that -- I
7    think the terminology that I have
8    seen is that there are primarily
9    qualified leads, and that's when
10   there's a match between the
11   prospective student and the
12   university.
13       The university doesn't
14   necessarily accept all of those
15   students.  So some of those
16   preliminary qualified leads may
17   become disqualified, and it is the
18   qualified leads that -- for which
19   there's an actual payment that's
20   made.
21   BY MR. ROBERTS:
22   Q    Okay.
23       So there is no payment, in your
24   understanding, for disqualified leads?
25   A    That's my understanding.

Page 58

1    Q    Let me ask you to turn to
2    Exhibit 5 to your report.
3        Exhibit 5 of your report.
4    A    (Reviewing.)
5    Q    Do you see the middle column is
6    eDescree [sic] -- eDegree unsubmitted
7    record -- records?
8    A    Yes.
9    Q    Do you see the third column under
10   eDegree unsubmitted records is payment to
11   affiliate?
12   A    Yes.
13   Q    What does that payment represent?
14   A    That is the payment to an
15   eDegree-type organization.
16   Q    And what is an unsubmitted record
17   in your terminology?
18   A    Let me turn to Exhibit 8 because
19   it will be helpful.
20       So it's -- the unsubmitted
21   records, as I am using them here, are the
22   records that come from DGS 000164 to 192.
23   So they are the records which were
24   allegedly obtained from eDegree for which
25   they were neither qualified leads nor

Page 59

1    disqualified leads.
2    Q    Why was there a payment to the
3    provider of those leads if they were
4    neither qualified nor disqualified?
5    A    I'm sorry, can you say that
6    again?
7    Q    Yeah.
8        Why didn't anybody get paid for
9    them if they were neither qualified nor
10   disqualified?
11   A    What I am calculating here is the
12   secondary qualified sales, so these are
13   the unsubmitted records from DGS 000164 to
14   192 for which eDegree did not receive a
15   payment, and the allegations in this case
16   are that there are certain records which
17   were received from eDegree which were then
18   qualified at another point in time for
19   which payment was received by DGS EDU for
20   which no payment was made to eDegree.
21   Q    So as I understand it, the
22   payments to affiliates in Exhibit 5 that
23   we have been looking at under eDegree
24   e-submitted records is the payment that
25   Ampush or DGS would make to a third-party

Page 60

1    call center based upon that call center's
2    submission of a lead based on calling what
3    I will call the pinged data from the
4    plaintiff to Ampush or EDS; is that
5    correct?
6        MR. SULLIVAN:  Objection.  It
7    misstates her prior testimony.
8        THE WITNESS:  Yeah, I think
9    you -- I think you used an
10   incorrect word when you were --
11   BY MR. ROBERTS:
12   Q    Which word was --
13   A    I think you said submitted, and
14   we were talking about unsubmitted records,
15   so if you could --
16   Q    Let me ask you -- let's back up
17   for a second.
18       Why don't you walk me through the
19   process as you understand it, and tell me
20   where in that process the payment to
21   affiliate under eDegree unsubmitted
22   records in Exhibit 5 comes in.  Walk me
23   through the dataflow.
24   A    Okay.  So I think the most
25   helpful way to do that is if we flip to

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 18 of 137 PageID 9286
Confidential
Connectus, LLC vs.
Dana Trexler Smith                                                    Ampush Media, Inc., et al.

Page 61

1  Exhibit 8, which is a picture of how the
2  records flow.
3        So if I first set up the sources
4  of the records.  If you look at the
5  left-hand side of the dotted line on this.
6  We have two populations of records.  These
7  both relate to eDegree records.  The top
8  one, which is submitted records, are what
9  we had talked about previously.
10       Those are the qualified leads for
11  which a university actually made payment
12  for the match between a prospective
13  student and the university program.  And
14  then there are the disqualified leads,
15  which are those where there was an initial
16  match, but for whatever reason, the
17  university disqualified those and no
18  payment was made.
19       That is what is included in the
20  top section under eDegree records, and the
21  source for that is DGS 000193.  The
22  population of data underneath that,
23  under -- again, under eDegree records to
24  the left of the dotted line, are what we
25  are referring to as unsubmitted records.

Page 62

1  And these essentially are the records
2  which were determined to be submitted by
3  eDegree, in the eDegree population of data
4  for which no payment was made by DGS to
5  eDegree on these records.
6        And the source for these records
7  is DGS 000164 to 192.  And what we did is
8  we used these two datasets --
9     Q    Can I just pause you there for
10  one second?
11    A    Absolutely.
12    Q    When you say unsubmitted records,
13  you have total records 3,459,593.
14        Do you see that?
15    A    Yes.  Hm-hm.
16    Q    You interpret DGS 164 to 192 as
17  an indication that the plaintiff in this
18  case searched against the Defendants'
19  3,459,593 times for which no payment was
20  made; is that right?
21        MR. SULLIVAN:  Objection,
22  misstates the witness's testimony.
23        MR. AARON:  Form.
24        THE WITNESS:  I -- I need to
25  look at the underlying data to see

Page 63

1  what adds up to that number because
2  there -- there are a number of
3  different -- there are a number of
4  different ways in which you can
5  look at the data, and to answer
6  that question I would need to
7  confirm which exactly that roughly
8  $3.5 million number is.
9  BY MR. ROBERTS:
10   Q    Okay.
11        What is your understanding as you
12  sit here today, ballpark, of how many
13  times the plaintiffs searched against the
14  defendant system in this case?
15        Do you have an understanding of
16  that?
17        MR. SULLIVAN:  Objection,
18  form.
19        THE WITNESS:  I would need to
20  look at some of the underlying
21  records.  I don't have the numbers
22  committed to memory.
23  BY MR. ROBERTS:
24   Q    Okay.
25        What is your best understanding,

Page 64

1  as you sit here today, of what the
2  3,459,593 refers to?
3        MR. SULLIVAN:  Objection.
4  Asked and answered.
5        THE WITNESS:  Again, I think I
6  need to look at the underlying
7  records.  I believe -- I believe it
8  may be the number of times that
9  those records were -- I -- I need
10  to look.  I have to look at the
11  underlying.  I don't want to
12  misanswer this question.
13  BY MR. ROBERTS:
14   Q    Okay.  Let me ask you
15  differently.
16        Can you explain what you
17  understand the unsubmitted records to be
18  because I am not quite following it?
19    A    Sure.  There's essentially the
20  records that were alleged to have been
21  brought in by eDegree, and -- and I
22  guess -- I guess "pinged" is the right
23  word -- pinged against the DGS EDU/Ampush
24  system, depending on the time period that
25  we are discussing.

Dana Trexler Smith                                          Connectus, LLC vs.
                                                           Ampush Media, Inc., et al.

Page 65

1    Q    Okay.
2        And then please continue with
3    your dataflow.
4    A    Okay.  Sure.
5        So then if we move over to the
6    right-hand side of Exhibit 8, it says all
7    affiliate records, and essentially we have
8    titled this submitted and qualified
9    records for all affiliates.
10       So this is the population of
11   eDegree's/Ampush's records where they
12   actually received a payment in from some
13   third-party on these records.  So this
14   is -- this is -- these are the records for
15   which there was revenue generated.
16       And what we did is we first
17   searched the submitted records under
18   eDegree's records to identify whether or
19   not there were any records which matched
20   records that sit in submitted and
21   qualified records for all affiliates.
22       And to the extent that we
23   identified that there were some records
24   for which a payment was received, we
25   recorded those in Exhibit 5 under eDegree

Page 66

1    submitted records, so that would be the
2    first set of -- of three columns.  So we
3    quantified the number of secondary
4    qualified sales, the revenue from
5    secondary qualified sales and any
6    corresponding payment to the affiliate.
7    Q    What is -- pardon.
8        What is a secondary qualified
9    sale?
10   A    So that's where there has been a
11   sale of -- of a record to a third party
12   for which eDegree did not receive payment.
13   Q    So just to back up for a second.
14   A    Certainly.
15   Q    The plaintiff in the case -- we
16   have used the word "ping" -- pings data to
17   the system of the defendant?
18   A    Yes.
19   Q    In some cases, a match is made?
20   A    Yes.
21   Q    In other cases, no match is made?
22   A    Correct.
23   Q    After a match is made, in some
24   cases, there is a submit or submission of
25   information from the plaintiff to the

Page 67

1    defendant, correct?
2    A    Yes.
3    Q    And in other cases, there is no
4    submission, but information was
5    transmitted from the plaintiff to the
6    defendant, for example, by the ping,
7    right?
8    A    That's my understanding.
9    Q    Okay.
10       The unsubmitted records you have
11   on Exhibit 8, as you understand it, that
12   is what I will call the pinged data, or is
13   it something more than the pinged data?
14   A    So to answer your question, it is
15   the pinged data for which no submission
16   was made -- no match was made to a
17   university.  So it's neither a qualified
18   lead nor a disqualified lead.  It is the
19   remaining information.
20   Q    I understand.  And the reason you
21   qualified it that way is because some
22   pinged data also was submitted.
23       So this is the data -- the
24   unsubmitted records in Exhibit 8 in your
25   understanding is the -- what we are

Page 68

1    calling the pinged queries that were not
2    then submitted later in time?
3        Is that -- do I have it right
4    now?
5        MR. SULLIVAN:  Objection.
6        THE WITNESS:  I believe it --
7    it is the pinged data that was then
8    not submitted and for which there
9    was no payment made to eDegree for
10   this data.
11   BY MR. ROBERTS:
12   Q    Okay.
13       Then from there we move to the
14   right-hand side of Exhibit 8, which is the
15   submitted and qualified records for all
16   affiliates.
17       And one question is that says
18   total records 513,000, and what I am
19   trying to understand is there's 50,000
20   records at the top and 3.459 at the bottom
21   and 513.
22   A    Hm-hm.
23   Q    So this seems like it is not the
24   addition of the two sets of records on the
25   left-hand side; is that correct?

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 20 of 137 PageID 9288
Confidential                                        Connectus, LLC vs.
Dana Trexler Smith                                  Ampush Media, Inc., et al.

Page 69

1    A    That is correct.
2         MR. SULLIVAN:  Objection.  It
3    misstates the exhibit.
4         THE WITNESS:  Yeah, that is
5    not the addition of those two.
6    BY MR. ROBERTS:
7    Q    Okay.
8         So how does -- what does the 513
9    represent in this diagram?
10   A    So the 513 represents records for
11   which eDegree receives some type of
12   revenue.  They received revenue on these
13   records from some other third-party, from
14   another -- a university paid for them or a
15   third party paid for those.
16        So it's a subset of all records.
17   These are just the ones for which eDegree
18   received some form of revenue.
19   Q    Okay.  And one of those forms of
20   revenue was a university paying eDegree
21   for a qualified lead?
22        MR. SULLIVAN:  Objection.
23   Misstates the witness's testimony.
24   BY MR. ROBERTS:
25   Q    Is that right?

Page 70

1    A    Not exactly.
2    Q    Okay.
3         What were the forms of revenue
4    for which payment was received on the
5    right-hand side of Exhibit 8?
6    A    Okay.  So it -- these -- this is
7    revenue that was received by DGS EDU.
8    Q    Okay.
9    A    Some of which could relate to
10   eDegree.  Some of which could relate to
11   other affiliates.
12   Q    Okay.  What was the -- so one of
13   the forms of revenue that DGS EDU received
14   in Exhibit 8 on the right-hand side is a
15   payment by a university for a qualified
16   lead; is that correct?
17        MR. SULLIVAN:  Objection,
18   form.
19        THE WITNESS:  Yes, it is -- it
20   is payment received by a university
21   for a qualified lead to -- it could
22   be eDegree.  It could be another
23   affiliate.  That is one form of the
24   revenue.
25   BY MR. ROBERTS:

Page 71

1    Q    I'm sorry.  When you say a
2    qualified lead -- strike that.
3         Am I understanding correct that
4    the right-hand side of Exhibit 8, the
5    513,930, those are the total number of
6    records for which DGS EDU and Ampush
7    received a payment from any source?
8         MR. SULLIVAN:  Objection.
9    Asked and answered.
10   BY MR. ROBERTS:
11   Q    Is that right?
12   A    It --
13        MR. SULLIVAN:  Same objection.
14        THE WITNESS:  It is -- it is
15   the total records for which DGS EDU
16   received revenue.
17   BY MR. ROBERTS:
18   Q    And one of the types of revenue
19   that DGS EDU received revenue is a payment
20   by a university in exchange for a lead,
21   correct?
22        MR. SULLIVAN:  Objection.
23   Asked and answered.
24        THE WITNESS:  My understanding
25   is that -- that one form of revenue

Page 72

1    is a payment by a university for a
2    submitted and accepted prospective
3    student's record.
4    BY MR. ROBERTS:
5    Q    And another form of revenue is
6    what DGS EDU and the defendants have
7    called bulk data sales or ancillary data
8    sales; is that right?
9    A    My understanding is that -- that,
10   yes, another -- another form of revenue
11   would be the records for which bulk sales,
12   as they have been used, has received --
13   although I do understand that there are
14   not record by record -- there isn't
15   record-by-record information available
16   which would say how much each record
17   received for those bulk sales --
18   Q    So that was my next question --
19   A    -- within this data.
20   Q    -- which is, how did you
21   determine what number of records or how
22   did you identify the population of records
23   for which the defendants received payment
24   from bulk sales?
25   A    So for that I had to look at the

Page 73

1    total -- total revenue for ancillary
2    sales, and then I apportioned out the
3    piece that related to eDegree records, to
4    split that piece out.
5         So we had underlying -- just to
6    back up, we have the record-level detail
7    of revenues earned by record for leads for
8    which universities made payments.  That
9    record-level detail does not exist.
10        What sits in these records for
11   the ancillary is an estimate.  That actual
12   information doesn't exist, so there's a
13   more accurate -- accurate way to --
14   Q    What I am trying to --
15   A    -- calculate that.
16   Q    -- understand is how did you go
17   from the -- I mean, what I understood you
18   to say was leaving -- you apportioned out
19   the university sales.  That would give you
20   a revenue amount associated with ancillary
21   data sales.
22        How did you then take that
23   revenue amount and convert it to a number
24   of records for purpose of putting it in
25   Exhibit 8?

Page 74

1    A    Can you say that again?
2    Q    Yeah.
3         Some of these 513,930 total
4    records in the right-hand side of
5    Exhibit 8 are in this count because the
6    defendants received payment from a
7    university, and so for a particular record
8    they received payment from a university,
9    that would count as one and would go into
10   the 513,930, correct?
11   A    Correct.
12   Q    And some of this count is there
13   because they received -- the defendants
14   received payment in the form of payment
15   for an ancillary data sale, correct?
16   A    Correct.
17   Q    How did you count the number of
18   records for which they received payment
19   for an ancillary data sale?
20   A    We did not do a record-by-record
21   analysis for the ancillary data sale.
22   Q    So how did you determine a
23   number?
24   A    We did -- okay.  So just to step
25   back to make sure we are clear about

Page 75

1    Exhibit 8.
2         Exhibit 8 we did the
3    record-by-record analysis to determine
4    what revenue occurred for university
5    matches, for which -- for revenue and
6    records for which the university actually
7    paid.
8         That analysis and the numbers for
9    that are captured in Exhibit 5.
10   Q    Okay.
11   A    Okay.
12   Q    And how many records were the
13   defendants paid for from a university that
14   are included within this 513,930?
15   A    We analyzed -- we analyzed the
16   records as they relate to eDegree.
17   Q    Yep.
18   A    I did not analyze how many
19   records they got across the board from all
20   affiliates.
21   Q    I understand.
22   A    That information is available,
23   but that wasn't the purpose of my
24   analysis.
25   Q    How many records that originated

Page 76

1    with the plaintiff in this case did the
2    defendants receive payment for from a
3    university?
4    A    Okay.  So that can be found on
5    Exhibit 5.  If you go to Exhibit 5 --
6    Q    I am looking at it.
7    A    Okay.  You would look at total
8    qualified sales in the third-to-last
9    column to the right, so it's 3,582 records
10   and that splits out between the
11   unsubmitted records and the submitted
12   records, which are the two populations we
13   looked at on Exhibit 8 to the left-hand
14   side of the dotted line.
15   Q    Of the 3,000 -- so we got 3,582
16   total payments to the defendants from
17   universities for records that are
18   associated with the plaintiff in this
19   case.  And the number of total records
20   that you have on Exhibit 8 on the
21   right-hand side is 513,930.
22        So if I subtract 3,582 from
23   513,930, I end up with about 510,000
24   records.
25        And I am wondering how did you

Page 77

1  count those 510,000 records?
2      How did you come up with that
3  number?
4      MR. AARON: Objection to form.
5      THE WITNESS: What do you mean
6  how did I count them? They were in
7  the data.
8  BY MR. ROBERTS:
9  Q   Yes. And they were -- so if I
10 understand your report, when you looked at
11 that data and you looked at the right-hand
12 column of it, there were estimates of
13 prices or estimates of amount of revenue
14 that was received but not actual numbers.
15 So some of those estimates were zero.
16      When you went through and counted
17 up the 513, did you go through and count
18 every single one of those records and
19 assume payment was made for all of them?
20      Did you only count the ones with
21 a revenue number greater than zero?
22      How did you perform that count?
23      MR. AARON: Objection to form.
24      MR. SULLIVAN: Objection,
25  form.

Page 78

1      THE WITNESS: So, again, I
2  think you're confusing what the
3  510,000 records are.
4  BY MR. ROBERTS:
5  Q   Okay.
6      What are they?
7  A   So they -- they also represent
8  records for which there's no eDegree
9  affiliation. So -- so the 510,000 are
10 records for which DGS EDU received
11 payments from all affiliates, eDegree,
12 other affiliates, and the ancillary sales
13 that we talked about.
14 Q   I'm sorry. When you say received
15 payments from eDegree, I am not sure you
16 what mean.
17 A   I'm sorry. Payments related to
18 eDegree.
19      So let me try that again. The
20 513,930 records that we see on Exhibit 8,
21 they represent payments -- revenue that
22 was received by DGS EDU relating to all of
23 its affiliates relating to -- one of which
24 is eDegree. So there's other affiliate
25 records.

Page 79

1      So it's not as if you can take
2  the 513,930 and back out 3,582 and say
3  that the remaining 510,000 records all
4  relate to eDegree data. They don't. That
5  relates to data that's also received by
6  other affiliates.
7  Q   Why did you mix together in
8  Exhibit 8 on the right-hand side payments
9  that were made to the defendants in this
10 case by universities associated with
11 eDegree records and payments made to the
12 defendants in this case associated with
13 records from all sorts of different places
14 and not merely from the plaintiff?
15 A   So this allows me to do a
16 complete analysis. What I received from
17 DGS EDU is -- I said I want to see any
18 record for which you received any revenue
19 because I wanted to make the determination
20 as to whether or not there was a match
21 between eDegree's records that are sitting
22 over here in the left-hand side of this
23 dotted line and I wanted to see if --
24 which of those records matched any of the
25 records for which DGS EDU received

Page 80

1  revenue.
2      I didn't want to rely on DGS EDU
3  to make the determination as to whether or
4  not there's a match. So I ran a query
5  between each of these two separate
6  datasets listed under eDegree and
7  determined whether or not there was a
8  match with any record for which DGS EDU
9  generated revenue.
10 Q   And there were 513,930 such
11 matches?
12 A   No.
13      MR. SULLIVAN: Objection. I
14 think it misstates the witness's --
15 BY MR. ROBERTS:
16 Q   How many matches were there?
17      MR. SULLIVAN: I'm sorry. I
18 want to put in my objection.
19      Objection. I think it
20 misstates the witness's testimony.
21 BY MR. ROBERTS:
22 Q   How many matches were there?
23      MR. SULLIVAN: Objection,
24 vague.
25 BY MR. ROBERTS:

Page 81

1    Q    You can answer the question.
2    A    Okay.  Can you specify the
3  question a little bit more?
4    Q    You just testified that there
5  were -- you ran a query to determine
6  whether there were any matches between any
7  of the records on the left-hand side and
8  any of the records for which eDegree
9  received payment -- which the defendants
10  received payment on the right-hand side.
11       Do you recall that?
12   A    Yes.
13   Q    How many such matches were there?
14   A    Okay.  All right.  You were
15  asking how many matches.  I wanted to be
16  specific because we broke it down into
17  different.
18       So if you're asking for total,
19  there were a total 3,582 matches.
20   Q    Where did the other 510,000
21  records reflected on the right-hand side
22  of Exhibit 8 come from?
23       MR. SULLIVAN:  Objection.
24   Asked and answered.
25       THE WITNESS:  So those 510,000

Page 82

1    records are made up of records that
2    came in from other affiliates.
3  BY MR. ROBERTS:
4    Q    So why did you include them here?
5       MR. SULLIVAN:  Objection.
6    Asked and answered.
7       THE WITNESS:  Okay.  So
8    there -- again, let me step back.
9    This population of data that we are
10   talking about is the complete set
11   of data for which DGS EDU received
12   payment.
13       So I wanted to identify from
14   DGS EDU, I need to know every
15   record that you received payment
16   on.  It doesn't matter from what
17   affiliate.  If you received
18   payment, I need to know about it.
19  BY MR. ROBERTS:
20   Q    So that gave you a big population
21  of records?
22   A    That gave me a big population.
23   Q    And against that, you looked at
24  the records received from the plaintiff in
25  this case?

Page 83

1    A    Yes.
2    Q    And you said, how many of the
3  records that they received payment on did
4  they receive or -- at any point from the
5  plaintiff in this case, and you are saying
6  there were only 3,000 records that they
7  received payment on from any source that
8  they received from the plaintiff in this
9  case?
10       MR. AARON:  Objection, form.
11       THE WITNESS:  Okay.  So -- and
12   I guess I also need to clarify
13   here, these are the records for
14   which -- yes, there were 3,582
15   records for which DGS EDU received
16   payment from another source for
17   which they did -- DGS EDU did not
18   make a payment to eDegree.
19       There are other records for
20   which eDegree received payment by
21   DGS EDU.  These are the ones
22   outside of that process, which is
23   why if you look on Exhibit 8, we
24   also looked and submitted records
25   to see if there were any additional

Page 84

1    submissions of those for which no
2    payment was made back to eDegree.
3  BY MR. ROBERTS:
4    Q    Let's assume, for example, as a
5  hypothetical, that we have a search query
6  from the plaintiff to the defendant, and
7  then a submission and the plaintiff then
8  paid the defendant -- sorry, the defendant
9  then paid the plaintiff for the submitted
10  record and then took the search query and
11  sold it as ancillary data.
12       In that instance, would that had
13  been included within your count as a
14  record for which the defendant received
15  payment, or would that had been excluded
16  from the 3,000 number because they did
17  receive payment although they only
18  received payment for the submitted lead
19  and not for the ancillary data sale?
20       (Reporter Clarification.)
21       MR. SULLIVAN:  Objection,
22   form.
23       MR. AARON:  Objection, form.
24       THE WITNESS:  So I think
25   that's conflating concepts.

**Dana Trexler Smith**                                    **Connectus, LLC vs. Ampush Media, Inc., et al.**

Page 85

1  BY MR. ROBERTS:
2    Q    Oh.  Help me straighten it out,
3  please.
4    A    Okay.
5       So when you are referring to
6  ancillary data, that sounds like you're
7  talking about bulk data.  When we are
8  talking about the 3,582 records, those are
9  records for which we can identify the
10  actual payment that was made by a
11  university or another party on that
12  record.
13       That number is exclusive of what
14  we would refer to as ancillary data or
15  bulk data earlier in the deposition.
16    Q    Okay.
17       Are you aware of any information
18  suggesting or showing that the defendants
19  in this case sold submitted lead data as
20  part of its bulk data sale program?
21    A    That would be -- to the extent
22  that it was again the record, my
23  understanding is record-by-record
24  information is not available for the
25  ancillary bulk lead data.  I did a

Page 86

1  separate analysis on that.
2       What we have been talking about
3  here in reference to Exhibit 5 is the
4  records for which we can identify actual
5  payments for which -- I'm sorry, actual
6  payments at the record level.
7    Q    Okay.
8       Again, moving away from Exhibit 5
9  for one moment.
10    A    Okay.
11    Q    We will come back to it.
12       Are you aware of whether or not
13  the defendants in this case received
14  submitted leads, would then sell them to
15  the university and would also take that
16  submitted lead data and sell it as part of
17  its ancillary record sale program?
18       MR. SULLIVAN:  Objection.
19    Asked and answered.
20       THE WITNESS:  So, again, my
21    understanding is that that
22    record-by-record-level data would
23    not be in there.
24       The analysis that I performed
25    would -- would allow for that

Page 87

1    possibility.
2  BY MR. ROBERTS:
3    Q    So the record-by-record-level
4  data does, in fact, show, does it not,
5  each record that was transmitted to a
6  third party such as Bragg or whatnot --
7       MR. AARON:  Objection.
8  BY MR. ROBERTS:
9    Q    -- in the bulk sale program, but
10  it doesn't show the specific revenue
11  received for that transfer?
12       MR. AARON:  I'm sorry to
13    interrupt.  Objection, form.
14       THE WITNESS:  So my
15    understanding is that there are --
16    there are estimates included in the
17    records for -- which could indicate
18    which records were sold as
19    ancillary data.
20       The estimate of the revenue
21    received is purely an estimate is
22    my understanding.
23  BY MR. ROBERTS:
24    Q    I -- I understand.  So we are
25  talking about a spreadsheet that shows

Page 88

1  each transfer of a record as part of the
2  ancillary sale process, and it also
3  contains an estimate of the amount of
4  revenue that would be received back by the
5  defendants in connection with that sale,
6  correct?
7       MR. SULLIVAN:  Objection,
8    vague.
9       THE WITNESS:  So -- so what it
10    looks like in the data is that
11    there is an estimate placed in each
12    of the records.  I am unsure if I
13    would be able to go back and
14    reconcile that these particular
15    records were part of this
16    particular ancillary data sale.
17  BY MR. ROBERTS:
18    Q    And did you attempt to, in
19  looking at the data, determine which of
20  the records in that spreadsheet were
21  transferred to which third-party
22  affiliates, or did you only look at the
23  revenue?
24    A    I -- I did a separate analysis
25  for the ancillary data.  I did not do a

Page 89

1 record-by-record analysis --
2 Q Analysis?
3 A -- to come up with the ancillary
4 data. I did a record-by-record analysis
5 to come up with revenue generated from --
6 or allegedly generated from the eDegree
7 records as they relate to sales to other
8 universities, not ancillary --
9 Q Okay.
10 A -- data.
11 Q When you do the record-by-record
12 analysis or sales to universities that
13 flow from eDegree record --
14 A Yes.
15 Q -- as I understand your
16 testimony, you come up with a number 3,582
17 records that were sold to universities by
18 the defendants in this case but for which
19 no payment was made to the plaintiff.
20 Do I understand that number on
21 Exhibit 5 correctly?
22 A That is correct, yes.
23 Q Okay.
24 How does that number, that 3582
25 relate to the 513,930 shown on the right

Page 90

1 side of Exhibit 8?
2 MR. SULLIVAN: Objection.
3 Asked and answered.
4 BY MR. ROBERTS:
5 Q Is it part of it? Is it apples
6 and oranges?
7 How do they relate to each other?
8 MR. SULLIVAN: Objection.
9 Asked and answered.
10 MR. AARON: Objection, form.
11 THE WITNESS: So the 3,582 are
12 part of the 5,000 -- 500,0000 --
13 513,930 records.
14 BY MR. ROBERTS:
15 Q Okay.
16 And the other approximately
17 510,000 and change of that 513,930
18 represents what?
19 MR. SULLIVAN: Objection.
20 Asked and answered.
21 THE WITNESS: So that other
22 510,000, roughly, relates to
23 payments that were received from
24 universities that relate to other
25 non-eDegree affiliate data or

Page 91

1 ancillary data.
2 BY MR. ROBERTS:
3 Q For the ones that relate to
4 ancillary data, how do you know that --
5 how did you come -- like, the reason I am
6 struggling is, as I understand it, you
7 didn't do a record-by-record analysis of
8 the ancillary data.
9 You did -- you looked at the
10 revenue side, and you did an allocation of
11 revenue. And this number seems to me to
12 suggest that you had some way of getting
13 between the revenue associated with
14 ancillary data and some kind of count of
15 records because this is a record count,
16 not a dollar count.
17 And I am wondering if you can
18 help me understand how you moved on the
19 ancillary side from a revenue analysis to
20 a record count that shows up, or I think
21 shows up in Exhibit 8 here.
22 MR. SULLIVAN: Objection.
23 Asked and answered.
24 THE WITNESS: Can you say
25 that -- are you asking -- can --

Page 92

1 can you ask that again?
2 Are you asking on the
3 ancillary data piece of it?
4 BY MR. ROBERTS:
5 Q Yes, ma'am.
6 Let me ask you this: Of the
7 513,930 that shows up on the right-hand
8 side, are any of those records sales of
9 ancillary data to third parties?
10 MR. SULLIVAN: Objection,
11 form. Asked and answered.
12 THE WITNESS: Yes, I believe
13 they are.
14 BY MR. ROBERTS:
15 Q Okay.
16 How did you count the sales of
17 ancillary data to third parties to come up
18 with a number of records if you didn't do
19 a record-by-record count?
20 MR. SULLIVAN: Objection.
21 Asked and answered.
22 THE WITNESS: Can -- can you
23 read that question back?
24 BY MR. ROBERTS:
25 Q Yes.

Page 93

1   How did you count the sale of
2   ancillary data to third parties to come up
3   with a number of records that were sold to
4   third parties if you didn't do, as you
5   said, a record-by-record count?
6        MR. AARON:  Objection, form.
7        THE WITNESS:  Okay.  I
8   didn't -- I didn't do a
9   record-by-record analysis for the
10  ancillary data.
11  BY MR. ROBERTS:
12   Q    And then how did you come up with
13  the 510 -- I mean, maybe we are talking
14  past each other.
15       This 513,930 -- I understand the
16  3,500.
17   A    Hm-hm.
18   Q    There's approximately 510,000
19  records that you are pointing to in this
20  bucket.
21       Those 510,000 records is a count,
22  one through 510,000, of ancillary data
23  transactions, correct?
24       MR. SULLIVAN:  Objection.
25  Asked and answered.

Page 94

1        THE WITNESS:  No.
2   BY MR. ROBERTS:
3    Q    What is -- if I were to look at
4   each of those 510,000, what would they be?
5    A    They would be a mix of -- some of
6   it's ancillary data and some of it is
7   leads paid for by universities that are
8   affiliated with -- or are related to other
9   affiliates, non-eDegree affiliates.
10   Q    Let's leave the university piece
11  aside.
12       Some portion of this 510,000 is
13  ancillary data record sales, correct?
14   A    Yes.
15       MR. SULLIVAN:  Objection.
16  Asked and answered.
17       THE WITNESS:  That is my
18  understanding, yes.
19  BY MR. ROBERTS:
20   Q    What number approximately of
21  ancillary data record sales are included
22  in the 513,000?
23   A    I didn't do that analysis to
24  determine record by record which ones
25  relate to ancillary data sales.  I would

Page 95

1   likely be able to strip that out, because
2   some of that 510,000 that's remaining
3   after you strip out the 3,582 relates to
4   ancillary data.
5        Another piece of it relates to
6   leads generated by working with other
7   university -- by working with
8   universities, but those leads came in from
9   non-eDegree affiliates.
10       So there's a -- there's a
11  population of the 510,000 that relates to
12  what I will call secondary -- that relates
13  to qualified leads.  They are just
14  qualified leads that are unrelated to
15  eDegree.  And with the underlying data, we
16  would be able to do the analysis, to strip
17  out what piece of those relate to
18  non-eDegree affiliates and what piece
19  relates to ancillary data.
20       But for the purposes of my
21  analysis, I was unconcerned with the leads
22  that were generated for non-eDegree
23  affiliate records.
24   Q    I am trying to -- there is --
25  here is the problem that I am having.

Page 96

1        There's a count of a number of
2   records, and at the same time you told me
3   you didn't have a count of the number of
4   records of affiliate data.  So what I am
5   trying to figure out is how did you arrive
6   at a number to put in the box on the
7   right-hand side of Exhibit 8 that includes
8   affiliate lead sales or affiliate lead
9   tran -- affiliate -- strike that.
10       Ancillary data sales -- the
11  number of records sold as ancillary data
12  without counting the number of records
13  sold as ancillary data?
14       MR. AARON:  Objection, form.
15       MR. SULLIVAN:  Objection.
16  Misstates the witness's prior
17  testimony.
18  BY MR. ROBERTS:
19   Q    If I say I have ten apples,
20  right, I can't get that from saying I
21  bought apples for $2.95 because I don't --
22  unless I know the price -- I guess I
23  could.  If I knew that each apple cost 29
24  and a half cents, I could divide the
25  revenue by the price and come up with a

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 27 of 137 PageID 0205
Confidential                                     Connectus, LLC vs.
Dana Trexler Smith                               Ampush Media, Inc., et al.

Page 97

1  number of apples.
2      What we have here is a number of
3  records, not a revenue associated with it.
4  So I am trying to figure out what data did
5  you have about the number of ancillary
6  data transactions.
7      Did you have any data at all
8  about the number of ancillary data
9  transactions?
10     A    So I think there's -- there's a
11 disconnect -- there's a disconnect between
12 this data and the way I did my calculation
13 of what portion of the ancillary data
14 revenue relates to eDegree.
15     Q    I am not asking about revenue.
16 I'm asking about number of records because
17 this is not -- there's no revenue on
18 Exhibit 8.  It's a number of records.
19     How did you determine the number
20 of records that relate to ancillary data
21 sales to put into this 513,000?
22     A    So, again, I think there's a
23 disconnect.  I used -- (Reviewing.)
24     I did not use what is on
25 Exhibit 8 in the -- the information from

Page 98

1  DGS 000200 to come up with my percentage
2  of eDegree records that relate to
3  affiliate data.
4      Q    Okay.
5      You just said percentage there,
6  but I am seeing account, not a percentage,
7  so I am not sure --
8      A    Where are you looking when you
9  see account?
10     Q    Exhibit 8, the blue box on the
11 right-hand side.
12     A    Right.
13     Q    Total records, colon, 513,930.
14 Does that represent a count of records?
15     A    That represents a count of
16 records, but because the revenue for
17 affiliate -- I'm sorry, for ancillary data
18 sales, you cannot obtain the revenue
19 amount by looking at a record-by-record
20 basis.
21     I did not use this as my data
22 source to come up with my allocation of
23 the revenue for ancillary data.
24     Q    I understand.
25     I am not asking how you came up

Page 99

1  with your allocation of revenue.  I'm
2  asking how you came up with the record
3  count.
4      A    So the record --
5      MR. SULLIVAN:  Objection.
6  Asked and answered.
7      THE WITNESS:  So, again, the
8  record count -- the 513,930
9  records, this is the entire
10  population of records that DGS EDU
11  has for which they have earned any
12  revenue on.
13     So that's going to, again,
14  include revenue generated from
15  universities, revenue generated
16  from the ancillary data sales.
17 BY MR. ROBERTS:
18     Q    But I thought you said that they
19 didn't have any records for what revenue
20 they generated from the ancillary data
21 sales.
22     MR. SULLIVAN:  Objection.
23 Misstates the witness's prior
24 testimony.
25     THE WITNESS:  Yeah.  The

Page 100

1  revenue that's included -- there is
2  a revenue amount on a
3  record-by-record basis included in
4  these records that relates to
5  ancillary data sales.
6      My understanding is that that
7  revenue amount is an estimate.
8  It's not the actual because the
9  actual payment comes in 45, 60 days
10  later than -- that the recording of
11  this information.
12     So if you want an accurate --
13  accurate picture of what revenues
14  were actually generated for
15  ancillary data sales, you have to
16  look at a different source, but you
17  can't look at the underlying
18  record-by-record --
19 BY MR. ROBERTS:
20     Q    Okay.
21     A    -- basis.
22     Q    So you looked at the
23 record-by-record basis -- so let me just
24 make sure I understand this mechanically.
25     Mechanically, you took all of the

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 28 of 137 PageID 9286
Confidential
Dana Trexler Smith                                    Cornelius, LLC vs.
                                                      Ampush Media, Inc., et al.

Page 101

1  record-by-record data for ancillary data
2  sales, understanding that the amounts were
3  an estimate, and you put them into the
4  computer, and you took the
5  record-by-record basis for university
6  sales, understanding that revenue was
7  accurate, and you said of each of those
8  records, five, for example, you need
9  e-mail address, which of these e-mail
10 addresses show up in the e-mail addresses
11 that came from eDegree, and that's how you
12 produce this count?
13       MR. SULLIVAN:  Objection.
14 Asked and answered.  Misstates the
15 witness's prior testimony.
16       MR. AARON:  Form.
17       THE WITNESS:  So, again, I
18 didn't produce this count.  This
19 count is the number of records that
20 was provided to me by DGS EDU.
21       They essentially dumped all of
22 their records for which they have
23 earned revenue, and they said here
24 it is, you use this in your
25 analysis, because I didn't want

Page 102

1  them -- I wanted the entire
2  universe of information that they
3  had available.
4        I did not want to rely on DGS
5  EDU to make the determination as to
6  whether or not there was a match.
7  I wanted to do that.  So to the
8  extent that they had made revenue
9  on more records, that number would
10 be higher than 513,930.
11       That -- that number of records
12 is solely a function on the number
13 of records for which DGS EDU
14 received payment.
15       MR. SULLIVAN:  Mr. Roberts,
16 can -- Mr. Roberts, it's an hour
17 and a half, so at some point in
18 time can you think about taking a
19 break?
20       MR. ROBERTS:  Sure.  Would you
21 like a break?
22       THE WITNESS:  I would love a
23 bio break, please.
24       THE VIDEOGRAPHER:  Off the
25 record at eleven o'clock.

Page 103

1        (Whereupon a Recess Commenced
2  at 11:00 and Testimony Recommenced
3  at 11:16.)
4        THE VIDEOGRAPHER:  We are on
5  the record at 11:16.
6        This is DVD number 2 of Dana
7  Trexler Smith's deposition.
8  BY MR. ROBERTS:
9    Q    Ms. Smith, turning back to
10 Exhibit 5, if we may.
11       So the first three columns are
12 labeled "eDegree submitted records."
13       Do you see that?
14   A    Yes.
15   Q    What are the eDegree submitted
16 records?
17   A    Just for clarification, it's
18 actually the second, third and fourth
19 columns that are labeled "eDegree
20 submitted records."
21   Q    Thank you.
22       After the time period?
23   A    Yes.
24       I'm sorry, you asked me what they
25 are?

Page 104

1    Q    Yes.
2    A    So those essentially are the
3  records that were -- in our definition,
4  they were either qualified leads or
5  disqualified leads, and they correspond to
6  the data on Exhibit 8 that comes from DGS
7  000193.
8    Q    And what does the number of
9  secondary qualified sales mean?
10   A    So that means that there was a
11 match.  If you go back to Exhibit 8, there
12 was a match between the eDegree records --
13 submitted records coming from DGS 000193
14 and the eDegree -- I'm sorry, the DGS EDU
15 records submitted and qualified records
16 for all affiliates that comes from DGS
17 000200.
18   Q    And when you say "there was a
19 match," what you mean is the record --
20 there is a record on DGS 000200, which
21 corresponds to a record on DGS 000193?
22       MR. SULLIVAN:  Objection.
23 Misstates the witness's testimony.
24       THE WITNESS:  That -- that's
25 partially correct.  It -- where we

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 29 of 137 PageID 0287
Confidential
Connectus, LLC vs.
Dana Trexler Smith                                                      Ampush Media, Inc., et al.

Page 105

1    say there's a match on Exhibit 5,
2    it's where there is a match between
3    those two data sources that you
4    just said for which eDegree did not
5    receive payment from DGS EDU.
6        So that's why we are calling
7    this a secondary qualified lead.
8    There was another match for which a
9    university paid for which DGS EDU
10   did not pay eDegree.
11       Because there are matches --
12   there are matches -- these 50,213
13   records that you see on Exhibit 8,
14   we see those matches also sitting
15   over here in the 513,930 records,
16   but on those records, eDegree did
17   receive payment.
18       So for the records for which
19   it received -- it either received
20   payment or it became a disqualified
21   lead for which no payment was due.
22   But for those records, they are
23   excluded from the amounts on
24   Exhibit 5.
25   BY MR. ROBERTS:

Page 106

1    Q    What is the revenue from
2    secondary qualified sales in the
3    subsequent column?
4        Is that the revenue received on
5    the sales in the first column?
6    A    Are you saying the third
7    column --
8    Q    Yes, I am.
9    A    -- on Exhibit 5?
10   Q    The third column on Exhibit 5
11   that is labeled "revenue from secondary
12   qualified sales."
13       So, for example, in June 2013 you
14   have that there were 22 secondary
15   qualified sales, and were those 22
16   associated with $638 received by the
17   defendant?
18   A    Yes, that is correct.
19   Q    And these were 22 records from
20   eDegree for which the defendants received
21   revenue but eDegree received no revenue,
22   and the amount of revenue received by the
23   defendants was $638?
24   A    So I would tweak what you said a
25   little bit.  eDegree may -- eDegree did

Page 107

1    receive some revenue on these records.
2    They did not receive any of the, in this
3    example, $638.
4        They were paid -- they were paid
5    by eDegree on these records for the
6    primary match, but that's not what we are
7    capturing here.  These 22 records, this is
8    additional revenue on these records that
9    eDegree did not receive from the
10   defendants.
11   Q    And what is the payment to
12   affiliate there?
13       Is that the payment that on those
14   22 records was made to the plaintiff, or
15   was it made to some other affiliate?
16   A    It was made to some other
17   affiliate.
18   Q    So as I understand this first
19   line, in June of 2013, you identified 22
20   records for which eDegree submitted the
21   information either as a qualified lead or
22   as a disqualified lead to the defendant.
23       The defendant monetized those
24   records and did not pay out a percentage
25   of that monetization to the plaintiff, and

Page 108

1    the 638 is the amount of the monetization,
2    and the 316 is the amount it paid to some
3    third party in order to create that
4    monetization?
5        MR. AARON:  Objection, form.
6        THE WITNESS:  So I -- I
7    believe that is a fair
8    characterization.  If I can say it
9    in my own words just to make sure
10   we are on the same page.
11   BY MR. ROBERTS:
12   Q    Please.  Yep.
13   A    These 22 leads are the leads --
14   the 22 leads that correspond to the $638
15   of revenue that was received by, I am
16   going to say the defendants, because it's
17   either Ampush or DGS EDU, depending on the
18   time period.  This one happens to be
19   Ampush.
20       It's $638 received on those 22
21   records for which eDegree was not paid.
22   Another affiliate was paid, and they were
23   paid $316.  And the reason I am just
24   making a little distinction is because on
25   these records -- these 22 records, eDegree

Page 109

1   likely did receive payment on, I will call
2   it the first go-around of submission to a
3   university, but that's not what is
4   captured in the $638.  This is revenue
5   that was generated outside of the eDegree
6   and defendants' relationship.
7       Q    Then there's three more columns
8   that are eDegree unsubmitted records.
9           What are these columns
10  reflecting?
11      A    Okay.  If we go back to
12  Exhibit 8, this is now doing matches
13  between the bottom data source under
14  eDegree records on Exhibit 8, and these
15  come from DGS 000164 to 192.
16          And so this is what we had talked
17  about previously.  These are neither the
18  qualified leads nor the disqualified
19  leads.  This is the other data that I
20  understand eDegree pinged, I think --
21  pinged or searched, against the defendant
22  system for which they received no payment.
23          So what we did is we took the
24  data from these unsubmitted records, if
25  you're looking at Exhibit 8, and we looked

Page 110

1   to identify whether or not there were any
2   matches in the DGS EDU records in DGS
3   000200.
4           And any time we identified that
5   there was a match, we captured it and we
6   included that record in the column number,
7   secondary qualified sales, and the
8   corresponding revenues received by either
9   one of the defendants is in the column
10  revenue from secondary qualified sales and
11  then the third column is any payments made
12  on those revenues generated to a
13  non-eDegree affiliate.
14      Q    Okay.
15          And then the total simply sums up
16  the previous sets of three columns,
17  meaning the next three columns are number
18  of -- number of secondary qualified sales
19  revenue from secondary qualified sales and
20  payments to affiliates and so, for
21  example, the payment to affiliate in the
22  very last cell of June 2013, 1618 is the
23  sum of 1302 and 316?
24      A    That is correct.
25      Q    So that's just a summation to the

Page 111

1   right?
2       A    It is, yes.  It totals the total
3   number of records, the total number of
4   revenues and total payment to affiliates
5   by adding the eDegree submitted record
6   matches with the eDegree unsubmitted
7   record matches.
8       Q    Okay.
9           Let's turn back to page 5 of your
10  report, please, and we were looking at the
11  first bullet point, qualified lead
12  revenue.
13          Are you familiar with the concept
14  of a warm or hot transfer?
15      A    Yes, I am.
16      Q    Do you consider a warm or hot
17  transfer to be qualified lead revenue or
18  not?
19      A    I think it would depend in the
20  context that you are using it.
21      Q    As you use the term "qualified
22  lead revenue" on the top of page 5 of your
23  expert report, do you consider that to
24  include warm or hot transfer revenue?
25      A    Well, I would say generally that

Page 112

1   would include a hot or warm transfer.  If
2   you're talking about going into the
3   records that we have here, my
4   understanding is with respect to the fact
5   if there is revenue generated from those
6   hot or warm transfers, they would be
7   captured in the analysis that I did.
8       Q    Okay.
9           Then below that, you have a
10  bullet point that says "ancillary data,"
11  and it says, "When data which is generated
12  and exchanged during the process of trying
13  to identify a qualified lead is sold in
14  bulk to a third party."
15          Do you see that?
16      A    Yes, I do.
17      Q    What do you mean by "in bulk"?
18      A    So the way I understand the
19  process works is that there are third
20  parties who will buy a number of records
21  that we are referring to in bulk.  It's
22  quite -- quite a number of records.  And
23  that they purchase those records from an
24  entity, and they make a payment for them.
25  And my understanding is that, you know,

**Dana Trexler Smith**                                          **Ampush Media, Inc., et al.**

Page 113

1  the records that are purchased -- there
2  are sort of a lump of records that's
3  provided, and the third-party entity
4  determines whether or not -- which of
5  those records they are going to accept,
6  whether they accept all of them or a
7  portion of them.
8     Q    So when you say "in bulk," you
9  just mean a large -- generally a large
10  number.
11        Is that what you mean?
12     A    Generally, a large number, yes,
13  of records.
14     Q    What about where a record is
15  given to a third party who then pays on a
16  conversion basis?
17        Are you aware of that happening?
18     A    What do you mean by that?  Can
19  you define that for me a little bit,
20  please?
21     Q    Yes.  So this is where the
22  defendants would transfer a record to
23  affiliate other than the plaintiff and the
24  affiliate other than the plaintiff would
25  pay the defendant based upon pay per

Page 114

1  conversion rather than pay per record.
2        So one thing an affiliate might
3  do is you give me a record, I will pay you
4  25 cents.  Another thing that an affiliate
5  might do is you give me records and every
6  one that results in a sale pay you a buck
7  fifty.
8        Are you aware -- I would term
9  that second one a pay-for-performance or
10  pay-for-conversion.
11        Are you familiar with that
12  concept as it relates to the defendants'
13  business practices?
14        MR. SULLIVAN:  Objection,
15  form.
16        THE WITNESS:  I mean, I
17  generally understand that that is a
18  business model.
19  BY MR. ROBERTS:
20     Q    And did the records in DGS 200
21  include, to your understanding, records
22  that were transferred to affiliates on a
23  pay-for-conversion payment process?
24     A    My understanding is that the
25  records in DGS 200 were all records where

Page 115

1  revenue was generated relating to all
2  affiliates.
3     Q    And we had talked about the fact
4  that those -- the revenue there was an
5  estimate.
6        Did -- do you recall that
7  conversation?
8     A    Not all of the revenue in DGS 200
9  is estimated.
10     Q    The -- sorry.  Which spreadsheet
11  is it that contains -- I believe it's --
12  sorry, DGS 164 to 192.  Excuse me.  I was
13  referring to the wrong -- the wrong
14  spreadsheet.
15        In DGS 164 to 192, there are
16  transfers to third-party affiliates of
17  what you called this bulk data, correct?
18     A    DGS 164 to 192 are the eDegree
19  records.  It's a population of eDegree
20  records.
21     Q    That were bulk transferred to
22  third-party affiliates, correct?
23        MR. SULLIVAN:  Objection.
24        THE WITNESS:  No.
25  BY MR. ROBERTS:

Page 116

1     Q    No.  What do you understand DGS
2  164 to 192 to contain?
3     A    DGS 164 to 192, those are the
4  unsubmitted records.  It's the entire
5  population of unsubmitted records that
6  were received -- or allegedly received
7  from eDegree.
8     Q    And in DGS 164 to 192, did you
9  see references to companies like Bragg and
10  other third-party affiliates in that set
11  of records?
12     A    No.  That would not be included
13  in that set of records.  These are eDegree
14  records.
15     Q    Where did you see -- did you see
16  any reference to Bragg or those other
17  entities?
18     A    I have seen reference to Bragg
19  and the other entities in some of the
20  ancillary data revenue spreadsheets that
21  were provided to me upon which I relied.
22     Q    What number are those?
23     A    If you give me a moment, I will
24  find them for you.
25        (Reviewing.)  I believe but I

**Dana Trexler Smith**                                          **Cornelius, LLC vs.**
                                                                **Ampush Media, Inc., et al.**

Page 117

1  need to see the spreadsheet, but I believe
2  it's what I am referencing in Exhibit 4 to
3  my report, under footnotes 1 and -- yeah,
4  Footnote 1.
5      Q    So DGS 229?
6      A    (Reviewing.)  I would have to see
7  the document.  I think that is the one
8  that it's referring to.  It may also be
9  the Ampush EDU ancillary data revenue
10  worksheet in that file and the worksheets
11  in the DGS EDU ancillary rev cost -
12  November 13th to October 15th.  It's one
13  of those files, I believe.
14     Q    I am going to hand you a page
15  from DGS 164, which was Exhibit Number 36
16  to Mr. Darwal's depo.
17         Rather than break out three
18  copies of this, let me show it to counsel
19  and then hand it to you.
20         We don't need to mark it again
21  because it's already been marked.
22     A    (Reviewing.)  Thank you.  Do you
23  need the exhibit reference from him?
24     Q    So I am showing you what is a
25  page DGS 164.

Page 118

1          Have you seen DGS 164 previously?
2      A    I have seen it in its database
3  form.  I did not print it out.
4      Q    Okay.
5          When you see column C here that
6  says "affiliate," what do you understand
7  that to mean in 164?
8          MR. SULLIVAN:  Objection,
9  form.
10         THE WITNESS:  That it's a --  a
11  third-party -- my understanding of
12  the affiliate in these columns is
13  that it's a third party like
14  eDegree that DGS EDU or Ampush
15  works with to receive information.
16         That is a general
17  understanding because I haven't
18  seen the contracts between each and
19  every one of these affiliates to
20  understand the full business
21  relationship, but that's my general
22  understanding.
23  BY MR. ROBERTS:
24     Q    So when you look at DGS 164, your
25  understanding of this spreadsheet is that

Page 119

1  these are leads that were sent to the
2  defendants by the affiliates listed in
3  column C?
4      A    Well, not necessarily.  It could
5  be -- it could -- it's an affiliate with
6  which the defendant worked.  Whether they
7  received information in that column or that
8  defendant, like eDegree or that they
9  worked with -- they may have sent
10  information out to them.
11     Q    Right.  But I'm asking what --
12  what -- what the lines in Exhibit 164
13  represent, right.  Each line is a record.
14         And is it an inbound record or
15  outbound record?
16     A    This would be -- (Reviewing.)
17  164, I believe this is -- let me
18  continue looking through here.
19         (Reviewing.)  I believe this is
20  an inbound record.
21     Q    Meaning that 164, as you
22  understand it and interpreted in your
23  report, is a record of leads that were
24  sent to the defendant from various
25  sources, and the sources being the

Page 120

1  affiliates shown in Exhibit C?
2          MR. SULLIVAN:  Objection.
3  Misstates the witness's prior
4  testimony.
5          THE WITNESS:  Yeah.  My
6  understanding is that 164 -- these
7  are the -- that 164 to 192, that
8  whole population, are the
9  unsubmitted records that allegedly
10  came in from DG -- I'm sorry, that
11  came in from eDegree to DGS EDU.
12  BY MR. ROBERTS:
13     Q    How did you use 164 to 19 --
14  sorry.
15         Is it -- what was the --
16     A    It's 164 to 192.
17     Q    How did you use 164 to 192 in
18  your report?
19         How did you use those
20  spreadsheets?
21         MR. SULLIVAN:  Objection,
22  form.
23         THE WITNESS:  Okay.  So this
24  spreadsheet is what we had been
25  talking about earlier in the

Confidential

Connectus, LLC vs.
                                                        Ampush Media, Inc., et al.

Page 121

1    deposition, that these are the
2    unsubmitted records that are
3    allegedly affiliated with eDegree
4    that came in or were pinged by
5    eDegree against the defendants'
6    system, and I used these in my
7    analysis to determine whether
8    there's a match between any of
9    these records included in this data
10   set, the DGS 164 to 192, whether
11   there are any matches for which the
12   defendants received a payment of
13   revenue and I determined that by
14   comparing the records in DGS 164 to
15   192 to the records in DGS 200.
16   BY MR. ROBERTS:
17   Q    So let me just ask you more
18   specifically, in Exhibit 36, there are
19   some lines highlighted here in blue.
20   A    Hm-hm.
21   Q    And can you walk me through how
22   you interpret let's say the first one,
23   11337, what your understanding is what
24   these columns mean and what the record
25   means?

Page 122

1        MR. SULLIVAN:  Objection,
2    form.
3        THE WITNESS:  (Reviewing.)
4    Well, I will do the best I can.  I
5    don't have all the information in
6    front of me that I had when I did
7    my analysis, so we will do my --
8    the best I can here.
9        (Reviewing.)  So I mean, the
10   ID number, I don't know
11   specifically what that is.  I
12   assume it's a way to track the
13   record that there's a unique ID
14   number for each record that comes
15   in.  The session ID, I don't know
16   what that specifically relates to.
17       There's an affiliate that's
18   included here as Lead Path Media.
19   I don't know what the table --
20   BY MR. ROBERTS:
21   Q    I'm sorry.  What is the
22   affiliate -- what is -- since these are
23   inbound from the plaintiff to the
24   defendant, what is the reference to the
25   affiliate here mean?

Page 123

1        MR. SULLIVAN:  Objection.  It
2    calls for the witness to speculate.
3        THE WITNESS:  Yeah.  I
4    don't -- I don't recall.
5    BY MR. ROBERTS:
6    Q    Okay.
7        And then the reference to table,
8    do you know what that is?
9    A    I don't recall.
10   Q    Okay.
11       And then table ID?
12   A    I don't recall.
13   Q    First name, last name?
14   A    I believe that would be the
15   individual that would be denoted as the
16   prospective student in the Lexicon that we
17   have been using.
18   Q    Yep.
19       And then each e-mail, is that the
20   prospective student's e-mail?
21   A    That is my understanding.
22   Q    And phone, is that his or her
23   phone number?
24   A    That's my understanding.
25   Q    And post -- what does post mean?

Page 124

1    A    (Reviewing.)  So my understanding
2    is that -- that that is the -- again, I
3    don't have the specific information, but
4    my understanding would be that that would
5    be the -- indicating that this record was
6    posted up against the system.
7    Q    And what do you mean by "posted"?
8        Does that mean the search?
9        Does it mean the submit?
10       What do you understand "post" to
11   mean in this context?
12   A    So I believe -- again, I am going
13   off of memory here.  I don't -- I don't
14   have the definition of each of these
15   columns.  I believe it was a search --
16   Q    Okay.
17   A    -- that was made.
18   Q    And date and time obviously are
19   date and time.  If you look at 1137 and
20   1138.
21   A    I'm sorry.  You have lost me.
22   Q    Yeah.
23       So there are -- in column 1 of
24   Exhibit 32, there are -- sorry.  Column 1
25   of Exhibit 36, there are column numbers.

Page 125

1       Do you see that?
2   A   I do, yes.
3   Q   And the first one that's
4   highlighted in blue is 1137, and the
5   second one is 1138?
6   A   (Reviewing.)  Okay.
7       It's --
8   Q   Do you?
9   A   I do.  It's hard to read in blue.
10  Q   I understand.
11      And do you see how all of the
12  ones that are highlighted in blue all are
13  Anthony Edwards?
14  A   I do.
15  Q   And do you interpret the one,
16  two, three, four, five, six, seven --
17  eight references to Anthony Edwards as the
18  plaintiff in this case submitting, or as
19  you said, I think, searching the defendant
20  system eight times for potential matches
21  for Mr. Edwards?
22      MR. AARON:  Objection, form.
23      MR. SULLIVAN:  Objection,
24  form.
25      THE WITNESS:  (Reviewing.)

Page 126

1   BY MR. ROBERTS:
2   Q   Or do you interpret this some
3   other way?
4       MR. SULLIVAN:  Objection.
5   Calls for the witness to speculate.
6       THE WITNESS:  (Reviewing.)
7       As I -- as I sit here today, I
8   don't -- I am unsure.
9   BY MR. ROBERTS:
10  Q   Okay.
11      Am I correct in understanding
12  that you did not interpret Exhibit 164 as
13  being ancillary data sales to third
14  parties?
15      MR. SULLIVAN:  Objection.  I
16  think it misstates the witness's
17  prior testimony.
18      THE WITNESS:  Yeah.  What I
19  use this for is, I use this to
20  identify any records.
21      So my understanding is that
22  this doesn't represent the revenue
23  that was generated by the
24  defendants.  This is used to
25  identify the records that were

Page 127

1   allegedly obtained from eDegree by
2   the defendants.  Some of which
3   could have been used for ancillary
4   sales by the defendants.  Some of
5   which were used for qualified leads
6   where eDegree received payment and
7   some -- I'm sorry, eDegree did not
8   receive payment from this
9   population of records.
10      But some of which the
11  defendants then could have used for
12  a secondary -- to generate revenue
13  through a secondary qualified lead,
14  which as we had talked about
15  before, would be revenue generated
16  for which eDegree did not receive
17  payment under their relationship.
18  BY MR. ROBERTS:
19  Q   Okay.
20      Let's put this to one side.  I
21  may come back to it, but just put it to
22  one side for the moment.
23      Turning back to page 5 of your
24  report and the definition of ancillary
25  revenue that you had given there.

Page 128

1       Where -- are you aware of an
2   allegation in this case that the
3   defendants took search data or pinged data
4   from the plaintiff and turned that data
5   over to an associated call center and then
6   called the prospect in that record in
7   order to generate leads that could then be
8   sold to universities?
9       MR. SULLIVAN:  Objection,
10  compound.
11      THE WITNESS:  So I can't
12  recall if it was in the complaint
13  listed as an allegation.  I have
14  seen discussion about it.  Whether
15  it was in any of the pleadings, the
16  complaint, that -- that that is
17  a -- I don't know how to term it.
18      I don't mean allegation in the
19  legal sense.  But that's something
20  that the plaintiff is complaining
21  about in this case that that has
22  happened.
23  BY MR. ROBERTS:
24  Q   And have you seen -- do you have
25  an understanding whether that happened or

Page 129

1  didn't happen, or you just understand it
2  to be an allegation?
3      A    I understand it to be an
4  allegation that that has occurred.  I have
5  no opinion on liability.
6      Q    I understand.
7          It's not a question of liability,
8  but have you seen in the records data
9  which shows or suggests that, in fact,
10  search data was called by the defendants'
11  affiliated call centers, and that leads
12  were generated based upon those phone
13  calls?
14          MR. SULLIVAN:  Objection,
15      form.  Asked and answered.
16          THE WITNESS:  So, you know,
17      again, I have no -- no opinion on
18      liability.
19          I have seen in the records
20      that I have looked at that there
21      were, in fact, leads generated by
22      the defendant -- leads -- they
23      received payment on records for
24      which it looks like their call
25      center made those telephone calls

Page 130

1  and that's what is captured in
2  Exhibit 5 in my report, those
3  revenues.
4  BY MR. ROBERTS:
5      Q    Do those revenues in your mind
6  constitute ancillary revenue or qualified
7  lead revenue or neither?
8          MR. SULLIVAN:  Objection.  I
9      think it's been asked and answered.
10          THE WITNESS:  In Exhibit 5, we
11      are capturing the qualified --
12      secondary qualified lead revenue.
13  BY MR. ROBERTS:
14      Q    But I am just -- so you would
15  consider that to be qualified or secondary
16  qualified lead revenue and neither -- and
17  not ancillary revenue; is that correct?
18      A    What is captured in my Exhibit 5?
19      Q    Yes.
20      A    That's correct.  That does not
21  include the ancillary revenue in Exhibit 5
22  to my report.
23          Now let me make sure I am
24  referring to the right exhibit number.
25  I'm doing that off of memory, but I better

Page 131

1  double-check.
2          I think that is the one we have
3  been talking about.  Yes, it is Exhibit 5.
4      Q    Have you heard of something
5  called the PK entity or the Pakistani
6  entity associated with DGS?
7          MR. SULLIVAN:  Objection.  To
8      the extent the response would -- is
9      part of attorney-client
10      communication, privileged
11      communication, I will instruct the
12      witness not to answer.
13          But if she has heard it from
14      other sources or means, she can
15      answer it.
16          THE WITNESS:  I have seen
17      discussion of the PK entity in some
18      of the depositions.
19  BY MR. ROBERTS:
20      Q    Did you see Mr. Darwal testify
21  that there was a contract between DGS and
22  the PK entity in his deposition?
23      A    I remember Mr. Darwal -- I
24  believe I remember Mr. Darwal discussing
25  the PK entity.  I don't remember anything

Page 132

1  specific about -- about the contract, but
2  there's a relationship between the two
3  parties.
4          I don't recall the specifics of
5  it.
6      Q    Have you seen a contract between
7  them?
8      A    I don't believe I have.  I
9  personally don't believe I have.
10      Q    Have you asked for a copy of that
11  contract?
12      A    I don't believe I have unless
13  it's included in my Exhibit B.
14      Q    Would understanding that
15  contract, if there is one, be important to
16  understanding the flow of payments
17  between and the revenue generated by DGS
18  EDU in the course of transmitting data to
19  that entity?
20          MR. SULLIVAN:  Objection,
21      form.
22          THE WITNESS:  Well, to the
23      extent that there is revenue
24      generated through that
25      relationship, that would have been

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 36 of 137 PageID 9204
Confidential                                          Connectus, LLC vs.
Dana Trexler Smith                                    Ampush Media, Inc., et al.

Page 133

1    captured in DGS 200 for the
2    purposes of my analysis.
3  BY MR. ROBERTS:
4    Q    Would that contract had given you
5  the ability to see the per record cost or
6  the way in which records were monetized as
7  between DGS EDU and the PK entity?
8    A    To the --
9        MR. SULLIVAN:  Objection.  It
10  calls for the witness to speculate.
11       THE WITNESS:  So to the extent
12  that we are referring to any
13  qualified leads, the way we have
14  been using that -- secondary
15  qualified leads, we would see in
16  the -- in DGS 200, we would see the
17  lead price, which would be the
18  amount by which -- the receipt of
19  the money from the university.  And
20  then in the affiliate column, that
21  would capture any payments that
22  were made to a non-eDegree
23  affiliate.
24  BY MR. ROBERTS:
25    Q    Did you do anything in your

Page 134

1  report to distinguish between data
2  generated from the defendants' own web
3  properties and data from third-party call
4  centers -- sorry, strike that.
5        Are you aware that the defendants
6  or at least DGS EDU operates websites for
7  generating its own leads?
8    A    If you are referring to the click
9  per -- I forget the terminology -- the
10  click per ad -- there is click-through ads
11  that are placed.
12    Q    Right.
13        So one way the defendants get
14  leads or DGS EDU gets leads, in any event,
15  is a call center such as the plaintiff
16  develops the lead and then interacts with
17  the defendant system in the search and
18  submit sequence that we have discussed,
19  right?
20    A    I'm sorry, can you say that
21  again?
22    Q    Yeah.
23        One way in which DGS EDU gets
24  lead information to transmit to the
25  universities for payment is from entities

Page 135

1  like the plaintiff -- call centers like
2  the plaintiff that generate the lead and
3  then search against the defendants'
4  available inventory and then submit if
5  there is a match.
6        You are aware of that process?
7    A    I am.
8    Q    Are you aware of another process
9  whereby defendants generate leads by
10  having their own websites where
11  individuals in the world will be driven to
12  those websites by, for example,
13  pay-per-click advertising and will fill
14  out a form that it self-constitutes a lead
15  that gets transmitted to the university?
16    A    I believe -- I believe they have
17  that, but I would need to go back and
18  confirm that.
19    Q    Okay.  Just looking at your
20  report -- and take a minute.
21        Is there anywhere in your report
22  that you discuss that activity?
23    A    Let me look.  I know when we are
24  talking about -- let me look.
25        (Reviewing.)  If I am

Page 136

1  understanding your question correctly, I
2  believe that DGS EDU is in the lead
3  generation business for prospective
4  students for -- both for-profit,
5  not-for-profit-universities.
6    Q    And one of the ways they generate
7  those leads is through their own websites
8  and by driving traffic to their own
9  websites.
10        Do you understand that to be
11  correct?
12    A    I know that they do have ads out
13  there to drive traffic to their website.
14    Q    What is the purpose of those
15  advertisements, as you understand it?
16        MR. SULLIVAN:  Objection,
17    form.
18        THE WITNESS:  My understanding
19    is that it's to drive business to
20    DGS.
21  BY MR. ROBERTS:
22    Q    And when someone clicks on one of
23  those ads and goes to DGS's website, what
24  is your understanding of what that person
25  might do that would be of monetary value

Page 137

1   to DGS EDU?
2        MR. SULLIVAN:  Objection.
3    Calls for the witness to speculate.
4        THE WITNESS:  What the -- what
5    the prospective student might do?
6   BY MR. ROBERTS:
7    Q    Yes, ma'am.
8    A    I don't know what you mean by
9   that.
10   Q    Well, so are you aware of a
11  process, for example, where a prospective
12  student will go on Google, search for a
13  degree he or she is interested in, find a
14  pay-per-click advertisement sponsored by
15  the defendant, click on that
16  advertisement, wind up at a DGS
17  EDU-sponsored website, fill in a form on
18  that website, that DGS EDU will take that
19  form and transmit it to a university and
20  receive payment in return?
21        At a high level, are you aware of
22  any such process?
23        MR. SULLIVAN:  Objection.
24    Compound question.
25        THE WITNESS:  So I think

Page 138

1    that's a very high-level process of
2    what happens, but I am aware that
3    the student clicks on the ad, fills
4    out a form and then is contacted.
5        Whether or not the university
6    pays for that particular student --
7    I think there's more steps to the
8    process than what you laid out in
9    your question.
10  BY MR. ROBERTS:
11   Q    I understand.  Without trying to
12  quibble whether I am describing every nook
13  and cranny of the process, I was trying to
14  focus on a particular process.
15        In that process, DGS EDU,
16  generally speaking, is developing leads
17  directly off the web rather than by, for
18  example, going through a call center such
19  as the plaintiff, correct?
20        MR. SULLIVAN:  Calls --
21    objection.  Calls for witness to
22    speculate.
23        THE WITNESS:  Can you -- can
24    you restate -- can you say that
25    question again?

Page 139

1   BY MR. ROBERTS:
2    Q    Yes.
3        In that process that we have
4   discussed, DGS EDU is organically
5   generating its own leads off the Internet,
6   correct?
7        MR. SULLIVAN:  Same objection.
8        THE WITNESS:  To the extent
9    DGS EDU is having students click on
10    their ads and come to their
11    website, that would be organically
12    generated.
13  BY MR. ROBERTS:
14   Q    And the --
15   A    That would be the beginning of
16  the process to try and generate revenue.
17   Q    Okay.
18        Have you done a study of DGS
19  EDU's costs for going through that
20  process?
21   A    For going through that process --
22    (Reviewing.)  I have looked at
23  the costs associated with data posting
24  costs, data scoring and verification
25  costs, and then I have looked generally at

Page 140

1    the selling, general, and administrative
2    costs.
3    Q    Okay.
4        What is the first -- in this
5   flow, where DGS EDU is growing a lead off
6   the Internet in order to sell it to a
7   university, what is the first cost that
8   DGS EDU incurs in developing that lead?
9        MR. SULLIVAN:  Objection.
10    Calls for the witness to speculate.
11        THE WITNESS:  Yeah, I wouldn't
12    know what the first cost was that
13    they incur.
14  BY MR. ROBERTS:
15   Q    Okay.
16        What about the search
17  advertisement cost?
18        Is that a cost that DGS EDU
19  incurs in the prospect of organically
20  developing a lead?
21        MR. SULLIVAN:  Objection.  It
22    calls for the witness to speculate.
23        THE WITNESS:  Yeah, I would
24    have -- I would have no information
25    on -- on that.

**Dana Trexler Smith**                                                    **Connectus, LLC vs.**
                                                                          **Ampush Media, Inc., et al.**

Page 141

BY MR. ROBERTS:
2    Q    So you do not have an opinion one
3 way or the other as to whether or not in
4 developing its own leads DGS EDU incurs
5 costs for pay-per-click advertisements?
6        MR. SULLIVAN: Objection. It
7 misstates the witness's testimony.
8        THE WITNESS: So when I look
9    at the financial statements, I can
10   see that there are costs associated
11   with that in the financial
12   information that has been provided
13   to me.
14       Neither I nor Mr. Kidder has
15   performed an analysis of DGS EDU's
16   costs beyond, you know,
17   understanding that there are costs
18   associated with that.
19 BY MR. ROBERTS:
20   Q    Without speaking for Mr. Kidder.
21 Just asking about what you have done.
22       When I look at your report, I
23 have seen places where you have excluded
24 the search engine advertisement costs from
25 DGS EDU's costs for developing a lead.

Page 142

1        Are you familiar with the fact
2 that your report does that?
3    A    Yes.
4    Q    Why did you exclude them?
5    A    Because I am looking at the --
6 what I am trying to do in my report is
7 looking at the costs associated with
8 generating the revenue affiliated with the
9 eDegree records that -- the records that
10 were received from eDegree and ultimately
11 generated revenue where eDegree did not
12 receive a payment and those costs would be
13 outside the costs that we were just
14 discussing.
15   Q    Okay. So you excluded, I think
16 you called them search engine costs and
17 media costs -- what was the specific term?
18       (Reviewing.) -- actions cost of
19 media.
20   A    Can you point me to where you are
21 looking at?
22   Q    Yeah. Look at page 17.
23   A    (Reviewing.)
24   Q    And your first full paragraph
25 says, "The fundamental flaw in this

Page 143

1 calculation is that cost of goods sold is
2 overstated because it includes costs
3 relating to actions cost of media and
4 search engine expense."
5        Do you see that?
6    A    Yes, I do.
7    Q    You say, "Which I understand are
8 related to generating revenue for
9 qualified or ancillary leads."
10       Do you see that?
11       MR. SULLIVAN: I think it says
12   "unrelated," not "related."
13 BY MR. ROBERTS:
14   Q    "Which are unrelated to
15 generating revenue for qualified or
16 ancillary leads."
17       Do you see that?
18   A    Yes, I do.
19   Q    Okay. When DGS EDU is generating
20 its own leads, not through the plaintiff,
21 but out there in the world, it is -- in
22 fact, the cost of goods sold would include
23 actions cost of media and search engine
24 expenses for those leads, correct?
25       MR. SULLIVAN: Objection.

Page 144

1        Asked and answered.
2        THE WITNESS: I would need
3    additional information because the
4    criticism here -- action cost of
5    media, that is pulling action cost
6    of media for the entire company.
7        There are different -- there
8    are different components. You
9    would need to look at that -- the
10   action cost of media is unrelated
11   to the analysis that I did here
12   because it's unrelated to
13   generating the revenues we are
14   talking about here. These were not
15   organic revenues.
16 BY MR. ROBERTS:
17   Q    I'm asking when DGS EDU is
18 engaged in developing organic revenues,
19 the actions cost of media and the search
20 engine expense in that case is part of the
21 cost of goods sold in that case?
22       MR. SULLIVAN: Objection.
23   Asked and answered.
24       MR. AARON: Form, too.
25       THE WITNESS: Yeah, I think

Page 145

1    there's more in those expenses than
2    the -- than the broad bush.
3        I believe there are some costs
4    related to the expenses that roll
5    up into actions cost of media and
6    search engine expenses which may
7    relate to organic generation of
8    revenue.
9    BY MR. ROBERTS:
10   Q    Are you familiar with what
11   components -- well, strike that.
12       Can you identify for me any
13   components of actions cost of media that
14   are not related to the generation of
15   organic revenue?
16   A    I would need to see the
17   underlying detail in that.
18   Q    Same question for search engine
19   expenses.
20       Same answer?
21   A    I would need to see the
22   underlying detail to refresh my
23   recollection.
24   Q    Okay.
25       But you agree then that at least

Page 146

1    some portion of actions cost of media and
2    the search engine expenses are the
3    expenses that DGS EDU incurs in order to
4    develop or groom organically generated
5    leads?
6        MR. SULLIVAN:  Objection.
7    Asked and answered.
8        THE WITNESS:  I would need to
9    look at additional information
10   to -- to understand, you know, what
11   those costs are.
12   BY MR. ROBERTS:
13   Q    Okay.
14       You are not intending in your
15   report, which you have in front of you and
16   free to look at -- you are not intending
17   to opine that the actions cost of media
18   and search engine expenses are not cost of
19   goods for organically generated leads,
20   correct?
21   A    I would -- my understanding is
22   that they are unrelated to generating
23   revenue for the qualified and ancillary
24   leads that we are talking about in this
25   case.

Page 147

1        I would need additional
2    information from Mr. Darwal to go through
3    and look at this from an organic
4    perspective.
5    Q    You haven't attempted to look at
6    this from an organic perspective in
7    preparation of the report that's
8    Exhibit 151?
9    A    I have not calculated the organic
10   costs for DGS EDU to generate an organic
11   lead because the leads that we are looking
12   at in this case are with respect to leads
13   obtained from eDegree records.
14   Q    Let's go back to page 6, if we
15   may.
16       Your second bullet -- I'm sorry.
17   Your second bullet point says, "If eDegree
18   is unable to provide a match based on its
19   own university relationships, it relies on
20   aggregators such as Ampush/DGS EDU who
21   have relationships with other
22   universities."
23       Do you see that?
24   A    I do.
25   Q    Is this an accurate depiction of

Page 148

1    your understanding of when and why eDegree
2    would use an aggregator?
3    A    Well, my understanding is that
4    eDegree would attempt to make matches
5    based on its own university relationships
6    because it's more lucrative to them.  And
7    if they are unable to make -- I mean,
8    maybe it should say make full matches,
9    they would then look to aggregators.
10   Q    What do you mean by "full
11   matches"?
12   A    So they may be able to match with
13   one university relationship that eDegree
14   has, but my understanding is that you are
15   allowed to match three or up to four --
16   there have been certain universities that
17   will allow you to match up to four --
18   match -- I'm sorry match prospective
19   students with up to three or four
20   universities.
21       So to the extent that eDegree is
22   unable to make those three or four matches
23   within their own university relationships,
24   they would go out and look to an
25   aggregator.

Page 149

1    Q    Did you look for instances where
2  the defendants matched a prospective
3  student with more than three universities?
4    A    We may have.
5        MR. SULLIVAN:  Objection.  I
6  think it assumes facts not in
7  evidence.
8        THE WITNESS:  Yeah.  I am
9  un --
10  BY MR. ROBERTS:
11    Q    My question is did you look
12  for --
13    A    I am unsure as sitting here.
14    Q    Are you aware of any such
15  instances as you sit here?
16    A    Not as I am sitting here, no.
17    Q    So did you attempt as part of
18  your analysis to look for a situation
19  where, for example, a completed search was
20  done by the plaintiff, that search
21  resulted in a match, that match was
22  submitted, and the defendant then sent the
23  number to Pakistan and matched it with
24  three additional entities?
25        Did you attempt to determine

Page 150

1  whether that occurred?
2    A    To the extent that there were any
3  subsequent matches outside of the eDegree
4  defendant relationship, those would have
5  been -- the revenues for those would have
6  been captured in Exhibit 5 to my report.
7    Q    So you might have looked at it
8  from whether or not those revenues were
9  captured, but you didn't look to see
10  whether or not more than three matches
11  were being made.
12        You looked at it from a holistic
13  revenue perspective; is that right?
14        MR. SULLIVAN:  Object --
15  objection.  Asked and answered.
16        THE WITNESS:  I -- I -- I
17    looked at it from whether or not
18    there were subsequent matches that
19    occurred in the data outside of
20    eDegree relationship.
21  BY MR. ROBERTS:
22    Q    Are you aware for a given record
23  of how many times the defendants in this
24  case would sell that record, meaning one
25  record from the plaintiff to the defendant

Page 151

1  and then the defendant turned around and
2  would sell it multiple times?
3        Did you see that happen ever?
4        MR. AARON:  Objection, form.
5        THE WITNESS:  I am unsure that
6    I looked for that specifically.
7  BY MR. ROBERTS:
8    Q    Okay.  Turning back to page 6.
9  You say, "To search" -- and this is third
10  bullet point.
11        "To search the defendants'
12  university relationships for a match,
13  eDegree logs directly into defendant
14  system and enters all of the prospective
15  student's data realtime."
16        Do you see that?
17    A    (Reviewing.)  Yes.
18    Q    What do you understand "realtime"
19  to mean?
20    A    So realtime would be while --
21  just give me a minute, and let me read
22  this again.
23        (Reviewing.)  So my understanding
24  of that is while the student is on the
25  phone.  They are speaking to the student

Page 152

1  and gathering the remainder of the
2  information and performing these searches
3  while they are on the phone with the
4  student.
5    Q    Then it says, "After the eDegree
6  data is submitted and searched in the
7  defendant system, the information falls
8  into one of the following categories.
9        Do you see that?
10    A    I do.
11    Q    If the information is only
12  searched against the defendant system but
13  not submitted, which of those categories
14  does it fall into?
15    A    Can you repeat that?  I just want
16  to make sure I am answering the question
17  you are asking.
18    Q    Yes.
19        If the information is only
20  searched against the defendant system but
21  not submitted, which of the following
22  categories does that fall into?
23    A    So that would fall into --
24  (Reviewing.) -- that would fall into the
25  ancillary data bullet point on page 7,

Page 153

1  which I see there's some inconsistency in
2  the language here, but if you go to
3  Exhibit 8. That would be the unsubmitted
4  records that we had talked about earlier
5  this morning.
6      Q    What is your understanding, if
7  any, about when the defendants took
8  ownership of data that was searched
9  against their system?
10        MR. SULLIVAN: Objection.
11  Calls for legal opinion.
12        THE WITNESS: Yeah. I have no
13  opinion with respect to ownership
14  of the records that --
15 BY MR. ROBERTS:
16     Q    Are you aware of situations in
17 which the defendants are required to
18 return data to the plaintiff?
19     A    I am aware of -- there may be
20 some language in the agreement or in some
21 of the deposition that talks about
22 returning data, but I have no legal
23 opinion with respect to that.
24     Q    Did you see -- did you see Mr.
25 Mayberry's testimony that once data was

Page 154

1  returned to the defendants, it was no
2  longer used for any purpose?
3      A    (Reviewing.) I believe I have
4  something referencing this in my report.
5  Let me just read that. I do remember
6  reading something about this.
7        (Reviewing.) Okay.
8        Can you re -- can you repeat your
9  question?
10     Q    Yeah.
11        Do you remember generally Mr.
12  Mayberry's testimony to the effect that
13  once a lead is returned, it's no longer
14  used for any purpose within DGS EDU?
15        MR. AARON: Objection, form.
16        THE WITNESS: So I believe
17  what Mr. Mayberry said -- I quoted
18  it on page 7 of my report -- any
19  data that was entered into the
20  system, meaning the defendant
21  system, that did not ultimately go
22  on to be a pre-qualified lead or a
23  qualified lead, became Ampush's
24  scrap data.
25        Any data that had a

Page 155

1  pre-qualified connection that was
2  transmitted to a university and was
3  either accepted by that university
4  or was rejected by that university
5  and returned to eDegree, nothing
6  further was done with those leads
7  per the terms of the contracts.
8      All other scrap data never
9  made it through any of that process
10  and therefore was abandoned data in
11  the system.
12 BY MR. ROBERTS:
13     Q    Okay.
14        Do you see where it says,
15 "Nothing further was done with those leads
16 per the terms of the contract"?
17     A    Hm-hm.
18     Q    Did you do anything to look at
19 the data to see whether or not that was
20 correct?
21        MR. SULLIVAN: Objection.
22  Asked and answered.
23        THE WITNESS: So with respect
24  to which -- to which leads? Is
25  that referring to the pre-qualified

Page 156

1  or qualified leads?
2 BY MR. ROBERTS:
3      Q    Accepted by the university or was
4  rejected by that university and returned
5  to eDegree. So let's take each one.
6      A    Okay.
7      Q    Did you see whether Mr. Mayberry
8  was correct that leads that were rejected,
9  that did nothing further was done with
10  those leads per the terms of the contract?
11        MR. AARON: Objection, form.
12        MR. SULLIVAN: Objection.
13  Asked and answered.
14        THE WITNESS: So I am making
15  no liability determination in my
16  analysis that we had talked about
17  this morning. To the extent that
18  any of the eDegree records, whether
19  they fell into the submitted
20  records or unsubmitted records, to
21  the extent that additional revenue
22  was earned on those records, I
23  considered those in my analysis.
24 BY MR. ROBERTS:
25     Q    I'm asking a slightly different

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 42 of 137 PageID 9210
Confidential
Dana Trexler Smith                                                    Connectus, LLC vs.
                                                                Ampush Media, Inc., et al.

Page 157

1 question.
2     I'm asking whether -- I think the
3 answer is no, but I'm asking whether you
4 performed any analysis in looking at the
5 data to determine whether Mr. Mayberry's
6 statement that disqualified leads were not
7 used, nothing further was done with those
8 leads.
9     Did you attempt to make any
10 determination about whether that was
11 factually accurate or not?
12     MR. AARON:  Objection, form.
13     THE WITNESS:  I made no
14   determination with respect to
15   liability to --
16 BY MR. ROBERTS:
17   Q    I understand but liability is a
18 separate question, right, because
19 liability is whether or not the defendants
20 would owe money as a result of the action.
21     I'm asking a more limited
22 question with whether or not you attempted
23 to determine whether, in fact, the
24 defendants in this case made use of
25 disqualified leads?

Page 158

1     MR. SULLIVAN:  Objection.
2   Asked and answered.
3     MR. AARON:  Same objection.
4   Form.
5     THE WITNESS:  So, again, I
6   took the -- the two buckets of
7   eDegree records that we had talked
8   about earlier today in the
9   deposition, the submitted records
10   and unsubmitted records, and to the
11   extent that there was anything done
12   with those records for which
13   revenue was earned outside the
14   eDegree relationship, that is
15   captured in Exhibit 5 to my report.
16 BY MR. ROBERTS:
17   Q    I understand that the revenue is
18 captured.  I'm asking a much narrower
19 question.
20     Did you attempt to look at the
21 line-level data that you were provided
22 with in the various spreadsheets and look
23 to see whether or not, for example, leads
24 that had been disqualified were the
25 subject of ancillary data sales?

Page 159

1     MR. SULLIVAN:  Objection.
2   Asked and answered.
3     THE WITNESS:  So you're now
4   asking about ancillary data sales?
5 BY MR. ROBERTS:
6   Q    Very specifically for ancillary
7 data sales.
8     Did you attempt to make that
9 determination, whether disqualified leads
10 were sold as part of the bulk record
11 sales?
12     MR. SULLIVAN:  Objection.
13   Asked and answered.
14     THE WITNESS:  My -- my
15   understanding -- again, we -- we
16   had talked about this before, that
17   the underlying record-level
18   analysis is unavailable for
19   ancillary data sales.
20 BY MR. ROBERTS:
21   Q    And did you attempt to determine
22 whether individual disqualified leads were
23 later called by, for example, the
24 Pakistani entity and matched with other
25 universities?

Page 160

1     MR. SULLIVAN:  Objection.
2   Asked and answered.
3     THE WITNESS:  Again, the
4   analysis that I performed is if
5   there was a match between what we
6   have determined as unsubmitted
7   records or submitted records on
8   Exhibit 8, if there was a match
9   between that and DGS 200, any of
10   those revenues would be captured in
11   Exhibit 5.
12 BY MR. ROBERTS:
13   Q    But you don't intend to testify
14 at trial, for example, about the timing of
15 when a record was disqualified and when
16 that record was sold as ancillary data
17 because, as far as you are aware, we don't
18 have any records in the data about when
19 the ancillary -- ancillary data sales took
20 place, correct?
21     MR. SULLIVAN:  Objection,
22   form.
23     THE WITNESS:  My
24   understanding --
25     MR. SULLIVAN:  It misstates

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 43 of 137 PageID 9211
Confidential

Dana Trexler Smith                                                    Connectus, LLC vs.
                                                                     Ampush Media, Inc., et al.

Page 161

1    the witness's prior testimony.
2        THE WITNESS:  My understanding
3    is that there is no record-level
4    data that's available for the
5    ancillary records.
6    BY MR. ROBERTS:
7        Q    And there is record-level data
8    that's available for matches that were
9    made and sold to universities, correct?
10       A    By -- by "matches," do you mean
11   qualified leads?
12       Q    Yes, ma'am.
13       A    Yes, there's record-level data
14   that's available to -- that's available
15   for qualified leads -- for records that
16   were ultimately sold to universities and
17   paid for by universities.
18       Q    And you don't intend at trial to
19   offer any testimony about the timing of
20   when those matches were made as it relates
21   to disqualified leads, correct?
22       MR. SULLIVAN:  Objection,
23   form.
24       THE WITNESS:  I am having
25   difficulty understanding your

Page 162

1    question.
2    BY MR. ROBERTS:
3        Q    Okay.
4        So imagine a lead comes in from
5    the plaintiff at time 1.  At time 2 that
6    lead is disqualified.  And at time 3 you
7    see that that same lead was called and
8    matched by the Pakistani call center
9    associated with DGS.
10       One might argue that after being
11   disqualified, DGS EDU used the record to
12   call and make a match, so it was making
13   use of a disqualified lead.  It's an
14   argument one might make.
15       Do you intend to offer any
16   opinions about whether or not that
17   happened?
18       MR. AARON:  Objection, form.
19       THE WITNESS:  So I will answer
20   you this way:  I am not
21   specifically looking at the timing
22   in that scenario.  The timing does
23   come into play when I perform my
24   analysis as captured in Exhibit 5,
25   where like Mr. Kidder, I have

Page 163

1    adopted sort of the 24-hour window
2    when a lead is received and when --
3    of when a lead is received.  I
4    adopted his methodology there, but
5    I think that answers your question.
6    BY MR. ROBERTS:
7        Q    Okay.
8        But you're not -- you're -- I am
9    not going -- when we are standing across
10   from each other at trial, I am not going
11   to hear you offer testimony, as far as you
12   know, about whether the data that has been
13   produced shows a pattern of using
14   disqualified leads.
15       You don't intend to offer an
16   opinion on that subject?
17       MR. SULLIVAN:  Objection,
18   form.  Argumentative.
19       THE WITNESS:  As -- as I sit
20   here today, I have not looked at
21   the timing between when a
22   disqualified lead -- of when a lead
23   was disqualified and when it was
24   used to generate what we are
25   calling secondary qualified leads.

Page 164

1    BY MR. ROBERTS:
2        Q    And have you developed an opinion
3    one way or the other whether, regardless
4    of the timing, what you're calling
5    disqualified leads were used to generate
6    what you're calling secondary qualified
7    leads?
8        A    I have -- I have -- I have
9    quantified instances where what may have
10   been deemed a disqualified lead -- I
11   didn't specifically look at disqualified
12   leads -- but where there was a submitted
13   record or an unsubmitted record received
14   by -- received by DGS EDU, I identified
15   instances where revenue was generated from
16   those records, and that's what I have
17   captured in my Exhibit 5 to my report.
18       Q    So you are aware then that there
19   are instances where, let's call them
20   submitted leads, were used to generate
21   what you're calling secondary qualified
22   leads?
23       MR. SULLIVAN:  Objection.
24   Asked and answered.
25       THE WITNESS:  So, again, I see

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 44 of 137 PageID 9312
Confidential
Dana Trexler Smith
Connectus, LLC vs.
Ampush Media, Inc., et al.

Page 165

1    there is revenue from what we
2    bucketed here as submitted records,
3    that for which revenue has been
4    generated by DGS EDU outside of the
5    eDegree relationship.
6    BY MR. ROBERTS:
7    Q    And one of the ways that revenue
8    was generated was by having an affiliated
9    call center such as the Pakistani entity
10   call the prospect in that record and make
11   a new match which was then sold to a
12   university, correct?
13       MR. SULLIVAN:  Objection.
14   Misstates the witness's prior
15   testimony.  Calls for the witness
16   to speculate.  Form.
17       THE WITNESS:  Again, so I have
18   really looked at whether or not the
19   revenue was generated, you know,
20   how -- how it was generated.  You
21   know, I haven't gotten through that
22   process.
23   BY MR. ROBERTS:
24   Q    So it would, in fact, require you
25   to speculate as to whether or not the

Page 166

1    defendant in this case re-monetized,
2    submitted or disqualified leads by calling
3    the prospects identified in those leads.
4        That would require you to
5    speculate because you don't know?
6        MR. SULLIVAN:  Objection,
7    form.  Argumentative.
8        THE WITNESS:  I would say what
9    I see in the data is that it looks
10   like a call center was involved.
11   Whether or not they made a call or
12   generated the revenue through
13   another means, I -- I wouldn't know
14   through looking at the record-level
15   data.
16   BY MR. ROBERTS:
17   Q    Okay.
18       So in your definition of
19   qualified leads here on page 6 -- let me
20   just ask you to review that for a moment.
21   A    Excuse me.
22       MR. SULLIVAN:  While she is
23   reviewing that, Mr. Roberts, it's
24   12:25.  We are coming up to three
25   hours in a few moments.

Page 167

1        When were you intending to
2    break for lunch?
3        MR. ROBERTS:  At the witness's
4    pleasure.
5        THE WITNESS:  I would say we
6    are getting to a good starting
7    point.  Starting to get a little
8    hungry.
9        MR. ROBERTS:  Would you like
10   to break now or answer a few more
11   questions?
12       What is your reference.
13       THE WITNESS:  If now is a good
14   stopping point, we can --
15       MR. ROBERTS:  Always a good
16   stopping point.  Fine.  Thank you.
17       THE VIDEOGRAPHER:  Off the
18   record at 12:23.
19       (Whereupon a Recess Commenced
20   at 12:23 and Testimony Recommenced
21   at 1:24.)
22       THE VIDEOGRAPHER:  We are on
23   the record at 1:24.
24   BY MR. ROBERTS:
25   Q    Good afternoon.

Page 168

1        Turning back to Exhibit 5 for a
2    second of your report.  I notice in some
3    of the places, looking at Exhibit 5, in
4    some of the lines, for example, it looks
5    to me like July of 2014, moving across,
6    you found three records that were
7    monetized by the defendant -- in this
8    case, it would be DGS -- that resulted in
9    $91 of revenue, but there was no payment
10   to the affiliate.
11       Do you see that?
12   A    I'm sorry.  I am looking at
13   July 2015.  What year did you say?
14   Q    July 2015 -- well, just if you
15   look at the column that is the fourth
16   column over, payments to affiliates.
17   A    Hm-hm.
18   Q    Some of them have little lines
19   through them indicating that there were no
20   such payments in the fourth column, and,
21   again, in the seventh column.  There's a
22   number of them where there's no payments
23   to the affiliates.
24       Do you see that?
25   A    I do.

Page 169

1    Q    And even in many of those places
2    where there's no payments to affiliates,
3    there's revenue from secondary qualified
4    sales, as you have captured that term?
5    A    Yes.
6    Q    Why was there revenue from
7    secondary qualified sales but no payments
8    to affiliate?
9    A    No payment was made out to the
10   affiliate.  I would have to look at the
11   underlying records to identify the reason
12   for each of those.  But there was no
13   payment out to the affiliate captured in
14   that.
15   Q    How did the defendant in those
16   cases make a secondary qualified sale
17   without making any payment for it?
18       Do you have -- do you have any
19   examples of that?
20       MR. SULLIVAN:  Objection,
21   form.
22       THE WITNESS:  I mean, I would
23   need to go in and -- and look.  I
24   could think of sort of a generic
25   example would be is if this -- I

Page 170

1    understand that a prospective
2    student may enter their information
3    on multiple websites at the same
4    time when they are looking to match
5    and to the extent that one of these
6    records came in from an EDU source
7    and EDU -- DGS EDU sourced it
8    independently through one of their
9    websites.
10       It could be an instance where
11   no payment was made to an affiliate
12   because they organically sourced
13   this record as well, but there was
14   a match in the data because it was
15   one that also came in from eDegree.
16   That would be an example.
17   BY MR. ROBERTS:
18   Q    Okay.
19       Did you get any information from
20   any of the defendants or either of the
21   defendants to show any instance in which
22   they got the data from the plaintiff in
23   the case but also got it from an
24   independent source?
25   A    I didn't perform that specific

Page 171

1    analysis.  It may be possible with the
2    underlying information that I have, but I
3    did not perform that analysis.
4    Q    Okay.
5        Have you seen any data that tells
6    you where the records came from other than
7    coming from the plaintiff in the case?
8    A    I can't recall sitting here
9    today.  I would need to go back and look.
10   Q    Okay.
11       So it's your testimony, if we
12   take, for example, the July 2014 number in
13   the first, second, third -- fourth column.
14   It's got 205 records.
15       They were sold for $5,510, and no
16   payments were made to the affiliate -- to
17   any affiliate, that you are operating
18   under the assumption that the 205 records
19   were all gotten from an independent
20   source?
21       MR. SULLIVAN:  Objection.  I
22   think it misstates the witness's
23   prior testimony.
24       THE WITNESS:  No.  I am saying
25   I would need to look at the

Page 172

1    underlying records to understand
2    why that would be, and I gave a
3    generic example as to how that
4    could have happened.
5    BY MR. ROBERTS:
6    Q    But you don't actually know how
7    it did happen in any instance?
8        MR. SULLIVAN:  Objection.
9    Asked and answered.
10       THE WITNESS:  I would need to
11   go back and look at the underlying
12   records.
13   BY MR. ROBERTS:
14   Q    So the answer to my question is
15   no, I don't currently know how it happened
16   in any instance?
17       MR. SULLIVAN:  Objection.
18   Asked and answered.  Argumentative.
19       THE WITNESS:  Yes, sitting
20   here right now, I would need to
21   look at the underlying records.  I
22   am unable telling looking at the
23   summary data in Exhibit 5.
24   BY MR. ROBERTS:
25   Q    Did you ask the defendants to

Page 173

1  give you information about the source of
2  qualified leads -- any other source they
3  had for the data that wound up that they
4  got -- strike that.
5        Did you ever ask any of -- either
6  of the defendants to give you information
7  about alternative sources of information
8  for the leads associated with the
9  plaintiff in the case?
10       MR. SULLIVAN:  Objection,
11   form.
12       THE WITNESS:  I am not sure I
13   understand your question.
14  BY MR. ROBERTS:
15   Q    Right.
16       So that would be going to Mr.
17  Darwal and saying, hey, you know what
18  would be really useful, if for each of the
19  records that the plaintiff gave you, can
20  you show me each instance in which you
21  obtained that record from another source?
22       Did you do anything like that?
23       MR. SULLIVAN:  Objection.  It
24   calls for the witness to speculate,
25   "anything like that."

Page 174

1        THE WITNESS:  A bunch -- I
2   don't recall asking Mr. Darwal for
3   information about where -- where
4   other records were sourced.  I -- I
5   asked for information where -- that
6   included all records from all
7   affiliates for which some sort of
8   revenue was generated.
9  BY MR. ROBERTS:
10   Q    And that was the DGS 165 that you
11  were looking at before Exhibit 38?
12   A    No.  That was DGS 200.
13   Q    And your understanding of DGS 200
14  is that it -- that's records from all
15  different affiliates and not merely from
16  the plaintiff?
17       MR. SULLIVAN:  Objection.
18   Misstates the witness's testimony.
19       THE WITNESS:  DGS 200 is
20   the -- is all -- it's records from
21   all affiliates for which DGS
22   received revenue.
23  BY MR. ROBERTS:
24   Q    Okay.
25       And I'm asking about not for

Page 175

1  which it received revenue.  I'm asking
2  about original sources of the data.
3        Do you have any records that you
4  are aware of that show an alternative
5  source for data other than the plaintiff?
6        MR. SULLIVAN:  Objection.
7   Asked and answered.
8        THE WITNESS:  I would have to
9   go back in and look into the
10    records to see if that -- that is a
11    field in the data.
12  BY MR. ROBERTS:
13   Q    You are not aware of any such
14  data, though, sitting here today.
15       You would have to look and see
16  whether that had been produced?
17       MR. SULLIVAN:  Objection.
18   Asked and answered.
19       THE WITNESS:  I am neither
20   aware nor unaware sitting here
21   today.  I would need to look at the
22   underlying records.
23       (Whereupon a Discussion is
24   Held Off the Record.)
25  BY MR. ROBERTS:

Page 176

1   Q    On page 7 you say, "DGS EDU
2  terminated eDegree access to its web
3  portal on or about October 30, 2015."
4        Do you see that?
5   A    Let me get there.
6   Q    It is the last bullet point on
7  page 7.
8   A    Yes.
9   Q    Do you know whether or not
10  eDegree had already terminated its access
11  to the web portal at the time mentioned in
12  this bullet point?
13   A    Whether eDegree terminated its
14  access?
15   Q    Yeah.  Yeah.
16   A    I am unsure.  I understand from
17  Mr. Darwal that DGS EDU terminated, and I
18  believe October 30, 2015, is corroborated
19  by the records we have, that we don't see
20  any subsequent to that date.
21   Q    And it's, in fact, true that for
22  several days before that you don't see any
23  records prior to October 30th either,
24  correct?
25       Like, you don't see any records

Page 177

1  on October 29th, correct?
2       MR. SULLIVAN:  Objection.
3  Form.  Compound.
4       THE WITNESS:  I would need to
5  go in and look at the records.  I
6  didn't memorize the last date.
7  BY MR. ROBERTS:
8    Q    So you are not intending to offer
9  an opinion in this case as to who
10 terminated performance under the contract
11 first?
12   A    No.
13   Q    Let me ask you to turn to page 8.
14      "Further, it is my opinion that
15 the analysis performed in the Kidder
16 report are neither based on sound economic
17 principles nor are they performed with" --
18 "within a reasonable degree of
19 professional certainty."
20      Do you see that?
21   A    I do.
22   Q    Which unsound economic
23 principles, in your view, did Mr. Kidder
24 rely on?
25   A    So when you look at Mr. Kidder's

Page 178

1  overall analysis, he comes up with costs
2  purported -- avoided costs that range from
3  approximately 3.8 million up to
4  $19 million, and he suggests that the
5  profits earned by the defendant on the
6  data is about $1.1 million, and it's
7  economically unsound for an economically
8  rational business to spend significantly
9  more in cost to generate a very small
10 fraction of revenue.
11   Q    Do you know whether or not the
12 defendants in this case have made money or
13 lost money?
14   A    I believe I have seen some
15 financials that show that they have
16 posted -- not posted -- reported some
17 losses.
18   Q    Was that economically irrational
19 for them to do that?
20      MR. SULLIVAN:  Objection.
21 Calls for speculation upon the
22 witness.
23      THE WITNESS:  So I believe
24 those were the topside financials,
25 and it would be economically

Page 179

1       irrational -- my recollection is
2       that they were slight losses that
3       were posted, but it would be
4       economically irrational for them to
5       spend 19 -- up to $19 million to
6       generate just $1.1 million in
7       losses.
8  BY MR. ROBERTS:
9    Q    That wasn't my question.
10      My question was -- did you finish
11 your answer?
12   A    I think I lost the train of
13 thought.
14   Q    I apologize.  I interrupted you.
15 Is it economically irrational for
16 someone to run a business at a loss?
17      MR. SULLIVAN:  Objection.
18 Calls for speculation on the part
19 of the witness.
20      (Reporter Clarification.)
21      THE WITNESS:  For-profit
22 entities tend to be in business to
23 make money, not to lose money.
24 BY MR. ROBERTS:
25   Q    In your experience as an

Page 180

1  accountant, have you seen lots of
2  businesses that lose money?
3       MR. SULLIVAN:  Objection.
4  Calls for speculation.
5       THE WITNESS:  Yeah, I think
6  that is a very broad statement.  I
7  have seen businesses that lose
8  money.  I have seen businesses that
9  make money.
10 BY MR. ROBERTS:
11   Q    And the businesses that lose
12 money, were they acting economically
13 irrational --
14      MR. SULLIVAN:  Objection.
15 Calls for --
16 BY MR. ROBERTS:
17   Q    -- in your view?
18      MR. SULLIVAN:  Objection.
19 Calls for speculation.
20      MR. AARON:  Objection.  Form.
21 Misleading.
22      THE WITNESS:  So, again,
23 there -- I am making that statement
24 in the context of the damages set
25 forth in Mr. Kidder's report, and

Dana Trexler Smith                                      Connectus, LLC vs.
                                                        Ampush Media, Inc., et al.

Page 181

1    it would be economically
2    irrational, in my opinion, to -- if
3    you just take the numbers in his
4    report to -- for the defendants
5    to -- to spend -- to have costs
6    that would result in revenues of
7    1.1 million.  That would put them
8    at losses ranging from 238 percent
9    to almost 1600 percent losses.
10   BY MR. ROBERTS:
11   Q    Let's talk about that in one
12   second.
13        I am just asking as a general
14   economic principle, since we are talking
15   about economic principles, you agree it's
16   not an unsound economic principle to run
17   business at a loss?
18   A    I would agree that entities tend
19   to operate at a profit.  There are certain
20   instances where a company may run at a
21   loss for a particular reason, but as a
22   general economic principle, for-profit
23   entities are in the money to make for
24   profit.
25   Q    Okay.

Page 182

1        Are you familiar with a company
2    called Amazon?
3    A    I am familiar with Amazon.
4    Q    Are you familiar with the fact
5    that up until this year, Amazon in its
6    entire history had lost money every year?
7    A    I have not looked at Amazon's
8    financials.
9    Q    Okay.
10       If I were to prove to you that
11   Amazon had lost money every single year of
12   its existence up to this year, would you
13   say that it was acting irrationally?
14       MR. SULLIVAN:  Objection.
15   Calls for the witness to speculate.
16       THE WITNESS:  Yeah.  I
17   wouldn't have any information on
18   that.  I would need much more
19   information about Amazon.
20   BY MR. ROBERTS:
21   Q    Okay.
22       Do you know whether SpaceX had
23   lost billions of dollars?
24   A    I know nothing about SpaceX.
25   Q    Okay.

Page 183

1        Would it be irrational for SpaceX
2    to continue operating knowing that every
3    year it's losing billions of dollars?
4        MR. SULLIVAN:  Objection.
5    Calls for the witness to speculate.
6    Argumentative.
7        THE WITNESS:  Yeah.  I am
8    unable to answer that.  I know
9    nothing about SpaceX.
10   BY MR. ROBERTS:
11   Q    What about Tesla?
12       Do you know whether Tesla has
13   made money or lost money?
14   A    I don't know whether Tesla has
15   made money or lost money.
16       (Reporter Clarification.)
17   BY MR. ROBERTS:
18   Q    If you were to find out that
19   Tesla had lost money every year of its
20   operation, would you say that Tesla were
21   acting irrationally?
22       MR. SULLIVAN:  Objection.
23   Calls for witness to speculate.
24   Argumentative.
25       THE WITNESS:  I would need

Page 184

1    additional information.
2    BY MR. ROBERTS:
3    Q    Okay.
4        Let me posit a business for you
5    that steals beer off of the back of trucks
6    in the Port of Oakland and then sells it
7    on the street for a fraction of the price.
8    Okay?
9        MR. AARON:  I'm sorry.  What
10   was that question?
11   BY MR. ROBERTS:
12   Q    I want to posit a business that
13   is a ring of thieves that steals beer off
14   the back of trucks in the Port of Oakland
15   and then sells them on the street for a
16   fraction of their list price.
17       Can you understand that as a
18   beginning point of a hypothetical?
19       MR. AARON:  Objection.  Form.
20   Argumentative.  Improper
21   hypothetical.
22       THE WITNESS:  It sounds like
23   an illegal business, but you can
24   continue with the hypothetical.
25   BY MR. ROBERTS:

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 49 of 137 PageID 9217
Confidential                                                    Cornelius, LLC vs.
Dana Trexler Smith                                              Ampush Media, Inc., et al.

Page 185

1    Q    Well, illegal businesses are what
2  we are here to talk about.
3        MR. SULLIVAN:  Objection,
4  argumentative.
5  BY MR. ROBERTS:
6    Q    So in that situation, what is the
7  cost of obtaining the beer?
8        Zero, because it's stolen, right?
9        MR. SULLIVAN:  Objection.
10   Calls for the witness to speculate.
11       THE WITNESS:  Are you asking
12   me to assume --
13 BY MR. ROBERTS:
14   Q    Yeah.
15   A    -- that there's zero cost?
16   Q    Let's assume that there's zero
17 cost because they are stealing the beer
18 off the back of the truck.  They are not
19 paying for it.  And they are turning
20 around, and they are selling cases of
21 beer, which the market price would be
22 if -- if the ring of thieves were going to
23 buy the beer, it would be $12 a case.
24 Okay.  And I want you to assume that they
25 are selling it for $1 a case.

Page 186

1    A    Okay.
2    Q    Is that economically irrational
3  activity?
4        MR. SULLIVAN:  Objection.
5    Calls for the witness to speculate.
6        THE WITNESS:  So if I put it
7    into context, under your
8    hypothetical that it cost them zero
9    and they sold it for a dollar, they
10   are making a profit of a dollar.
11   That would be economically
12   rational.
13 BY MR. ROBERTS:
14   Q    Okay.
15       What if I am the owner of the
16 beer trucks, and I sue them for stealing
17 my beer?  Okay.  And I say the beer cost
18 $12 a case.  You stole it.  I want the $12
19 a case.
20       Would you offer an opinion in
21 that case that it was economically
22 irrational for me to calculate the
23 damages -- the cost of the beer because
24 the thieves would not had stolen it at $12
25 a case if they can only sell it for $1 a

Page 187

1  case?
2        MR. AARON:  Objection.  Form.
3    Compound.  Improper hypothetical.
4        THE WITNESS:  Yeah.  I am not
5    following the hypothetical.
6  BY MR. ROBERTS:
7    Q    Let's say I am the owner of the
8  beer whose been stolen, and I sue the
9  thieves for stealing my beer.
10       Follow me so far?
11   A    Hm-hm.
12   Q    And I get a damages expert to say
13 that the damages are $12 per case of beer
14 because the thieves were unjustly enriched
15 by $12 per case because that was the cost
16 they avoided by stealing the beer rather
17 than buying it.
18       Follow that so far?
19   A    I can assume that.
20   Q    Okay.
21       Under those assumptions, would
22 your argument that my -- would you say
23 that my damages argument was economically
24 unsound because I am assuming that the
25 thieves would had paid $12 a case for beer

Page 188

1  where they can only sell it for $1?
2        MR. AARON:  Objection.  Same
3    objections.
4        THE WITNESS:  I think -- I
5    think you're baking a lot of
6    assumptions into that damages
7    expert's conclusions.  I would need
8    more information to answer that
9    hypothetical.
10 BY MR. ROBERTS:
11   Q    How is that -- but from an
12 economic principles perspective, how is
13 that economic principle in that case
14 different from the economic principle that
15 you are saying is not rational in this
16 case?
17       MR. SULLIVAN:  Objection.
18 BY MR. ROBERTS:
19   Q    In each case the goods are
20 stolen.
21       MR. AARON:  Objection.
22       MR. SULLIVAN:  Objection.
23       MR. AARON:  Assumes facts not
24   in evidence.
25 BY MR. ROBERTS:

Confidential

Connectus, LLC vs.

Dana Trexler Smith                                                    Ampush Media, Inc., et al.

Page 189

1    Q    In each case the plaintiff is
2  alleging the goods are stolen.  There's no
3  marginal cost for obtaining the goods
4  because they are not paying the person who
5  owns the goods, and in each case they are
6  selling it for a fraction of what it would
7  have cost to obtain the goods.
8        Why are those two situations
9  different in your view?
10       MR. SULLIVAN:  Objection.
11   Assumes facts not in evidence.  You
12   asked the witness to speculate.
13   Improper hypothetical.
14       THE WITNESS:  So if you're
15   asking me how the situation is
16   similar and how are they different,
17   well, they are -- they are -- first
18   of all, I am not making any
19   liability assumptions here.
20       You baked into your
21   question --
22 BY MR. ROBERTS:
23   Q    Correct.
24   A    -- that that data was, in fact,
25 stolen.  That's for the fact finder to

Page 190

1  find.
2    Q    Agreed.
3    A    And we are looking at costs of
4  the data because in the analysis, it's
5  considering that there are payments made
6  to affiliates.  So that is different from
7  your beer example.
8        And the costs of the data that
9  are included here in the Kidder report
10  are -- first of all, they are
11  fundamentally flawed.  They are calculated
12  incorrectly, and, you know, it's just not
13  economically rational.
14   Q    So -- but I am going -- so let's
15  add something to my beer example.  So.
16       I am selling the beer for a
17  dollar and as part of selling the beer for
18  the dollar, I got to pay my dealers ten
19  cents per case of beer that they sell.  So
20  now --
21   A    Sorry.  Can you go back?
22   Q    Yeah.
23       So I am selling the beer on the
24  street of Oakland for a dollar.  I got
25  some kids running around selling the beer.

Page 191

1  I got to pay those kids for their work
2  selling the beer.  So I am going to pay
3  them some proportion of the dollar.  I pay
4  them 50 cents on the dollar.
5        Okay.  Now, it's closer because
6  you said one objection you had to my
7  hypothetical was, well, in the case -- in
8  this case, there are affiliate costs
9  because the defendants had to pay
10  affiliates to re-monetize the data they
11  obtained from the plaintiff, so now I have
12  added a cost to re-monetize the beer that
13  was obtained from the plaintiff in my
14  hypothetical.
15       Okay.  Why is one of those
16  businesses economically sound and one of
17  them -- why is the damages in one
18  economically sound and the damages in the
19  other unsound?
20       MR. AARON:  Objection.  Form.
21       THE WITNESS:  I never said
22   either was economically sound.
23 BY MR. ROBERTS:
24   Q    So in the case of my hypothetical
25 where I as the plaintiff sue the defendant

Page 192

1  and my damages model is based upon cost
2  avoidance of buying the beer, would you
3  say that my analysis was economically
4  unsound because the defendant in that case
5  would never by beer for $12 and then turn
6  around and sell it for a dollar?
7        MR. AARON:  Objection.  Form.
8        MR. SULLIVAN:  Objection.
9   Asking the witness to speculate.
10   Misstates the witness's testimony.
11 BY MR. ROBERTS:
12   Q    It's a hypothetical.  You are an
13  expert.  You can answer it.
14   A    Yeah.  I am not -- I am not
15  following your -- your hypothetical.
16   Q    Which part don't you understand,
17  ma'am?
18       MR. SULLIVAN:  Objection.
19   Argumentative.
20 BY MR. ROBERTS:
21   Q    No.  I'm asking, which part don't
22  you understand?
23   A    I mean, you're assuming -- you're
24  assuming in your hypothetical that it is
25  irrational -- replacement cost to the beer

Page 193

1  is rational.  I mean, you have a lot of
2  assumptions baked in there that aren't --
3  aren't fully vetted.
4        It's very difficult to answer it,
5  and you are trying to draw parallels to
6  this situation, which are -- you know, I
7  don't see the parallels between the two
8  situations.
9        Q    We are talking about economic
10  principles, and as I understood the
11  economic principle that you articulated in
12  criticizing Mr. Kidder's report is that
13  they would not have agreed to pay
14  $19 million in order to sell it for
15  $1 million.
16        Is that a fair re-articulation of
17  your principle?
18        MR. SULLIVAN:  Objection.  I
19    think it misstates the witness's
20    testimony and the witness's expert
21    report.
22        THE WITNESS:  So what I am
23    saying in my expert report is that
24    the analyses performed in
25    Mr. Kidder's report are not based

Page 194

1  on rational economic principles
2    that -- nor are they performed
3    within a reasonable degree of
4    professional certainty.
5  BY MR. ROBERTS:
6        Q    Leave aside whether -- the
7  details of the calculation.  I am talking
8  about the economic principles here for the
9  moment.
10        We will talk about the
11  calculations in a second.
12        Your principle, as I understood
13  it, was that it would not be rational --
14  that Mr. Kidder's analysis was irrational
15  because Mr. Kidder was assuming that the
16  defendants in this case would buy the data
17  for $19 million and sell it at 1 million,
18  and I'm asking how is that any different
19  from a situation where I would be assuming
20  that they would buy the beer for $12 and
21  sell it for $1?
22        MR. SULLIVAN:  Objection.
23    Asked and answered.
24        MR. AARON:  Form.  Improper
25    hypothetical.

Page 195

1  BY MR. ROBERTS:
2        Q    Can you articulate any difference
3  between those two things from a principle
4  perspective?
5        MR. SULLIVAN:  Objection.
6    Same objection.
7        THE WITNESS:  Again, I think
8    there is -- there are a lot of
9    problems with the hypothetical.  In
10    your beer analysis, you seem to
11    indicate that, you know, beer is
12    sold for $12 a case.  That that's a
13    cost -- it sounds like in your
14    example that is a known cost.
15        In this example, the costs
16    that are calculated are fraught
17    with errors.  They are incorrect.
18    And so you're comparing a cost,
19    which in my opinion, is inflated.
20    I don't see the parallels between
21    your hypothetical and what we are
22    actually talking about here in --
23    with the errors in Mr. Kidder's
24    report.
25  BY MR. ROBERTS:

Page 196

1        Q    With respect, ma'am, you're now
2  talking about allegations in how the costs
3  were calculated and whether the costs were
4  added up correctly.
5        And I am not trying to talk about
6  that yet.  We will get there.  I am trying
7  to talk about the economic principles that
8  you write here on page 8 of your report
9  and that we have been talking about in
10  which I understand is a principle saying
11  that it is unsound from an economic
12  perspective to build a damages model based
13  on avoided costs where the revenue
14  obtained from those avoided costs is
15  smaller than the avoided cost.
16        Is that, in fact, your principle
17  that you have been advocating?
18        MR. SULLIVAN:  Objection.
19    Asked and answered and misstates
20    the witness's prior testimony.
21        THE WITNESS:  So, again, from
22    my perspective, it is -- it is
23    unsound that the -- in my opinion,
24    that the defendants would be
25    willing to pay up to $19 million in

Page 197

1    order to generate only $1.1 million
2    of cost -- $1.1 million of profit
3    as, he -- as Mr. Kidder says in his
4    report.
5        I don't think you can uncouple
6    that from all of the errors in his
7    report, the fact that he, you know,
8    looks at the wrong cost and
9    miscalculates what the costs are.
10   BY MR. ROBERTS:
11   Q    So I am just asking about the
12   economic principle.
13       Would you say -- let's say the
14   thieves in my hypothetical stole
15   $19 million worth of beer, and they sold
16   it for 1 million.
17       Would it be an economically
18   unsound argument for me to make to say,
19   hey, my damages or their unjust enrichment
20   is $19 million because that is the cost
21   that they avoided even though they only
22   sold the beer for $1 million?
23       Would you make the same argument
24   in that case?
25       MR. SULLIVAN:  Objection.

Page 198

1        Asked the witness to speculate.
2        MR. AARON:  Form.
3        THE WITNESS:  One more time.
4    BY MR. ROBERTS:
5    Q    If this were a case about beer
6    rather than about data, and the allegation
7    were that the plaintiff had stolen
8    $19 million worth of beer, and forget
9    about whether the beer is actually worth
10   12 million or 6 million or whether I added
11   up the calculations of the beer or I
12   forgot the fuel cost for delivering the
13   beer.  The allegation is that the beer
14   cost $19 million and -- or the value of
15   the beer was $19 million, that that was
16   the avoided cost by stealing the beer
17   rather than purchasing the beer, and the
18   beer was sold for $1 million.
19       If this were beer rather than
20   data, would you make the same argument?
21       Would you say it's economically
22   unsound to ask the plaintiff -- to ask the
23   defendant to pay for the avoided cost of
24   the beer because the revenue was so much
25   smaller than the avoided cost?

Page 199

1        MR. AARON:  Objection.  Form.
2    Compound.  Improper hypothetical.
3    Calls for the witness to speculate.
4    It's misleading.
5        THE WITNESS:  Yeah.  I am
6    unsure that I can answer that.
7    BY MR. ROBERTS:
8    Q    You can't answer that question?
9        MR. SULLIVAN:  Objection.
10   Argumentative.
11   BY MR. ROBERTS:
12   Q    Or you won't?
13       MR. SULLIVAN:  Objection.
14   Argumentative.
15       THE WITNESS:  I just don't
16   think your -- your hypothetical
17   makes sense in this context.
18   And -- and, you know, again, it
19   assumes that avoided cost is the
20   appropriate measure of damages.
21   BY MR. ROBERTS:
22   Q    No.  I'm asking -- that's exactly
23   the question I'm asking.
24       Can you make an avoided cost
25   argument properly if the thing being

Page 200

1    stolen and re-sold is beer rather than
2    data?
3        MR. SULLIVAN:  Objection.
4        MR. AARON:  Same objection.
5        MR. SULLIVAN:  Same
6    objections.
7        THE WITNESS:  Yeah.  You would
8    need far more facts to determine if
9    that is the appropriate measure of
10   damages.
11   BY MR. ROBERTS:
12   Q    You would -- not an appropriate
13   measure or not whether or not the
14   calculations are correct.
15       I am just asking about this sound
16   economic principle that you have been
17   articulating, and the principle, as I
18   understand it, from reading your report is
19   Mr. Kidder does not make sense at a
20   fundamental level because the damages he's
21   claiming, 19 -- 3 to $19 million in
22   avoided costs are much larger than the
23   revenue associated with those avoided
24   costs.
25       Do you think that's a --

**Confidential**

Page 201

1  that principle is a problem with
2  Mr. Kidder's report?
3        MR. SULLIVAN:  Objection.
4  Asked and answered.  Argumentative.
5        THE WITNESS:  So, again, I
6  have explained that from an
7  economic -- a fundamental economic
8  principle is that for-profit
9  entities are in the business to
10  make money.
11  BY MR. ROBERTS:
12    Q    Are the thieves a for-profit
13  entity in my hypothetical?
14        MR. SULLIVAN:  Objection.
15  Asked the witness to speculate.
16        THE WITNESS:  Well, again, I
17  don't know.  Are they?
18  BY MR. ROBERTS:
19    Q    Ma'am, my question is really
20  quite simple.
21        If this were beer rather than
22  data, would your opinion be any different?
23        MR. AARON:  Objection.  Form.
24  I don't think it's quite simple
25  either.  It's misleading.

Page 202

1        MR. ROBERTS:  No, it's not.
2  The witness can answer the question
3  to the best of her ability.
4        MR. SULLIVAN:  Objection.
5  Asked -- asking the witness to
6  speculate.  Asked and answered.
7  BY MR. ROBERTS:
8    Q    Can you say anything more on this
9  topic, ma'am?
10    A    I think I have given you the
11  answers that I can give to you.
12    Q    Okay.  Let's look at your
13  scenario 1 in your summary of opinions.
14        What portion of scenario 1 here
15  is not a legal argument?
16    A    So I am not making any legal
17  arguments.
18    Q    Okay.  So which calculation did
19  you perform in scenario 1?
20    A    So I have read the Section 13 of
21  the agreement, and under scenario 1, I
22  have assumed that the fact finder finds
23  that this clause holds, and to the extent
24  that this clause holds, it says, "Either
25  vendor or Ampush be liable for any lost

Page 203

1  profits, lost revenues or for any
2  indirect, incidental, consequential,
3  special or exemplary damages arising out
4  or related to this agreement even if such
5  damages are foreseeable and whether or not
6  the other party has been advised of
7  possibility of such damages."
8    Q    And you're interpreting that
9  contract language.
10        Is that what you are doing?
11    A    No, I am not.
12        MR. SULLIVAN:  Objection.
13  Objection.  It misstates the
14  witness's testimony.  It misstates
15  the other report.
16        THE WITNESS:  I am not.
17  BY MR. ROBERTS:
18    Q    So what accounting principles
19  have you applied in scenario 1?
20    A    Again, I set out scenario 1 in
21  the -- in the event that the court finds
22  that this is the appropriate cause by
23  which the agreement should be read.
24  That's all I am doing.
25    Q    I'm asking -- you understand you

Page 204

1  are here testifying as an expert witness,
2  and the basis for people offering expert
3  witness testimony to a court is a
4  specialized expertise.
5        Are you aware of that?
6        MR. SULLIVAN:  Objection.
7  Argumentative.
8  BY MR. ROBERTS:
9    Q    That's why we have experts,
10  because they have expertise.
11        MR. SULLIVAN:  Objection.
12  Argumentative.
13        THE WITNESS:  My understanding
14  is that an expert is there to
15  assist the trier of fact based on
16  their area of expertise.
17  BY MR. ROBERTS:
18    Q    Great.
19        So how are you attempting to
20  assist the trier of fact based on your
21  expertise in accounting in scenario 1?
22    A    So in scenario 1, I am just
23  setting forward that if the trier of fact
24  finds that this clause applies, then there
25  would be zero damages.

Page 205

1    Q    Are you doing any accounting in
2  arriving at that conclusion?
3    A    I am just stating that the
4  damages would be zero, if the fact finder
5  finds that this clause is relevant to the
6  damages.
7    Q    Okay.
8         What classes have you taken at
9  Wharton or as a CPA to help you formulate
10  that opinion?
11    A    Well --
12         MR. SULLIVAN:  Objection,
13  argumentative.
14         THE WITNESS:  Again, zero
15  damages are applicable if the fact
16  finder finds that there can be no
17  damages found under the agreement.
18         I am not making any legal
19  conclusion.
20  BY MR. ROBERTS:
21    Q    How is that not a legal
22  conclusion?
23    A    Because I am not making the
24  conclusion.
25         MR. SULLIVAN:  Objection.

Page 206

1         Asked and answered.
2         THE WITNESS:  Sorry.
3         MR. SULLIVAN:  Objection.
4  Asked and answered.
5         THE WITNESS:  I am not making
6    a conclusion.  It's for the fact
7    finder to find.
8  BY MR. ROBERTS:
9    Q    Did you make any calculations
10  with respect to scenario 1?
11         MR. SULLIVAN:  Objection.
12  Asked and answered.
13         THE WITNESS:  Damages would be
14    zero if the fact finder finds that
15    this clause applies.
16  BY MR. ROBERTS:
17    Q    Where did you set forth those
18  calculations in your report?
19         Can you show me, please?
20    A    I -- there is no calculation
21  behind that.  It is summarized in
22  exhibit -- my opinion of damages are
23  summarized in Exhibit 1.
24    Q    Let's turn to scenario 2.
25         The resulting damages under

Page 207

1  scenario 2 depend on the date at which the
2  court determined the causes of action to
3  have begun.
4         Do you see that?
5    A    I do.
6    Q    Who told you that?
7         MR. SULLIVAN:  Objection to
8    the extent that it asks the witness
9    to divulge attorney-client
10    communications.
11         To the extent it doesn't, then
12    she can answer the question.
13         THE WITNESS:  So setting aside
14    any discussions that I had with
15    counsel, there is language in the
16    agreement that I believe limits
17    damages to payments that were made
18    within the preceding 12 months is
19    how, I believe, it is read.
20  BY MR. ROBERTS:
21    Q    Okay.
22         Are you interpreting that
23  contractual provision, or are you assuming
24  that it has particular meaning?
25    A    I am making no contract

Page 208

1  interpretation.
2    Q    Okay.
3         Are you familiar with the concept
4  of a continuing tort or a continuing
5  breach?
6    A    It sounds like a legal term.  So
7  what I have done in scenario 2 is I have
8  quantified the payments that were made
9  throughout the duration of the contract
10  and I provide that information to allow
11  the court in whatever way they choose to
12  determine the contract or it chooses to
13  determine the contract language, they have
14  the information available, which would
15  allow them to calculate any damages under
16  that interpretation, if any.
17    Q    Where you say depend on the data
18  in which the court determines the cause of
19  action to have begun, you don't know and
20  you are not intending to tell the court
21  that the damages should -- should run from
22  the date at which the court determines it
23  to have begun?
24         MR. SULLIVAN:  Objection.
25  Vague.

Page 209

1        THE WITNESS:  No.  I am
2    providing this information which
3    will enable the court -- it
4    provides the court with the
5    information of what payments were
6    made month by month during the
7    duration of the agreement between
8    the defendant and the plaintiff,
9    and the court can determine how
10    that is relevant to whatever
11    damages they deem are appropriate
12    under this scenario, if any.
13 BY MR. ROBERTS:
14    Q    Okay.  Let's turn to scenario 3.
15        Did you -- are you familiar with
16 DGS 229?
17    A    I would need to see it.
18    Q    Well, did you see anything where
19 Mr. Darwal attempted to calculate unjust
20 enrichment from ancillary data?
21    A    Yes.
22    Q    And it seems to me that -- as I
23 look at it, that you guys recalculated
24 that; that you took that data from the
25 spreadsheet and re-did it.

Page 210

1        Do you recall a process like
2    that?
3        MR. SULLIVAN:  Objection.
4    Asking the witness to speculate.
5        THE WITNESS:  (Reviewing.)
6    Can I see that document?
7 BY MR. ROBERTS:
8    Q    It's so -- probably, you can.
9    A    I mean, I know Mr. Darwal -- if I
10 can see it -- I want to make sure I am
11 answering the right question for this
12 particular piece.
13        Mr. Darwal did some analysis, and
14 then I did my analysis sort of
15 independently of his.  But I want to make
16 sure I am referring to the right document
17 here.
18    Q    All right.  Let me ask you about
19 DGS 202.
20        Are you familiar with DGS 202?
21    A    Again, I would need to see that
22 document.  I just don't have the Bates
23 numbers memorized.  I'm sorry.
24    Q    We will come back to this.
25        Are you familiar with the concept

Page 211

1 of unjust enrichment?
2    A    Yes, I am.
3    Q    When you think about unjust
4 enrichment as a damages person, at what
5 point in time should the enrichment be
6 measured?
7        MR. AARON:  Objection.  Lacks
8    foundation.  Form of the question.
9        THE WITNESS:  Yeah.  What --
10    what do you mean?
11 BY MR. ROBERTS:
12    Q    So if I steal stock from you
13 that's worth a million dollars and the
14 market goes down and I sell it for a
15 hundred thousand dollars, by how much was
16 I unjustly enriched?
17        MR. AARON:  Objection.  Form.
18    Lacks foundation.
19        THE WITNESS:  Yeah.  I
20    think -- go ahead.  Sorry.
21        MR. SULLIVAN:  I was going to
22    say objection.  Improper
23    hypothetical.
24        THE WITNESS:  Yeah.  You would
25    need more information under --

Page 212

1    under that hypothetical.  There's
2    some --
3 BY MR. ROBERTS:
4    Q    What else would you need?
5        The market value with the day I
6 steal -- the day I steal it from you -- at
7 the moment I steal it from you on the Dow
8 Jones industrial market is $1 million, and
9 a month later the economy had crashed and
10 I turn around and sell it and get a
11 hundred thousand dollars' worth of cash.
12        In your view, was I enriched by a
13 million dollars or a hundred thousand
14 dollars?
15        MR. AARON:  Same objection.
16        MR. SULLIVAN:  Same objection.
17        THE WITNESS:  I'm sorry.  Give
18    it to me again, because my brain is
19    running.  There are a lot of very
20    specific analyses that go into
21    calculating that type of damages
22    claim.
23 BY MR. ROBERTS:
24    Q    Okay.
25        I steal a million dollars' worth

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 56 of 137 PageID 9224

Dana Trexler Smith

Confidential

Cornerius, LLC vs.
Ampush Media, Inc., et al.

Page 213

1  of stock from you, bearer bonds that are
2  worth a million bucks, and I steal them
3  from you.  And on the day I steal them
4  from you, they are liquid investments.  We
5  know exactly what the price is.  It's a
6  million dollars in the market.  And on the
7  day I sell them, the value of those bonds
8  has gone down 30 days later.  And I turn
9  around and I sell them and make -- at that
10  point fetch a hundred thousand dollars.
11        How much have I been unjustly
12  enriched by?
13        MR. AARON:  Same objection.
14  Same question.
15        THE WITNESS:  I don't know
16  that I can answer that question.
17  Let me think about it a little bit.
18        I don't know that I can answer
19  that question in that hypothetical.
20  I would need to think through that.
21  BY MR. ROBERTS:
22  Q    Okay.
23        Put differently, should I be
24  measuring the unjust enrichment as of the
25  value of the thing at the day I took it,

Page 214

1  or should I be measuring it in terms of
2  what I got for it when I turned around and
3  sold it?
4        Do you have an opinion about
5  that?
6  A    Well, typically, when you look at
7  unjust enrichment damages, it is the
8  amount by which the party was unjustly
9  enriched.
10  Q    And the value of that is measured
11  at the time of the misappropriation,
12  correct?
13        MR. SULLIVAN:  Objection.
14        THE WITNESS:  How --
15        MR. AARON:  Objection.
16        MR. SULLIVAN:  It misstates
17  the witness's testimony.
18        MR. AARON:  It calls for a
19  legal conclusion.
20  BY MR. ROBERTS:
21  Q    I'm asking you as an expert how
22  you calculate unjust enrichment.
23        Do you calculate it at the time
24  it was taken, or do you calculate it at
25  the time it was sold?

Page 215

1        MR. SULLIVAN:  Objection.
2  Calls for the witness to speculate
3  between two different
4  hypotheticals.
5        THE WITNESS:  I would agree
6  that they are two different
7  hypotheticals.  Typically, when I
8  calculate unjust enrichment, I am
9  looking at the amount by which
10  the -- in this case, the
11  defendant -- the amount of profits
12  by which the defendants -- the
13  amount of profits that the
14  defendant received by following the
15  allegations in this case, utilizing
16  data which may or may not belong to
17  them.
18  BY MR. ROBERTS:
19  Q    Okay.
20        If I steal a million dollars of
21  cash from you but then I sell it to a
22  money launderer for 800,000.  I am worried
23  that the bills are marked, so I send them
24  to a money launderer who gives me $800,000
25  for my million in dirty money.

Page 216

1        How much was I unjustly enriched
2  by; a million bucks or 800,000?
3        MR. AARON:  Objection.  Form.
4  Calls for a legal conclusion.
5        THE WITNESS:  Yeah.  Again, I
6  don't know that I can answer that
7  hypo -- hypothetical.
8  BY MR. ROBERTS:
9  Q    How as a damages expert would you
10  think about analyzing that hypothetical?
11  A    Well, again, I think it is an
12  incomplete hypothetical.  It's very
13  difficult to answer.  I would need legal
14  input into the analysis and consideration
15  of the dates.
16        At the end of the day, in your
17  analysis, the person who took the money
18  ended up with $800,000 in their pocket
19  under that hypothetical.
20        If you are calculating it on the
21  date -- you know, if I get legal direction
22  and you're calculating it on the date the
23  money was taken, before they have sold it,
24  then they have a million dollars in your
25  hypothetical.

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 57 of 137 PageID 9225
Confidential
Dana Trexler Smith                                                    Connectus, LLC vs.
                                                                    Ampush Media, Inc., et al.

Page 217

1    Q    If I steal your grandfather's
2  watch, which is a nice watch worth a
3  hundred thousand dollars, and I turn
4  around and sell it for $10,000, by how
5  much was I unjustly enriched?
6        MR. AARON:  Same objections.
7        THE WITNESS:  I think it would
8    be a very similar answer.
9        If you have a watch worth a
10   hundred thousand dollars on the
11   date that you took it, at that
12   moment in time it's worth a hundred
13   thousand dollars.  On the date that
14   you sell it, you -- I'm sorry.  You
15   have been unjustly enriched by a
16   hundred thousand dollars.
17       If you turn around and sell
18   it, the date in which you sell it,
19   it's worth -- you have been
20   unjustly enriched by the amount
21   that you are left with at the end
22   of the day.
23       I forget how much you said you
24   sold it for.
25  BY MR. ROBERTS:

Page 218

1    Q    10,000.
2        So by turning around and selling
3  your grandfather's watch, I reduced the
4  amount by which I have been unjustly
5  enriched from a hundred thousand -- by
6  $90,000 down to 10,000, as you understand
7  it?
8        MR. SULLIVAN:  Objection.
9    Misstates the witness's testimony.
10       THE WITNESS:  Yeah.  That's --
11   that's not what I said.
12  BY MR. ROBERTS:
13   Q    Well, if I just kept the watch
14  that was worth a hundred thousand dollars
15  and I hadn't turned around and sold it,
16  how much would I be unjustly enriched by;
17  the value of the watch, right?
18       MR. SULLIVAN:  Objection.
19       THE WITNESS:  If you assume
20   that that watch is worth a hundred
21   thousand dollars, you're --
22   essentially you're -- you're
23   unjustly enriched by the watch.
24   That's what you have.
25  BY MR. ROBERTS:

Page 219

1    Q    Right.
2        And -- and the value of that
3  watch would be appropriate measure of
4  unjust enrichment, correct?
5    A    It's possible under that
6  hypothetical.  There may be other factors
7  that come into play.
8    Q    Okay.
9        And if I turn around and sell it
10  for $10,000 a month later, is it your view
11  that -- again, thinking as a damages
12  expert, that, well, too bad you sued after
13  he sold it, he sold it for ten grand, so
14  he's only been enriched by ten grand --
15       MR. AARON:  Objection.  Form.
16  BY MR. ROBERTS:
17   Q    -- whereas if I sued a month
18  earlier before he sold the watch, I could
19  have recovered a hundred thousand?
20       MR. AARON:  Objection.  Form.
21   Compound.
22       THE WITNESS:  I think you
23   are -- I think you're conflating
24   concepts.
25  BY MR. ROBERTS:

Page 220

1    Q    I'm asking questions, ma'am.  I
2  am not attempting to conflate concepts.
3    A    The hypothetical is conflating
4  concepts.
5    Q    Well, ma'am, if I sell the watch
6  for $10,000.
7        At the moment I sell the watch,
8  at that moment, in your expert opinion,
9  how much have I been unjustly enriched by?
10       MR. SULLIVAN:  Objection.
11   Asked and answered.
12       THE WITNESS:  At that point in
13   time, you have $10,000 in your
14   pocket.
15  BY MR. ROBERTS:
16   Q    So you would say in the stock
17  market case then, if I stole a million
18  dollars' worth of stock, that at the date
19  that I steal it, I have been unjustly
20  enriched by a million dollars.  And when I
21  turn around and sell it for a hundred
22  thousand, I have only been enriched --
23  unjustly enriched by a hundred thousand.
24       So the amount of my unjust
25  enrichment had gone down between the date

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 58 of 137 PageID 9226
Confidential
Dana Trexler Smith                                    Connectus, LLC vs.
                                                      Ampush Media, Inc., et al.

Page 221

1   that I stole it and the date I sold it; is
2   that right?
3         MR. SULLIVAN:  Objection.  It
4   misstates the witness's prior
5   testimony.
6         MR. AARON:  Form.
7         MR. SULLIVAN:  Improper
8   hypothetical.
9         THE WITNESS:  And, again, it
10  would depend on the legal
11  assumptions that I am being asked
12  to make in -- in those
13  hypotheticals.
14  BY MR. ROBERTS:
15  Q    Okay.
16       So if you were asked in this case
17  to look at the value to the defendants on
18  the date that they took the data rather
19  than at the time that they sold the data,
20  your opinion would have to change,
21  correct?
22       MR. SULLIVAN:  Objection.
23  Again, it misstates the witness's
24  testimony.
25       THE WITNESS:  Again, how are

Page 222

1   you valuing the data?  I mean, you
2   have used that -- what do you mean
3   by value?  Value of the data; what
4   does that mean?
5   BY MR. ROBERTS:
6   Q    Right.
7        So avoided costs is one way to
8   value the data, right?
9        If it -- if it would have cost
10  the plaintiff $25 to develop a lead on
11  their own but instead they stole it from
12  the plaintiffs, have they avoided $25 in
13  cost?
14       MR. AARON:  I am going to
15  object.  Form.  Assumes facts not
16  in evidence.
17       THE WITNESS:  Avoided costs
18  can be an appropriate measure of
19  damages under unjust enrichment as
20  can defendants' profits.  Those are
21  two measures of damages of unjust
22  enrichment if properly calculated.
23  BY MR. ROBERTS:
24  Q    Let's do another hypothetical.
25       If I steal a $50,000 BMW from you

Page 223

1   and I crashed into a tree and sold it for
2   scrap metal for $35, how much was I
3   unjustly enriched by?
4         MR. AARON:  Objection.  Form.
5   Improper hypothetical, and it's
6   becoming burdensome in a request of
7   the witness to be asking the
8   identical hypotheticals with
9   different characters in it with the
10  same analysis.
11       So at some point in time, I
12  think I am going to direct the
13  witness not to answer the questions
14  because it's becoming oppressive.
15       MR. ROBERTS:  You do so at
16  your peril, sir.
17  BY MR. ROBERTS:
18  Q    Ma'am, can you answer my
19  question?
20  A    Well, I think it is the same --
21  the same answer that I have given in the
22  other hypotheticals.
23  Q    Which is what?
24       MR. SULLIVAN:  Objection.
25  Asked and answered.  Argumentative.

Page 224

1   BY MR. ROBERTS:
2   Q    With respect to the BMW, does it
3   matter that, through my own actions, I
4   crashed the BMW and I personally affected
5   or negatively affected the value of the
6   vehicle?
7   A    Well, again, you're asking how
8   much you were -- give me the hypothetical
9   again.
10  Q    Yeah.
11       I steal your
12  hundred-thousand-dollar car or your
13  $50,000 car.  I drive it real fast, and I
14  crash it into a tree, and then I sell it
15  for scrap metal.  And at the time that I
16  sell it, it's only worth $35 because I
17  totaled it.  That's my hypothetical.
18       How much would you, in that case,
19  say I unjustly enriched by?
20       MR. SULLIVAN:  Same
21  objections.
22  BY MR. ROBERTS:
23  Q    To be clear, the way this
24  hypothetical is different from some of the
25  others is that my own personal actions

Page 225

1  were partially responsible for -- or maybe
2  largely responsible for the diminution of
3  value.
4       MR. SULLIVAN:  Same
5  objections.
6       THE WITNESS:  So, again, at
7  the end of the day, in your
8  hypothetical, the person who stole
9  the BMW and crashed it has 35
10  additional dollars in their pocket
11  at the end of the day.
12  BY MR. ROBERTS:
13  Q    And that -- in your view, in that
14  hypothetical, that's how you would think
15  the proper way to calculate unjust
16  enrichment is?
17  A    If you're looking --
18       MR. SULLIVAN:  Objection.
19  Asked and answered.  Misstates the
20  witness's prior testimony.
21       THE WITNESS:  Yeah.  And if
22  you're looking at defendants'
23  profit, then they profited by $35.
24  BY MR. ROBERTS:
25  Q    And would that be, in that

Page 226

1  situation, in your view, an appropriate
2  way to calculate the defendants' unjust
3  enrichment?
4       MR. SULLIVAN:  Objection.
5  Asked and answered.
6       THE WITNESS:  The defendants'
7  unjust enrichment -- I would need
8  more -- more facts.
9  BY MR. ROBERTS:
10  Q    Okay.  Let's move on.
11       On page 10, footnote 45, you
12  wrote, "Since the evidence provided by
13  Ampush DGS indicates that it provided
14  leads" --
15  A    I'm sorry, I am not with you.  I
16  was in the beginning of 45.
17  Q    Excuse me.  I have that wrong.
18  Wrong page.  So let me find the right
19  page.
20  A    Are you saying footnote 45?
21  Q    I was but that's actually not
22  where I am quoting from.  So the -- my
23  attempt to ask you about that question --
24  yes, so I am looking at footnote 45, and
25  halfway through the footnote it begins,

Page 227

1  "The Kidder report then proffers..."
2       Do you see that?  It's on the
3  fourth line of the footnote.
4  A    Yes.
5  Q    "The Kidder report then
6  proffers," quote, "since the evidence
7  provided by Ampush, DGS EDU indicates that
8  it provided leads to at least 12
9  affiliates, eDegree is facing a potential
10  exposure of between 900,000 and 6 million
11  in legal fees."
12       And then it says, "I have neither
13  formed an opinion with respect to the
14  amounts expect by" -- expressed by Brita
15  Strandberg nor the extrapolation performed
16  in the Kidder report."
17       Do you see that?
18  A    I do.
19  Q    Is it correct to say that at
20  trial you do not intend to offer an
21  opinion one way or the other about this
22  subject?
23  A    I have no opinion on the -- on
24  this subject.
25  Q    Let's move to page 12.

Page 228

1       On page 12 you say, at the first
2  bullet point, "Avoided cost damages in the
3  Kidder report suggest that the defendants
4  would have been willing to incur costs
5  ranging between 3.8 million to 19 million
6  to generate revenues of 1,127,724."
7       Do you see that?
8  A    I do.
9  Q    Why does it suggest that?
10  A    Well, because --
11  Q    To put it differently:  Why do we
12  have to assume that the defendants would
13  have been willing to incur those costs?
14       MR. AARON:  Well, I am going
15  to object.  I think that's
16  misleading because that's not what
17  the document says.
18  BY MR. ROBERTS:
19  Q    You see where it says "defendants
20  would have been willing to incur costs"?
21       MR. AARON:  I don't mean to --
22  but it says "the Kidder report
23  suggests."
24  BY MR. ROBERTS:
25  Q    Correct.

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 60 of 137 PageID 9228
Confidential
Dana Trexler Smith                                    Connectus, LLC vs.
                                                      Ampush Media, Inc., et al.

Page 229

1    "The Kidder report suggests that
2 the defendants would have been willing to
3 incur costs."
4        Do you see that?
5   A    I do.
6   Q    Why do you think the Kid- -- why
7 does the Kidder report suggest that the
8 defendants would have been willing to
9 incur those costs?
10       MR. SULLIVAN:  Objection.
11  It's asking the witness to
12    speculate.
13       MR. ROBERTS:  No, it's not.
14 BY MR. ROBERTS:
15   Q    I'm asking how you interpret the
16 Kidder report as requiring an assumption
17 that the defendants were willing to incur
18 those costs?
19       MR. SULLIVAN:  Same objection.
20       MR. AARON:  You could answer,
21 if you know.  Yeah.
22       THE WITNESS:  Okay.
23       Thanks.  So what I mean by
24 this is the Kidder report shows
25 that the defendants earned revenue

Page 230

1 of about $1.1 million and yet
2 suggests that they would be willing
3 to pay anywhere from 3.8 million to
4 19 million to obtain the leads from
5 which they would generate a million
6 dollars in revenue.
7        MR. ROBERTS:  Let's go off the
8 record because she has to change
9 the DVD.
10       THE VIDEOGRAPHER:  Off the
11 record at 2:14.
12       (Whereupon a Recess Commenced
13 at 2:14 and Testimony Recommenced
14 at 2:26.)
15       THE VIDEOGRAPHER:  We are on
16 the record at 2:26.
17       This is DVD number 3 of Dana
18 Tex -- Trexler Smith's deposition.
19 BY MR. ROBERTS:
20   Q    Ma'am, one criticism you have of
21 Mr. Kidder's report, as articulated on
22 page 12 of your report, is that the Kidder
23 report assumes or suggests or would
24 require the defendants to have been
25 willing to incur costs substantially in

Page 231

1 excess of the revenue they generated from
2 taking the data.
3        Is that -- do I have that general
4 principle right, as you understand it?
5        MR. SULLIVAN:  Objection.
6   Asked and answered.
7        THE WITNESS:  Yes.
8 BY MR. ROBERTS:
9   Q    Okay.
10       It seems like hidden in there is
11 a belief that there's sort of a but-for
12 world, meaning you're looking at the
13 damages situation as saying but-for the
14 complaint, the plaintiffs -- we have to
15 look at the economic realities of what
16 would have happened had the plaintiffs
17 sold this data to the defendants and then
18 data then monetized it.
19       Is that right?
20       Are you looking at this as a
21 but-for-type calculation?
22       MR. SULLIVAN:  Objection,
23   form.
24       THE WITNESS:  No, I am not.
25 BY MR. ROBERTS:

Page 232

1   Q    Okay.
2        So if it's not a but-for-type
3 calculation, why would one have to assume
4 to come up with Mr. Kidder's damages, that
5 the plaintiffs would have been willing?
6        Isn't "would have been," that
7 verb phrase, isn't that -- what would have
8 been, isn't that articulating a
9 hypothetical alternative reality?
10       MR. SULLIVAN:  Objection.
11   Form.
12       THE WITNESS:  That's not my
13 intent.  Maybe I could have used
14 the language differently, but I am
15 trying to show that the costs put
16 forth -- the avoided costs in the
17 Kidder report don't make sense with
18 the revenue that would have been
19 generated from those leads also as
20 calculated in the Kidder report.
21 BY MR. ROBERTS:
22   Q    What do you mean by saying it
23 doesn't make sense?  That's what I don't
24 understand.
25       Right.  It would be -- there's no

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 61 of 137 PageID 9229
Confidential
Dana Trexler Smith                                                    Connectus, LLC vs.
                                                                    Ampush Media, Inc., et al.

Page 233

1  mathematical prohibition on taking things
2  that are worth a lot and turning around
3  and selling them for a little, correct?
4       Like that is something that could
5  happen in the world, right?
6       You could take really valuable
7  data and turn around and sell it for a
8  fraction of what it would cost to generate
9  that data.  Right?
10      MR. SULLIVAN:  Objection.
11   Form.  Calls for the witness to
12   speculate.
13      THE WITNESS:  So if you're
14   asking me if somebody in the world
15   could take something that's
16   valuable and sell it for less than
17   it's worth, yes, that could happen
18   in the world.
19 BY MR. ROBERTS:
20   Q    Okay.  So let's take movies.
21      Movies cost hundreds of millions
22 of dollars to produce sometimes, like
23 James Cameron's Avatar.
24      Are you familiar with that film?
25 Did you see it?

Page 234

1   A   I did see that film.
2   Q   Did you see Titanic?
3   A   I did.
4   Q   These are big, expensive movies
5  to produce, right?
6      MR. SULLIVAN:  Objection.
7   Asked the witness to speculate.
8      THE WITNESS:  If you are
9   asking me to assume they are big,
10   expensive movies -- in comparison
11   to what?  I --
12 BY MR. ROBERTS:
13   Q   Well, you know that those movies
14 cost many millions of dollars to produce,
15 certainly?
16      MR. SULLIVAN:  Objection.
17   Asked the witness to speculate.
18      THE WITNESS:  I would assume
19   it costs many millions of dollars
20   to --
21 BY MR. ROBERTS:
22   Q   Okay.
23      And if I took that movie from Mr.
24 Cameron, I could turn around and sell it
25 for $2 for a copy of that movie, correct?

Page 235

1      MR. SULLIVAN:  Objection.
2   Again, asking the witness to
3   speculate.
4      THE WITNESS:  If you are
5   asking me to assume that you could
6   sell a copy of that movie for $2, I
7   assume you could.
8  BY MR. ROBERTS:
9   Q    Okay.
10      And would you say in that sense
11 that if Mr. -- that my -- I avoided
12 millions of dollars' worth of costs if I
13 am out there selling the movie even
14 though -- I guess what I don't -- I don't
15 understand why that wouldn't -- that is a
16 terrible question.  Let me withdraw that
17 and start again.
18      If DGS had to pay for the actual
19 value of the leads -- let's assume that
20 the actual value of the leads was the
21 contractual price of the leads, $24.
22      What would DGS had done with
23 those leads, if it had to pay $24 for
24 them?
25      MR. SULLIVAN:  Objection.  It

Page 236

1  asked the witness to speculate.
2  Form.
3      THE WITNESS:  So you are
4   asking me to assume for every
5   lead -- so I am assuming this is a
6   lead for which money is received
7   from a university, because that's
8   how we have been using the term
9   "lead" --
10 BY MR. ROBERTS:
11   Q   So let me be clear then.
12      If every time the plaintiff sent
13 a prospective lead to DGS, if DGS instead
14 of taking that data and using it however
15 it wanted, had to pay $24 for that
16 record, would it have bought those
17 records?
18      MR. SULLIVAN:  Objection.  It
19   asked the witness to speculate.
20   Form.
21      THE WITNESS:  Yeah, I don't
22   know if they would have bought
23   those records for $24.  That's --
24   there's no evidence to suggest that
25   they would have.

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 62 of 137 PageID 0220
Confidential
Dana Trexler Smith                                                      Cornelius, LLC vs.
Ampush Media, Inc., et al.

Page 237

1  BY MR. ROBERTS:
2    Q    Well, you're criticizing
3  Mr. Kidder for assuming that they would
4  have, right?
5        MR. SULLIVAN:  Objection.
6  Asked and answered.
7        THE WITNESS:  I am criticize
8  -- I am pointing out that the cost
9  Mr. Kidder calculates in his
10   report, the avoided cost, are too
11   high as compared to the revenues
12   that were generated from these
13   leads and that had he looked at --
14   that could have been apparent to
15   him in assessing the reasonableness
16   of the costs that he have
17   calculated.
18  BY MR. ROBERTS:
19   Q    You use things like "too high."
20       In what sense was it too high?
21   A    Do you want me to get into the
22  errors of his calculation that explain why
23  they're too high?  I can do that.
24   Q    You're asking -- I'm asking
25  you -- you take the 19 million or the 3

Page 238

1  million, and you are saying relative to
2  revenues of one -- 127.
3        Why are you comparing those
4  things?
5        Why is the revenue relevant?
6    A    Because Mr. Kidder is suggesting
7  that it would have cost the defendants
8  between 3.8 and $19 million to obtain
9  leads from which they would only generate
10  and have only generated approximately
11  $1.1 million.
12        That's economically irrational,
13  and it's inconsistent with the financial
14  performance of DGS EDU.
15   Q    But it's totally economically
16  rational, isn't it, ma'am, if they are
17  just stealing the leads?
18        If I steal $19 million of gold
19  bars from you and sell them for
20  $1 million, that is perfectly rational
21  behavior economically on my part, right?
22        MR. SULLIVAN:  Objection.
23  Form.  You asked the witness to
24  speculate.
25        THE WITNESS:  Say that again.

Page 239

1  BY MR. ROBERTS:
2    Q    Yeah.
3        If I steal $19 million worth of
4  gold bars from you and I sell them for
5  $1 million, have I behaved economically
6  rational?
7        MR. SULLIVAN:  Objection.
8  It's asking the witness to
9  speculate.  Form.
10        THE WITNESS:  Under your
11   hypothetical, you would have
12   benefited by -- your -- you would
13   have had an additional million
14   dollars in your pocket had you not
15   taken that.
16  BY MR. ROBERTS:
17   Q    Right.
18       And if you sued me for my unjust
19  enrichment or my avoided costs, my avoided
20  costs under that hypothetical would be
21  $19 million, correct, notwithstanding the
22  fact that I only sold the gold bars for a
23  million bucks?
24        I avoided $19 million of costs by
25  stealing them from you.

Page 240

1    A    Assuming it would cost 19 million
2  to obtain the gold bars, under your
3  hypothetical -- I think you're
4  conflating -- I think you're conflating
5  actual losses to the plaintiff with
6  defendants' unjust enrichment in that
7  scenario.
8    Q    I am not.  I am comparing avoided
9  costs to revenue.
10        If I steal $19 million of gold
11  bars instead of going to Fort Knox and
12  buying them, my avoided costs, at that
13  moment, you would agree is $19 million,
14  correct?
15   A    If you are asking me to assume
16  that it would cost 19 million --
17   Q    Yes.
18   A    -- to get those gold bars,
19  irrespective of whether or not you have 19
20  million to make that purchase, if it makes
21  sense for you business -- economic -- if
22  it makes sense for you to do that, if you
23  could do that, if you would do that, if
24  you knew it would cost you 19 million --
25  if you're telling me the cost to acquire

Page 241

1  those gold bars is 19 million, that would
2  be your cost should you choose to do it.
3     Q    Okay.
4        So in a situation where I steal
5  gold bars that would have cost me
6  $19 million to acquire -- just assume it
7  would have cost me $19 million to buy
8  these gold bars.  At the moment that I
9  take the gold bars, I have $19 million
10 worth of gold bars, and I have $19 million
11 of avoided costs at that moment.
12       I have the gold bars in my
13 possession.  I didn't have to spend
14 $19 million to get them.  If I wanted to
15 buy them legitimately, I would have had to
16 spend $19 million.
17       Assuming those facts, you would
18 agree with me that at that moment with the
19 gold bars in my possession, that my
20 avoided costs are 19 million.  Correct?
21    MR. AARON: Objection.  Form.
22    THE WITNESS: If you are
23 asking me to assume that it would
24 have cost you 19 million to obtain
25 those gold bars and that you

Page 242

1     obtained those gold bars without
2     spending the 19 million, then I
3     guess, as you're defining it, the
4     avoided costs would be $19 million.
5  BY MR. ROBERTS:
6     Q    Okay.
7        And at that moment, when I have
8  the gold bars in my possession, my unjust
9  enrichment would be also $19 million
10 because I have $19 million worth of stuff
11 that I didn't pay for.
12       Correct?
13    A    Under your hypothetical, you had
14 $19 million of stuff that you didn't pay
15 for.
16    Q    And I would be unjustly enriched
17 at that moment by $19 million, correct?
18    A    Under your definitions of avoided
19 costs in that hypothetical, as you set it
20 out.
21    Q    Now let's assume I take those
22 $19 million worth of gold bars, and I sell
23 them for a million dollars.
24       Okay.  What is my unjust
25 enrichment at that moment after I have

Page 243

1  done that, and now I have a nice neat
2  stack of a million dollars in cash?
3     MR. AARON: Objection.  Form.
4     Lacks foundation.  It's an improper
5     hypothetical, and it's misleading
6     as asked.
7     THE WITNESS: So, again, if
8     you're asking me what the defendant
9     has as of the date of sale, they
10    have $1 million in cash.
11 BY MR. ROBERTS:
12    Q    And so their unjust enrichment
13 has gone from $19 million at the time that
14 they had the gold bars to $1 million as a
15 result of making that sale?
16    A    I think the unjust enrichment is
17 different between the two points in time
18 given the asset that they possess at that
19 point in time.
20    Q    And the difference in value at
21 those two points in time is a function of
22 the fact that I, the defendant, have taken
23 that $19 million and sold it for a million
24 dollars, and by engaging in that
25 transaction, I have lowered the unjust

Page 244

1  enrichment from 19 million down to 1
2  million?
3     MR. SULLIVAN: Objection.  If
4     that's a question, form.
5     MR. AARON:  Objection.
6  BY MR. ROBERTS:
7     Q    Is that your view?
8     MR. SULLIVAN:  Objection.
9     Form.
10    THE WITNESS:  So -- so I am
11    saying that the unjust enrichment
12    as of the different points in time
13    are based on the asset that you
14    possess at that point in time.
15 BY MR. ROBERTS:
16    Q    And the -- my unjust enrichment
17 has gone from 19 million to 1 million as a
18 result of the fact that the asset that I
19 own at those two different points in time
20 is different?
21    A    Again, the -- the assets that you
22 possess when you have the -- I forget what
23 asset we are talking about at this point.
24 Gold bars?
25    Q    Gold bars.

Page 245

1     A     The asset that you possess when
2  you take possession of the gold bars is
3  the 19 million in gold bars.
4         The asset that you possess as of
5  the date of sale once the cash is
6  exchanged is a million dollars. It's --
7  it's two different points in time.
8     Q     And therefore my unjust
9  enrichment at those two different points
10  in time is also different, in your view?
11     A     It's different in this
12  hypothetical.
13     Q     And it has been made different by
14  the fact that I, the defendant, have sold
15  the $19 million worth of gold bars and
16  received back $1 million in cash.
17         By engaging in that transaction,
18  I have changed the asset in my possession
19  and therefore changed the amount by which
20  I have been unjustly enriched?
21         MR. SULLIVAN:  Objection.
22     Form.  Compound.
23         THE WITNESS:  And, again, I
24     think that would depend.
25  BY MR. ROBERTS:

Page 246

1     Q     What would it depend on?
2     A     Well, it would depend on when you
3  sold it, what the value of the gold bars
4  was as of that date.
5         You know, if you sold it three
6  years later and the price of gold fell,
7  that -- that would impact.  There would be
8  other factors that need to be considered
9  within that hypothetical.
10     Q     Are you aware of any economic
11  principles that say businesses will make
12  money?
13         MR. SULLIVAN:  Objection.
14     Asked the witness to speculate.
15         THE WITNESS:  I know that -- I
16     know that for-profit entities,
17     their mission is to make profit.
18  BY MR. ROBERTS:
19     Q     And many of them do not succeed,
20  correct?
21         MR. SULLIVAN:  Objection.
22         THE WITNESS:  I don't know if
23     many.  Certain businesses make
24     profit.  Certain businesses don't
25     make profit.

Page 247

1  BY MR. ROBERTS:
2     Q     Let me ask you to turn to page
3  13.
4         In the very top it says, "No
5  rational economic actor would incur the
6  cost profited in the Kidder report to
7  generate revenues of approximately
8  $1.1 million."
9         Do you see that?
10     A     I do.
11     Q     Is it your view that the
12  defendants in this case were attempting to
13  incur those costs in order to generate the
14  $1.1 million in revenue?
15     A     So when -- can you say -- I'm
16  sorry, can you explain what you mean?
17  Were they attempting to --
18     Q     Right.
19         You say no rational economic
20  actor would do A in order to get B.  That
21  is the form of the sentence.  That is the
22  structure of it.
23         Correct?
24         MR. SULLIVAN:  Objection.
25     Form.  Asked the witness to

Page 248

1     speculate.
2         THE WITNESS:  So the sentence
3     says, "No economic actor would
4     incur the cost proffered in the
5     Kidder report to generate revenues
6     of approximately $1.1 million."
7  BY MR. ROBERTS:
8     Q     Right.
9         No one would do X in order to get
10  Y.  That is the structural form of that
11  sentence.
12         Would you agree?
13         MR. SULLIVAN:  Objection.  I
14     think it misstates the witness's
15     testimony.
16         THE WITNESS:  So what I am
17     saying there is the defendants as
18     economic rational actors would not
19     incur $19 million of costs in order
20     to generate $1.1 million.
21  BY MR. ROBERTS:
22     Q     And the defendants as rational
23  economic actors would steal $19 million
24  worth of data in order to generate
25  $1.1 million worth of revenue.

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 65 of 137 PageID 9223
Confidential
Connectus, LLC vs.
Dana Trexler Smith                                          Ampush Media, Inc., et al.

Page 249

1    Not that that's what they did,
2  but that would be economically rational
3  for them, right?
4         MR. AARON:  I am going to
5  object.  Form.  Assumes facts not
6  in evidence, and assumes the value
7  was worth $19 million.
8         MR. SULLIVAN:  And
9  objection -- Same objections and
10  improper hypothetical.
11        THE WITNESS:  Yeah.  Again,
12  you're assuming that they -- it's
13  making the assumption that the
14  $19 million is a valid
15  representation of the costs that
16  they would incur and I am saying
17  that that is economically
18  irrational in order to generate
19  $1.1 million in revenue.
20  BY MR. ROBERTS:
21  Q    Correct.
22        If you wanted to generate
23  $1.1 million in revenue, it would be a
24  terrible idea to go and buy things for
25  $19 million in order to generate that

Page 250

1  1.1 million.  No disagreement.
2         But it would be completely
3  rational if you wanted to generate
4  $1.1 million to steal the data and then
5  sell it for $1.1 million because by
6  stealing it, you have no cost, right?
7         MR. SULLIVAN:  Objection.
8  Asked the witness to speculate.
9         THE WITNESS:  So, again, this
10  is just a hypothetical.  I think it
11  is out of context of what we are
12  talking about here.
13        What we are talking about here
14  in the Kidder report is he assumes
15  that there are these very high
16  costs for every record that comes
17  in the door when, in fact -- and
18  that there's going to be, quote,
19  value, attached to those records,
20  you know, based on the amount that
21  DGS EDU -- the amount that he
22  assumes DGS EDU was paying eDegree
23  and not every lead turns into --
24  I'm sorry, not every record turns
25  into a paid lead, and the cost --

Page 251

1  you know, we are using 19 million
2  as the high end of that range --
3  but that the cost is not
4  representative and had he stepped
5  back and said do these costs make
6  sense with the revenue that's being
7  generated, or any of the other --
8  the -- any of the other data
9  available in this case, does this
10  make sense.  And that is the point
11  we are trying to make.
12        His damages calculated don't
13  make sense when you put it in
14  context of the other information
15  that's available in this case.
16        MR. ROBERTS:  I move to strike
17  as non-responsive.
18  BY MR. ROBERTS:
19  Q    Let me ask you to turn back to
20  page 12.
21        MR. AARON:  Is Mr. Kidder
22  still on the phone or --
23        MR. ROBERTS:  I think not.
24  That's what that sounds like.
25  Sounds like he hung up.

Page 252

1         (Whereupon a Discussion is
2  Held Off the Record.)
3  BY MR. ROBERTS:
4  Q    Footnote 48 you say, "Elite is
5  defined in the Kidder report as a
6  collection of contact and other
7  information for a prospect.  I understand
8  that the definition used for elite in the
9  Kidder report is different from what the
10  industry considers elite."
11        Do you see that?
12  A    I do.
13  Q    What is that understanding based
14  on?
15  A    It was based on reading
16  deposition transcripts and discussions
17  that I had with Mr. Darwal.
18  Q    Okay.
19        Do you have any independent basis
20  for knowing what the industry considers to
21  be elite?
22  A    No, just based on my discussions
23  and information in the record.  This was
24  to clarify my understanding and maybe some
25  differences between the way that I was

Page 253

1  looking at it and he was looking at it
2  just so the rest of the report read with
3  that understanding.
4     Q    Did you look at the transcript
5  from Higher Ed Growth in forming this
6  opinion?
7        MR. SULLIVAN:  Objection.
8     Asked and answered.
9        THE WITNESS:  Can you remind
10    me whose deposition that was?  I
11    might recognize the name.
12  BY MR. ROBERTS:
13    Q    Kolin Porter.
14    A    Yes.
15        (Reporter Clarification.)
16  BY MR. ROBERTS:
17    Q    Did you -- what did Mr. Porter
18  tell you elite was in that transcript?
19    A    I don't remember how he defined
20  elite sitting here.
21    Q    Okay.
22        Did you take that into
23  consideration in deciding that
24  Mr. Kidder's definition was wrong?
25    A    I -- I am just saying I

Page 254

1  understand he's using it differently
2  than -- than what I understand the
3  industry considers elite and so I was
4  putting some definition around what my
5  understanding is and just basically
6  stating the language that I will use in
7  the remainder of this section, that it's
8  in -- so that it's consistent with the way
9  in which Mr. Kidder uses it in his report,
10  it's simply to clarify.
11        I am not -- I am not making a
12  point as to whether or not he's right or
13  wrong.  I am just saying I understand it's
14  used differently, and I am adopting his
15  definition in the rest of this section.
16    Q    Okay.
17        You then say, "I understand that
18  in this industry the date" -- "this data
19  is referred to as a search."
20        Do you see that?
21    A    I do.
22    Q    Search is a verb, is it not?
23    A    Well to search is a verb, yes.
24    Q    So you are using a search as
25  being a noun to refer to a collection of

Page 255

1  information?
2     A    (Reviewing.)  A -- let me re-read
3  what he has here.
4        (Reviewing.)  That's how I've
5  heard it referred to.
6     Q    So if I have a collection of
7  information sitting in my database about a
8  prospect, you would call that a search?
9        MR. SULLIVAN:  Objection.  I
10    think it misstates the witness's
11    testimony.
12        THE WITNESS:  I -- my
13    understanding is that is what a --
14    that the industry has referred to
15    it as.  I have -- I have referred
16    to it as a record.
17  BY MR. ROBERTS:
18    Q    Let me ask you to turn back to
19  page 13.  The second bullet point you say,
20  "Awarding these avoided costs would create
21  a windfall to the plaintiff."
22        Do you see that?
23    A    (Reviewing.)  Yes.
24    Q    Does awarding unjust enrichment
25  always create a windfall to the plaintiff

Page 256

1  where the plaintiff doesn't claim lost
2  profits?
3        MR. SULLIVAN:  Objection.
4     Calls for the witness to speculate.
5        MR. AARON:  Form.  It's
6     misleading.
7        THE WITNESS:  I -- I don't
8     know.
9  BY MR. ROBERTS:
10    Q    Well, if the plaintiff isn't
11  claiming lost profits -- they are not
12  claiming advancing a claim for lost
13  profit.  Then giving them the other side's
14  unjust enrichment, gives them money that
15  they have not attempted to claim through
16  lost profits.
17        Wouldn't that be a windfall under
18  your use of the term?
19        MR. SULLIVAN:  Objection.  It
20    asks the witness to speculate.
21    Form.
22        THE WITNESS:  Can you say that
23    again?
24  BY MR. ROBERTS:
25    Q    Yeah.

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 67 of 137 PageID 9225
**Dana Trexler Smith**                                        Confidential                  **Cornelius, LLC vs.**
                                                                                             **Ampush Media, Inc., et al.**

Page 257

1       What is your understanding of the
2   term "windfall" as you used it in this
3   sentence?
4      A    So I am using that to -- let me
5   just read it again.
6       (Reviewing.)  So I am using that
7   term to show that the revenue -- that the
8   revenues -- profits generated by these
9   records was $900,300 to DGS EDU and that
10  an award of up to $19 million would be
11  greater -- greater than the payments that
12  were generated from these leads, which
13  suggest that these leads may be worth less
14  than the avoided cost calculation.
15     Q    Do you know how much the
16  plaintiff in this case was harmed as a
17  result of the defendants' actions?
18       MR. SULLIVAN:  Objection.
19       MR. AARON:  Objection.  Form.
20       THE WITNESS:  My understanding
21    is that the -- whether the
22    plaintiff was harmed and the amount
23    by which has not been calculated by
24    Mr. Kidder nor myself.
25  BY MR. ROBERTS:

Page 258

1     Q    Okay.
2       So you have not attempted to
3   calculate the harm to, for example, the
4   plaintiff's reputation, correct?
5       MR. SULLIVAN:  Objection.
6   Asked and answered.
7       THE WITNESS:  No, neither I
8    nor Mr. Kidder calculated that
9    amount --
10  BY MR. ROBERTS:
11    Q    Okay.
12    A    -- if any.
13    Q    You are aware that both
14  Mr. Kidder -- well, then maybe you would
15  be aware if Mr. Marinucci have asserted
16  that the plaintiff has, in fact, been very
17  grievously harmed by the defendant in this
18  case.
19       Are you aware of that?
20    A    I am aware that some assertions
21  have been made that the plaintiff has been
22  harmed, but I see no calculations
23  proffered by Mr. Kidder or anybody else
24  putting a dollar value to that.
25    Q    Okay.

Page 259

1       So you don't know sitting here
2   today, for example, whether the
3   $19 million number, if awarded, would be
4   greater than or less than the actual
5   magnitude of harm that was done to the
6   plaintiff by the defendants' actions?
7       MR. SULLIVAN:  Objection.
8   Asked and answered.
9       THE WITNESS:  My understanding
10   is that there has been no dollar
11   amount proffered with respect to
12   any actual harm sustained, if any,
13   by the plaintiff.
14  BY MR. ROBERTS:
15    Q    Correct.
16       And therefore, because there has
17  been no dollar either proffered and you
18  have engaged in no calculation, you cannot
19  say one way or the other whether the
20  $19 million is greater than or less than
21  the fair value of the harm, if any,
22  suffered by the plaintiff?
23       MR. SULLIVAN:  Objection.  It
24   asked the witness to speculate.
25       THE WITNESS:  So I -- I am

Page 260

1   unaware of what the value of that
2    harm is.
3   BY MR. ROBERTS:
4    Q    Okay.
5       And because you are unaware of
6   the value of that harm, you don't know
7   whether if the plaintiff received
8   $3 million or $19 million, whether or not
9   that would be a windfall or whether that
10  would end up roughly compensating for its
11  injuries or whether that would still be
12  much less than the value of its injuries
13  as a result of the actions today?
14       MR. SULLIVAN:  Objection.
15   Form.  Asked and answered and
16   asking the witness to speculate.
17       THE WITNESS:  Again, I -- I
18   have seen no many -- I have seen no
19   information with respect to any
20   dollar value of actual harm to the
21   plaintiffs.
22  BY MR. ROBERTS:
23    Q    Okay.
24       You understand that the concept
25  of a windfall is the concept of an

Dana Trexler Smith                                                    Connectus, LLC vs.
                                                                     Ampush Media, Inc., et al.

Page 261

1  unjustified benefit --
2       MR. SULLIVAN:  Objection.
3  BY MR. ROBERTS:
4     Q    -- correct?
5       MR. SULLIVAN:  Objection.
6  Asked and answered.
7       THE WITNESS:  I'm sorry,
8  again.
9  BY MR. ROBERTS:
10    Q    A windfall is an unjustifiable
11 benefit, correct?
12      MR. SULLIVAN:  Objection.
13 Asked and answered.
14      THE WITNESS:  Again, I have --
15 I understand that the -- yes, I am
16 saying that it would be -- it would
17 be awarding too much to the
18 plaintiffs for the amounts
19 generated by these leads.
20 BY MR. ROBERTS:
21    Q    Wouldn't -- in order to determine
22 whether or not it would be a windfall,
23 wouldn't you have to compare the amount
24 claimed in unjust enrichment with the
25 amount of harm suffered by the plaintiff

Page 262

1  in order to determine whether the
2  plaintiff would or would not receive a
3  windfall as a result of that award?
4       MR. SULLIVAN:  Objection.  It
5  asks the witness to speculate and
6  form.
7       THE WITNESS:  Well, again, I
8  am looking at this comparing the
9  avoided costs in the Kidder report.
10      When I am talking about a
11 windfall, the windfall I am talking
12 about is when you look at the
13 avoided costs calculated in the
14 Kidder report and you compare it to
15 the revenue generated from the
16 leads at issue -- from the records
17 at issue in this case.
18      And I am saying that the
19 amounts of revenue generated or
20 profits generated by these leads
21 suggest that it's about $900,000,
22 which is nowhere close to the 19
23 million.
24      That is how I am using it in
25 this sentence.

Page 263

1  BY MR. ROBERTS:
2     Q    So you're comparing avoided costs
3  to the defendants with revenue to the
4  defendants, but you are not comparing
5  avoided costs to the defendant with harm
6  to the plaintiff, correct?
7       MR. SULLIVAN:  Objection.  It
8  misstates the witness's testimony.
9       THE WITNESS:  So, again, I
10 am -- I am comparing the profits
11 made by the defendants with respect
12 to the eDegree records to the
13 avoided costs that the plaintiff
14 claims through the Kidder report.
15      I have no information
16 available on any actual harms
17 suffered by the plaintiff.
18 BY MR. ROBERTS:
19    Q    And so it's entirely possible
20 that if the judge awards $19 million to
21 the plaintiff, that the plaintiff will be
22 brought barely back up to the level it
23 would have been in but-for the defendants'
24 conduct.
25      You just don't know whether

Page 264

1  that's true or not true, correct?
2       MR. SULLIVAN:  Objection.
3  Form.  It asks the witness to
4  speculate.
5       THE WITNESS:  I have no
6  information that would allow me to
7  answer that one way or other.
8  BY MR. ROBERTS:
9     Q    So you don't intend to offer at
10 trial an opinion about whether or not the
11 amount of money the plaintiff is asking
12 for is more or less than the actual harm
13 suffered by the plaintiff?
14    A    I am not offering any opinion on
15 the actual harm suffered by the plaintiff.
16 I have no information to do so.
17    Q    And you have no information to
18 decide whether or not the amount of money
19 requested in the Kidder report is greater
20 or less than the amount of harm actually
21 suffered by the plaintiff?
22      MR. SULLIVAN:  Objection --
23      THE WITNESS:  I have no --
24      MR. SULLIVAN:  -- form, and
25 asked the witness to speculate.

Dana Trexler Smith

Page 265

1    THE WITNESS:  I have no
2  information on the actual harm
3  for -- the plaintiff's actual harm
4  because it's not been calculated or
5  proffered by them.
6  BY MR. ROBERTS:
7    Q    Okay.
8      Down below on page 13, you say,
9  "The" -- and this is the second-to-last
10  bullet.  You say, "The avoided cost
11  overstate the actual value of the data
12  because it assumes that each lead will
13  result in revenue generation, which is
14  contrary to actual experience."
15      Do you see that?
16    A    I do.
17    Q    What percentage of the leads that
18  the defendant received from the
19  plaintiff -- and using lead as Mr. Kidder
20  does as a collection of information about
21  a prospect -- what percentage of those
22  leads resulted in revenue generation for
23  the plaintiff?
24    A    I need to -- I don't have the
25  records in front of me, but I know it was

Page 266

1  a much smaller percentage.  Even if you
2  look at just the information that we had
3  on the -- what we referred to earlier as
4  pre-qualified leads, which I think were
5  about -- it was about 59,000 records, I
6  believe even of those only 35,000 roughly
7  ended up becoming what we have used the
8  term "qualified lead" and those were of
9  the pre-qualified records.
10      There were many other records for
11  which they neither became qualified nor
12  disqualified.  So I can't tell you the
13  percentage sitting here.  I would be able
14  to look at that if I had my files in front
15  of me, but I don't.
16    Q    For the records that were neither
17  qualified or disqualified, what percentage
18  of them were re-monetized by the
19  plaintiff?
20    A    Let me see.
21      (Reviewing.)  I am not going to
22  be able to do this in my head, but I can
23  give you the numbers so that we could
24  compute it later.
25      Let me get to the right place.

Page 267

1      (Reviewing.)  So of the
2  approximately 3.5 million records that we
3  were talking about earlier --
4      (Reviewing.)  So of about the
5  3.5 million records, I am going to say
6  about 38,000 of them were monetized into
7  what we've called qualified leads, whether
8  they were primary qualified leads or the
9  secondary qualified leads that we talked
10  about.
11    Q    How many of them were monetized
12  into bulk datasets?
13    A    We don't have the information
14  which would enable us to determine on a
15  record-by-record basis how many of those
16  related to bulk data sales.
17    Q    So based on your analysis, the
18  defendants received 3.5 million records
19  from the plaintiff, and the only thing you
20  can say about them is that roughly 35,000
21  of them were re-monetized.
22      Is that -- do I have the math
23  right?
24    MR. SULLIVAN:  Objection.  I
25  think you misstate the witness's

Page 268

1  testimony.
2    THE WITNESS:  No.  You had
3  asked me about the percentage of
4  leads that were -- that became
5  qualified leads.  That's what I was
6  answering.
7      I wasn't talking about
8  monetized through ancillary sales.
9  So it was about -- what did I
10  say -- 30 -- about 38,000 of the
11  3.5.
12  BY MR. ROBERTS:
13    Q    So let me ask my question again.
14      The -- in your understanding of
15  the data, the defendants receives
16  3.5 million records from the plaintiff,
17  correct?
18    MR. SULLIVAN:  Objection.  I
19  think that misstates the witness's
20  testimony.
21    THE WITNESS:  Yeah, I was
22  talking about the -- the records
23  that we were looking at here
24  from --
25  BY MR. ROBERTS:

Page 269

1    Q    Okay.
2    A    -- from Exhibit 8.
3    Q    How many records in your
4  understanding did the defendant receive
5  from the plaintiff?
6    A    I guess I need to qualify.  I am
7  not talking about individual names when I
8  am referring to this information.  I
9  believe these are the posts that we are
10  talking about here.
11    Q    Okay.
12        And each post was a search by the
13  plaintiff against the defendant, as you
14  understand it?
15        MR. SULLIVAN:  Objection.  I
16    think it misstates the witness's
17    testimony.
18        Which year are we talking
19    about?
20        MR. ROBERTS:  I am trying to
21    figure out when she says
22    3.5 million, what that is.
23        THE WITNESS:  Those are the
24    records that are denoted in
25    Exhibit 8.

Page 270

1  BY MR. ROBERTS:
2    Q    Okay.  That's where they are.
3        What are they?  They signify
4  what?
5    A    My understanding is that those
6  are posts of --
7    Q    From?
8    A    -- the individual records -- oh,
9  I'm sorry -- from DGS 193 and DGS 164 to
10  192.
11    Q    Sorry.  From what entity to what
12  entity?
13    A    Those are the records that were
14  originally pinged from eDegree to DGS.
15    Q    So how many such pings are you
16  saying there were?
17    A    From these records here, it looks
18  like about 3.5 --
19    Q    Okay.
20    A    -- million.
21    Q    So there were approximately
22  3.5 million pings from the plaintiff to
23  the defendant, and of that 3.5 million
24  pings, how many of them in total were
25  re-monetized in any form, meaning

Page 271

1  secondary qualified leads, ancillary data
2  sales, how -- what percentage of that
3  3.5 million did you discover as being
4  re-monetized?
5    A    I can't answer that question
6  because we don't have the record-level
7  data for ancillary sales.
8    Q    Okay.
9        If you were to find out, as a
10  hypothetical, that every single ping sent
11  from the plaintiff to the defendant was
12  re-monetized multiple times through
13  ancillary data sales, would your opinion
14  change?
15    A    I think it would be inconsistent
16  with the data that I have seen given --
17  given the volume of ancillary sales.
18    Q    Okay.
19        When you say it would be
20  inconsistent with it, would your opinion
21  change as a result of finding out that
22  that was true?
23    A    My opinion of what?
24    Q    Your opinion of whether or not
25  the avoided cost overstate the value of

Page 272

1  the data because it assumes that each lead
2  will result in revenue generation which is
3  contrary to actual experience?
4        MR. SULLIVAN:  Objection.
5    Improper hypothetical.
6        THE WITNESS:  (Reviewing.)
7    Okay.
8        And I'm sorry.  What was
9    your -- what was your question one
10    more time?
11  BY MR. ROBERTS:
12    Q    If you were to find out that
13  every single ping sent from the plaintiff
14  to the defendant was re-monetized multiple
15  times --
16    A    Hm-hm.
17    Q    -- either through transmission to
18  a call center and subsequently being
19  called and qualified as what you called a
20  secondary qualified lead, or through bulk
21  data sales, how would that impact your
22  opinion as expressed here in the third
23  bullet point on page 13 of your report?
24        MR. AARON:  Objection.  Form.
25    Assumes facts not in evidence.

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 71 of 137 PageID 9229
Confidential   Cornelius, LLC, et al. vs.
Dana Trexler Smith                                Ampush Media, Inc., et al.

Page 273

1       MR. SULLIVAN:  Objection.
2   Vague.
3       THE WITNESS:  So I still think
4   it's my opinion that the avoided
5   costs in the Kidder report
6   overstate the actual value of the
7   data because there are errors in
8   that avoided cost calculation.
9       I also think -- it's also
10  assuming that each lead will result
11  in revenue generation, which is
12  inconsistent with the information
13  that I have seen in the records.
14  BY MR. ROBERTS:
15   Q    Okay.
16       So it's fair to say that your
17  opinion is predicated on, number 1, the
18  fact that as you have looked at the data,
19  not every ping from the defendant to the
20  plaintiff -- from the plaintiff to the
21  defendant was monetized.
22       And number 2, that -- well, let's
23  start with that.
24       Actually, I am going to strike
25  the whole question, and we are going to

Page 274

1   just move on.  It's getting a little
2   complicated.
3    A    When you have a chance, if we can
4   take a bio break.  I can go a little bit
5   longer, but I just want to give you a
6   heads-up.
7    Q    Okay.
8       I am just -- I am going to have
9   another beer question, and then we will do
10  a bio break.
11   A    Okay.
12   Q    If I steal a case of beer and
13  then let it go bad in my garage, it
14  spoils, did I avoid the cost of buying the
15  beer even if it didn't result in any
16  revenue to me?
17       MR. SULLIVAN:  Objection.
18  Form.  Asking the witness to
19  speculate.
20       THE WITNESS:  If you steal the
21  beer --
22  BY MR. ROBERTS:
23   Q    I am going to withdraw the
24  question.  Let's take a bio break.
25       THE VIDEOGRAPHER:  Off the

Page 275

1   record at 3:05.
2       (Whereupon a Recess Commenced
3   at 3:05 and Testimony Recommenced
4   at 3:18.)
5       THE VIDEOGRAPHER:  We are on
6   the record at 3:18.
7   BY MR. ROBERTS:
8    Q    So page 15 of your report, you
9   say, "Essentially, the Kidder report
10  assumes that the defendants will pay for
11  all searches even those which do not
12  generate revenue at the premium amount
13  that is paid for qualified leads, thus
14  overstating the damage."
15       Do you see that?
16   A    I'm sorry.  Where are you on 15?
17   Q    I will show you.
18       (Reviewing.)  So it's on page 15
19  in the first bullet point, starting
20  halfway through the first bullet point
21  with the word "essentially."
22   A    Okay.  Thank you.
23   Q    And it says again, "Essentially,
24  the Kidder report assumes that the
25  defendants will pay for all searches even

Page 276

1   those which do not generate revenue at the
2   premium amount that is paid for a
3   qualified lead, thus overstating the
4   damages."
5       Do you see that?
6    A    I do, yes.
7    Q    Why do you say the Kidder report
8   assumes that the defendants will pay for
9   all searches?
10       Isn't he just saying what the
11  value was of those searches?
12       Why is it an assumption that the
13  defendants will pay for them?
14   A    (Reviewing.)  I guess it should
15  say "would pay."
16   Q    Right.  Would under -- would
17  seems like it's a hypothetical or it's an
18  alternative but-for world.
19       Why does Mr. Kidder need to
20  assume that the defendants would pay?
21       Doesn't he just have to assume
22  what the value -- what costs they avoided
23  by not paying?
24   A    What --
25       MR. SULLIVAN:  Objection,

Page 277

1    form.  I think it calls for the
2    witness to speculate as to what
3    Mr. Kidder assumed.
4        MR. ROBERTS:  I'm asking why
5    she says that Mr. Kidder makes that
6    assumption.
7        THE WITNESS:  Let me just
8    ground myself to where he is in his
9    report and where I am in my report,
10   please.
11       (Reviewing.)  Okay.  I found
12   where he is saying that, so let me
13   go back and read this in context.
14       (Reviewing.)  Okay.  So what
15   he's doing in his analysis is he
16   assumes that every eDegree -- in
17   his calculation, he's inherently
18   assuming that every eDegree lead
19   hosted by Ampush, DGS EDU would --
20   that the cost for each one of those
21   leads would be the dollar amount by
22   which he determined that DGS ED --
23   EDU paid eDegree for those leads.
24   BY MR. ROBERTS:
25   Q    Okay.

Page 278

1        Let's do it -- if we could do it
2    a different way.
3        Would you agree that it would be
4    a proper methodology to say what would it
5    have -- if they had not paid -- strike
6    that.
7        Would it be a proper methodology
8    under your view to look at what the cost
9    of those leads was by analyzing how much
10   it would have cost the defendants to
11   develop that lead themselves if they had
12   not gotten it from the plaintiff?
13   A    So let me rephrase your question
14   to make sure I am understanding it.
15       You're asking me if it would be a
16   proper methodology to calculate the
17   defendants' cost to organically generate a
18   record?
19   Q    Yes.  You seem to have criticism
20   for Mr. Kidder using the contract price.
21       If instead of the contract price,
22   one were to use the defendants' organic
23   cost for growing a lead up to the point
24   where it could be accepted or rejected by
25   a university, so not the cost of a

Page 279

1    qualified lead but the cost of developing
2    a lead organically up to the point where a
3    university can say yes or no, would you
4    agree that that is an appropriate measure
5    of the avoided cost the defendants
6    received by taking the lead from the
7    plaintiff?
8        MR. SULLIVAN:  Objection.
9    Form.
10       MR. AARON:  Objection.  Form.
11       THE WITNESS:  So putting it in
12   my words, it could be appropriate
13   to calculate the defendants' -- it
14   could be appropriate to calculate
15   the cost that the defendant would
16   have incurred to organically
17   develop a lead, but that's not what
18   this is.
19   BY MR. ROBERTS:
20   Q    Okay.
21       Did you see in Mr. Darwal's
22   testimony, his estimate for the cost to
23   the defendant of organically generating a
24   lead?
25   A    I saw that he had some testimony,

Page 280

1    but I believe that related -- and I don't
2    have the testimony in front of me.  I
3    believe that related to a subset of the
4    population that he was being asked about.
5        I don't believe that was the
6    entire population of all leads.
7    Q    I think he was being asked --
8    tell me if you disagree -- about the
9    population of leads that they grow
10   organically, meaning on the Internet, and
11   his testimony was that it was
12   approximately $25 per lead.
13       Is that consistent with your
14   memory?
15   A    No.  I think that's out of
16   context.  I think he was referring to a
17   smaller subset when he gave his answer.
18       I would need to see the
19   deposition testimony, but my recollection
20   is that there -- that that was referring
21   to a subset of the population.  It may
22   have related to organic leads, but I think
23   it was a subset of those.
24   Q    Okay.
25       Would another way to calculate

Page 281

1 the avoided costs be to say what would it
2 have cost the defendant to purchase the
3 lead or a comparable lead from another
4 third-party call center, meaning to
5 compare the contract price for other
6 third-party call centers that the
7 defendant did business with and used that
8 price as a basis to calculate avoided
9 costs?
10        MR. SULLIVAN:  Objection,
11   form.
12        THE WITNESS:  So I think it
13   would depend on those contracts
14   because the way I understand the
15   arrangement between eDegree and the
16   defendants is that a payment is
17   only made to the extent that the
18   lead is accepted by a university.
19     That is what triggers the
20   payment.  The fact that there is a
21   record that gets searched doesn't
22   trigger a payment.  So in order to
23   use as a proxy, the payment terms
24   you would need to understand the
25   contracts between those other --

Page 282

1   other entities in DGS EDU because
2   it sounds like a payment is only
3   made when DGS EDU receives a
4   payment from another third party.
5 BY MR. ROBERTS:
6   Q    Certainly those contracts would
7 be relevant for performing the avoided
8 cost analysis, depending upon their
9 content?
10        MR. SULLIVAN:  Objection.
11   Form.  Asking the witness to
12   speculate.
13        THE WITNESS:  It's possible
14   they are relevant.  Without having
15   looked at those, it would be
16   difficult to say because, you know,
17   the issue here is, you know,
18   Mr. Kidder is looking at all -- the
19   population of all records here and
20   assuming there would be a payment
21   made on those when, in fact, that's
22   contrary to the evidence that I
23   have seen in the record.
24 BY MR. ROBERTS:
25   Q    Okay.

Page 283

1        Is it true in your experience
2 that people take more of something when
3 they don't have to pay for it, meaning do
4 people -- if you are giving away jelly
5 beans -- take more jelly beans than if
6 they were just getting the jelly beans for
7 free?
8        MR. SULLIVAN:  Objection.
9   Asked the witness to speculate.
10        THE WITNESS:  I have no idea.
11   I think it would depend.
12 BY MR. ROBERTS:
13   Q    Okay.
14        Well, you have testified about
15 general economic principles, and one of
16 the general economic principles is that as
17 price goes down, quantity demand
18 increases, correct?
19   A    I'm sorry, say that again.
20   Q    Yeah.
21        Are you familiar with the general
22 economic principles of the supply and
23 demand curves?
24   A    Yes.
25   Q    Okay.

Page 284

1        And the demand curve is generally
2 shaped up and to the right because --
3 sorry, down and to the right, because as
4 price goes down, the quantity demanded
5 increase?
6        MR. SULLIVAN:  Objection.
7   Asked the witness to speculate.
8   Vague.
9 BY MR. ROBERTS:
10   Q    No, I'm asking you about general
11 economic principles.
12        Are you familiar with general
13 economic principles?
14   A    I am, yes.
15   Q    Okay.
16        And in general economic terms,
17 demand curves slope from the upper left to
18 the lower right, generally speaking,
19 because as price drops, the quantity
20 demand goes up, correct?
21        MR. SULLIVAN:  Objection.
22   Form.  Asking the witness to
23   speculate.
24        THE WITNESS:  So generally, in
25   economics, if I understand what you

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 74 of 137 PageID 9242
Confidential

Dana Trexler Smith                                          Cornerstus, LLC vs.
                                                          Ampush Media, Inc., et al.

Page 285

1    are saying, you tend to have price
2    on the vertical axis and you have
3    demand on the horizontal axis where
4    the top line on the horizontal axis
5    would be a higher price than the
6    lower line -- I'm sorry, did I say
7    horizontal?
8        The top line of the vertical
9    axis is a higher price than the
10   lower part of that vertical line
11   and the left-hand side of the
12   horizontal axis is a lower quantity
13   of units than the right-hand side
14   of the horizontal line.
15   BY MR. ROBERTS:
16   Q    And for that reason, the demand
17   curve slopes from the upper left,
18   generally, to the lower right?
19   A    Right.  I am just prefacing my
20   answer for you, with that understanding.
21   Q    Okay.
22   A    And general economic theory
23   states that as price declines, demand
24   increases.  It would depend, though, on
25   the goods, the market, et cetera.

Page 286

1    Q    And in this case, the defendants
2    were assuming that the price of the
3    non-matched leads was zero, right, that it
4    did not have to pay the plaintiff any
5    money for taking a lead that did not have
6    a matched and a qualified submission
7    thereafter --
8        MR. SULLIVAN:  Objection.
9    BY MR. ROBERTS:
10   Q    -- correct?
11       MR. SULLIVAN:  Objection.
12   Form.
13       THE WITNESS:  So, no, we have
14   seen evidence where the lead --
15   there was a payment to the
16   plaintiffs for leads and we also
17   see in the calculation of the
18   secondary qualified lead
19   calculation that there were
20   payments also made to affiliates in
21   that data.  So I disagree with your
22   statement.
23   BY MR. ROBERTS:
24   Q    I am just talking about the
25   relationship between the plaintiff and the

Page 287

1    defendant.
2        The defendant was, as you
3    understand it, operating on the assumption
4    that it did not need to pay the plaintiff
5    unless there was a match and a qualified
6    lead, correct?
7    A    That is my non-legal
8    interpretation understanding of the
9    contract between the plaintiff and the
10   defendants.
11   Q    I understand.  I am not asking
12   you for legal interpretation.  I am just
13   trying to get to basic economics here.
14   A    I am just making sure that's
15   clear on the record that I am not making
16   any kind of legal determination.
17   Q    Clear enough.
18       The defendants assumed that for
19   non-matched leads, they could take all of
20   them because the price -- the marginal
21   price of taking that lead, storing it in
22   their database, ingesting it was zero.
23   Right?
24       MR. SULLIVAN:  Objection.
25       MR. AARON:  Objection.  Form.

Page 288

1        THE WITNESS:  I don't know
2    what the defendants assumed.
3    BY MR. ROBERTS:
4    Q    Well, they weren't paying for it,
5    right?
6        MR. SULLIVAN:  Objection.
7    Misstates the witness's testimony.
8    BY MR. ROBERTS:
9    Q    They weren't paying the plaintiff
10   for it, correct?
11       MR. AARON:  Form.  Assumes
12   facts not in evidence.
13       THE WITNESS:  Well, again, I
14   have seen evidence where they --
15   they paid for records that were
16   submitted by -- that -- you are
17   shaking your head.  I haven't
18   finished my answer.
19   BY MR. ROBERTS:
20   Q    I am not asking about records
21   submitted.
22   A    I'm sorry.
23   Q    I'm not talking about the pinged
24   data.  That was not submitted.
25   A    Okay.

**Dana Trexler Smith**

Page 289

1    Q    So I'm talking about what I call
2  no match leads, I think is what Mr. Kidder
3  uses.  A ping that does not result in a
4  match or if there is a match, no
5  submission is completed -- no submission
6  is consummated.  Okay.
7    A    Thank you for the clarification.
8    Q    Okay.
9         I am going to refer to those as
10  no match leads for a moment.
11    A    Okay.
12    Q    The defendants were operating
13  under the assumption that the marginal
14  cost for saving, storing, possessing,
15  owning, that no match lead was zero
16  because they were not required to pay the
17  plaintiff for any no match leads, correct?
18         MR. SULLIVAN:  Objection,
19    form.
20         THE WITNESS:  Again, I don't
21    know under what assumption the
22    defendants were operating.
23  BY MR. ROBERTS:
24    Q    You have the opinion that the
25  defendants, in this case, if they had to

Page 290

1  pay $24 for each one of those no match
2  leads, would not have purchased them,
3  right?
4         MR. SULLIVAN:  Objection.  I
5    think it misstates the witness's
6    testimony.
7         THE WITNESS:  So, again, my
8    testimony is that they pay for -- I
9    don't know what they would or would
10    not have done.
11         My testimony is that -- my
12    understanding is that the
13    contractual arrangement between the
14    plaintiff and the defendants is
15    that they pay for leads for which
16    they generate revenue on.
17  BY MR. ROBERTS:
18    Q    Let me just back up to what you
19  just said.
20         In no sense should I read
21  anything in your report or in your
22  testimony as an effort to say what the
23  defendants would have done under different
24  circumstances, correct?
25         MR. SULLIVAN:  Objection.  It

Page 291

1    misstates the witness's testimony.
2         THE WITNESS:  I used the
3    phrase in my report "the defendants
4    would have" or "the defendants
5    will" within the context of my
6    report in certain -- certain
7    circumstances.
8         I was referencing -- I think
9    your question had something to do
10    with, you know, would the
11    defendants have purchased this data
12    from the plaintiffs if they weren't
13    going to generate revenue.  That's
14    what I was responding to.
15         And I don't know what the
16    defendants would or would not have
17    done.
18  BY MR. ROBERTS:
19    Q    Isn't your whole report based on
20  this argument that the defendants would
21  not have purchased the data for 19 million
22  if they were only going to get $1 million
23  out of it?
24         MR. SULLIVAN:  Objection.  I
25    think it misstates the report.

Page 292

1         THE WITNESS:  That's not --
2    that's not what the entirety of my
3    report is.  My report has numerous
4    opinions in here which I would be
5    happy to walk you through what they
6    are.
7  BY MR. ROBERTS:
8    Q    That's one of your opinions,
9  correct?
10    A    One of my opinions is that it
11  would be economically irrational for the
12  defendants to pay up to $19 million in
13  costs to obtain leads for which they have
14  only generated $1.1 million, and that
15  suggests that the $19 million does not, in
16  fact, represent the avoided cost for the
17  defendants, that that's overstated.
18    Q    If I steal diamonds worth
19  $19 million and I sell them for 6 bucks,
20  does the fact that I sold them for 6 bucks
21  suggest to you that the diamonds weren't
22  worth $19 million?
23         MR. SULLIVAN:  Objection.
24    Argumentative.
25  BY MR. ROBERTS:

Confidential

Page 293

1      Q    I guess let me ask -- let me
2  strike it and ask it this way:  How does
3  the amount of revenue which the defendants
4  got for the leads suggest what the value
5  or the avoided cost was?
6          MR. SULLIVAN:  Objection.
7  Asked and answered.
8          THE WITNESS:  So if you look
9  at the value of the revenue that
10  the defendants generated -- they
11  are a for-profit entity, and you
12  assume that they are trying to
13  maximize their profits because
14  under general economic theory,
15  that's what a rational for-profit
16  entity actor would do, and you
17  assume that they are trying to
18  maximize the value of each one of
19  these leads in the ordinary course
20  of business.
21      And what they have been able
22  to generate from these records is
23  $1.1 million.  So that suggests
24  that the $19 million that has been
25  proffered as the cost is likely

Page 294

1  overstated as to the value or the
2  cost, however you are using that
3  term, of these leads, and that is
4  the point.
5  BY MR. ROBERTS:
6      Q    Do you know whether the
7  defendants were good at business or bad at
8  business?
9          MR. SULLIVAN:  Objection.
10          THE WITNESS:  I have no
11  opinion on that one way or the
12  other.
13  BY MR. ROBERTS:
14      Q    Okay.
15      So it's entirely possible then,
16  consistent with the pattern you see, that
17  they took $19 million of data and
18  were just absolutely awful at effectively
19  monetizing it.
20      That would be consistent with
21  taking $19 million and receiving
22  $1.1 million from the value of that data?
23          MR. SULLIVAN:  Objection.
24  Form.  Misstates the witness's
25  prior testimony.

Page 295

1          THE WITNESS:  Yeah.  I don't
2  think that is -- is consistent and,
3  you know, what's suggested by the
4  fact that you -- that the
5  defendants could -- would pay
6  $19 million to get leads for which
7  they would generate $1.1 million,
8  which suggests that they would be
9  posting significant losses -- in
10  the hundreds to thousands of
11  percentage point losses, which is
12  inconsistent in the data.
13  BY MR. ROBERTS:
14      Q    Oh, no, they weren't -- they
15  weren't getting losses because they
16  thought they were getting the data for
17  free.
18      Right?
19          MR. AARON:  Objection.
20  BY MR. ROBERTS:
21      Q    Let me ask you this:  If you got
22  a bunch of data for free and you got a
23  million dollars out of it, you would think
24  you had done pretty well, right?
25          MR. SULLIVAN:  Objection.

Page 296

1  BY MR. ROBERTS:
2      Q    I got a million dollars.  It
3  didn't cost me anything.  Look at all the
4  money I made.  I got the data for free and
5  I turned around and sold it for a million
6  bucks.
7      From your perspective, you're
8  doing pretty good, right?
9          MR. SULLIVAN:  Objection.
10          THE WITNESS:  I -- I would
11  think that depends.  That's
12  relative.  And, again, that
13  suggests that the data is worth 19
14  times what -- what you actually
15  generated from it, which just --
16  given all the other errors, the
17  point is that calculating, you
18  know, up to $19 million of cost,
19  it's just out of line with the data
20  and the information, and it's
21  because there are errors in that
22  calculation.
23  BY MR. ROBERTS:
24      Q    Let's take the lower bound, for
25  example, 3.5 million.

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 77 of 137 PageID 9245
Confidential

Dana Trexler Smith                                    Cornelius, LLC vs.
                                                      Ampush Media, Inc., et al.

Page 297

1    Does it strike you as implausible
2  that the defendants got 30 percent of the
3  revenue that could have been obtained
4  through efficient use of the data they
5  took from the plaintiff?
6        MR. SULLIVAN:  Objection.  I
7    think it misstates the witness's
8    prior testimony and the witness's
9    report.
10       THE WITNESS:  Yeah.  Again --
11   it, again, is assuming that lower
12   bound is appropriately calculating
13   the cost -- the cost -- the avoided
14   cost to which I disagree with the
15   calculations for all the reasons in
16   my report.
17 BY MR. ROBERTS:
18   Q    You're avoiding my question.  My
19 question was not do you agree with the
20 mathematical question.
21     We are talking about your
22 argument that -- that $19 million is so
23 much larger than the $1 million; that it
24 is implausible that the 19 million
25 reflects the accuracy of the data because

Page 298

1  it doesn't strike you as possible --
2  reasonably possible that the defendants
3  monetized it for 5 percent of its true
4  value.
5        And I'm asking whether you have
6  the same opinion, that it's implausible
7  that when the defendants monetized it,
8  they obtained 30 percent of its true
9  value.
10  A    Again --
11       MR. AARON:  Objection.  Form.
12   Argumentative too.
13       THE WITNESS:  Again, it would
14   be inconsistent -- the way in which
15   the 3 million -- $3.8 million was
16   calculated, it's inconsistent with
17   the information in the record.
18 BY MR. ROBERTS:
19   Q    That's not the question.
20   A    You can't step away from the --
21       MR. AARON:  Let her answer the
22   question, please.
23       THE WITNESS:  You can't step
24   away from the way in which that
25   3.8 million was calculated.

Page 299

1  BY MR. ROBERTS:
2    Q    Can you answer my --
3    A    I am trying to answer your
4  question.
5    Q    No.
6        Really, I'm asking -- you had
7  made a point, which I am trying to
8  understand, which was without going
9  through the calculations, the sheer
10  difference in magnitude of the 19 million
11  and the 1 million seemed to you to be a
12  problem, or do you not?
13       Do you think there's no problem
14  with 19 million and 1 million; it's all
15  about the methodology used to do the
16  calculation?
17       MR. SULLIVAN:  Objection.
18   Asked and answered.  Misstates the
19   witness's prior testimony.
20       THE WITNESS:  Can you repeat
21   that last question?
22 BY MR. ROBERTS:
23   Q    Yeah.
24       Are you intending to offer the
25 opinion at trial that the sheer magnitude

Page 300

1  of the difference between $19 million and
2  1 million, without reference to the
3  calculations, is itself a factor that
4  indicates that Mr. Kidder's analysis is
5  too high?
6        MR. SULLIVAN:  Objection.
7    Misstates the witness's prior
8    testimony.  Asked and answered.
9    Form.
10       THE WITNESS:  And, again, you
11   need to -- you can't divorce the
12   way in which those values were
13   calculated.
14       I -- I am making the
15   statements in my report with the
16   knowledge that these values were
17   incorrectly calculated, and I am
18   pointing out that had Mr. Kidder
19   stepped back and looked at the
20   analysis, these inconsistencies may
21   have become apparent that, you
22   know, economically the numbers
23   calculated here don't make sense.
24 BY MR. ROBERTS:
25   Q    Does it make sense to you that

Dana Trexler Smith

Cornelius, LLC vs.
Ampush Media, Inc., et al.

Page 301

1    the plaintiff sent 3.4 million pings to
2    the defendants?
3         Does that make sense to you?
4         MR. SULLIVAN:  Objection.
5    Asking the witness to speculate.
6         THE WITNESS:  Does it make --
7         MR. ROBERTS:  Well, she is
8    telling me everything that doesn't
9    make sense.
10   BY MR. ROBERTS:
11   Q    I am wondering, does that number
12   make sense to you?
13        MR. SULLIVAN:  Objection.
14   Argumentative.
15        THE WITNESS:  I have no
16   opinion one way or the other as to
17   the number of pings that were sent
18   from the plaintiffs to the
19   defendants.
20   BY MR. ROBERTS:
21   Q    Okay.
22   A    I am relying on the records that
23   have been provided to me for that
24   information.
25   Q    What is actions cost of media?

Page 302

1    A    (Reviewing.)  I had a definition
2    of this.  Let me find it to make sure I
3    answer you --
4    Q    Footnote 69 on page 17.
5         (Reporter Clarification.)
6         THE WITNESS:  It's defined
7    here as the cost of ads placed on
8    services like Google and Facebook.
9    BY MR. ROBERTS:
10   Q    And the purpose of those ads is
11   organic lead generation for the defendant?
12        MR. SULLIVAN:  Objection.
13        THE WITNESS:  The -- I have to
14   look at what statement this is
15   coming off of.
16        It is for the purposes of
17   organic lead generation.  I am
18   unsure if it just relates -- this
19   number in particular relates to DGS
20   EDU.  I believe the number we are
21   referring to might be for the whole
22   company, and I understand that
23   the -- I am unsure what the legal
24   entity is.  I am going to call it
25   DGS, Inc., the parent company for

Page 303

1    which those financial statements
2    have other lines of business; that
3    may also be included in the actions
4    cost of media and search engine
5    expenses.
6    BY MR. ROBERTS:
7    Q    Got it.
8         So in Table 4, you don't know as
9    you sit here, what the 1.653 actions cost
10   of media is just for DGS EDU or whether
11   it's also for other lines of business
12   within DGS LTD?
13   A    I just don't remember sitting
14   here today which these numbers are.  These
15   are the numbers Mr. Kidder used in his
16   report, and there is a document that
17   provides that underlying detail.  I just
18   can't remember.
19        I think this may have been for
20   the whole company, but I would need to
21   verify with that underlying document.
22   Q    Okay.
23        You say that these are -- and I
24   am looking right above Table 4.  You say
25   they are unrelated to generating revenue

Page 304

1    for qualified or ancillary leads.
2         Do you see that?
3    A    I do.
4    Q    That's not a true statement,
5    correct?
6         MR. SULLIVAN:  Objection.
7    Argumentative.
8         THE WITNESS:  So my
9    understanding based on discussions
10   with Mr. Darwal, that the costs
11   that were included in the actions
12   cost of media and search engine
13   expenses were unrelated to the
14   leads at issue in this case.
15   BY MR. ROBERTS:
16   Q    Okay.
17        You think they are unrelated to
18   the leads that were received from the
19   plaintiff, but they are not unrelated to
20   the cost for the defendant to generate
21   their own organic leads, right?
22   A    I would need to defer to Mr.
23   Darwal on that because I got that
24   information from him.  In the discussion
25   we had, it seemed to make sense in this

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 79 of 137 PageID 9247
Confidential                                                    Cornelius, LLC vs.
Dana Trexler Smith                                             Ampush Media, Inc., et al.

Page 305

1  context.
2      Q    So you don't know one way or the
3  other whether, in fact, actions cost of
4  media and search engine expenses, as
5  listed in Table 4, are or are not related
6  to the costs of generating revenue for
7  qualified or ancillary lead sales where
8  DGS EDU does so organically?
9          MR. SULLIVAN:  Objection.
10  Asked and answered.
11         THE WITNESS:  I would need to
12     look at the underlying records.  I
13     had that information available.  I
14     just need the underlying records in
15     order to answer your question.
16  BY MR. ROBERTS:
17     Q    What record do you need?
18     A    I don't know which Bates number
19  it is, but there was a document that set
20  forth these -- I think there were two
21  documents.  One was for the Ampush time
22  period, and one was for the time period
23  after the sale to DGS.
24         There were -- there were some
25  documents that underlied those expenses.

Page 306

1      Q    Okay.
2          You say that the amounts in Table
3  4 are slightly different from the amounts
4  in Exhibit 3.5 to the Kidder report
5  because he does not use the actual cost of
6  goods sold for the period July 15th
7  through October 15th but approximates them
8  using June 2015 data.
9          Do you see that?
10     A    I do.
11     Q    Was that data -- that actual data
12  was provided to you by counsel, correct?
13     A    (Reviewing.)  What do you mean
14  the actual -- data upon which I relied?
15     Q    Yes.
16     A    I imagine it was produced by the
17  defendant.  I received it through the
18  document production.
19     Q    Okay.
20         When did you first get that, and
21  I am specifically thinking about the G&L,
22  the general ledger data?
23     A    I don't know.  Sometime before
24  the issuance of my report.  I would be
25  unable to give you an exact date.  I would

Page 307

1  say it was within a week of the issuance
2  of my report.
3      Q    Did you ask for it?
4      A    I am sure I did, yeah.
5      Q    And how long between the time
6  that you asked for it and the time it was
7  provided?
8      A    I -- I wouldn't know.
9      Q    Was it weeks and weeks, or was it
10  a day?
11     A    Oh, it was --
12         MR. SULLIVAN:  Objection.
13  Asked and answered.
14         THE WITNESS:  Yeah.  It was
15     not weeks and weeks.  I would say
16     it was within a day or two or three
17     of asking for it.
18  BY MR. ROBERTS:
19     Q    So within a day or two or three
20  of your asking for the general ledger
21  data, the defendants were able to provide
22  it to you, and they did provide it to you,
23  in your memory, about a week before you
24  signed the report?
25         MR. SULLIVAN:  Objection.

Page 308

1          THE WITNESS:  It was
2     sometime --
3          MR. SULLIVAN:  Asked and
4     answered.
5          THE WITNESS:  It was sometime
6     within a week before issuing my
7     report, give or take.
8  BY MR. ROBERTS:
9      Q    Okay.
10         General ledger data of the kind
11  that you used in preparing this report is
12  useful in generating a damages report,
13  generally?
14         MR. SULLIVAN:  Objection.
15  Calls for speculation.
16         THE WITNESS:  I mean,
17     generally speaking, I look at -- in
18     certain cases, it's more relevant
19     than in other cases.
20         Sometimes I am able to
21     identify the information without
22     looking at the general ledger.  I
23     can look at financial statements.
24     I can look at other financial
25     records.

Page 309

1    Other times looking at the
2  general ledger is useful or the
3  trial balance.  It really depends.
4  BY MR. ROBERTS:
5    Q    Page 18 of your report.  Last
6  sentence.
7    You say, "Essentially, the Kidder
8  report makes the assumption that there is
9  a relationship between the number of
10  searches, leads in the Kidder report, and
11  the number of qualified leads, posts in
12  the Kidder report, that result without any
13  analysis to demonstrate this
14  relationship."
15    Do you see that?
16    A    I do.
17    Q    Okay.
18    In your understanding of the
19  Kidder report, as you interpret it, posts
20  are qualified leads?
21    A    Let me go back, because I want to
22  look -- he defines -- I think he defines
23  post as qualified leads that are outside
24  of the DGS EDU relationship.
25    So let me -- you asked me how he

Page 310

1  defines posts?
2    Q    Well, I'm asking you -- on page
3  18 of your report, you say, "And the
4  number of qualified leads," paren, "posts
5  in the Kidder report."
6    And I am specifically asking you
7  about that sentence where you use a
8  parenthetical to indicate that the number
9  of qualified leads is equivalent to posts
10  in the Kidder report.  And I'm asking you
11  if that's correct.
12    A    Okay.  Let me -- let me spend a
13  minute reading it here.
14    (Reviewing.)  So I think he is --
15  he is defining posts as the transmission
16  of a lead to a third party that is not a
17  university.
18    And he goes on to say,
19  "Throughout this report I use the term
20  'post' only in reference to leads that
21  were transmitted by Ampush, DGS EDU to
22  third parties that are not universities.
23  A lead that is transmitted to a university
24  is submitted."
25    And then he has definition for

Page 311

1  that.
2    Q    Okay.
3    So looking at the last sentence
4  on page 18, you say that the number of
5  qualified leads are posts in the Kidder
6  report.
7    And after having now reviewed the
8  Kidder report, do you think your statement
9  is correct?
10    A    I think --
11    (Reviewing.)  I need to look at
12  his exhibit too as well.  Okay.
13    This is a little bit of a tangled
14  web.
15    (Reviewing.)  Do you have DGS 229
16  available?  That is the underlying
17  document that will allow me to answer your
18  question.
19    Q    Is that cited in the Kidder
20  report?
21    A    Pardon me?
22    Q    Is it cited in the Kidder report?
23    A    It is.  It is --
24    Q    You have the whole Kidder report
25  and all the exhibits right there.

Page 312

1    A    No.  DGS 229 is something he
2  relies on for his schedule 3.5, and I need
3  that document because this -- this is
4  something that took us a while to
5  decipher, and I need to look at the
6  underlying document.
7    Q    I'm sorry.  I don't have it for
8  you.
9    Without that document, can you
10  tell me whether the posts in the Kidder
11  report are qualified leads?
12    A    I would have to look at that --
13  at that document to understand this
14  comparison because it's from that document
15  that I would -- I would see how he's
16  defining it.
17    It's possible that I used an
18  incorrect word here.  In which case, you
19  know, I would be happy to update that.
20  You know, I am comfortable that the
21  underlying comparison that's made is
22  incorrect.  I just -- I can't answer your
23  question as I sit here without that
24  document.
25    Q    So is it incorrect that you don't

**Dana Trexler Smith**

Page 313

1  know actually what comparison he was
2  making?
3     A    I know he made it an un -- he
4  made an unrelated comparison.  I believe
5  the comparison he was making is assuming
6  that the total records --
7        (Reviewing.)  I think I clarify
8  it over here.
9        He's assuming a relationship
10  between the number of searches, records,
11  and the number of -- so the number of
12  pings, I think is the term he uses.  I
13  think he is making -- if I recall
14  correctly, he's making an assumption that
15  there is a relationship between the number
16  of pings from eDegree to DGS EDU and the
17  number of actual posts that then occur
18  between DGS EDU and third parties.
19     Q    And in your view, he can't be
20  doing that because we don't know what
21  posts were made from DGS EDU to third
22  parties?
23        MR. SULLIVAN:  Objection.
24     Misstates the witness's testimony.
25     Ask the witness.

Page 314

1  BY MR. ROBERTS:
2     Q    Well, do we have, in your
3  opinion, individual post data to know
4  what -- I won't use post data --
5  individual ancillary data sales per record
6  sales to show which records were sold by
7  DGS EDU to third parties?
8     A    I am referring to qualified
9  leads.
10     Q    You say, "The Kidder report makes
11  the assumption that there's a relationship
12  between the number of searches, that's
13  ping, and the number of qualified lead,
14  posts."
15        I am going to ask you to assume
16  for a moment that when Mr. Kidder uses the
17  word "posts," he's referring to ancillary
18  data record sales.
19     A    (Reviewing.)  Okay.
20        Then I need to look -- I need to
21  look at that underlying document because I
22  don't -- I don't think he made the right
23  comparison here.
24     Q    Okay.
25     A    I need to see the underlying data

Page 315

1  in order to answer your question.
2     Q    I'm just asking you to make an
3  assumption.
4     A    Okay.
5     Q    Assume when Mr. Kidder talks
6  about posts, he's talking about an
7  ancillary data record sale.
8     A    Okay.
9     Q    Not a qualified lead.
10     A    Okay.
11     Q    Okay.
12        If that is the case, then the
13  criticism here at the bottom of page 18 is
14  misplaced because you assumed that he was
15  making a relationship between the number
16  of searches and the number of qualified
17  leads?
18        MR. SULLIVAN:  Objection.
19        MR. AARON:  Objection.
20        MR. SULLIVAN:  Asked and
21     answered.  Form.
22        MR. AARON:  It's misleading.
23        THE WITNESS:  (Reviewing.)  I
24     would have to look at the
25     underlying -- the underlying

Page 316

1     document.  This was -- this was
2     something that we spent some time
3     really looking at and analyzing,
4     and without the underlying
5     document, it will be difficult for
6     me to answer this question.
7     I'm sorry.
8  BY MR. ROBERTS:
9     Q    So is there, in fact, a
10  relationship between the number of pings
11  or searches and the number of ancillary
12  data record sales?
13     A    Number of pings and searches?
14  I -- I don't know.  Sitting here, I don't
15  know.
16     Q    Okay.
17        Based on the data that you have
18  seen, would it be possible for Mr. Kidder
19  to determine a relationship between the
20  number of searches and the number of
21  ancillary data record transmissions as
22  part of the bulk data sales?
23        MR. SULLIVAN:  Objection.
24     Asks -- calls for the witness to
25     speculate.

Page 317

1      THE WITNESS:  Well, again, the
2   underlying record-by-record
3   information is unavailable for
4   ancillary data sales.
5   BY MR. ROBERTS:
6      Q    Okay.
7          And it's because you believed
8   that the underlying record-by-record
9   transmission for ancillary data sales is
10  unavailable, you would say that Mr. Kidder
11  cannot be making a relationship between
12  the number of searches and the number of
13  such data sales, correct?
14      MR. SULLIVAN:  Objection.
15  Misstates the witness's testimony.
16  Vague.
17      THE WITNESS:  No, I believe
18  the percentage he's using -- if you
19  look at Exhibit 3.5, it comes from
20  his column 2.  He gets that from
21  DGS 229, and I'd need to look at
22  that underlying information because
23  I believe that percentage is
24  inapplicable to what he uses in
25  column 1.

Page 318

1      But without the information, I
2   just don't have that document
3   memorized.  I am unable to --
4   BY MR. ROBERTS:
5      Q    Would it be possible, based upon
6   what you know today, your knowledge of the
7   documents that you spent this 80 hours
8   looking at, for someone to determine a
9   relationship between the number of
10  searches and the number of individual
11  ancillary data record sales?
12      A    I don't know how you are using
13  the term "searches."
14      Q    Ping.
15      A    A ping.
16          Okay.  And the --
17      Q    The number of individual sales of
18  individual ancillary data records.
19      A    Again, my understanding is there
20  is no information about the underlying
21  ancillary data of records for which
22  revenue is generated -- well, there is
23  underlying inform -- there is no way to
24  identify from the records we have which of
25  the ancillary data records were sold as

Page 319

1   they relate to eDegree and the revenue
2   associated with each individual record.
3      Q    And that is why if Mr. Kidder
4   assumed a relationship between the number
5   of pings and the number of individual
6   instances in which ancillary data records
7   were sold, he would be making an
8   unjustified assumption, in your view?
9      MR. SULLIVAN:  Objection.
10  Form.  Misstates the witness's
11  testimony.
12      THE WITNESS:  So I don't take
13  issue with the fact that he had to
14  try and approximate that.  I
15  believe the information he used to
16  approximate it was the -- was an
17  unrelated percentage.
18      I agree he had to -- it would
19  be reasonable for him to -- to make
20  some type of assumption given that
21  the underlying record-by-record
22  information is unavailable to do
23  the analysis.
24      I take issue with the
25  percentage that he used to do so.

Page 320

1   BY MR. ROBERTS:
2      Q    Okay.
3          And in your view, this is a major
4   flaw with his report?
5      MR. SULLIVAN:  Objection.
6      THE WITNESS:  In my view,
7   it -- it results in the calculation
8   of total -- let me see.  I think he
9   uses the total leads posted -- yes,
10  in my view, it results in an
11  incorrect calculation of total
12  leads posted --
13  BY MR. ROBERTS:
14      Q    Okay.
15      A    -- which is one of the flaws in
16  his report.
17      Q    Let me ask you to turn to page
18  19.
19      A    Just give me a second.  I want to
20  put this back together before it's so out
21  of whack that I can't --
22      MR. SULLIVAN:  She has her
23  report.  She is just putting it
24  together.
25      THE WITNESS:  Okay.

Page 321

1        I'm sorry.  And which page did
2    you want me to go in my report?
3    BY MR. ROBERTS:
4        Q    Page 19.
5        A    Okay.
6        Q    The first full sentence it says,
7    "To the contrary, I understand there is no
8    relationship between the number of
9    searches, leads, and the number of
10   qualified leads, posts, to non-degree
11   parties."
12       So first of all, what do you mean
13   a qualified lead post to non-degree
14   parties?
15       Do you mean a qualified lead sent
16   to a university?
17       A    (Reviewing.)  No, I don't believe
18   that's what I mean.  Let me read this.
19       (Reviewing.)  No.  This is
20   referring to the ancillary data.
21       Q    Okay.
22       And so your understanding is that
23   there is no relationship between the
24   number of searches, pings, and the number
25   of ancillary record sales?

Page 322

1        A    I'm sorry, can you say that
2    again?
3        Q    It's your opinion that there is
4    no relationship between the number of
5    searches that were performed by the
6    plaintiff in this case and the number of
7    ancillary data sales made by the
8    defendant?
9        A    Are you referring to searches as
10   they relate to ancillary data sales?
11       Q    I am referring exactly to the way
12   you are using the terms in the first
13   sentence on page 19, which is that there
14   is no relationship between the number of
15   searches and the number of qualified leads
16   to non-degree parties.
17       As -- if I understand you, the
18   searches are the pings, and the qualified
19   leads, posts, to non-eDegree parties are
20   individual record sales of ancillary data,
21   or do I misunderstand what you're
22   comparing?
23       A    (Reviewing.)  That is my
24   understanding based on discussions with
25   Mr. Darwal.

Page 323

1        Q    Okay.
2        And if one were to get
3    record-by-record data showing each time a
4    record was sold in the ancillary data
5    process, at that point, one could
6    establish the relationship between the
7    number of searches, leads and the number
8    of qualified leads, posts, to non-eDegree
9    parties?
10       MR. AARON:  Objection to form.
11       THE WITNESS:  They may be able
12   to.  It would depend what is
13   included in that dataset.
14   BY MR. ROBERTS:
15       Q    Okay.
16       But the reason you say that
17   there's no relationship here is because we
18   don't have line-by-line granular data
19   about what records were sold in the
20   ancillary data process?
21       MR. SULLIVAN:  Objection.
22   Misstates the witness's testimony.
23   BY MR. ROBERTS:
24       Q    Is that correct?
25       A    I am unsure that it's solely

Page 324

1    because of that.  It may be in -- it would
2    have to do with the business model as
3    well.
4        I had a discussion with Mr.
5    Darwal about the way ancillary data is
6    sold.
7        Q    Well -- so let's look at the next
8    sentence.
9        "I understand that the number of
10   times a search is sent to a potential
11   buyer is determined entirely by the number
12   of matches a user accepts on the phone."
13       Do you -- it's your understanding
14   that the number of times a ping is sold to
15   an ancillary data buyer depends upon the
16   number of matches that the user accepts on
17   the phone?
18       A    I think -- I think that sentence
19   is misplaced.  That sentence, I believe,
20   related to the discussion when we were
21   talking about qualified leads.  I don't
22   believe that relates to ancillary data
23   sales.
24       Q    So explain to me when -- starting
25   from the "to the contrary" through the end

**Dana Trexler Smith**                                     Cornelius, LLC vs.
                                                          Ampush Media, Inc., et al.

Page 325

1   of the next sentence, what -- what concept
2   you're intending to impart there.
3       A    So my understanding is that the
4   percentage that Mr. Kidder uses in
5   Exhibit 3.5 to his report is unrelated to
6   what he's attempting to calculate, and I
7   am unable to tell you exactly why that is
8   without the underlying source document,
9   DGS 229, but that is the point that we are
10  trying to make here.
11      Q    I'm sorry.  You're talking about
12  Mr. Kidder's analysis, and this doesn't
13  make -- these sentences don't make any
14  mention of anything that Mr. Kidder did or
15  didn't do.
16      A    That's what we are talking about.
17  We are talking about --
18          MR. SULLIVAN:  Objection.  It
19      misstates the other report.  It
20      misstates the witness's testimony.
21  BY MR. ROBERTS:
22      Q    You are saying there's no
23  relationship between the number of
24  searches and the number of qualified
25  leads.

Page 326

1       Right?
2       Those two things are unrelated.
3   Not that Mr. Kidder misrelated them or
4   that he performed a calculation wrong.
5   That there is no relationship between A
6   and B.
7       Correct?
8       A    I am referring to the formula
9   that is included on page 18 that is taken
10  from Mr. Kidder's report.  We are talking
11  about the denominator in this formula.
12  And he used eDegree posts as a percentage
13  of total posts --
14      Q    Yep.
15      A    -- in his calculation.
16      Q    Yep.
17      A    And I am taking an issue with
18  that percentage that he used -- uses to
19  calculate total leads posted because I
20  understand the percentage he used is
21  unrelated to the eDegree leads posted,
22  which is the numerator in his calculation.
23          That's what this discussion is
24  about.
25      Q    "I understand that the number of

Page 327

1   times a search lead is sent to a potential
2   buyer is determined entirely by the number
3   of matches a user accepts on the phone."
4           What does that mean?
5       A    I think that sentence may be
6   misplaced here, but I would have to go
7   back and get further clarification from
8   Mr. Darwal.
9           We had a whole discussion about
10  this, and I don't remember as I sit here
11  today.
12      Q    Is it fair to say you don't
13  understand what you were referring to in
14  this sentence as you sit here today?
15          MR. SULLIVAN:  Objection.  I
16      think it misstates the witness's
17      testimony.
18          THE WITNESS:  Yeah.  I had
19      information available to me when I
20      wrote this, and I would just need
21      to go back and look at that.  And I
22      would need the underlying document,
23      DGS 229.
24  BY MR. ROBERTS:
25      Q    Do you see a citation here to

Page 328

1   evidence for that sentence?
2       A    No.
3           But go ahead.  No, I do not.
4       Q    Okay.
5           Let's turn to -- in that same
6   sentence, where you say, "I understand
7   that the number of times a search lead is
8   sent to a potential buyer," that's talking
9   about a qualified lead, right?
10      A    I believe so.
11      Q    And that is determined by the
12  number of matches a user accepts on the
13  phone, correct?
14      A    Yes.
15      Q    And that has nothing to do -- to
16  use your phrase, it's apples and oranges
17  with what the ancillary data sales are,
18  correct?
19          MR. SULLIVAN:  Objection.  I
20      think it has been asked and
21      answered, and I think it misstates
22      the witness's prior testimony.
23          THE WITNESS:  Again, I believe
24      that relates to the qualified
25      leads.  That could be the problem

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 85 of 137 PageID 9353
Confidential
Dana Trexler Smith                                                    Connectus, LLC vs.
                                                                  Ampush Media, Inc., et al.

Page 329

1      here.  That may be what this
2      percentage is on page 18 that he
3      used -- Mr. Kidder uses as his
4      denominator.
5          That may be what that
6      percentage relates to, and it's
7      unrelated to qualified leads.  I
8      need to look, though, to tie that
9      together.
10         I am unable to answer you any
11     better without some additional
12     information.
13         MR. ROBERTS:  Okay.
14         Can we take a brief bio break?
15         THE VIDEOGRAPHER:  Off the
16     record at 4:09.
17         (Whereupon a Recess Commenced
18     at 4:09 and Testimony Recommenced
19     at 4:19.)
20         THE VIDEOGRAPHER:  We are on
21     the record at 4:19.
22         This is DVD Number 4 of Dana
23     Trexler Smith's deposition.
24     BY MR. ROBERTS:
25     Q    Ms. Trexler -- sorry, Ms. Smith.

Page 330

1      Excuse me.
2      A    I go by either one.  That's fine.
3      Q    Very good.  I do apologize.
4          Could I ask you to turn to page
5      20 of your report, and specifically
6      looking at Table 5.
7      A    Yes.
8      Q    See how you calculated an error
9      rate here in the last column?
10     A    Yes.
11     Q    Is it true this error rate, as
12     you called it -- is it true that this
13     error rate reduces the damages otherwise
14     that Mr. Kidder would have find -- found
15     using his methodology?
16     A    Let me refresh myself on this.
17     Q    Let me walk you through it.
18         If there were a lower error rate,
19     as you defined it, there would be fewer
20     total qualified leads, correct?
21     A    (Reviewing.)  If there were a --
22     let me get myself grounded here, if you
23     would.
24     Q    Please do.
25     A    Let me go to his deposition --

Page 331

1      I'm sorry, his report.
2          Okay.
3          (Reviewing.)  So he -- I am just
4      trying to remember --
5      Q    Let me --
6      A    -- what he did in the calculation
7      here to answer your question.
8      Q    If we just look at your table.
9      You have estimated total qualified leads.
10         That was Mr. Kidder's estimate,
11     correct, in your table?
12     A    (Reviewing.)  No.
13     Q    What was Mr. Kidder's estimate?
14     A    Mr. Kidder for June 2013,
15     July 2013, August 2013 and
16     September 2013 --
17     Q    Yep.
18     A    -- he uses the actual information
19     for these months that was available from,
20     I believe it was a financial document that
21     was attached to the -- I think it was the
22     DGS - Ampush purchase agreement.
23     Q    So if we look down below, Table
24     5, you say, "As illustrated above,
25     application of the methodology by which

Page 332

1      the Kidder report estimates total
2      qualified leads for the period of
3      October 2013 through October 2015 results
4      in variance between actual and estimated
5      total qualified leads."
6          Do you see that?
7      A    Yes.
8      Q    So Mr. Kidder was estimating
9      total qualified leads?
10     A    So he estimated total qualified
11     leads for the period from October 2013
12     through October 2015.
13     Q    And your criticism is that using
14     his estimation methodology results in an
15     overstatement of the number of total
16     qualified leads as compared to the actual
17     qualified leads, which we know by looking
18     at the June through September 2013 data?
19     A    That -- it should probably say a
20     likely overstatement.  I think we are
21     missing the word "likely" there because
22     he -- he didn't have any actual to compare
23     it to for those time frames.
24     Q    Got it.
25         But in any event, what you did is

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 86 of 137 PageID 9354
Confidential
Dana Trexler Smith                                                    Connectus, LLC vs.
Ampush Media, Inc., et al.

Page 333

1  you said, look, if I gave you the
2  methodology he used between October 2013
3  and October 2015 and I used that same
4  methodology for June, July, August and
5  September 2013, what I find is that
6  Mr. Kidder's methodology would have
7  overestimated, as compared to the actual,
8  the number of total qualified leads?
9      MR. SULLIVAN:  Objection.
10     Form.  Misstates the witness's
11     testimony.
12         THE WITNESS:  So what this is
13     doing is this is showing if you did
14     apply the methodology that
15     Mr. Kidder used from October -- I'm
16     sorry -- yes, from October 2013
17     through October 2015, if you employ
18     that methodology to try and
19     determine the -- to calculate -- to
20     estimate the total qualified leads
21     for the period June 2013 through
22     September 2013, you would come up
23     with the number of leads in the
24     column estimated total qualified
25     leads.

Page 334

1  BY MR. ROBERTS:
2      Q    Okay.
3         So from this, you concluded that
4  Mr. Kidder tended to overestimate the
5  number of total qualified leads as
6  compared to what you would expect the
7  actual numbers to be for the period
8  October '13 through October '15?
9      A    Yes, that is correct.
10     Q    Okay.
11         And because Mr. Kidder assumed
12  that the defendants paid for qualified
13  leads, he didn't seek damages for those
14  leads in his calculation, correct?
15     A    Say that again.
16     Q    Because Mr. Kidder assumed that
17  the defendants paid for the qualified
18  lead, meaning when the lead was qualified,
19  it was an actual qualified lead, that the
20  plaintiff received payment from the
21  defendant for that lead, he didn't include
22  those leads in his damages calculation,
23  correct?
24         MR. SULLIVAN:  Objection.
25     Form.

Page 335

1         THE WITNESS:  That's an in --
2      these qualified leads that we are
3      referring to aren't just related to
4      the plaintiffs.
5  BY MR. ROBERTS:
6      Q    I understand that.
7         But my point is between
8  October 2013 and October 2015, you believe
9  Mr. Kidder overestimated the number of
10  qualified leads, correct?
11     A    I believe he likely overestimated
12  the number of qualified leads for the
13  entire company.
14     Q    And in performing that
15  overestimation, he reduced the total
16  amount of his damages calculation,
17  correct?
18     A    That I need to see how it flows
19  through here, because he has six
20  components that flow in his calculation.
21  I just need to refresh myself.
22     Q    Go ahead.
23     A    May I borrow somebody's pen
24  because it would make this easier for me?
25         Thank you.

Page 336

1         (Reviewing.)  Okay.  Thank you
2  for bearing with me.  There are a lot of
3  pieces to this.  I would agree that it
4  would -- it would reduce the cost per lead
5  from non-eDegree sources for that
6  component of the calculation.
7      Q    And thereby, it would have it --
8  the error rate -- the higher the error
9  rate, the greater the tendency to lower
10  the overall amount he had otherwise
11  claimed in damages?
12     A    It would -- it would lower the --
13  the overall damages that are calculated,
14  and the point that we are making here in
15  the report is that, you know, these are
16  pretty high error rates, though.
17         The point I am making is
18  within -- his calculations are not within
19  a reasonable degree of professional
20  certainty, and that is what is being
21  calculated here.
22         MR. ROBERTS:  Move to strike
23     everything after "it would lower
24     the overall damages that are
25     calculated."

Page 337

1  BY MR. ROBERTS:
2    Q    If Mr. Kidder used a methodology
3  that resulted in a lower error rate, the
4  total amount of damages he would have
5  claimed in his report, using his
6  methodology, would have gone up?
7    A    You're assuming that there would
8  be a lower error rate?
9    Q    Yes.
10        If he had used a methodology that
11  had a lower error rate, the total amount
12  of damages, using his methodology, the
13  same in all other respects, would have
14  gone up?
15        MR. SULLIVAN:  Objection.
16    Form.
17        In his report or --
18        MR. ROBERTS:  In his report.
19  BY MR. ROBERTS:
20    Q    Meaning the error rate is
21  inversely correlated with damages.
22    A    So to the extent that he
23  calculated it in a way that there was a
24  lower error rate would mean that his
25  estimated total qualified leads number

Page 338

1  would have been lower.
2    Q    Yes.
3        And that means the cost per lead
4  would have been higher?
5    A    Higher.
6    Q    And that means that the damages
7  would have been higher?
8    A    Yes, if it flowed through in that
9  way.
10    Q    Okay.  Let me ask you to turn to
11  page 21.
12        You say, "The results of the
13  testing in Table 5 demonstrate" -- Table 5
14  above demonstrate that the revenue per
15  qualified lead is not representative of
16  the average qualified lead price for all
17  revenues included in the Kidder report
18  calculation?"
19        Do you see that?
20    A    I do.
21    Q    What do you mean by that?
22    A    Let me read it in the context of
23  the rest of this section.
24        (Reviewing.)  So I think what --
25  what I mean by this, this is pointing out

Page 339

1  that because of all of the various errors
2  that I discuss in the bullet points on
3  page 20, the analysis I perform in
4  Table 5, that for all of these reasons,
5  the revenue per qualified lead that's used
6  here in this calculation, it's -- let
7  me -- let me restate that.
8        (Reviewing.)  The point that I am
9  making here is the Kidder report is taking
10  revenue per qualified lead in this
11  calculation and is utilizing this as an
12  underlying assumption that this would be
13  the average revenue for all qualified
14  leads, and there is evidence and
15  information which suggests that DGS EDU
16  does not receive payments as high as
17  those -- does not generate revenue as high
18  as those that it generates for eDegree
19  records and that to the extent that this
20  is overstated, it overstates the
21  calculations.
22    Q    What information or data do you
23  have or point to to suggest that other
24  leads other than eDegree are associated
25  with lower revenue numbers?

Page 340

1    A    You can look in DGS 200.
2    Q    Okay.
3        And that tends to show that the
4  leads received from eDegree are
5  associated, generally speaking, with more
6  revenue than leads that the defendants
7  receives from eDegree's competitors?
8    A    There is information in there
9  that allows you to look at it.  The point
10  is he performed no analysis of -- of these
11  amounts.
12    Q    Did you --
13    A    I was critiquing his report.  I
14  did not do this calculation.
15    Q    Okay.
16        So you don't know if you had done
17  the calculation, whether it would have
18  made any different whatsoever in the total
19  number?
20    A    I did not perform that
21  calculation.  However, as an expert in a
22  case, if I were proffering an opinion on
23  this, I would have done an analysis.
24    Q    Okay.
25    A    And that is the point.  He failed

Page 341

1  to do any analysis.  He included this
2  number in his calculation of damages
3  without utilizing the information that was
4  available to him.
5      Q    Okay.
6          But you don't intend to offer an
7  opinion that had that calculation been
8  done, it would have changed the numbers at
9  all because you didn't yourself do that
10  calculation, correct?
11         MR. SULLIVAN:  Objection.  It
12      misstates the witness's testimony
13      and report.
14         THE WITNESS:  So the point
15      that I am making in the report is
16      that I see evidence in the record
17      that suggests that there are --
18      there's revenue -- that there is
19      revenue from other non-eDegree
20      entities that is lower than the
21      amount proffered here in
22      Exhibit 3.5 of the Kidder report.
23  BY MR. ROBERTS:
24      Q    Okay.
25      A    And that that is something that

Page 342

1  Mr. Kidder should have considered in his
2  analysis rather than just using --
3  utilizing these revenue for qualified lead
4  numbers.
5      Q    When you -- so when you look at
6  that data, another way to say it would be
7  there is evidence that the leads from
8  eDegree are particularly valuable and are
9  associated with more revenue than the
10  leads from eDegree's competitors?
11         MR. SULLIVAN:  Objection.
12      Form.  Misstates the witness's
13      testimony.
14         THE WITNESS:  No, that's not
15      what I am saying.
16  BY MR. ROBERTS:
17      Q    Are the revenues -- are the leads
18  from eDegree result in more revenue than
19  the leads from competitors or less revenue
20  than leads from competitors or don't you
21  know one way or the other?
22         MR. SULLIVAN:  Objection.
23      Form.  Argumentative.
24         THE WITNESS:  Again, I have
25      seen that there is evidence in the

Page 343

1  record that -- suggesting that
2  there is -- that the revenue per
3  qualified lead included here in
4  Mr. Kidder's Exhibit 3.5 is -- that
5  he should have performed an
6  analysis to determine if that is
7  representative, and he failed to do
8  so.  That is the point.
9  BY MR. ROBERTS:
10      Q    Okay.
11          But you are not saying it's not
12  representative?
13         MR. SULLIVAN:  Objection.
14      Asked and answered.  Misstates the
15      witness's testimony.
16         THE WITNESS:  Again, I am
17      saying that that is an analysis
18      Mr. Kidder should have performed.
19  BY MR. ROBERTS:
20      Q    Okay.
21          And you are not saying that it is
22  not representative.
23          You're just saying I think he
24  should have done that -- double-check, and
25  he didn't, but I don't know one way or the

Page 344

1  other whether or not if he had done that
2  check, it would have come out or made a
3  hair's worth of difference, right?
4         MR. SULLIVAN:  Objection.  I
5      think it misstates the witness's
6      testimony.  It's been asked and
7      answered.
8         MR. AARON:  Form.
9         THE WITNESS:  Again, I am
10      saying that there's evidence to
11      suggest that this may not be
12      representative, and Mr. Kidder
13      should have performed that analysis
14      utilizing the information that he
15      had available at the time of his
16      report to perform that analysis.
17  BY MR. ROBERTS:
18      Q    And when you say "evidence to
19  suggest," you mean you gave it the good
20  old-fashioned eyeball test?
21         MR. SULLIVAN:  Objection.
22      Argumentative.  Misstates the
23      witness's testimony.
24  BY MR. ROBERTS:
25      Q    Well, let me ask it this way,

Page 345

1   ma'am:  What evidence is there that
2   suggests that it's not representative?
3       A    You can go in and look at the
4   records, and there are records that have
5   dollar amounts that are lower than this.
6   There are records --
7       Q    And are the records that have
8   dollar amounts -- excuse me.  I
9   interrupted you.  I apologize.
10          Are there records that have
11  dollar amounts that are higher than this?
12      A    I am sure there are.  I need to
13  look at the -- the underlying records.
14  The point is he used a subset, which is
15  just revenue for qualified leads here, and
16  assumed that applied to the whole
17  population.
18      Q    Okay.
19          And it's total speculation on
20  your part one way or the other whether or
21  not if that check were performed, it would
22  make any difference in the calculation?
23          MR. SULLIVAN:  Objection.
24      Form.  Asked and answered.  It
25      misstates the witness's testimony.

Page 346

1           THE WITNESS:  Again, I am
2       pointing out that that is something
3       he should have considered rather
4       than assuming that it would just be
5       at the high dollar amount for a
6       subset of data.
7   BY MR. ROBERTS:
8       Q    Do you have any factual basis, as
9   you sit here, to suggest that it would
10  have made a difference in the
11  calculation -- in the result?
12          MR. SULLIVAN:  Object --
13      objection.  Asked and answered.
14          THE WITNESS:  I have given you
15      my answer.  I have answered it
16      several times.
17  BY MR. ROBERTS:
18      Q    So then you have -- I think we --
19  move on to page 21, and there's a formula
20  for total disqualified leads in the middle
21  of the page.
22          Do you see that, ma'am?
23      A    I do.
24      Q    And right below that you say,
25  "This calculation assumes that a

Page 347

1   percentage of qualified leads includes a
2   percentage of disqualified leads, which is
3   a fundamentally flawed and incorrect
4   concept.  It is impossible for leads that
5   are qualified, i.e., leads for which
6   payment has been received, to include a
7   subset of disqualified leads for which
8   payment has not been received."
9           Do you see that?
10      A    I do.
11      Q    What makes that impossible?
12      A    Well, the definition that we have
13  been using for qualified leads are the
14  leads for which payment has been received.
15  You haven't received payment on a
16  disqualified lead.
17      Q    Let me give you a hypothetical.
18          Suppose that a -- the plaintiff
19  searches against the defendants' portal
20  and suppose that two matches are returned
21  and suppose that both matches are
22  submitted and suppose that one of those
23  submits is disqualified and the other is
24  not.
25          Would that be a record in which

Page 348

1   the lead includes both a qualified and a
2   disqualified lead for the same student?
3           MR. SULLIVAN:  Objection,
4       form.
5           THE WITNESS:  That's -- that
6       is different from the calculation.
7       The calculation is taking total
8       qualified leads.  Those are the
9       leads for which a payment has been
10      received.
11          It's not pre-qualified leads.
12      What you just described is a
13      pre-qualified lead of which there
14      are some leads for which you get
15      payment and some which are
16      disqualified.
17          This number is qualified
18      leads.  You have -- the defendants
19      have received payment for these
20      leads.
21  BY MR. ROBERTS:
22      Q    Let's look at this formula in
23  more detail.
24      A    Hm-hm.
25      Q    eDegree disqualified leads is the

Page 349

1   numerator.
2      A    Hm-hm.
3      Q    And the nominator is eDegree
4   qualified leads, plus eDegree disqualified
5   leads.
6          Do you see that?
7      A    I do.
8      Q    And the eDegree qualified leads
9   plus the eDegree disqualified leads, you
10  would agree that those two things together
11  are all of the submitted leads because the
12  submitted leads are the qualified and the
13  disqualified?
14     A    Yes.
15     Q    And so this ratio tells you the
16  ratio of qualified leads to submitted
17  leads, correct?
18     A    No.
19     Q    Well, the denominator is the
20  total number of submitted leads?
21     A    Hm-hm.
22     Q    And the numerator is the total
23  number of qualified leads, correct?
24     A    No.  The numerator is eDegree
25  disqualified leads.

Page 350

1      Q    Excuse me.
2          This tells you the percentage of
3   disqualified leads as a percentage of
4   submitted leads, correct?
5      A    Yes, that's what that
6   numerator/denominator shows.
7      Q    Okay.
8          So it is, in fact, true that you
9   can have a -- this percentage makes sense
10  to say -- if I want to know what percent
11  of submitted leads are disqualified, this
12  is, in fact, the formula you would use?
13     A    No.
14     Q    Why not?  It's disqualified
15  divided by submitted.
16     A    I'm sorry.  Maybe I misheard your
17  question.  Say it again.
18     Q    Okay.
19          If I want to know what
20  fraction -- or what percentage of
21  submitted leads were disqualified --
22     A    Hm-hm.
23     Q    -- isn't this the formula I would
24  use?
25     A    Yes, that is the formula you

Page 351

1   would use to figure that out.
2      Q    And there's nothing wrong with
3   calculating the percentage of leads that
4   are disqualified using the percentage of
5   submitted leads that are disqualified
6   using this formula?
7          MR. SULLIVAN:  Objection.
8      Form.
9          THE WITNESS:  So I have no
10     problem with the way that formula
11     is calculated.  It's how it's
12     applied.  It's applied against
13     total qualified leads.  It's not
14     applied to total submitted leads.
15         It's applied to total
16     qualified leads.  And the
17     definition of a qualified lead, as
18     it's used in this source document,
19     is a lead for which a payment was
20     received.
21         So essentially what he's doing
22     is he's taking a pie that is only
23     qualified leads.  Money -- revenues
24     have been generated for every piece
25     of that pie, and then what he's

Page 352

1   saying is I am going to carve out a
2   piece of that pie and say this
3   piece was disqualified.
4          It's impossible for it to be
5   disqualified if the entire pie has
6   been -- has generated revenue.
7   That is the problem with this.  He
8   applied it to the wrong pie.
9   BY MR. ROBERTS:
10     Q    Even if the pie includes both
11  qual -- leads that have been both
12  qualified an disqualified at the same
13  time?
14     A    It doesn't.  It doesn't because
15  if you look at the -- the months from
16  June 2013 through October 2013, it's
17  actual information and it's the qualified
18  leads as reported in the financial
19  statements.
20          It's not submitted.  It's
21  qualified and those are the leads on which
22  revenue has been paid.
23     Q    Okay.
24          So another way to talk about what
25  this formula here on page 21 represents is

Page 353

1   it represents the scrub rate or the rate
2   at which disqualified leads are scrubbed
3   out of the total number of submits,
4   correct?
5       A    Say that again.
6       Q    Yes.  This is the scrub rate.
7           This is the rate at which leads
8   are disqualified from the total number of
9   submits?
10          MR. SULLIVAN:  Objection.
11      Misstates the witness's testimony.
12  BY MR. ROBERTS:
13      Q    Is it correct that the formula
14  shown on the middle of page 21, eDegree
15  disqualified leads divided by eDegree
16  qualified leads, plus eDegree disqualified
17  leads is, in fact, equal to the scrub
18  rate?
19      A    That would be -- it represents
20  the percentage of leads -- the percentage
21  of pre-qualified leads that became
22  disqualified through the process.
23      Q    Okay.
24          And, again, based on your
25  criticism, Mr. Kidder has overestimated

Page 354

1   the disqualified and the qualified leads
2   by calculating it this way, correct?
3           MR. SULLIVAN:  Objection.
4       Misstates the witness's testimony.
5           THE WITNESS:  No.
6       Essentially, the Kidder report has
7       calculated a nonsensical number,
8       because he applied a percentage
9       against a number that it's
10      impossible for it to include any of
11      the subset that he's trying to
12      calculate.
13          So the resulting number
14      doesn't mean anything.
15  BY MR. ROBERTS:
16      Q    Where in his report did you see
17  him apply this formula to the total number
18  of qualified leads?
19      A    It's in his Exhibit 3.5, and it
20  is the formula in footnote 9.
21      Q    And what column is he applying it
22  to?
23      A    What do you mean "what column is
24  he applying it to"?
25      Q    Where is that formula used on

Page 355

1   that page?
2       A    He uses the formula on page 21 of
3   my report to calculate column 9.  This is
4   his formula.
5       Q    And that's your criticism; it's
6   column 9 of Exhibit 3.5?
7           MR. SULLIVAN:  Objection.
8       Misstates the witness's previous
9       testimony.
10          THE WITNESS:  So he's -- the
11      formula that he sets out in
12      Exhibit 3.5 of the Kidder report,
13      column 9, total disqualified leads,
14      he says he calculates that using
15      the formula that I have set out on
16      page 21 of my report.
17          That is how that number is
18      calculated.  And that number then
19      flows into his calculation of
20      column 10, which then flows into
21      the calculation in column 13.
22  BY MR. ROBERTS:
23      Q    And if he had multiplied the
24  scrub rate on page 21 of your report by
25  the total number of submits rather than by

Page 356

1   the total number of qualified leads, if he
2   had done it the way you suggested it
3   should have been done, the number of
4   qualified and disqualified leads shown in
5   column 9 would be higher, would they not?
6           MR. AARON:  Objection, form
7       and assumes facts not in evidence.
8   BY MR. ROBERTS:
9       Q    Because the total number of
10  submitted leads is larger than the total
11  number of qualified leads, so he's
12  multiplied the ratio by a smaller number
13  rather than a larger number and therefore
14  it has reduced the number of qualified
15  leads, correct?
16          MR. AARON:  Objection.  Form.
17          THE WITNESS:  Again, he's
18      applying -- the number he's
19      calculated is -- it's like saying I
20      am going to take a red pie and
21      figure out what piece of it is
22      yellow.  There is no yellow piece
23      in that red pie, and so he's --
24      he's applied it to the wrong -- the
25      wrong base.

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

Page 357

1    So I would need to -- I would
2 need to see what that real base
3 looked like.
4 BY MR. ROBERTS:
5    Q    Did you attempt to actually redo
6 Mr. Kidder's math in light of your
7 criticism?
8    A    No, I did not.
9    Q    Any reason you know that couldn't
10 be done?
11    A    I don't know.  I would have to
12 look at the underlying -- underlying data.
13    Q    Okay.
14    But as you sit here today, is
15 there any reason that you know of, that
16 your criticism of his mathematical
17 calculation could not be corrected?
18    MR. SULLIVAN:  Objection.
19 Asked and answered.
20    THE WITNESS:  Yeah.  I would
21    need to look at the underlying data
22    to see what is available to do that
23    calculation.
24 BY MR. ROBERTS:
25    Q    Okay.  Let's look at page 22.

Page 358

1    You say, "Cost of goods sold is
2 an incremental cost because it increases
3 with each additional sale."
4    Do you see that?
5    A    I'm sorry.  You're on page 22?
6    Q    Yes, ma'am.
7    A    And where -- where on page 22?
8    Q    The second bullet point in the
9 middle of the page, the fourth -- the
10 second line of the second bullet point at
11 the end begins with the sentence, "for
12 example," and then it says, "Cost of goods
13 sold is an incremental cost because it
14 increases with each additional sale."
15    A    Yes, I see that.
16    Q    What makes you say that?
17    A    Well, cost of goods sold is
18 the -- it's essentially the materials and
19 labor that go into generating a sale.
20    Q    Well, let's take the call center
21 expenses for example.
22    Is it true that those wouldn't
23 change based upon sales?
24    I mean, presumably the call
25 center agent has to make the call anyway.

Page 359

1 If they get a sale, they do.  If they
2 don't, they don't.  But the cost of hiring
3 a call center agent and having them sit
4 there and whether or not they make the
5 sale or don't make the sale is not
6 incremental cost based upon whether or not
7 the sale gets made?
8    MR. SULLIVAN:  Objection.
9 Form.
10    THE WITNESS:  So in that
11    particular example, I agree that an
12    hour -- you have to look at the
13    facts and circumstances.
14    An hourly employee who gets
15    paid irrespective of whether or not
16    revenue is generated, that wouldn't
17    be considered an incremental cost.
18    You know, here, in this
19    context, we are looking for
20    incremental costs -- costs that
21    would have been incremental, for
22    example, payment to an affiliate.
23 BY MR. ROBERTS:
24    Q    Well, you included advertising
25 and promotion, did you not?

Page 360

1    A    In my analysis?
2    Q    Yes, ma'am.
3    A    No.  I analyzed the costs.  The
4 only incremental costs that I have
5 included in my analysis are -- I believe
6 it's just the affiliate cost.  And I say
7 that back in -- give me a minute.  I will
8 tell you where I say that.
9    (Reviewing.) "Although all of the
10 above costs are incremental to generating
11 unjust sales" -- I'm sorry.  It's on page
12 33 -- "I have only applied the lead
13 generation cost in my analysis of
14 defendants' profits because the remaining
15 costs are de minimis when allocated to the
16 records at issue in this matter."
17    Q    So what makes you say they are de
18 minimis?
19    A    When I look at the lead
20 generation costs, the data scoring
21 verification costs, and the data hosting
22 costs and divide them over the number of
23 records we have at issue as compared to
24 the total number of records -- we did the
25 math -- and it came out to be something

**Dana Trexler Smith**                                    **Connectus, LLC vs.**
                                                         **Ampush Media, Inc., et al.**

Page 361

1  like $30, and it wasn't worth including in
2  the calculation.
3     Q    What about the costs for
4  pay-per-click advertising?
5        Did you include those?
6        Were those de minimis?
7     A    No, because those are -- those
8  are unrelated to the revenues that I have
9  included in my analysis.
10    Q    Okay.
11       What about costs of -- I think it
12  was called costs of media?
13    A    Again, that's unrelated to the
14  lead revenue generation that I have
15  included in my analysis.
16    Q    Okay.
17       Do you agree with me that
18  subcontracting and advertising and
19  promotion are included in DGS 289 under
20  cost of goods sold?
21    A    What is DGS 289?
22       Can you point me --
23    Q    Have you cited it?
24    A    I may have.  If you can point me
25  to it, I will be happy to try to refresh

Page 362

1  my recollection.
2     Q    It's okay.  We don't need to go
3  into it.  That's fine.  We can do it at
4  trial.
5        I withdraw that last comment.
6        Let me ask you to turn to page
7  24.  You say at the top, "Further, I
8  understand that the estimated affiliate
9  price for the individual records is an
10  estimate, which is typically higher than
11  the actual amounts realized."
12       Do you see that?
13    A    I do, yes.
14    Q    Other than the plaintiff's
15  assertion on this point, have you seen
16  anything to back that up?
17    A    That this amount is an estimate?
18    Q    No.  That the estimate is
19  typically higher than the actual amounts
20  realized.
21    A    I can't recall sitting here.
22    Q    Okay.
23       You saw that many of the
24  estimates are zero, correct?
25    A    I am unsure if those are

Page 363

1  estimates.  I know that there were zeroes
2  in that field.  I am unsure if that was
3  considered an estimate or if it was the
4  default for the system to just put a zero
5  there for which there was no other
6  information.
7     Q    Okay.
8        Clearly, that zero is not
9  typically higher than the actual amount
10  received?
11    A    That is correct, but it may be
12  unrelated to a record that was actually
13  part of the transaction.  I am unable to
14  tell if the zero is the default, and it
15  only turns to something if it gets -- if
16  that record is populated.
17    Q    Well, you don't know, for
18  example, if somebody went through and
19  added up the amounts in that spreadsheet,
20  whether the estimates that you would get
21  would be higher or lower than what was
22  actually received, correct?
23    A    I have not performed that
24  analysis, no, because that -- you know, I
25  understood that data was an estimate.  It

Page 364

1  was really less relevant to my analysis.
2     Q    Do you know what percentage of
3  those records were listed as being at
4  zero?
5     A    Not sitting here today, no.
6     Q    Did you attempt to calculate
7  that?
8     A    No, I did not.
9     Q    Now, if you used the total
10  estimated revenues from posting eDegree
11  ancillary data from, I think, DGS 288 and
12  229, you get 847,647.
13       Do you recall that?
14    A    I -- what are those two
15  documents?  Can you refresh me, please?
16    Q    Nope.  I don't have a lot of
17  time, and I think everybody is getting
18  tired.
19       Let me ask you to turn to page
20  25.
21       Now, in this section, it seems
22  like at a high level, your criticism of
23  Mr. Kidder is he didn't do a full business
24  evaluation; is that right?
25    A    My -- my criticism is that the

Page 365

1  analysis he does really is -- it's -- it's
2  inappropriate.  It fails to calculate what
3  I think -- it's an inappropriate
4  methodology by which to try and apportion
5  a percentage of the allegedly overinflated
6  sales price between Ampush and DGS EDU.
7     Q    Well, have you tried to do some
8  other calculation that you thought was
9  more appropriate?
10    A    No, I didn't.  I would need -- I
11  would need information to do an
12  appropriate calculation, which would
13  require -- you know, that's set forth in
14  these next several pages.
15    Q    Did you ask for that information
16  from anyone?
17    A    No, I didn't because I don't
18  believe that Mr. Kidder performed an
19  appropriate analysis here to -- to
20  calculate this type of damages.
21    Q    So you have no idea whether if
22  you did any of the methodologies that you
23  have here, you would have ended up with a
24  different result in any degree?
25       MR. SULLIVAN:  Objection.  I

Page 366

1     think it misstates the witness's
2  testimony in her expert report.
3  BY MR. ROBERTS:
4     Q    I am not attempting to ask -- to
5  state your testimony.  I'm asking you a
6  question.
7       Do you know, one way or the
8  other, whether you had performed any of
9  the calculations set forth between pages
10  25 and 27 of your report, you would have
11  ended up with a different result?
12    A    I --
13       MR. SULLIVAN:  Objection.
14  Form.
15       THE WITNESS:  Sorry.
16       I would be unable to -- to
17  give you an answer as to what
18  number I would come up with if I do
19  that analysis, because I have not
20  performed an analysis.
21       The point here is that the
22  methodology by which Mr. Kidder
23  calculates his secondary unjust
24  enrichment is not one that would be
25  accepted by -- by, you know,

Page 367

1     experts in this area.
2  BY MR. ROBERTS:
3     Q    Do you have any backup for that
4  other than the fact that you don't accept
5  it, and you think it's inappropriate?
6     A    Yes.  If you look into the -- the
7  Statement on Standards for Valuation
8  Services, which I have cited in my report
9  on page 25, 26, and 27, I layout the types
10  of analyses that are typically performed
11  when performing evaluation of a business,
12  and those -- that is a methodology that
13  would be generally accepted.
14    Q    Mr. Kidder wasn't attempting to
15  value the business, was he?
16       MR. SULLIVAN:  Objection.
17  Form.
18  BY MR. ROBERTS:
19    Q    We know what the business sold
20  for.  We know what the price was.
21       Right?
22       He didn't need to value the
23  business because we had a market arm's
24  length contract for the sale of the
25  business, right?

Page 368

1       MR. SULLIVAN:  Objection.
2  Form.
3       THE WITNESS:  So what
4  Mr. Kidder would have needed to do
5  is understand how the valuation was
6  determined with the alleged
7  inclusion of the alleged
8  wrongfully -- wrongfully obtained
9  profits and without, and without
10  going through a full analysis, he's
11  assuming that there's a linear
12  relationship, which is -- it's a
13  big assumption.
14       I don't think there's any
15  evidence to suggest that in the
16  record, and there are a lot of
17  other components that come into
18  performing a valuation.  He
19  considered none of those.
20  BY MR. ROBERTS:
21    Q    Did you read Mr. Pujji's
22  deposition transcript?
23    A    Yes, I did.
24    Q    Did you see where Mr. Pujji said
25  that the valuation of the business was not

Page 369

1  done in a mathematical way; it was just a
2  bargained-for solution?
3      A    I saw that and to do an
4  analysis -- a proper analysis of what that
5  amount would be if the revenues were
6  different -- you know, you said it wasn't
7  a mathematical calculation. Mr. Kidder
8  assumes that it was.
9          He does a linear calculation here
10  between the profits that were included in,
11  I guess, the due diligence information and
12  the profits which were alleged in this
13  case to be unjustly enriching the
14  defendant.
15     Q    Do you have any basis at all to
16  suggest that it was not a linear
17  relationship?
18     A    Well, you just told me that Mr.
19  Pujji said that it wasn't a mathematical
20  relationship.
21     Q    No, I mean, a linear relationship
22  between the two buckets of revenue.
23         Well, let me ask you this way.
24  Right.
25         Sometimes when people value

Page 370

1  businesses, they will treat certain types
2  of revenue different from other types for
3  purposes of establishing a PE multiple,
4  correct?
5      A    There are often adjustments that
6  are made in a valuation. When you go
7  through, you look at different revenue
8  streams. You look at different expenses.
9  You determine, you know, which are
10  relevant to the transaction. You may
11  strip others out.
12         That's sort of the point of this
13  section. There's a lot of analysis that
14  goes into performing a valuation, and
15  Mr. Kidder performed none of those.
16         MR. ROBERTS:  Okay.
17  Move to strike the answer.
18         MR. AARON:  On what basis?
19         MR. ROBERTS:  On the basis
20  that the witness is just trying to
21  talk me to death and not actually
22  answering the question.
23         MR. SULLIVAN:  Objection.
24         MR. AARON:  I will object to
25  that.  I think she was answering

Page 371

1  your question.
2  BY MR. ROBERTS:
3      Q    Let me ask -- this is a "yes" or
4  "no" question.
5          MR. SULLIVAN:  Objection.
6          MR. AARON:  Objection. Form.
7          MR. ROBERTS:  Let's take a
8  break so I don't yell at you guys.
9          THE VIDEOGRAPHER:  Off the
10  record at 5:01.
11         (Whereupon a Recess Commenced
12  at 5:01 and Testimony Recommenced
13  at 5:06.)
14         THE VIDEOGRAPHER:  On the
15  record at 5:06.
16  BY MR. ROBERTS:
17     Q    Sometimes a business evaluation
18  will treat different types of revenue
19  differently, correct?
20     A    Yes, depending on the facts and
21  circumstances of a valuation.
22     Q    So, for example, in doing a
23  valuation, you might treat recurring
24  revenue differently from one-time revenue
25  when assigning it a multiple for purposes

Page 372

1  of acquiring business, correct?
2      A    Yes, you would look at it
3  differently. Typically, you may strip out
4  one-time non-referring revenue or
5  non-referring expenses, but that analysis
6  is fact-specific.
7      Q    Have you seen any evidence that
8  anyone assigned different multiples to
9  ancillary data sales revenue as compared
10  to qualified lead revenue in the
11  acquisition of the business at issue in
12  this case?
13     A    I have seen no information -- I
14  have yet -- I have not seen the underlying
15  records of the valuation of the business.
16     Q    All right. Both ancillary data
17  sales and qualified lead revenue come from
18  the monetization of the same sources of
19  data, namely, leads presented by either
20  organic growth or third-party call
21  centers?
22     A    My understanding is that -- that
23  an -- I'm sorry, ancillary -- ancillary
24  data revenue and qualified lead data
25  revenue come from the underlying records

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 96 of 137 PageID 9264
Confidential

Dana Trexler Smith                                          Cornelius, LLC vs.
Ampush Media, Inc., et al.

Page 373

1  whether they are obtained organically or
2  from a third party.
3      Q    Neither of them is recurring?
4      A    I would say -- if you mean by
5  recurring where you are getting repeated
6  revenue per each record, you may be able
7  to monetize that record more than once.
8          I would think the recurring
9  relationship is less with the prospective
10 student and more with the third party from
11 which you are getting those leads.
12     Q    Okay.
13         You have no basis to say, as you
14 sit here today, that either qualified lead
15 revenue or ancillary data sale revenue
16 would be assigned a higher or lower
17 multiple in a typical business valuation,
18 correct?
19     A    Well, I have no opinion on what
20 multiple those sources of revenue would be
21 assigned. And you are saying in a typical
22 business valuation; they may be unrelated
23 to a typical.
24         You would look at the facts and
25 circumstances of each individual valuation

Page 374

1  and determine which revenue streams are
2  relevant, how they are relevant to the
3  valuation.
4          There's a lot of work that goes
5  into performing a valuation.
6      Q    And Mr. Kidder's method was to
7  apply the PE from the actual purchase
8  price to the revenue attributable to the
9  bad acts, correct?
10         (Reporter Clarification.)
11         THE WITNESS:  So Mr. Kidder
12     just -- he assumed 15 percent --
13     that there was an overstatement of
14     the -- is it the revenue or
15     profits?
16         He assumed there was an
17     overstatement of the businesses
18     profits by 15 percent, and he just
19     multiplied that 15 percent by what
20     he has here as the price paid to
21     Ampush for its educational business
22     of $2.4 million.
23 BY MR. ROBERTS:
24     Q    Right.
25         So the overstatement by

Page 375

1  15 percent, that was calculated from the
2  calculation of the percentage of the
3  activities -- the economic activities were
4  due to the challenged activities as
5  compared to all the other activities in
6  the business?
7          MR. SULLIVAN:  Objection,
8      form.
9          THE WITNESS:  So that
10     15 percent was calculated based on
11     his calculations of the alleged
12     overstatement of the profit.
13 BY MR. ROBERTS:
14     Q    Right.
15         And then he took that and he
16 multiplied it by the total amount of the
17 sales of the business, which was
18 effectively assuming that that 15 percent
19 was worth the same to the buyer as the
20 other 85 percent in terms of the PE
21 multiple that would be achieved on that
22 revenue?
23         MR. SULLIVAN:  Objection,
24     form.
25         THE WITNESS:  Well, again,

Page 376

1  he's assuming that -- he's assuming
2  that -- he's assuming that the
3  value paid for for the business
4  of -- you know, I understand from
5  reading his deposition that it may
6  not be the $2.4 million amount, but
7  let's assume for this discussion
8  that that's the amount that the
9  business was purchased for.
10         He assumes that that purchase
11 price is based off of the profits.
12 As we discussed earlier, there may
13 be -- there likely are other
14 factors that go into performing a
15 valuation, such as those that I
16 have included on pages 25 through
17 27 of my report, that may have gone
18 into valuing the business.
19         He's assuming that it's solely
20 related to -- that that valuation
21 was determined solely based off of
22 profit.
23 BY MR. ROBERTS:
24     Q    Do you have any information to
25 suggest that he's wrong?

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 97 of 137 PageID 0265

Confidential

Dana Trexler Smith                                    Connectus, LLC vs.
                                                  Ampush Media, Inc., et al.

Page 377

1    MR. SULLIVAN:  Objection.
2  Asked and answered.
3       THE WITNESS:  I have no
4  underlying information on how this
5  value was calculated, but the point
6  is neither does he, and he makes a
7  broad-brush assumption in coming up
8  with this methodology that flies in
9  the face of what an accepted
10  methodology for calculating an
11  overstatement of a value of a
12  business would be.
13 BY MR. ROBERTS:
14    Q    Let me ask you to look at page
15 26.
16       You have income approach, market
17 approach and cost approach here?
18    A    Yes.
19    Q    Did you attempt to take any of
20 these approaches yourself?
21    MR. SULLIVAN:  Objection.
22  Asked and answered.
23       THE WITNESS:  No, I did not.
24 BY MR. ROBERTS:
25    Q    You have no idea whether if you

Page 378

1  had, the result would have been materially
2  different from the result used by
3  Mr. Kidder?
4       MR. SULLIVAN:  Objection.
5  Asked and answered.  Form.
6       THE WITNESS:  Again, I would
7  need to go through and perform the
8  analysis to perform a valuation of
9  the business including -- well, we
10  know what the valuation was --
11  including the alleged unjustly
12  earned revenues, and then I would
13  need to perform an analysis going
14  through, again, the types of
15  analyses that are included in 25 to
16  27 of my report to value the
17  business without those alleged
18  unjustly received profits.
19 BY MR. ROBERTS:
20    Q    So the question you answered is
21 what would I need to do in order to
22 develop such an opinion, and the question
23 I was asking you is whether you, sitting
24 here today, have an opinion about whether
25 the results would have been materially

Page 379

1  different from the result used by
2  Mr. Kidder?
3       MR. SULLIVAN:  Objection.
4  Asked and answered.  Misstates the
5  witness's testimony.
6       THE WITNESS:  I am unable to
7  determine what those results would
8  be without performing a proper
9  analysis.
10 BY MR. ROBERTS:
11    Q    Well, whether or not that
12 analysis you suggest is proper or not, you
13 don't know whether it would have made, to
14 use a colloquialism, a darn bit of
15 difference in the ultimate outcome,
16 correct?
17       MR. SULLIVAN:  Objection.
18  Asked and answered.
19       THE WITNESS:  Again, I am
20  unable to -- to make that
21  evaluation one way or the other
22  without performing a proper
23  analysis.
24 BY MR. ROBERTS:
25    Q    Let me ask you to turn to page

Page 380

1  28.
2       At the top of page 28 it says,
3  "As previously discussed, I understand
4  that the ownership rights and the
5  defendants' usage of ancillary data are at
6  issue in this matter.  Specifically, I
7  understand that revenues were generated by
8  the defendants using the ancillary data
9  obtained from eDegree in one of two ways.
10  First, through ancillary bulk sales or the
11  data was sold to third parties, ancillary
12  data sales, and by generating qualified
13  leads to non-eDegree third parties."
14       Who are the non-eDegree third
15 parties in that sentence?
16    A    So those are the -- so I am
17 referring here to the revenues that -- the
18 secondary lead generation.  So it would
19 be -- it would be -- it's what we had
20 talked about earlier this morning, where
21 DGS EDU received revenue on leads that
22 allegedly originated from eDegree for
23 which eDegree did not receive payment.
24    Q    So are the non-eDegree third
25 parties mentioned in the second bullet

Page 381

1  point on page 28 universities?
2     A     (Reviewing.)  So what I am saying
3  is they are generating the qualified leads
4  from universities, but they are not then
5  in turn paying eDegree.
6     Q     It says, "lead to non-eDegree
7  third-party."  And I am wondering whether
8  the "lead to" means the transmission of a
9  lead to a third party who was not eDegree,
10  namely, to a university or whether it
11  means something else.
12     A     So let me clarify what I mean by
13  this.
14           What we are saying is these are
15  the secondary qualified leads.  So it is
16  taking the records that are alleged to
17  have come from eDegree, going out,
18  qualifying them with the university,
19  receiving payment and it's where those --
20  to the extent that a payment was made to
21  an affiliate associated with that sale,
22  the affiliate was not eDegree.
23     Q     Okay.
24           One of the affiliates to whom
25  those payments were made was the Pakistani

Page 382

1  entity affiliated with DGS EDU, correct?
2     A     I believe --
3           MR. SULLIVAN:  Objection.
4           THE WITNESS:  I believe that
5     the records indicate that, yes.
6  BY MR. ROBERTS:
7     Q     When you were thinking about the
8  defendants' unjust enrichment, did you
9  consider the payments made to that
10  Pakistani entity to be a cost, or did you
11  consider them to be part of the profit of
12  the allegedly illegal enterprise?
13     A     I would have included that in the
14  cost.
15     Q     So when one part of the business
16  pays another part of the business, some
17  part of the revenue it received from the
18  challenged enterprise, you took that as
19  being a cost, not being -- moving the same
20  ill-gotten gains around within different
21  pockets inside that company?
22           MR. SULLIVAN:  Objection.
23     Form.  Misstates the witness's
24     testimony.  Misstates the facts.
25           THE WITNESS:  So to the extent

Page 383

1     that in the data the revenue -- I
2     assume that what was in the revenue
3     column was revenue to eDegree and
4     what was in the -- I think it is
5     termed affiliate cost column, that
6     that was paid out to an affiliate.
7  BY MR. ROBERTS:
8     Q     Okay.
9           So if DGS EDU had decided to pay
10  a hundred percent of the revenue from
11  these secondary qualified sales over to
12  the PK entity, your view would be that
13  the -- there would be no unjust enrichment
14  because the cost would equal the -- all of
15  the alledgedly ill-gotten gains?
16           MR. SULLIVAN:  Objection.
17     Form.
18           THE WITNESS:  I would need to
19     understand the ownership
20     relationship between the two
21     entities.
22           The way it is calculated is
23     assuming that that cost is paid out
24     to a third-party entity.
25  BY MR. ROBERTS:

Page 384

1     Q     Okay.
2           You are familiar with the fact
3  that there's no contract between those two
4  parties?
5           MR. SULLIVAN:  Objection.
6     Asked and answered.
7           THE WITNESS:  Yeah.  I
8     believe -- I have not seen a
9     contract between the two -- two
10     parties.
11  BY MR. ROBERTS:
12     Q     Did you see Mr. Darwal's
13  testimony that they share the legal and
14  accounting function?
15     A     I remember some discussion in Mr.
16  Darwal's deposition about that, but I
17  don't -- I don't recall the specifics.
18     Q     Okay.
19           And do you recall that from
20  looking at the DGS LTD's financial
21  statements, that it all rolls up to be
22  reported on the same spreadsheets within
23  DGS LTD?
24     A     I would need to look at the
25  underlying spreadsheet.  I don't have a

**Dana Trexler Smith**

Cornelius, LLC vs.
Ampush Media, Inc., et al.

Page 385

1  recollection of that.
2   Q   Okay.
3       Are you familiar with the concept
4  of transfer pricing?
5   A   Vaguely.
6   Q   So that's where, for example,
7  Apple charges it -- parks its intellectual
8  property in Ireland, which is a low tax
9  jurisdiction, and then charges itself huge
10 amounts to rent that IP and effectively
11 moves all of its profits over to Ireland
12 and out of the United States to avoid
13 taxes.
14      Are you familiar with that as a
15 concept?
16  A   I think that's getting very
17 specific.  I understand that there's --
18 there are a lot of rules -- taxation rules
19 around transfer pricing and how -- I don't
20 know if goods and services are the
21 right -- goods and services, I will use
22 that very broadly, are -- they are the
23 prices at which they are transferred
24 between entities in various countries.
25  Q   Okay.

Page 386

1       Do you have any reason to believe
2  the price with which the revenue was
3  transferred between DGS EDU and the
4  Pakistani entity was an arm's length
5  price?
6   A   I have not performed an analysis
7  of that.
8   Q   So perfectly consistent with your
9  understanding for it to be a transfer
10 price?
11      MR. SULLIVAN:  Objection.
12 Misstates the testimony.
13 BY MR. ROBERTS:
14  Q   Let me rephrase the question.
15      Are you aware of any facts that
16 suggests that was not transfer pricing?
17      MR. SULLIVAN:  Objection.
18 Asked and answered.
19      THE WITNESS:  I -- yeah, I
20 would -- I would need to look at
21 that more.  I -- I don't have any
22 information as I sit here that I
23 can answer your question either
24 way.
25 BY MR. ROBERTS:

Page 387

1   Q   Turn to page 29.
2       It says, "I understand that
3  Ampush sold some but not all of eDegree's
4  records to third-party call centers, which
5  would offer other opportunities that were
6  available through university programs
7  offered by Ampush."
8       Do you see that?
9   A   I do.
10  Q   Were you intending to limit your
11 statement to Ampush, or were you intending
12 to include both Ampush and DGS EDU in that
13 sentence?
14  A   (Reviewing.)  I believe -- I -- I
15 meant that more broadly to both
16 defendants.
17  Q   Okay.
18  A   I think the deposition was
19 referencing Ampush.
20  Q   So were you including the PK
21 entity in that statement?
22  A   (Reviewing.)
23      MR. SULLIVAN:  Objection,
24 form.
25 BY MR. ROBERTS:

Page 388

1   Q   Let me phrase it more clearly.
2       Where you said "third-party call
3  centers," did you consider the PK entity
4  to be a third-party call center within the
5  meaning of that sentence?
6   A   (Reviewing.)  I don't know if I
7  did or not within the meaning of that
8  sentence.
9   Q   Did you assume that DGS got paid
10 for those records?
11  A   For which records?
12  Q   The records identified here as
13 secondary qualified leads.
14      MR. SULLIVAN:  Objection.
15 Form.
16      In what analysis --
17 BY MR. ROBERTS:
18  Q   Let me be more specific.
19      So Ampush includes DGS EDU, and
20 DGS EDU sent records to the Pakistani
21 entity, which called them and that
22 resulted in secondary qualified leads.
23      Correct?
24      MR. SULLIVAN:  Objection.
25 Form.  Misstates the witness's

Case 8:15-cv-02778-VMC-JSS  Document 201-9  Filed 02/01/17  Page 100 of 137 PageID 9368
Confidential
Dana Trexler Smith                                                    Connectus, LLC vs.
                                                                     Ampush Media, Inc., et al.

Page 389

1    prior testimony.
2        THE WITNESS:  Again, can
3    you -- can you say that -- you lost
4    me.
5    BY MR. ROBERTS:
6    Q    Yeah.
7    A    I thought you said Ampush called
8    DGS EDU.
9        (Reporter Clarification.)
10       THE WITNESS:  I thought he
11   said Ampush called DGS EDU, and I
12   believe I trailed off.
13   BY MR. ROBERTS:
14   Q    The plaintiff sent records or
15   searched records against DGS EDU.  DGS EDU
16   took those no match leads --
17   A    Hm-hm.
18   Q    -- and sent them to Pakistani.
19   A    Hm-hm.
20   Q    The call center in Pakistan
21   called those leads, developed some matches
22   and sent them back through DGS EDU to a
23   university.
24       When that happened, the
25   university would pay DGS EDU and

Page 390

1    presumably, in your affiliate price, DGS
2    EDU would pay the Pakistani entity.
3        Is that your understanding of how
4    the money flowed?
5        MR. SULLIVAN:  Objection.
6    Form.  Misstates the -- the
7    evidence in the case.
8        THE WITNESS:  So in my
9    analysis where there was a -- where
10   there was revenue generated in the
11   revenue column, I assumed that a
12   sale was made to a university, and
13   I captured that in my analysis, and
14   then where there was an amount paid
15   to affiliate, I assumed that that
16   was a cost in my analysis.
17   BY MR. ROBERTS:
18   Q    Okay.
19       When the -- DGS EDU first sent
20   the record to the Pakistani entity, do you
21   know if there was a price associated with
22   that transfer?
23       MR. SULLIVAN:  Objection.
24   Form.  Misstates the evidence.
25       THE WITNESS:  The data I

Page 391

1    relied on was in -- for any revenue
2    or costing information was included
3    in DGS 200, so I am unsure that I
4    can answer that question.
5    BY MR. ROBERTS:
6    Q    Okay.
7        Are you aware, as you sit here
8    today, of the Pakistani entity paying DGS
9    EDU for any of the data that it received?
10       MR. SULLIVAN:  Objection.
11   Asked and answered.
12       THE WITNESS:  I can't recall.
13   BY MR. ROBERTS:
14   Q    Okay.
15       Are you aware of the testimony of
16   DGS EDU's Mr. Darwal, that DGS EDU has no
17   idea what the Pakistani entity did with
18   the data that it was sent?
19   A    I remember a discussion about the
20   DGS Pakistani entity.  I don't remember
21   that specific statement.
22   Q    Did you attempt in your analysis
23   to figure out whether the Pakistani entity
24   had monetized the data through any way
25   other than by creating secondary qualified

Page 392

1    leads?
2        MR. SULLIVAN:  Objection.
3    Asked and answered.
4        THE WITNESS:  So my analysis
5    relied on the information in DGS
6    200, which, again, I understand is
7    the population of records for which
8    DGS EDU received revenues.
9    BY MR. ROBERTS:
10   Q    Let's ask you to look at Footnote
11   100.
12   A    (Reviewing.)
13   Q    "I understand that for remaining
14   records in DGS 200, i.e., those without
15   affiliate education match, relate to DGS
16   EDU's call center, which was in contact
17   with an" --
18   A    I guess they want us to leave.
19   Q    -- "individually independent from
20   the eDegree relationship and qualify that
21   individual as a lead through the
22   defendants' web portal."
23       What do you mean, "which was in
24   contact with an individual independently
25   from the eDegree relationship"?

Dana Trexler Smith                                                    Ampush Media, Inc., et al.

Page 393

1    A    So I understand that -- that
2  there's a population of leads within DGS
3  200.  There's education match, and those
4  are the ones that we believe are at issue
5  in this matter, and then there are
6  others -- because these are all revenues
7  in DGS 200 that came in, and as we talked
8  earlier today, there are other affiliates.
9  There is organically generated records.
10  And that any of those which were not
11  denoted as education match relate to those
12  other records is what I am trying to say
13  here, maybe inarticulately.
14    Q    Have you looked at the data in
15  Mr. Kidder's report showing the close
16  temporal proximity between the time in
17  which the data came in from the plaintiff
18  and the time the PK entity started calling
19  that same prospect?
20    A    I did, yes.
21    Q    Did you form any opinion about
22  that?
23    A    I mean, I -- I looked at it.
24  I -- I don't know that I spent a lot of
25  time.

Page 394

1    Q    Are you intending to rebut that
2  testimony in any way as you sit here
3  today?
4    A    Not as I sit here today, no.
5    Q    I ask you to turn to page 31.
6        "The total revenue is generated
7  by non-eDegree third parties on the
8  matched eDegree records are summarized in
9  Exhibit 5 and are included in my analysis
10  of unjust sales of secondary qualified
11  leads."
12        How does your analysis in
13  Exhibit 5 differ from DGS 202?
14    A    Remind me what DGS 202 is.
15    Q    You don't recall what DGS 202 is?
16    A    I don't have the Bates numbers
17  memorized.  I am sure I know what the
18  document is.  If you can show it to me
19  or --
20    Q    I didn't bring copies.
21    A    -- point me to it.
22    Q    They are all enormous documents,
23  so I didn't bring copies of them.  So we
24  will just move on.
25        Let me ask you to turn to page

Page 395

1  32 -- oh, actually, before we do that,
2  Footnote 103 and 104, did you get any
3  general ledger information other than what
4  is referenced in Footnote 103 and 104?
5    A    (Reviewing.)  I believe I recall
6  what these are.  I am going to answer, as
7  I sit here today, I believe that's
8  everything.  I mean, I -- I included in
9  Exhibit B all of the documents that I
10  would have referenced.  So to the extent
11  there's anything in there that's general
12  ledger information, it would either be
13  included here or in there.
14    Q    I understand.
15    A    I just can't remember what every
16  Bates number there was.
17    Q    But you didn't get any general
18  ledger information that is not reflected
19  in Exhibit B?
20        MR. SULLIVAN:  Objection.
21  Asked and answered.
22        THE WITNESS:  Yeah.  To the
23  best of my knowledge, Exhibit B
24  should be complete.
25  BY MR. ROBERTS:

Page 396

1    Q    Okay.  Turning to page 32.
2    A    Okay.
3    Q    You have a lot of costs here, but
4  am I correct that ultimately the only ones
5  you end up using in your analysis are the
6  lead generation costs?
7    A    That's correct.  I performed an
8  analysis to understand which costs may be
9  relevant as incremental costs, and then
10  when I -- I looked at lead generation data
11  scoring verification and data hosting
12  costs, over the subset of records that are
13  at issue in this case, it ended up being
14  de minimis amounts, in the $30 type range,
15  so...
16    Q    Except you didn't -- as we talked
17  about, you didn't use the advertising
18  costs, and your basis for doing that was
19  that those advertising costs weren't
20  incurred for the particular type of
21  third-party call center leads generated in
22  this case?
23        MR. SULLIVAN:  Objection.
24  Asked and answered.
25        THE WITNESS:  Well, again,

Page 397

1  those -- those costs, while they
2  may be costs for organically
3  generating leads by DGS EDU, they
4  are unrelated to generating
5  revenues on the subset of records
6  at issue in -- the subset of
7  records on which I have calculated
8  the unjust enrichment damage
9  calculation.
10     So it would be inappropriate
11 to include those costs because we
12 would be including costs that
13 related to a different set of
14 revenues.
15 BY MR. ROBERTS:
16  Q   And those costs would be
17 appropriate to include if one were going
18 to do a cost-avoided analysis by looking
19 at the cost of generating the leads
20 through an organic process, correct?
21     MR. SULLIVAN:  Objection.
22 Form.  Asked and answered.
23     THE WITNESS:  Those are the
24 types of costs that you may
25 consider.  You'd need to perform an

Page 398

1  analysis and make sure that you are
2  looking at the cost relevant to
3  those types of leads rather than
4  the overall business.
5     But those are the type of
6  costs generally that you may
7  consider.
8  BY MR. ROBERTS:
9  Q   Okay.
10     Let me ask you to look at
11 Exhibit 6, please.
12  A   (Reviewing.)
13  Q   The fourth and fifth columns are
14 eDegree disqualified.
15  A   Yes.
16  Q   What do those columns represent?
17  A   So these are -- okay.
18     So we're -- the subset of records
19 that we are looking at in the eDegree
20 qualified column and eDegree disqualified
21 column are the eDegree submitted records
22 and we had talked earlier that some of
23 those are accepted by a university and for
24 which payment is made.
25     Those are what we are referring

Page 399

1  to here as the eDegree qualified.  And
2  then there's another subset that are the
3  eDegree disqualified.
4  Q   Okay.
5     And under the disqualified, why
6  is there qualified sales revenue for
7  disqualified records?
8  A   That may -- I would have to go
9  look at the underlying data.
10  Q   Didn't we talk earlier about the
11 fact that you were told that when records
12 were disqualified, they were not used for
13 qualified sales?
14     There should be no qualified sale
15 revenue associated with a disqualified
16 record?
17     MR. SULLIVAN:  Objection.
18 Misstates the witness's prior
19 testimony.  Asked and answered.
20     THE WITNESS:  Yeah.  We were
21 talking about a different data
22 source than what is -- than what
23 this is pulling information from.
24     We were talking about the
25 financial statements.

Page 400

1  BY MR. ROBERTS:
2  Q   No, ma'am.
3     If I as the plaintiff submit a
4  record to the defendant and that record is
5  subsequently disqualified --
6  A   Yes.
7  Q   -- it's your understanding based
8  on the testimony of Mr. Mayberry, as you
9  quoted essentially in your report, that
10 once it was disqualified.
11     They did not use that -- they did
12 not seek to monetize that data, correct?
13     MR. SULLIVAN:  Objection.
14 Form.  Misstates the witness's
15 testimony.
16     Are you asking what Mr.
17 Mayberry says or what she knows?
18 BY MR. ROBERTS:
19  Q   I'm asking your understanding
20 based upon your quoting of Mr. Mayberry.
21     MR. SULLIVAN:  Same objection.
22 Form.  Misstates the witness's
23 prior testimony.
24     THE WITNESS:  So I seem to
25 recall that Mr. Mayberry had said

Page 401

1    that the -- that the data was no
2    longer used.
3        This may -- and I have to look
4    at the underlying records.  This
5    could relate to what you were
6    referring to as the DQ scrub.
7  BY MR. ROBERTS:
8    Q    So take a minute and tell me what
9  this revenue represents, please.
10       MR. SULLIVAN:  Objection.
11   Asked and answered.
12  BY MR. ROBERTS:
13   Q    Have you answered what the data
14  represents?
15       MR. SULLIVAN:  Objection.
16   Argumentative.
17       MR. ROBERTS:  No, Mike.  Stop.
18  BY MR. ROBERTS:
19   Q    Have you answered what the data
20  represents?  Please tell me what the data
21  represents.
22       MR. SULLIVAN:  Mr. Roberts,
23   she said she would have to look at
24   the underlying documents.
25       MR. ROBERTS:  Mike.

Page 402

1        MR. AARON:  I agree with Mike
2    here.
3        MR. ROBERTS:  You're so trying
4    to interfere with this deposition.
5    I am trying to get a simple answer.
6  BY MR. ROBERTS:
7    Q    Please, take the time.  Look at
8  all the documents you have.
9        Tell me what the revenue in the
10  one, two, three -- fourth column on
11  Exhibit 6 represents, if you can, please.
12       MR. SULLIVAN:  Objection.
13   Argumentative.  Asked and answered.
14       THE WITNESS:  Okay.
15       Please provide me with DGS 193
16   and DGS 200, and I would be happy
17   to answer your question.
18  BY MR. ROBERTS:
19   Q    So you can't answer my question
20  without looking back at the records
21  because you don't remember?
22       MR. SULLIVAN:  Objection.
23   Asked and answered.
24       MR. ROBERTS:  We are done for
25   today.

Page 403

1        Thank you.
2        MR. AARON:  You got about
3    another hour to go.
4        THE VIDEOGRAPHER:  Off the
5    record at 5:35.
6        (Whereupon Testimony Concluded
7    at 5:35 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 404

1      I, S. Arielle Santos, C.S.R., a
2    Registered Professional Reporter,
3    Certified Shorthand Reporter, Certified
4    LiveNote Reporter do hereby certify:
5    That prior to being examined, the witness
6    named in the forgoing deposition, was by
7    me duly sworn to testify the truth, the
8    whole truth, and nothing but the truth.
9    That said deposition was taken before me
10   at the time and place set forth and was
11   taken down by me in shorthand and
12   thereafter reduced to computerized
13   transcription under my direction and
14   supervision, and I hereby certify the
15   foregoing deposition is a full, true and
16   correct transcript of my shorthand notes
17   so taken.
18   I further certify that I am neither
19   counsel for nor related to any party to
20   said action nor in anywise interested in
21   the outcome thereof.
       Further, that if the foregoing pertains to the
22   original transcript of a deposition in a federal
     case, before completion of the proceedings,
23   review of the transcript [ ] was [x] was not
     requested.
24   Date: December 8, 2016

25        S. Arielle Santos, RPR, CSR, CLR

**Dana Trexler Smith**

Page 405

1    DECLARATION UNDER PENALTY OF PERJURY

2    Case Name: Connectus, LLC vs.

         Ampush Media, Inc., et al.

3    Date of Deposition: 12/05/2016

4    Job No.: 10028980

5

6         I, DANA TREXLER SMITH, hereby certify

7    under penalty of perjury under the laws of the State of

8    _____ that the foregoing is true and correct.

9         Executed this _____ day of

10   _____, 2016, at _____.

11

12

13       _____

14         DANA TREXLER SMITH

15

16   NOTARIZATION (If Required)

17   State of _____

18   County of _____

19   Subscribed and sworn to (or affirmed) before me on

20   this _____ day of _____, 20__,

21   by_____,   proved to me on the

22   basis of satisfactory evidence to be the person

23   who appeared before me.

24   Signature: _____ (Seal)

25

Page 406

1    DEPOSITION ERRATA SHEET

2    Case Name: Connectus, LLC vs.

         Ampush Media, Inc., et al.

     Name of Witness: Dana Trexler Smith

3    Date of Deposition: 12/05/2016

     Job No.: 10028980

4    Reason Codes:  1. To clarify the record.

                    2. To conform to the facts.

5                   3. To correct transcription errors.

6    Page _____ Line _____ Reason _____

7    From _____ to _____

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24   Page _____ Line _____ Reason _____

25   From _____ to _____

Page 407

1    DEPOSITION ERRATA SHEET

2    Page _____ Line _____ Reason _____

3    From _____ to _____

4    Page _____ Line _____ Reason _____

5    From _____ to _____

6    Page _____ Line _____ Reason _____

7    From _____ to _____

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   _____ Subject to the above changes, I certify that the

         transcript is true and correct

23   _____ No changes have been made. I certify that the

         transcript  is true and correct.

24

     _____

25         DANA TREXLER SMITH

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 105 of 137 PageID 9373
Confidential
Dana Trexler Smith                                                    Connectus, LLC vs.
                                                                     Ampush Media, Inc., et al.

**$**

**$1**  185:25 186:25 188:1
193:15 194:21 197:22
198:18 212:8 238:20
239:5 243:10,14 245:16
291:22 297:23

**$1.1**  178:6 179:6 197:1,2
230:1 238:11 247:8,14
248:6,20,25 249:19,23
250:4,5 292:14 293:23
294:22 295:7

**$10,000**  217:4 219:10
220:6,13

**$12**  185:23 186:18,24
187:13,15,25 192:5
194:20 195:12

**$175**  20:17

**$19**  178:4 179:5 193:14
194:17 196:25 197:15,
20 198:8,14,15 200:21
238:8,18 239:3,21,24
240:10,13 241:6,7,9,10,
14,16 242:4,9,10,14,17,
22 243:13,23 245:15
248:19,23 249:7,14,25
257:10 259:3,20 260:8
263:20 292:12,15,19,22
293:24 294:17,21 295:6
296:18 297:22 300:1

**$2**  234:25 235:6

**$2.4**  374:22 376:6

**$2.95**  96:21

**$24**  235:21,23 236:15,23
290:1

**$25**  222:10,12 280:12

**$3**  260:8

**$3.5**  63:8

**$3.8**  298:15

**$30**  361:1 396:14

**$316**  108:23

**$35**  223:2 224:16 225:23

**$400**  20:18

**$460**  19:17

**$5,510**  171:15

**$50,000**  222:25 224:13

**$638**  106:16,23 107:3
108:14,20 109:4

**$800,000**  215:24 216:18

**$90,000**  218:6

**$900,000**  262:21

**$900,300**  257:9

**$91**  168:9

**0**

**000164**  58:22 59:13 62:7
109:15

**000193**  61:21 104:7,13,
21

**000200**  98:1 104:17,20
110:3

**1**

**1**  117:3,4 124:23,24
162:5 194:17 197:16
202:13,14,19,21 203:19,
20 204:21,22 206:10,23
244:1,17 273:17 299:11,
14 300:2 317:25

**1,127,724**  228:6

**1.1**  181:7 250:1

**1.653**  303:9

**10**  54:15 226:11 355:20

**10,000**  218:1,6

**100**  392:11

**103**  395:2,4

**104**  395:2,4

**11337**  121:23

**1137**  124:19 125:4

**1138**  124:20 125:5

**11:00**  103:2

**11:16**  103:3,5

**12**  198:10 207:18 227:8,
25 228:1 230:22 251:20

**127**  238:2

**12:23**  167:18,20

**12:25**  166:24

**13**  202:20 247:3 255:19
265:8 272:23 334:8
355:21

**1302**  110:23

**13th**  117:12

**15**  275:8,16,18 334:8
374:12,18,19 375:1,10,
18

**150**  4:1 6:8 22:5 24:11,
24 25:19 43:7 46:20

**151**  4:2 6:23 7:23 9:21
10:18,23 14:25 15:12
16:1,5,8,13 24:1 147:8

**15th**  117:12 306:6,7

**1600**  181:9

**1618**  110:22

**164**  62:16 115:12,15,18
116:2,3,8 117:15,25
118:1,7,24 119:12,17,21
120:6,7,13,16,17
121:10,14 126:12 270:9

**165**  174:10

**16th**  26:15

**17**  142:22 302:4

**18**  309:5 310:3 311:4
315:13 326:9 329:2

**19**  120:13 179:5 200:21
228:5 230:4 237:25
240:1,16,19,24 241:1,
20,24 242:2 244:1,17
245:3 251:1 262:22
291:21 296:13 297:24
299:10,14 320:18 321:4
322:13

**192**  58:22 59:14 62:7,16
109:15 115:12,15,18
116:2,3,8 120:7,16,17
121:10,15 270:10

**193**  270:9 402:15

**1993**  52:15

**1994**  47:13

**1995**  47:14

**1997**  51:23

**1:24**  167:21,23

**2**

**2**  103:6 162:5 206:24
207:1 208:7 273:22
317:20

**20**  330:5 339:3

**200**  114:20,25 115:8
121:15 133:1,16 160:9
174:12,13,19 340:1
391:3 392:6,14 393:3,7
402:16

**2000**  52:23

**2001**  46:16 52:23

**2012**  51:20 53:1

**2013**  106:13 107:19
110:22 331:14,15,16
332:3,11,18 333:2,5,16,
21,22 335:8 352:16

**2014**  168:5 171:12

**2015**  168:13,14 176:3,18
306:8 332:3,12 333:3,17
335:8

**2016**  4:5 7:13 10:18 13:5
15:17 19:5 43:15

**202**  210:19,20 394:13,
14,15

**205**  171:14,18

**21**  338:11 346:19 352:25
353:14 355:2,16,24

**22**  7:13 10:18 13:5 15:17
43:14 106:14,15,19
107:7,14,19 108:13,14,
20,25 357:25 358:5,7

**229**  117:5 209:16 311:15
312:1 317:21 325:9
327:23 364:12

**22nd**  9:23 10:4,6 11:3,25
20:25 26:16 44:9

**238**  181:8

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 106 of 137 PageID 9374

Dana Trexler Smith
Confidential
Connectus, LLC vs.
Ampush Media, Inc., et al.

**24** 362:7

**24-hour** 163:1

**25** 114:4 364:20 366:10 367:9 376:16 378:15

**26** 16:13 367:9 377:15

**27** 366:10 367:9 376:17 378:16

**28** 380:1,2 381:1

**288** 364:11

**289** 361:19,21

**29** 96:23 387:1

**29th** 177:1

**2:14** 230:11,13

**2:26** 230:14,16

----

**3**

**3** 19:20 162:6 200:21 209:14 230:17 237:25 298:15

**3,000** 76:15 83:6 84:16

**3,459,593** 62:13,19 64:2

**3,500** 93:16

**3,582** 76:9,15,22 79:2 81:19 83:14 85:8 89:16 90:11 95:3

**3.4** 301:1

**3.459** 68:20

**3.5** 267:2,5,18 268:11,16 269:22 270:18,22,23 271:3 296:25 306:4 312:2 317:19 325:5 341:22 343:4 354:19 355:6,12

**3.8** 178:3 228:5 230:3 238:8 298:25

**30** 176:3,18 213:8 268:10 297:2 298:8

**30/70** 54:2

**300** 4:12 21:14

**30th** 176:23

**31** 394:5

**316** 108:2 110:23

**32** 124:24 395:1 396:1

**320ish** 21:21

**33** 360:12

**35** 7:8 225:9

**35,000** 266:6 267:20

**3582** 89:24

**36** 117:15 121:18 124:25

**38** 174:11

**38,000** 267:6 268:10

**3:05** 275:1,3

**3:18** 275:4,6

**3rd** 28:7

----

**4**

**4** 54:25 117:2 303:8,24 305:5 306:3 329:22

**40** 54:24

**45** 100:9 226:11,16,20, 24

**48** 252:4

**4:09** 329:16,18

**4:19** 329:19,21

**4th** 28:8

----

**5**

**5** 4:5 54:15 55:21,23 58:2,3 59:22 60:22 65:25 75:9 76:5 86:3,8 89:21 103:10 105:1,24 106:9,10 111:9,22 127:23 130:2,10,18,21 131:3 150:6 158:15 160:11 162:24 164:17 168:1,3 172:23 298:3 330:6 331:24 338:13 339:4 394:9,13

**5,000** 90:12

**50** 54:24 191:4

**50,000** 68:19

**50,213** 105:12

**500,0000** 90:12

**510** 93:13

**510,000** 76:23 77:1 78:3, 9 79:3 81:20,25 90:17, 22 93:18,21,22 94:4,12 95:2,11

**513** 68:21 69:8,10 77:17

**513,000** 68:18 94:22 97:21

**513,930** 71:5 74:3,10 75:14 76:21,23 78:20 79:2 80:10 89:25 90:13, 17 92:7 93:15 98:13 99:8 102:10 105:15

**59,000** 266:5

**5:01** 371:10,12

**5:06** 371:13,15

**5:35** 403:5,7

----

**6**

**6** 147:14 151:8 166:19 198:10 227:10 292:19, 20 398:11 402:11

**60** 100:9

**60/40** 53:25

**600** 4:11

**638** 108:1

**69** 302:4

----

**7**

**7** 152:25 154:18 176:1,7

----

**8**

**8** 19:5 58:18 61:1 65:6 67:11,24 68:14 70:5,14 71:4 73:25 74:5 75:1,2 76:13,20 78:20 79:8 81:22 83:23 90:1 91:21 96:7 97:18,25 98:10 104:6,11 105:13 109:12, 14,25 153:3 160:8

**177:13** 196:8 269:2,25

**80** 20:23 21:3 23:23 24:5,8,13 318:7

**800,000** 215:22 216:2

**847,647** 364:12

**85** 375:20

**8:15-CV-02778-VMC-JSS** 4:22

----

**9**

**9** 354:20 355:3,6,13 356:5

**90** 23:24 47:13

**900,000** 227:10

**95** 20:23 24:5,9

**9:29** 4:4

----

**A**

**a.m.** 4:4

**Aaron** 5:9 7:15,19 12:19 13:6 32:8 37:7,11 38:22 39:8 49:15 62:23 77:4, 23 83:10 84:23 87:7,12 90:10 93:6 96:14 101:16 108:5 125:22 144:24 151:4 154:15 156:11 157:12 158:3 162:18 180:20 184:9,19 187:2 188:2,21,23 191:20 192:7 194:24 198:2 199:1 200:4 201:23 211:7,17 212:15 213:13 214:15,18 216:3 217:6 219:15,20 221:6 222:14 223:4 228:14,21 229:20 241:21 243:3 244:5 249:4 251:21 256:5 257:19 272:24 279:10 287:25 288:11 295:19 298:11,21 315:19,22 323:10 344:8 356:6,16 370:18,24 371:6 402:1 403:2

**abandoned** 155:10

**ability** 133:5 202:3

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

**absolutely** 62:11 294:18

**accept** 57:2,14 113:5,6 367:4

**accepted** 72:2 155:3 156:3 278:24 281:18 366:25 367:13 377:9 398:23

**accepts** 324:12,16 327:3 328:12

**access** 176:2,10,14

**account** 98:6,9

**accountant** 47:10 50:18 180:1

**Accountants** 51:5

**accounting** 46:23 47:16, 18 48:15 49:1,14,19 50:7,10,12,14 51:8,11, 15,16 203:18 204:21 205:1 384:14

**accounts** 51:10

**accuracy** 297:25

**accurate** 73:13 100:12, 13 101:7 147:25 157:11

**achieved** 375:21

**acquire** 240:25 241:6

**acquiring** 372:1

**acquisition** 372:11

**acting** 180:12 182:13 183:21

**action** 14:18 144:4,5,10 157:20 207:2 208:19

**actions** 142:18 143:3,23 144:19 145:5,13 146:1, 17 224:3,25 257:17 259:6 260:13 301:25 303:3,9 304:11 305:3

**activities** 375:3,4,5

**activity** 135:22 186:3

**actor** 247:5,20 248:3 293:16

**actors** 248:18,23

**acts** 374:9

**actual** 57:19 73:11 77:14 85:10 86:4,5 100:8,9 235:18,20 240:5 259:4, 12 260:20 263:16 264:12,15 265:2,3,11,14 272:3 273:6 306:5,11,14 313:17 331:18 332:4,16, 22 333:7 334:7,19 352:17 362:11,19 363:9 374:7

**ad** 134:10 138:3

**Adam** 20:5 26:2

**add** 190:15

**added** 191:12 196:4 198:10 363:19

**adding** 111:5

**addition** 68:24 69:5

**additional** 9:24 11:4 12:2,14 13:22 14:2,6,22 15:18 43:11 44:7 83:25 107:8 144:3 146:9 147:1 149:24 156:21 184:1 225:10 239:13 329:11 358:3,14

**address** 101:9

**addresses** 101:10

**adds** 63:1

**adjustments** 370:5

**administer** 5:14

**administration** 46:22

**administrative** 140:1

**admonition** 13:14

**adopted** 163:1,4

**adopting** 254:14

**ads** 134:10 136:12,23 139:10 302:7,10

**advancing** 256:12

**advertisement** 137:14, 16 140:17 141:24

**advertisements** 136:15 141:5

**advertising** 135:13 359:24 361:4,18 396:17, 19

**advised** 203:6

**advocating** 196:17

**affected** 224:4,5

**affiliate** 58:11 60:21 65:7 66:6 70:23 78:24 82:17 90:25 95:23 96:4,8,9 98:3,17 107:12,15,17 108:22 110:13,21 113:23,24 114:2,4 118:6,12 119:5 122:17, 22,25 133:20,23 168:10 169:8,10,13 170:11 171:16,17 191:8 359:22 360:6 362:8 381:21,22 383:5,6 390:1,15 392:15

**affiliated** 94:8 121:3 129:11 142:8 165:8 382:1

**affiliates** 59:22 65:9,21 68:16 70:11 75:20 78:11,12,23 79:6 82:2 88:22 94:9 95:9,18 104:16 110:20 111:4 114:22 115:2,16,22 116:10 118:19 119:2 120:1 168:16,23 169:2 174:7,15,21 190:6 191:10 227:9 286:20 381:24 393:8

**affiliation** 78:9

**afternoon** 167:25

**agent** 358:25 359:3

**aggregator** 148:2,25

**aggregators** 147:20 148:9

**agree** 145:25 181:15,18 215:5 240:13 241:18 248:12 278:3 279:4 297:19 319:18 336:3 349:10 359:11 361:17 402:1

**agreed** 190:2 193:13

**agreement** 18:5,13 153:20 202:21 203:4,23 205:17 207:16 209:7 331:22

19

**agrees** 56:2

**ahead** 211:20 328:3 335:22

**alledgedly** 383:15

**allegation** 128:2,13,18 129:2,4 198:6,13

**allegations** 59:15 196:2 215:15

**alleged** 64:20 368:6,7 369:12 375:11 378:11, 17 381:16

**allegedly** 58:24 89:6 116:6 120:9 121:3 127:1 365:5 380:22 382:12

**alleging** 189:2

**allocated** 360:15

**allocation** 91:10 98:22 99:1

**allowed** 148:15

**alternative** 173:7 175:4 232:9 276:18

**Amazon** 182:2,3,5,11,19

**Amazon's** 182:7

**amount** 73:20,23 77:13 88:3 98:19 100:2,7 106:22 108:1,2 133:18 214:8 215:9,11,13 217:20 218:4 220:24 245:19 250:20,21 257:22 258:9 259:11 261:23,25 264:11,18,20 275:12 276:2 277:21 293:3 335:16 336:10 337:4,11 341:21 346:5 362:17 363:9 369:5 375:16 376:6,8 390:14

**amounts** 101:2 105:23 227:14 261:18 262:19 306:2,3 340:11 345:5,8, 11 362:11,19 363:19 385:10 396:14

**Ampush** 4:17 5:10 18:1, 3,12,15 59:25 60:4 71:6 108:17,19 117:9 118:14 202:25 226:13 227:7 277:19 305:21 310:21

Case 8:15-cv-02778-VMC-JSS    Document 201-9    Filed 02/01/17    Page 108 of 137 PageID 9376

Dana Trexler Smith

Confidential

Connectus, LLC vs.
Ampush Media, Inc., et al.

331:22 365:6 374:21
387:3,7,11,12,19 388:19
389:7,11

**Ampush's** 154:23

**Ampush/dgs** 147:20

**analyses** 24:16 193:24
212:20 367:10 378:15

**analysis** 10:22 20:8
24:19 25:8,14,15 29:12,
25 30:12,15,18,20 48:7,
9 49:1,14,19 50:7,9,12,
13 53:13 74:21 75:3,8,
24 79:16 86:1,24 88:24
89:1,2,4,12 91:7,19 93:9
94:23 95:16,21 101:25
112:7 121:7 122:7 133:2
141:15 144:11 149:18
156:16,23 157:4 159:18
160:4 162:24 171:1,3
177:15 178:1 190:4
192:3 194:14 195:10
210:13,14 216:14,17
223:10 267:17 277:15
282:8 300:4,20 309:13
319:23 325:12 339:3
340:10,23 341:1 342:2
343:6,17 344:13,16
360:1,5,13 361:9,15
363:24 364:1 365:1,19
366:19,20 368:10 369:4
370:13 372:5 378:8,13
379:9,12,23 386:6
388:16 390:9,13,16
391:22 392:4 394:9,12
396:5,8 397:18 398:1

**analyze** 75:18

**analyzed** 75:15 360:3

**analyzing** 216:10 278:9
316:3

**ancillary** 72:7 73:1,11,20
74:15,19,21 78:12
84:11,19 85:6,14,25
86:17 87:19 88:2,16,25
89:3,8 91:1,4,8,14,19
92:3,9,17 93:2,10,22
94:6,13,21,25 95:4,19
96:10,11,13 97:5,8,13,
20 98:17,23 99:16,20
100:5,15 101:1 112:10
116:20 117:9,11 126:13

127:3,24 130:6,17,21
143:9,16 146:23 152:25
158:25 159:4,6,19
160:16,19 161:5 209:20
268:8 271:1,7,13,17
304:1 305:7 314:5,17
315:7 316:11,21 317:4,9
318:11,18,21,25 319:6
321:20,25 322:7,10,20
323:4,20 324:5,15,22
328:17 364:11 372:9,16,
23 373:15 380:5,8,10,11

**answering** 33:14 35:11
152:16 210:11 268:6
370:22,25

**answers** 163:5 202:11

**Anthony** 125:13,17

**apologize** 20:11 179:14
330:3 345:9

**apparent** 237:14 300:21

**appearance** 5:2

**appearing** 6:14

**appears** 7:1,5 28:16

**apple** 96:23 385:7

**apples** 90:5 96:19,21
97:1 328:16

**applicable** 205:15

**application** 331:25

**applied** 203:19 345:16
351:12,14,15 352:8
354:8 356:24 360:12

**applies** 204:24 206:15

**apply** 333:14 354:17
374:7

**applying** 354:21,24
356:18

**apportion** 365:4

**apportioned** 73:2,18

**approach** 377:16,17

**approaches** 377:20

**appropriately** 297:12

**approximate** 319:14,16

**approximately** 21:3,14
23:23 24:8,10 90:16
93:18 94:20 178:3
238:10 247:7 248:6
267:2 270:21 280:12

**approximates** 306:7

**Aptus** 4:7,10

**area** 204:16 367:1

**argue** 162:10

**argument** 162:14
187:22,23 197:18,23
198:20 199:25 202:15
291:20 297:22

**argumentative** 46:1
163:18 166:7 172:18
183:6,24 184:20 185:4
192:19 199:10,14 201:4
204:7,12 205:13 223:25
292:24 298:12 301:14
304:7 342:23 344:22
401:16 402:13

**argumentive** 46:7

**arguments** 202:17

**Arielle** 4:10

**arising** 203:3

**arm's** 367:23 386:4

**arrangement** 281:15
290:13

**arrive** 96:5

**arriving** 205:2

**articulate** 195:2

**articulated** 193:11
230:21

**articulating** 200:17
232:8

**Ashcroft** 17:22

**asks** 31:1 207:8 256:20
262:5 264:3 316:24

**aspects** 47:3

**asserted** 258:15

**assertion** 362:15

**assertions** 258:20

**assessing** 237:15

**asset** 243:18 244:13,18,
23 245:1,4,18

**assets** 244:21

**assign** 25:7

**assigned** 372:8 373:16,
21

**assigning** 371:25

**assist** 204:15,20

**associate** 20:7

**assume** 77:19 84:4
122:12 185:12,16,24
187:19 218:19 228:12
232:3 234:9,18 235:5,7,
19 236:4 240:15 241:6,
23 242:21 276:20,21
293:12,17 314:15 315:5
376:7 383:2 388:9

**assumed** 202:22 277:3
287:18 288:2 315:14
319:4 334:11,16 345:16
374:12,16 390:11,15

**assumes** 25:21 32:18
38:23 39:9 149:6 188:23
189:11 199:19 222:15
230:23 249:5,6 250:14,
22 265:12 272:1,25
275:10,24 276:8 277:16
288:11 346:25 356:7
369:8 376:10

**assuming** 187:24
192:23,24 194:15,19
207:23 236:5 237:3
240:1 241:17 249:12
273:10 277:18 282:20
286:2 297:11 313:5,9
337:7 346:4 368:11
375:18 376:1,2,19
383:23

**assumption** 171:18
229:16 249:13 276:12
277:6 287:3 289:13,21
309:8 313:14 314:11
315:3 319:8,20 339:12
368:13 377:7

**assumptions** 8:23 38:19
39:6 187:21 188:6
189:19 193:2 221:11

Dana Trexler Smith

Confidential

Connectus, LLC vs.
Ampush Media, Inc., et al.

**assurance** 52:4,5

**attached** 250:19 331:21

**attempt** 47:15 88:18
148:4 149:17,25 157:9
158:20 159:8,21 226:23
357:5 364:6 377:19
391:22

**attempted** 147:5 157:22
209:19 256:15 258:2

**attempting** 204:19 220:2
247:12,17 325:6 366:4
367:14

**attorney** 10:13

**attorney-client** 10:12
11:9,11,15 13:2,11,13
29:2,6,19 31:3,17 32:22
33:15,25 35:12 131:9
207:9

**attorneys** 5:1

**attributable** 374:8

**audit** 52:6

**August** 331:15 333:4

**Avatar** 233:23

**average** 338:16 339:13

**avoid** 274:14 385:12

**avoidance** 192:2

**avoided** 178:2 187:16
196:13,14,15 197:21
198:16,23,25 199:19,24
200:22,23 222:7,12,17
228:2 232:16 235:11
237:10 239:19,24 240:8,
12 241:11,20 242:4,18
255:20 257:14 262:9,13
263:2,5,13 265:10
271:25 273:4,8 276:22
279:5 281:1,8 282:7
292:16 293:5 297:13

**avoiding** 297:18

**award** 257:10 262:3

**awarded** 259:3

**awarding** 255:20,24
261:17

**awards** 263:20

**aware** 7:21 8:7 85:17
86:12 113:17 114:8
128:1 134:5 135:6,8
137:10,21 138:2 149:14
150:22 153:16,19
160:17 164:18 175:4,13,
20 204:5 246:10 258:13,
15,19,20 386:15 391:7,
15

**awful** 294:18

**axis** 285:2,3,4,9,12

---

## B

**B-u-c-h-a-k-j-i-a-n** 26:5

**back** 10:7 16:12 40:7
42:15 43:4,22 44:10,21,
22,24,25 45:10 60:16
66:13 73:6 74:25 79:2
82:8 84:2 86:11 88:4,13
92:23 103:9 104:11
109:11 111:9 127:21,23
135:17 147:14 151:8
168:1 171:9 172:11
175:9 184:5,14 185:18
190:21 210:24 245:16
251:5,19 255:18 263:22
277:13 290:18 300:19
309:21 320:20 327:7,21
360:7 362:16 389:22
402:20

**background** 19:21

**backup** 367:3

**bad** 219:12 274:13 294:7
374:9

**baked** 189:20 193:2

**baking** 188:5

**balance** 309:3

**ballpark** 20:16 63:12

**ballparking** 21:22

**barely** 263:22

**bargained-for** 369:2

**bars** 238:19 239:4,22
240:2,11,18 241:1,5,8,9,
10,12,19,25 242:1,8,22
243:14 244:24,25 245:2,
3,15 246:3

**base** 356:25 357:2

**based** 7:6 31:21 45:5
53:7 60:1,2 113:25
129:12 147:18 148:5
177:16 192:1 193:25
196:12 204:15,20
244:13 250:20 252:13,
15,22 267:17 291:19
304:9 316:17 318:5
322:24 353:24 358:23
359:6 375:10 376:11,21
400:7,20

**basic** 287:13

**basically** 254:5

**basis** 98:20 100:3,21,23
101:5 113:16 204:2
252:19 267:15 281:8
346:8 369:15 370:18,19
373:13 396:18

**Bates** 8:15 210:22
305:18 394:16 395:16

**beans** 283:5,6

**Beard** 53:3

**bearer** 213:1

**bearing** 336:2

**beer** 184:5,13 185:7,17,
21,23 186:16,17,23
187:8,9,13,16,25 190:7,
15,16,17,19,23,25
191:2,12 192:2,5,25
194:20 195:10,11
197:15,22 198:5,8,9,11,
13,15,16,17,18,19,24
200:1 201:21 274:9,12,
15,21

**beginning** 55:11 139:15
184:18 226:16

**begins** 4:14 226:25
358:11

**begun** 207:3 208:19,23

**behalf** 5:8,10,12 17:22,
23 50:25

**behaved** 239:5

**behavior** 238:21

**belief** 231:11

**believed** 317:7

**belong** 215:16

**benefit** 261:1,11

**benefited** 239:12

**big** 82:20,22 234:4,9
368:13

**billions** 182:23 183:3

**bills** 215:23

**bio** 102:23 274:4,10,24
329:14

**bit** 81:3 106:25 113:19
213:17 274:4 311:13
379:14

**blanket** 41:8

**blue** 98:10 121:19 125:4,
9,12

**BMW** 222:25 224:2,4
225:9

**board** 75:19

**bonds** 213:1,7

**borrow** 335:23

**bottom** 68:20 109:13
315:13

**bought** 96:21 236:16,22

**bound** 296:24 297:12

**box** 96:6 98:10

**Bragg** 87:6 116:9,16,18

**brain** 212:18

**breach** 208:5

**break** 102:19,21,23
117:17 167:2,10 274:4,
10,24 329:14 371:8

**bring** 394:20,23

**Brita** 227:14

**broad** 49:10 50:2,5
145:2 180:6

**broad-brush** 377:7

**broadly** 385:22 387:15

**Broadway** 4:12

**broke** 81:16

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 110 of 137 PageID 9378

Dana Trexler Smith

Confidential

Connectus, LLC vs.
Ampush Media, Inc., et al.

**brought** 64:21 263:22

**Buchakjian** 26:4

**buck** 114:6

**bucket** 93:20

**bucketed** 165:2

**buckets** 158:6 369:22

**bucks** 213:2 216:2 239:23 292:19,20 296:6

**build** 196:12

**bulk** 72:7,11,17,24 85:7, 15,20,25 87:9 112:14, 17,21 113:8 115:17,21 159:10 267:12,16 272:20 316:22 380:10

**bullet** 55:22 111:11 112:10 147:16,17 151:10 152:25 176:6,12 228:2 255:19 265:10 272:23 275:19,20 339:2 358:8,10 380:25

**bunch** 174:1 295:22

**burdensome** 223:6

**bush** 145:2

**business** 46:21,23,25 50:23 114:13,18 118:20 136:3,19 178:8 179:16, 22 181:17 184:4,12,23 201:9 240:21 281:7 293:20 294:7,8 303:2,11 324:2 364:23 367:11,15, 19,23,25 368:25 371:17 372:1,11,15 373:17,22 374:21 375:6,17 376:3, 9,18 377:12 378:9,17 382:15,16 398:4

**businesses** 180:2,7,8,11 185:1 191:16 246:11,23, 24 370:1 374:17

**but-for** 231:11,13 263:23 276:18

**but-for-type** 231:21 232:2

**buy** 112:20 185:23 194:16,20 241:7,15 249:24

**buyer** 324:11,15 327:2 328:8 375:19

**buying** 187:17 192:2 240:12 274:14

---

**C**

**calculate** 73:15 186:22 208:15 209:19 214:22, 23,24 215:8 225:15 226:2 258:3 278:16 279:13,14 280:25 281:8 325:6 326:19 333:19 354:12 355:3 364:6 365:2,20

**calculated** 147:9 190:11 195:16 196:3 222:22 232:20 237:17 251:12 257:23 258:8 262:13 265:4 298:16,25 300:13, 17,23 330:8 336:13,21, 25 337:23 351:11 354:7 355:18 356:19 375:1,10 377:5 383:22 397:7

**calculates** 237:9 355:14 366:23

**calculating** 59:11 212:21 216:20,22 296:17 297:12 351:3 354:2 377:10

**calculation** 38:12 97:12 143:1 194:7 202:18 206:20 231:21 232:3 237:22 257:14 259:18 273:8 277:17 286:17,19 296:22 299:16 320:7,11 326:4,15,22 331:6 334:14,22 335:16,20 336:6 338:18 339:6,11 340:14,17,21 341:2,7,10 345:22 346:11,25 348:6, 7 355:19,21 357:17,23 361:2 365:8,12 369:7,9 375:2 397:9

**calculations** 194:11 198:11 200:14 206:9,18 258:22 297:15 299:9 300:3 336:18 339:21 366:9 375:11

**California** 4:13

**call** 27:4 32:20 60:1,3 67:12 95:12 109:1 128:5 129:11,24 134:3,15 135:1 138:18 162:8,12 164:19 165:9,10 166:10, 11 255:8 272:18 281:4,6 289:1 302:24 358:20,24, 25 359:3 372:20 387:4 388:2,4 389:20 392:16 396:21

**called** 72:7 115:17 128:6 129:10 131:5 142:16 159:23 162:7 182:2 267:7 272:19 330:12 361:12 388:21 389:7,11, 21

**calling** 60:2 68:1 105:6 163:25 164:4,6,21 166:2 393:18

**calls** 28:25 31:16 56:12 123:2 126:5 129:13,25 133:10 137:3 138:20,21 140:10,22 153:11 165:15 173:24 178:21 179:18 180:4,15,19 182:15 183:5,23 185:10 186:5 199:3 214:18 215:2 216:4 233:11 256:4 277:1 308:15 316:24

**Cameron** 234:24

**Cameron's** 233:23

**capture** 133:21

**captured** 75:9 109:4 110:5 112:7 130:1,18 133:1 150:6,9 158:15,18 160:10 162:24 164:17 169:4,13 390:13

**capturing** 107:7 130:11

**car** 224:12,13

**career** 50:17

**carve** 352:1

**case** 4:21 9:15 11:5 12:3,14 13:4 15:2,15 17:2,7 20:21 21:2,16 23:25 26:13 36:16 39:17,22 40:1 41:4,25 52:10 53:24 55:16,20

**59**:15 62:18 63:14 66:15 76:1,19 79:10,12 82:25 83:5,9 85:19 86:13 89:18 125:18 128:2,21 144:20,21 146:25 147:12 150:24 157:24 166:1 168:8 170:23 171:7 173:9 177:9 178:12 185:23,25 186:18,19,21,25 187:1, 13,15,25 188:13,16,19 189:1,5 190:19 191:7,8, 24 192:4 194:16 195:12 197:24 198:5 215:10,15 220:17 221:16 224:18 247:12 251:9,15 257:16 258:18 262:17 274:12 286:1 289:25 304:14 312:18 315:12 322:6 340:22 369:13 372:12 390:7 396:13,22

**caseload** 54:7

**cases** 40:8 52:18 66:19, 21,24 67:3 169:16 185:20 308:18,19

**cash** 212:11 215:21 243:2,10 245:5,16

**categories** 152:8,13,22

**caught** 8:13

**cell** 110:22

**center** 60:1 128:5 129:25 134:15 138:18 162:8 165:9 166:10 272:18 281:4 358:20,25 359:3 388:4 389:20 392:16 396:21

**center's** 60:1

**centers** 129:11 134:4 135:1 281:6 372:21 387:4 388:3

**cents** 96:24 114:4 190:19 191:4

**certainty** 177:19 194:4 336:20

**certified** 47:9 51:5

**cetera** 285:25

**chair** 43:21

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

**challenged** 375:4 382:18

**chance** 274:3

**change** 9:5 90:17 221:20 230:8 271:14,21 358:23

**changed** 245:18,19 341:8

**characterization** 108:8

**characters** 223:9

**charges** 385:7,9

**check** 344:2 345:21

**checking** 20:10

**choose** 208:11 241:2

**chooses** 208:12

**Chris** 4:6

**circumstances** 290:24 291:7 359:13 371:21 373:25

**citation** 327:25

**cited** 34:14 311:19,22 361:23 367:8

**citing** 34:21

**city** 6:2

**claim** 212:22 256:1,12, 15

**claimed** 261:24 336:11 337:5

**claiming** 200:21 256:11, 12

**claims** 263:14

**clarification** 27:15 40:17 50:20 84:20 103:17 179:20 183:16 253:15 289:7 302:5 327:7 374:10 389:9

**clarify** 14:14 49:2 83:12 252:24 254:10 313:7 381:12

**classes** 46:18,23 205:8

**clause** 202:23,24 204:24 205:5 206:15

**clear** 35:10 74:25 224:23 236:11 287:15,17

**Clem** 5:5

**click** 134:8,10 137:15 139:9

**click-through** 134:10

**clicks** 136:22 138:3

**close** 262:22 393:15

**closer** 191:5

**CLVS** 4:7

**collection** 51:9 252:6 254:25 255:6 265:20

**collectively** 47:6

**college** 51:25 52:2

**colloquialism** 379:14

**colon** 98:13

**column** 58:5,9 76:9 77:12 106:3,5,7,10 110:6,9,11 118:5 119:3 124:23,24,25 133:20 168:15,16,20,21 171:13 317:20,25 330:9 333:24 354:21,23 355:3,6,13, 20,21 356:5 383:3,5 390:11 398:20,21 402:10

**columns** 66:2 103:11,19 109:7,9 110:16,17 118:12 121:24 124:15 398:13,16

**comfortable** 312:20

**Commenced** 103:1 167:19 230:12 275:2 329:17 371:11

**comment** 362:5

**comments** 27:6,9

**commercial** 53:20 54:2, 20

**committed** 63:22

**communication** 11:10 12:17 29:3,7,19,21 31:4, 17,22 32:1,22 33:16 34:1 35:13 131:10,11

**communications** 11:16 13:3 18:23 32:7 207:10

**companies** 116:9

**company** 48:16 144:6 181:20 182:1 302:22,25 303:20 335:13 382:21

**comparable** 281:3

**compare** 261:23 262:14 281:5 332:22

**compared** 237:11 332:16 333:7 334:6 360:23 372:9 375:5

**comparing** 121:14 195:18 238:3 240:8 262:8 263:2,4,10 322:22

**comparison** 234:10 312:14,21 313:1,4,5 314:23

**compensating** 260:10

**compensation** 22:1

**competitors** 340:7 342:10,19,20

**complaining** 128:20

**complaint** 128:12,16 231:14

**complete** 7:6 9:14 14:25 15:12 16:1,8 79:16 82:10 395:24

**completed** 149:19 289:5

**completely** 250:2

**complex** 53:20 54:2

**complicated** 274:2

**component** 336:6

**components** 144:8 145:11,13 335:20 368:17

**compound** 128:10 137:24 177:3 187:3 199:2 219:21 245:22

**compute** 266:24

**computer** 101:4

**concept** 111:13 114:12 208:3 210:25 260:24,25

325:1 347:4 385:3,15

**concepts** 84:25 219:24 220:2,4

**concluded** 334:3 403:6

**conclusion** 205:2,19,22, 24 206:6 214:19 216:4

**conclusions** 188:7

**concurring** 26:6

**conduct** 263:24

**confirm** 63:7 135:18

**conflate** 220:2

**conflating** 84:25 219:23 220:3 240:4

**confusing** 78:2

**connection** 55:16 88:5 155:1

**Connectus** 4:17

**consequential** 203:2

**consideration** 216:14 253:23

**considered** 27:18 156:23 246:8 342:1 346:3 359:17 363:3 368:19

**considers** 252:10,20 254:3

**consistent** 254:8 280:13 294:16,20 295:2 386:8

**constitute** 130:6

**consulting** 50:19 51:20

**consummated** 289:6

**contact** 56:4 252:6 392:16,24

**contacted** 56:2 138:4

**content** 282:9

**context** 34:22 111:20 124:11 180:24 186:7 199:17 250:11 251:14 277:13 280:16 291:5 305:1 338:22 359:19

**continue** 65:2 119:18 183:2 184:24

**continuing** 208:4

**contract** 18:10 54:20 131:21 132:1,6,11,15 133:4 155:16 156:10 177:10 203:9 207:25 208:9,12,13 278:20,21 281:5 287:9 367:24 384:3,9

**contracts** 53:18 118:18 155:7 281:13,25 282:6

**contractual** 48:20 207:23 235:21 290:13

**contrary** 265:14 272:3 282:22 321:7 324:25

**conversation** 115:7

**conversion** 113:16 114:1

**convert** 73:23

**Coopers** 52:2,15

**copies** 117:18 394:20,23

**copy** 6:24 7:2,4 26:14 132:10 234:25 235:6

**copyrights** 53:17

**correct** 6:25 8:3 9:16 11:1,2 16:10 18:17 22:17 26:15 31:13 32:4 36:17,25 38:21 41:21 46:14 47:17 50:19 51:20 53:14 56:10,17 60:5 66:22 67:1 68:25 69:1 70:16 71:3,21 74:10,11, 15,16 88:6 89:22 93:23 94:13 104:25 106:18 110:24 115:17,22 126:11 130:17,20 136:11 138:19 139:6 143:24 146:20 155:20 156:8 160:20 161:9,21 165:12 176:24 177:1 189:23 200:14 214:12 219:4 221:21 227:19 228:25 233:3 234:25 239:21 240:14 241:20 242:12,17 246:20 247:23 249:21 258:4 259:15 261:4,11 263:6 264:1 268:17 283:18 284:20 286:10 287:6

288:10 289:17 290:24 292:9 304:5 306:12 310:11 311:9 317:13 323:24 326:7 328:13,18 330:20 331:11 334:9,14, 23 335:10,17 341:10 349:17,23 350:4 353:4, 13 354:2 356:15 362:24 363:11,22 370:4 371:19 372:1 373:18 374:9 379:16 382:1 388:23 396:4,7 397:20 400:12

**corrected** 6:21 357:17

**correctly** 89:21 136:1 196:4 313:14

**correlated** 337:21

**correspond** 104:5 108:14

**corresponds** 104:21

**corroborated** 176:18

**cost** 48:19 96:23 117:11 133:5 140:7,12,17,18 142:18 143:1,3,22,23 144:4,5,10,19,21 145:5, 13 146:1,17,18 178:9 185:7,15,17 186:8,17,23 187:15 189:3,7 191:12 192:1,25 195:13,14,18 196:15 197:2,8,20 198:12,14,16,23,25 199:19,24 222:9,13 228:2 233:8,21 234:14 237:8,10 238:7 240:1, 16,24,25 241:2,5,7,24 247:6 248:4 250:6,25 251:3 257:14 265:10 271:25 273:8 274:14 277:20 278:8,10,17,23, 25 279:1,5,15,22 281:2 282:8 289:14 292:16 293:5,25 294:2 296:3,18 297:13,14 301:25 302:7 303:4,9 304:12,20 305:3 306:5 336:4 338:3 358:1,2,12,13,17 359:2, 6,17 360:6,13 361:20 377:17 382:10,14,19 383:5,14,23 390:16 397:19 398:2

**cost-avoided** 397:18

**costing** 391:2

**costs** 48:10,22 139:19, 23,24,25 140:2 141:5, 10,16,17,24,25 142:7, 12,13,16,17 143:2 145:3 146:11 147:10 178:1,2 181:5 190:3,8 191:8 195:15 196:2,3,13,14 197:9 200:22,24 222:7, 17 228:4,13,20 229:3,9, 18 230:25 232:15,16 234:19 235:12 237:16 239:19,20,24 240:9,12 241:11,20 242:4,19 247:13 248:19 249:15 250:16 251:5 255:20 262:9,13 263:2,5,13 273:5 276:22 281:1,9 292:13 304:10 305:6 359:20 360:3,4,10,15, 20,21,22 361:3,11,12 396:3,6,8,9,12,18,19 397:1,2,11,12,16,24 398:6

**counsel** 12:18 27:7 29:16,22 33:4,5 36:12 42:20 117:18 207:15 306:12

**counsel's** 33:21

**count** 74:5,9,12,17 77:1, 6,17,20,22 84:13 91:14, 15,16,20 92:16,19 93:1, 5,21 96:1,3 98:14,15 99:3,8 101:12,18,19

**counted** 77:16

**counting** 96:12

**countries** 385:24

**court** 4:7,9,10,18,19 5:14 203:21 204:3 207:2 208:11,18,20,22 209:3, 4,9

**CPA** 50:21 205:9

**cranny** 138:13

**crash** 224:14

**crashed** 212:9 223:1 224:4 225:9

**create** 26:20,22,24 108:3 255:20,25

**costing** 391:2

**creating** 391:25

**criticism** 144:4 230:20 278:19 315:13 332:13 353:25 355:5 357:7,16 364:22,25

**criticize** 237:7

**criticizing** 193:12 237:2

**critiquing** 340:13

**cross-examination** 37:4

**current** 43:4,22 45:10 53:23 54:7

**cursory** 7:6

**curve** 284:1 285:17

**curves** 283:23 284:17

**cutting** 53:9

---

**D**

**daily** 50:8

**damage** 275:14 397:8

**damages** 19:3 30:15 36:8 38:12 40:4 41:4 54:20 180:24 186:23 187:12,13,23 188:6 191:17,18 192:1 196:12 197:19 199:20 200:10, 20 203:3,5,7 204:25 205:4,6,15,17 206:13, 22,25 207:17 208:15,21 209:11 211:4 212:21 214:7 216:9 219:11 222:19,21 228:2 231:13 232:4 251:12 276:4 308:12 330:13 334:13, 22 335:16 336:11,13,24 337:4,12,21 338:6 341:2 365:20

**Dana** 4:15 5:17 6:1,9 103:6 230:17 329:22

**darn** 379:14

**Darwal** 131:20,23,24 147:2 173:17 174:2 176:17 209:19 210:9,13 252:17 304:10,23 322:25 324:5 327:8 391:16

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 113 of 137 PageID 9381

Confidential

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

**Darwal's** 28:6 117:16
279:21 384:12,16

**data** 22:9,15,16 23:2
60:3 61:22 62:3,25 63:5
66:16 67:12,13,15,22,23
68:7,10 72:7,19 73:21
74:15,19,21 77:7,11
79:4,5 82:9,11 84:11,19
85:6,7,14,15,19,20,25
86:16,22 87:4,19 88:10,
16,19,25 89:4,10 90:25
91:1,4,8,14 92:3,9,17
93:2,10,22 94:6,13,21,
25 95:4,15,19 96:4,10,
11,13 97:4,6,7,8,12,13,
20 98:3,17,21,23 99:16,
20 100:5,15 101:1 104:6
105:3 109:13,19,24
112:10,11 115:17
116:20 117:9 121:9
126:13 128:3,4 129:8,10
132:18 134:1,3 139:23,
24 150:19 151:15 152:6,
25 153:8,18,22,25
154:19,24,25 155:8,10,
19 157:5 158:21,25
159:4,7,19 160:16,18,19
161:4,7,13 163:12
166:9,15 170:14,22
171:5 172:23 173:3
175:2,5,11,14 178:6
189:24 190:4,8 191:10
194:16 198:6,20 200:2
201:22 208:17 209:20,
24 215:16 221:18,19
222:1,3,8 231:2,17,18
233:7,9 236:14 248:24
250:4 251:8 254:18
265:11 267:16 268:15
271:1,7,13,16 272:1,21
273:7,18 286:21 288:24
291:11,21 294:17,22
295:12,16,22 296:4,13,
19 297:4,25 306:8,11,
14,22 307:21 308:10
314:3,4,5,18,25 315:7
316:12,17,21,22 317:4,
9,13 318:11,18,21,25
319:6 321:20 322:7,10,
20 323:3,4,18,20 324:5,
15,22 328:17 332:18
339:22 342:6 346:6
357:12,21 360:20,21

363:25 364:11 372:9,16,
19,24 373:15 380:5,8,
11,12 383:1 390:25
391:9,18,24 393:14,17
396:10,11 399:9,21
400:12 401:1,13,19,20

**database** 118:2 255:7
287:22

**dataflow** 60:23 65:3

**dataset** 323:13

**datasets** 62:8 80:6
267:12

**date** 9:22 11:25 16:1
17:13 28:20 42:24
124:18,19 176:20 177:6
207:1 208:22 216:21,22
217:11,13,18 220:18,25
221:1,18 243:9 245:5
246:4 254:18 306:25

**dated** 19:5

**dates** 216:15

**day** 38:2 212:5,6 213:3,
7,25 216:16 217:22
225:7,11 307:10,16,19

**days** 100:9 176:22 213:8

**de** 360:15,17 361:6
396:14

**dealers** 190:18

**death** 370:21

**December** 4:5

**decide** 43:19 45:11
264:18

**decided** 383:9

**deciding** 253:23

**decipher** 312:5

**decision** 32:13,15 44:20,
24

**declines** 285:23

**deem** 209:11

**deemed** 30:19 57:5
164:10

**default** 32:23 363:4,14

**defendant** 14:9 17:7,23
25:5 63:14 66:17 67:1,6
84:6,8,14 106:17
107:22,23 109:21
113:25 119:6,8,24
122:24 125:19 129:22
134:17 137:15 149:22
150:4,25 151:1,13
152:7,12,20 154:20
166:1 168:7 169:15
178:5 191:25 192:4
198:23 209:8 215:11,14
243:8,22 245:14 258:17
263:5 265:18 269:4,13
270:23 271:11 272:14
273:19,21 279:15,23
281:2,7 287:1,2 302:11
304:20 306:17 322:8
334:21 369:14 400:4

**defendants** 22:10 72:6,
23 74:6,13 75:13 76:2,
16 79:9,12 81:9 85:18
86:13 88:5 89:18
106:20,23 107:10
108:16 110:9 113:22
119:2 121:12 126:24
127:2,4,11 128:3 134:5,
13 135:9 149:2 150:23
153:7,17 154:1 157:19,
24 170:20,21 172:25
173:6 178:12 181:4
191:9 194:16 196:24
215:12 221:17 228:3,12,
19 229:2,8,17,25 230:24
231:17 238:7 247:12
248:17,22 263:3,4,11
267:18 268:15 275:10,
25 276:8,13,20 278:10
279:5 281:16 286:1
287:10,18 288:2 289:12,
22,25 290:14,23 291:3,
4,11,16,20 292:12,17
293:3,10 294:7 295:5
297:2 298:2,7 301:2,19
307:21 334:12,17 340:6
348:18 380:8 387:16

**defendants'** 48:12 62:18
109:6 114:12 121:5
129:10 134:2 135:3
151:11 222:20 225:22
226:2,6 240:6 257:17
259:6 263:23 278:17,22
279:13 347:19 360:14

380:5 382:8 392:22

**defense** 18:4

**defer** 304:22

**define** 113:19

**defined** 252:5 253:19
302:6 330:19

**defines** 309:22 310:1

**defining** 242:3 310:15
312:16

**definition** 104:3 124:14
127:24 166:18 252:8
253:24 254:4,15 302:1
310:25 347:12 351:17

**definitions** 242:18

**degree** 137:13 177:18
194:3 336:19 365:24

**delivering** 198:12

**demand** 283:17,23
284:1,17,20 285:3,16,23

**demanded** 284:4

**demonstrate** 309:13
338:13,14

**denominator** 326:11
329:4 349:19

**denoted** 123:15 269:24
393:11

**department** 51:12,16
52:1,17 53:7

**depend** 111:19 207:1
208:17 221:10 245:24
246:1,2 281:13 283:11
285:24 323:12

**dependent** 22:1

**depending** 54:6 64:24
108:17 282:8 371:20

**depends** 53:23 296:11
309:3 324:15

**depiction** 147:25

**depo** 28:6 38:1 117:16

**deposed** 16:20

**deposition** 4:15 6:9
14:12,20 20:21 28:8,13

Dana Trexler Smith                                                                Connectus, LLC vs.
                                                                                 Ampush Media, Inc., et al.

30:18 31:12 34:5,9,15
35:1 36:2,6 37:22 38:11,
15,17,25 39:11,14,23
40:2,20 41:10,24 43:5,
23,25 44:6,25 85:15
103:7 121:1 131:22
153:21 158:9 230:18
252:16 253:10 280:19
329:23 330:25 368:22
376:5 384:16 387:18
402:4

**depositions** 14:4 28:19,
22 29:10,11 30:9 41:12,
18,23 42:2,4,8,10,16,21
131:18

**describing** 138:12

**description** 24:22

**detail** 73:6,9 145:17,22
303:17 348:23

**details** 194:7

**determination** 29:14,15
30:10 31:11,20 32:4
33:8 79:19 80:3 102:5
156:15 157:10,14 159:9
287:16

**determine** 72:21 74:22
75:3 81:5 88:19 94:24
97:19 121:7 149:25
157:5,23 159:21 200:8
208:12,13 209:9 261:21
262:1 267:14 316:19
318:8 333:19 343:6
370:9 374:1 379:7

**determined** 62:2 80:7
121:13 160:6 207:2
277:22 324:11 327:2
328:11 368:6 376:21

**determines** 113:4
208:18,22

**develop** 146:4 222:10
278:11 279:17 378:22

**developed** 12:13 13:4,
21 164:2 389:21

**developing** 138:16
140:8,20 141:4,25
144:18 279:1

**develops** 134:16

**DG** 120:10

**DGS** 5:8,12 17:23 18:9,
12,19 58:22 59:13,19,25
61:21 62:4,7,16 64:23
70:7,13 71:6,15,19 72:6
78:10,22 79:17,25 80:2,
8 82:11,14 83:15,17,21
98:1 99:10 101:20
102:4,13 104:6,13,14,
16,20,21 105:5,9 108:17
109:15 110:2 114:20,25
115:8,12,15,18 116:1,3,
8 117:5,11,15,25 118:1,
14,24 120:11 121:10,14,
15 131:6,21 132:17
133:1,7,16 134:6,14,23
136:2,20 137:1,16,18
138:15 139:4,9,18
140:5,8,18 141:4,15,25
143:19 144:17 146:3
147:10 154:14 160:9
162:9,11 164:14 165:4
168:8 170:7 174:10,12,
13,19,21 176:1,17
209:16 210:19,20
226:13 227:7 235:18,22
236:13 238:14 250:21,
22 257:9 270:9,14
277:19,22 282:1,3
302:19,25 303:10,12
305:8,23 309:24 310:21
311:15 312:1 313:16,18,
21 314:7 317:21 325:9
327:23 331:22 339:15
340:1 361:19,21 364:11
365:6 380:21 382:1
383:9 384:20,23 386:3
387:12 388:9,19,20
389:8,11,15,22,25
390:1,19 391:3,8,16,20
392:5,8,14,15 393:2,7
394:13,14,15 397:3
402:15,16

**DGS'S** 136:23

**diagram** 69:9

**diamonds** 292:18,21

**Diego** 4:12

**differ** 394:13

**difference** 195:2 243:20
299:10 300:1 344:3

345:22 346:10 379:15

**differences** 252:25

**differently** 64:15 213:23
228:11 232:14 254:1,14
371:19,24 372:3

**difficult** 24:17 54:5
193:4 216:13 282:16
316:5

**difficulty** 161:25

**diligence** 369:11

**diminution** 225:2

**direct** 223:12

**direction** 216:21

**directly** 138:17 151:13

**director** 20:4

**dirty** 215:25

**disagree** 280:8 286:21
297:14

**disagreement** 250:1

**disclose** 9:18

**Disclosure** 16:14

**disconnect** 97:11,23

**discover** 271:3

**discovery** 9:24

**discuss** 135:22 339:2

**discussed** 30:9 134:18
139:4 376:12 380:3

**discusses** 11:9

**discussing** 64:25
131:24 142:14

**discussion** 7:17 32:9
34:12 128:14 131:17
175:23 252:1 304:24
324:4,20 326:23 327:9
376:7 384:15 391:19

**discussions** 32:11
34:13 36:12 207:14
252:16,22 304:9 322:24

**dispute-type** 52:18

**disputes** 54:3

**disqualified** 57:17,24

59:1,4,10 61:14,17
67:18 104:5 105:20
107:22 109:18 157:6,25
158:24 159:9,22 160:15
161:21 162:6,11,13
163:14,22,23 164:5,10,
11 166:2 266:12,17
346:20 347:2,7,16,23
348:2,16,25 349:4,9,13,
25 350:3,11,14,21
351:4,5 352:3,5,12
353:2,8,15,16,22 354:1
355:13 356:4 398:14,20
399:3,5,7,12,15 400:5,
10

**distinction** 52:12 108:24

**distinguish** 134:1

**district** 4:19,20 17:3,5

**divide** 53:16 96:24
360:22

**divided** 350:15 353:15

**Division** 4:21

**divorce** 300:11

**divulge** 31:16 32:6,21
33:15,16 36:11 207:9

**divulging** 13:12 29:6,21
33:25 35:12

**document** 117:7 210:6,
16,22 228:17 303:16,21
305:19 306:18 311:17
312:3,6,9,13,14,24
314:21 316:1,5 318:2
325:8 327:22 331:20
351:18 394:18

**documentation** 24:15,
20

**documents** 14:6,12 25:2
27:18,20 28:3 305:21,25
318:7 364:15 394:22
395:9 401:24 402:8

**dollar** 21:13 91:16
186:9,10 190:17,18,24
191:3,4 192:6 258:24
259:10,17 260:20
277:25 345:5,8,11 346:5

**dollars** 182:23 183:3
211:13,15 212:13,14

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 115 of 137 PageID 9383

Dana Trexler Smith

Confidential

Connectus, LLC vs.
Ampush Media, Inc., et al.

213:6,10 215:20 216:24
217:3,10,13,16 218:14,
21 220:20 225:10 230:6
233:22 234:14,19
239:14 242:23 243:2,24
245:6 295:23 296:2

**dollars'** 212:11,25
220:18 235:12

**door** 250:17

**dotted** 61:5,24 76:14
79:23

**double-check** 131:1
343:24

**Douglas** 19:4

**Dow** 212:7

**DQ** 401:6

**draft** 25:11,12,18,19
26:9,19,23,25 27:5

**drafted** 10:24 26:8

**drafting** 22:4 23:25
24:11,14,23 25:12

**draw** 193:5

**drive** 136:13,19 224:13

**driven** 135:11

**driving** 136:8

**drops** 284:19

**due** 105:21 369:11 375:4

**dues** 51:9

**duly** 5:17

**dumped** 101:21

**duration** 208:9 209:7

**Durie** 5:5

**DVD** 103:6 230:9,17
329:22

———————————

**E**

———————————

**e-mail** 101:9,10 123:19,
20

**e-submitted** 59:24

**earlier** 19:23 85:15
120:25 153:4 158:8

219:18 266:3 267:3
376:12 380:20 393:8
398:22 399:10

**early** 17:17,19 52:22

**earned** 73:7 99:11
101:23 156:22 158:13
178:5 229:25 378:12

**easier** 335:24

**Eastern** 17:5

**economic** 48:23 177:16,
22 181:14,15,16,22
188:12,13,14 193:9,11
194:1,8 196:7,11 197:12
200:16 201:7 231:15
240:21 246:10 247:5,19
248:3,18,23 283:15,16,
22 284:11,13,16 285:22
293:14 375:3

**economically** 178:7,18,
25 179:4,15 180:12
181:1 186:2,11,21
187:23 190:13 191:16,
18,22 192:3 197:17
198:21 238:12,15,21
239:5 249:2,17 292:11
300:22

**economics** 284:25
287:13

**economy** 212:9

**Ed** 253:5 277:22

**edegree** 58:6,10,24
59:14,17,20,23 60:21
61:7,20,23 62:3,5 64:21
65:25 66:12 68:9 69:11,
17,20 70:10,22 73:3
75:16 78:8,11,15,18,24
79:4,11 80:6 81:8 83:18,
20 84:2 89:6,13 95:15
97:14 98:2 101:11
103:12,15,19 104:12,14
105:4,10,16 106:20,21,
25 107:5,9,20 108:21,25
109:5,8,14,20 111:5,6
115:18,19 116:7,13
118:14 119:8 120:11
121:3,5 127:1,6,7,16
142:9,10,11 147:13,17
148:1,4,13,21 150:3,20
151:13 152:5 155:5

156:5,18 158:7,14 165:5
170:15 176:2,10,13
227:9 250:22 263:12
270:14 277:16,18,23
281:15 313:16 319:1
326:12,21 339:18,24
340:4 342:8,18 348:25
349:3,4,8,9,24 353:14,
15,16 364:10 380:9,22,
23 381:5,9,17,22 383:3
392:20,25 394:8 398:14,
19,20,21 399:1,3

**edegree's** 65:18 79:21
340:7 342:10 387:3

**edegree's/ampush's**
65:11

**edegree-type** 58:15

**edescree** 58:6

**edge** 53:9

**EDS** 60:4

**EDU'S** 139:19 141:15,25
391:16 392:16

**EDU-SPONSORED**
137:17

**EDU/AMPUSH** 64:23

**education** 46:11,24
392:15 393:3,11

**educational** 55:8 374:21

**Edwards** 125:13,17,21

**effect** 154:12

**effectively** 294:18
375:18 385:10

**efficient** 297:4

**effort** 25:8 290:22

**eleven** 102:25

**elite** 252:4,8,10,21
253:18,20 254:3

**employ** 333:17

**employee** 359:14

**enable** 209:3 267:14

**encompasses** 48:14

**end** 76:23 216:16 217:21
225:7,11 251:2 260:10

324:25 358:11 396:5

**ended** 216:18 266:7
365:23 366:11 396:13

**engaged** 17:20,21 18:1
37:19 144:18 259:18

**engagement** 17:13 18:2

**engaging** 243:24 245:17

**engine** 141:24 142:16
143:4,23 144:20 145:6,
18 146:2,18 303:4
304:12 305:4

**enormous** 394:22

**enriched** 187:14 211:16
212:12 213:12 214:9
216:1 217:5,15,20
218:5,16,23 219:14
220:9,20,22,23 223:3
224:19 242:16 245:20

**enriching** 369:13

**enrichment** 197:19
209:20 211:1,4,5 213:24
214:7,22 215:8 219:4
220:25 222:19,22
225:16 226:3,7 239:19
240:6 242:9,25 243:12,
16 244:1,11,16 245:9
255:24 256:14 261:24
366:24 382:8 383:13
397:8

**enter** 170:2

**entered** 154:19

**enterprise** 382:12,18

**enters** 151:14

**entire** 50:17 99:9 102:1
116:4 144:6 182:6 280:6
335:13 352:5

**entirety** 292:2

**entities** 116:17,19
134:25 149:24 179:22
181:18,23 201:9 246:16
282:1 341:20 383:21
385:24

**entity** 112:24 113:3
131:5,6,17,22,25 132:19
133:7 159:24 165:9
201:13 270:11,12

**Index: dollars'–entity**

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 116 of 137 PageID 9384

Confidential

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

293:11,16 302:24 382:1,
10 383:12,24 386:4
387:21 388:3,21 390:2,
20 391:8,17,20,23
393:18

**entries** 51:8

**equal** 353:17 383:14

**equivalent** 310:9

**error** 330:8,11,13,18
336:8,16 337:3,8,11,20,
24

**errors** 7:22 195:17,23
197:6 237:22 273:7
296:16,21 339:1

**essentially** 32:21 36:25
62:1 64:19 65:7 101:21
104:2 218:22 275:9,21,
23 309:7 351:21 354:6
358:18 400:9

**establish** 323:6

**establishing** 370:3

**estimate** 28:4 54:9,23
73:11 87:20,21 88:3,11
100:7 101:3 115:5
279:22 331:10,13
333:20 362:10,17,18
363:3,25

**estimated** 115:9 331:9
332:4,10 333:24 337:25
362:8 364:10

**estimates** 21:23 77:12,
13,15 87:16 332:1
362:24 363:1,20

**estimating** 332:8

**estimation** 332:14

**et al** 4:18

**evaluate** 19:4

**evaluation** 364:24
367:11 371:17 379:21

**event** 134:14 203:21
332:25

**evidence** 25:21,22 32:19
38:23 149:7 188:24
189:11 222:16 226:12
227:6 236:24 249:6

272:25 282:22 286:14
288:12,14 328:1 339:14
341:16 342:7,25 344:10,
18 345:1 356:7 368:15
372:7 390:7,24

**exact** 17:13 306:25

**EXAMINATION** 5:20

**examples** 169:19

**excess** 231:1

**exchange** 71:20

**exchanged** 112:12
245:6

**exclude** 142:4

**excluded** 84:15 105:23
141:23 142:15

**exclusive** 85:13

**excuse** 12:22 24:6 46:17
50:13 115:12 166:21
226:17 330:1 345:8
350:1

**exemplary** 203:3

**exhibit** 4:1,2 6:7,8,23
7:23 8:14 9:5,21 10:18,
23 14:25 15:12 16:1,13
22:5 24:1,11,24 25:19
27:13,20 43:7 46:20
58:2,3,18 59:22 60:22
61:1 65:6,25 67:11,24
68:14 69:3 70:5,14 71:4
73:25 74:5 75:1,2,9
76:5,13,20 78:20 79:8
81:22 83:23 86:3,8
89:21 90:1 91:21 96:7
97:18,25 98:10 103:10
104:6,11 105:1,13,24
106:9,10 109:12,14,25
117:2,15,23 119:12
120:1 121:18 124:24,25
126:12 130:2,10,18,21,
24 131:3 132:13 147:8
150:6 153:3 158:15
160:8,11 162:24 164:17
168:1,3 172:23 174:11
206:22,23 269:2,25
306:4 311:12 317:19
325:5 341:22 343:4
354:19 355:6,12 394:9,
13 395:9,19,23 398:11

402:11

**exhibits** 311:25

**exist** 73:9,12

**existence** 182:12

**expect** 227:14 334:6

**expense** 143:4 144:20

**expenses** 18:16 48:3
143:24 145:1,4,6,19
146:2,3,18 303:5 304:13
305:4,25 358:21 370:8
372:5

**expensive** 234:4,10

**experience** 39:16 46:25
53:12 179:25 265:14
272:3 283:1

**expert** 6:24 7:2 19:4
36:5 37:13,18 40:4
43:25 52:8,9,10,11,20
111:23 187:12 192:13
193:20,23 204:1,2,14
214:21 216:9 219:12
220:8 340:21 366:2

**expert's** 188:7

**expertise** 204:4,10,16,
21

**experts** 204:9 367:1

**explain** 13:15 64:16
237:22 247:16 324:24

**explained** 201:6

**exposure** 52:18 227:10

**expressed** 227:14
272:22

**extent** 10:1,11 11:8
18:15 28:25 29:5,20
31:1,15 32:20 33:13
44:3 57:1 65:22 85:21
102:8 131:8 132:23
133:11 139:8 148:21
150:2 156:17,21 158:11
170:5 202:23 207:8,11
281:17 337:22 339:19
381:20 382:25 395:10

**extrapolation** 227:15

**eyeball** 344:20

**F**

**face** 377:9

**Facebook** 302:8

**facing** 227:9

**fact** 8:13 20:10 87:4
112:4 115:3 129:9,21
142:1 143:22 157:23
165:24 176:21 182:4
189:24,25 196:16 197:7
202:22 204:15,20,23
205:4,15 206:6,14
239:22 243:22 244:18
245:14 250:17 258:16
273:18 281:20 282:21
292:16,20 295:4 305:3
316:9 319:13 350:8,12
353:17 367:4 384:2
399:11

**fact-specific** 40:9 41:9
372:6

**factor** 300:3

**factors** 219:6 246:8
376:14

**facts** 25:21 32:18 38:23
39:9 149:6 188:23
189:11 200:8 222:15
226:8 241:17 249:5
272:25 288:12 356:7
359:13 371:20 373:24
382:24 386:15

**factual** 346:8

**factually** 56:16 157:11

**failed** 340:25 343:7

**fails** 365:2

**fair** 14:24 15:11 34:4
108:7 193:16 259:21
273:16 327:12

**fall** 152:14,22,23,24

**fallibility** 8:9

**falls** 152:7

**familiar** 47:20 111:13
114:11 142:1 145:10
182:1,3,4 208:3 209:15
210:20,25 233:24

283:21 284:12 384:2 385:3,14

**fast** 224:13

**Federal** 16:13

**fees** 18:16 227:11

**fell** 156:19 246:6

**fetch** 213:10

**fewer** 330:19

**field** 175:11 363:2

**fifty** 114:7

**figure** 42:20 96:5 97:4 269:21 351:1 356:21 391:23

**file** 117:10

**files** 117:13 266:14

**fill** 135:13 137:17

**fills** 138:3

**film** 233:24 234:1

**final** 26:14,17,23

**financial** 48:13,16,17 141:9,11 238:13 303:1 308:23,24 331:20 352:18 384:20 399:25

**financials** 48:19 178:15, 24 182:8

**find** 35:5 36:3 116:24 137:13 183:18 190:1 206:7 226:18 271:9 272:12 302:2 330:14 333:5

**finder** 189:25 202:22 205:4,16 206:7,14

**finding** 271:21

**finds** 202:22 203:21 204:24 205:5,16 206:14

**fine** 167:16 330:2 362:3

**finish** 20:12 37:11 179:10

**finished** 27:3 288:18

**firm** 17:23 21:4,19

**firm's** 21:10 22:1

**firms** 53:5

**flaw** 142:25 320:4

**flawed** 190:11 347:3

**flaws** 320:15

**flies** 377:8

**flip** 60:25

**Florida** 4:20

**flow** 48:14,17 51:12 61:2 89:13 132:16 140:5 335:20

**flowed** 338:8 390:4

**flows** 48:11 335:18 355:19,20

**focus** 138:14

**Follow** 187:10,18

**footnote** 117:4 226:11, 20,24,25 227:3 252:4 302:4 354:20 392:10 395:2,4

**footnotes** 117:3

**for-profit** 136:4 179:21 181:22 201:8,12 246:16 293:11,15

**forensic** 52:1,16 53:4,22 54:4

**foreseeable** 203:5

**forget** 134:9 198:8 217:23 244:22

**forgot** 198:12

**form** 19:2 39:8 41:6 43:9 62:23 63:18 69:18 70:18,23 71:25 72:5,10 74:14 77:4,23,25 83:10 84:22,23 87:13 90:10 92:11 93:6 96:14 101:16 108:5 114:15 118:3,9 120:22 122:2 125:22,24 129:15 132:21 135:14 136:17 137:17,19 138:4 144:24 151:4 154:15 156:11 157:12 158:4 160:22 161:23 162:18 163:18 165:16 166:7 169:21 173:11 177:3 180:20 184:19 187:2

191:20 192:7 194:24 198:2 199:1 201:23 211:8,17 216:3 219:15, 20 221:6 222:15 223:4 231:23 232:11 233:11 236:2,20 238:23 239:9 241:21 243:3 244:4,9 245:22 247:21,25 248:10 249:5 256:5,21 257:19 260:15 262:6 264:3,24 270:25 272:24 274:18 277:1 279:9,10 281:11 282:11 284:22 286:12 287:25 288:11 289:19 294:24 298:11 300:9 315:21 319:10 323:10 333:10 334:25 337:16 342:12,23 344:8 345:24 348:4 351:8 356:6,16 359:9 366:14 367:17 368:2 371:6 375:8,24 378:5 382:23 383:17 387:24 388:15, 25 390:6,24 393:21 397:22 400:14,22

**formed** 227:13

**forming** 36:7 41:3 253:5

**forms** 69:19 70:3,13

**formula** 326:8,11 346:19 348:22 350:12,23,25 351:6,10 352:25 353:13 354:17,20,25 355:2,4, 11,15

**formulate** 205:9

**Fort** 240:11

**forward** 204:23

**found** 19:3 76:4 168:6 205:17 277:11 330:14

**foundation** 211:8,18 243:4

**fourth** 103:18 168:15,20 171:13 227:3 358:9 398:13 402:10

**fraction** 178:10 184:7,16 189:6 233:8 350:20

**frame** 52:23

**frames** 332:23

**fraud** 53:21 54:4

**fraught** 195:16

**free** 146:16 283:7 295:17,22 296:4

**front** 6:6,23 122:6 146:15 265:25 266:14 280:2

**fuel** 198:12

**full** 5:24 118:20 142:24 148:8,10 321:6 364:23 368:10

**fully** 13:15 193:3

**function** 102:12 243:21 384:14

**functions** 55:18

**fundamental** 142:25 200:20 201:7

**fundamentally** 190:11 347:3

**future** 43:19 44:16

---

**G**

**G&I** 306:21

**GAAP** 47:20,22,25 48:14

**gains** 382:20 383:15

**garage** 274:13

**gathering** 152:1

**gave** 26:6 82:20,22 172:2 173:19 280:17 333:1 344:19

**general** 16:25 48:8,12, 23 118:16,21 140:1 181:13,22 231:3 283:15, 16,21 284:10,12,16 285:22 293:14 306:22 307:20 308:10,22 309:2 395:3,11,17

**generally** 22:19 24:25 111:25 113:9,12 114:17 138:16 139:25 154:11 284:1,18,24 285:18 308:13,17 340:5 367:13 398:6

**generate** 127:12 128:7 135:2,9 136:6 139:16 147:10 163:24 164:5,20 178:9 179:6 197:1 228:6 230:5 233:8 238:9 247:7,13 248:5,20,24 249:18,22,25 250:3 275:12 276:1 278:17 290:16 291:13 293:22 295:7 304:20 339:17

**generated** 11:4 12:2 65:15 80:9 89:5,6 95:6, 22 99:14,15,20 100:14 109:5 110:12 112:5,11 115:1 126:23 127:15 129:12,21 132:17,24 134:2 139:12 142:11 146:4,19 164:15 165:4, 8,19,20 166:12 174:8 231:1 232:19 237:12 238:10 251:7 257:8,12 261:19 262:15,19,20 292:14 293:10 296:15 318:22 351:24 352:6 359:16 380:7 390:10 393:9 394:6 396:21

**generates** 339:18

**generating** 134:7 139:5 142:8 143:8,15,19 144:13 146:22 279:23 303:25 305:6 308:12 358:19 360:10 380:12 381:3 397:3,4,19

**generation** 55:8 136:3 145:7,14 265:13,22 272:2 273:11 302:11,17 360:13,20 361:14 380:18 396:6,10

**generic** 169:24 172:3

**give** 15:24 24:21 45:17 53:5 54:8 56:19 73:19 114:3,5 116:23 151:21 173:1,6 202:11 212:17 224:8 266:23 274:5 306:25 308:7 320:19 347:17 360:7 366:17

**giving** 256:13 283:4

**go-around** 109:2

**gold** 238:18 239:4,22 240:2,10,18 241:1,5,8,9,

10,12,19,25 242:1,8,22 243:14 244:24,25 245:2, 3,15 246:3,6

**good** 5:4,22,23 6:21 52:12 167:6,13,15,25 294:7 296:8 330:3 344:19

**goods** 50:23 143:1,22 144:21 146:19 188:19 189:2,3,5,7 285:25 306:6 358:1,12,17 361:20 385:20,21

**Google** 137:12 302:8

**graduated** 46:16

**graduation** 52:3

**grand** 219:13,14

**grandfather's** 217:1 218:3

**granular** 323:18

**Great** 204:18

**greater** 77:21 257:11 259:4,20 264:19 336:9

**grievously** 258:17

**groom** 146:4

**ground** 277:8

**grounded** 330:22

**grow** 280:9

**growing** 140:5 278:23

**growth** 253:5 372:20

**guess** 13:6 27:4 51:23 64:22 83:12 96:22 235:14 242:3 269:6 276:14 293:1 369:11 392:18

**guys** 37:24 209:23 371:8

---

**H**

**hair's** 344:3

**half** 96:24 102:17

**halfway** 226:25 275:20

**hand** 117:14,19

**happen** 129:1 151:3 172:7 233:5,17

**happened** 128:22,25 162:17 172:4,15 231:16 389:24

**happening** 113:17

**happy** 292:5 312:19 361:25 402:16

**hard** 125:9

**harm** 258:3 259:5,12,21 260:2,6,20 261:25 263:5 264:12,15,20 265:2,3

**harmed** 257:16,22 258:17,22

**harms** 263:16

**head** 20:16 266:22 288:17

**heading** 55:2

**heads-up** 274:6

**hear** 163:11

**heard** 131:4,13 255:5

**Held** 7:18 175:24 252:2

**helped** 20:7,9

**helpful** 58:19 60:25

**helping** 13:9

**hey** 173:17 197:19

**hidden** 231:10

**high** 137:21 237:11,19, 20,23 250:15 251:2 300:5 336:16 339:16,17 346:5 364:22

**high-level** 24:22 138:1

**higher** 102:10 253:5 285:5,9 336:8 338:4,5,7 345:11 356:5 362:10,19 363:9,21 373:16

**highlighted** 121:19 125:4,12

**hiring** 359:2

**history** 55:3 182:6

**Hm-hm** 62:15 68:22 93:17 121:20 155:17

168:17 187:11 272:16 348:24 349:2,21 350:22 389:17,19

**hold** 10:7 15:1,13 16:2,5, 9

**holds** 202:23,24

**holistic** 150:12

**horizontal** 285:3,4,7,12, 14

**hosted** 277:19

**hosting** 360:21 396:11

**hot** 111:14,16,24 112:1,6

**hour** 19:17 20:18 102:16 359:12 403:3

**hourly** 19:16 20:14 21:17 359:14

**hours** 20:19,23 21:1,14, 18 23:24 24:5,9,14 166:25 318:7

**huge** 385:9

**human** 8:9

**hundred** 211:15 212:11, 13 213:10 217:3,10,12, 16 218:5,14,20 219:19 220:21,23 383:10

**hundred-thousand-dollar** 224:12

**hundreds** 233:21 295:10

**hung** 251:25

**hungry** 167:8

**hypo** 216:7

**hypothetical** 84:5 184:18,21,24 186:8 187:3,5 188:9 189:13 191:7,14,24 192:12,15, 24 194:25 195:9,21 197:14 199:2,16 201:13 211:23 212:1 213:19 216:7,10,12,19,25 219:6 220:3 221:8 222:24 223:5 224:8,17,24 225:8,14 232:9 239:11, 20 240:3 242:13,19 243:5 245:12 246:9 249:10 250:10 271:10

**Dana Trexler Smith**

272:5 276:17 347:17

**hypotheticals** 215:4,7
221:13 223:8,22

---

**I**

**i.e.** 347:5 392:14

**ID** 122:10,13,15 123:11

**idea** 249:24 283:10
365:21 377:25 391:17

**identical** 223:8

**identified** 65:23 107:19
110:4 164:14 166:3
388:12

**identify** 22:22 23:10,19
65:18 72:22 82:13 85:9
86:4 110:1 112:13
126:20,25 145:12
169:11 308:21 318:24

**ignore** 41:2

**III** 19:21

**ill-gotten** 382:20 383:15

**illegal** 184:23 185:1
382:12

**illustrated** 331:24

**imagine** 162:4 306:16

**impact** 246:7 272:21

**impart** 325:2

**implausible** 297:1,24
298:6

**important** 9:13 132:15

**impossible** 347:4,11
352:4 354:10

**impression** 53:12

**improper** 184:20 187:3
189:13 194:24 199:2
211:22 221:7 223:5
243:4 249:10 272:5

**IMS** 17:22

**inapplicable** 317:24

**inappropriate** 365:2,3
367:5 397:10

**inarticulately** 393:13

**inbound** 119:14,20
122:23

**incidental** 203:2

**include** 82:4 99:14
111:24 112:1 114:21
130:21 143:22 334:21
347:6 354:10 361:5
387:12 397:11,17

**included** 41:10 61:19
75:14 84:13 87:16 94:21
100:1,3 110:6 116:12
121:9 122:18 132:13
174:6 190:9 303:3
304:11 323:13 326:9
338:17 341:1 343:3
359:24 360:5 361:9,15,
19 369:10 376:16
378:15 382:13 391:2
394:9 395:8,13

**includes** 96:7 143:2
347:1 348:1 352:10
388:19

**including** 361:1 378:9,
11 387:20 397:12

**inclusion** 368:7

**income** 377:16

**incomplete** 216:12

**inconsistencies** 300:20

**inconsistency** 153:1

**inconsistent** 238:13
271:15,20 273:12
295:12 298:14,16

**incorrect** 8:11,14 9:1,4
39:7 60:10 195:17
312:18,22,25 320:11
347:3

**incorrectly** 6:17 190:12
300:17

**increase** 284:5

**increases** 283:18 285:24
358:2,14

**incremental** 48:10
358:2,13 359:6,17,20,21
360:4,10 396:9

**incur** 140:13 228:4,13,
20 229:3,9,17 230:25
247:5,13 248:4,19
249:16

**incurred** 279:16 396:20

**incurs** 140:8,19 141:4
146:3

**independent** 170:24
171:19 252:19 392:19

**independently** 170:8
210:15 392:24

**indicating** 124:5 168:19

**indication** 62:17

**indirect** 203:2

**individual** 26:4 123:15
159:22 269:7 270:8
314:3,5 318:10,17,18
319:2,5 322:20 362:9
373:25 392:21,24

**individually** 392:19

**individuals** 25:6 135:11

**industrial** 212:8

**industry** 55:4,6,13,17
252:10,20 254:3,18
255:14

**inflated** 195:19

**inform** 318:23

**information** 8:22 13:23
14:2,22 15:18 25:3
29:24 30:2,17 39:5
40:15 43:12,13 44:4,5,7,
11 48:18 51:13 56:5,25
57:3 66:25 67:4,19
72:15 73:12 75:22
85:17,24 97:25 100:11
102:2 107:21 118:15
119:7,10 122:5 124:3
134:24 140:24 141:12
144:3 146:9 147:2
152:2,7,11,19 170:2,19
171:2 173:1,6,7 174:3,5
182:17,19 184:1 188:8
208:10,14 209:2,5
211:25 251:14 252:7,23
255:1,7 260:19 263:15
264:6,16,17 265:2,20
266:2 267:13 269:8

**incur** — column continues...

**incurred** 279:16 396:20

273:12 296:20 298:17
301:24 304:24 305:13
308:21 317:3,22 318:1,
20 319:15,22 327:19
329:12 331:18 339:15,
22 340:8 341:3 344:14
352:17 363:6 365:11,15
369:11 372:13 376:24
377:4 386:22 391:2
392:5 395:3,12,18
399:23

**infringement** 17:2

**ingesting** 287:22

**inherently** 277:17

**initial** 26:19 61:15

**injuries** 260:11,12

**input** 216:14

**inputs** 26:7

**inside** 382:21

**instance** 84:12 170:10,
21 172:7,16 173:20

**instances** 149:1,15
164:9,15,19 181:20
319:6

**Institute** 51:4

**instruct** 11:7 29:3 35:16
131:11

**instructed** 33:3 35:19

**instructing** 11:18 12:9
13:8 31:5,18,22 32:23
33:6,17

**instruction** 33:11,12,22

**intellectual** 54:1 385:7

**intend** 9:15,19 10:19
12:19 36:13 41:14 42:15
44:17,19 45:13 47:22
160:13 161:18 162:15
163:15 227:20 264:9
341:6

**intended** 13:1

**intending** 10:25 146:14,
16 167:1 177:8 208:20
299:24 325:2 387:10,11
394:1

Index: hypotheticals–intending

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 120 of 137 PageID 9388

Confidential

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

**intends** 12:5

**intent** 43:4,22 45:6,10 232:13

**interacts** 134:16

**interested** 137:13

**Interesting** 21:23

**interfere** 402:4

**International** 4:24

**Internet** 139:5 140:6 280:10

**interning** 52:15

**internship** 51:23

**interpret** 62:16 121:22 125:15 126:2,12 229:15 309:19

**interpretation** 208:1,16 287:8,12

**interpreted** 119:22

**interpreting** 203:8 207:22

**interrupt** 7:15 13:7 87:13

**interrupted** 179:14 345:9

**invade** 10:11

**inventory** 135:4

**inversely** 337:21

**investigation** 53:22

**investigations** 54:4

**investments** 213:4

**invoice** 21:7,10,15

**invoices** 21:4 51:13

**involved** 52:11 166:10

**involving** 55:13

**IP** 385:10

**Ireland** 385:8,11

**irrational** 178:18 179:1, 4,15 180:13 181:2 183:1 186:2,22 192:25 194:14 238:12 249:18 292:11

**irrationally** 182:13 183:21

**irrelevant** 36:7 38:12

**irrespective** 240:19 359:15

**issuance** 9:25 13:24 15:20 17:12 19:12 20:24 41:13,20 42:3,11,17 306:24 307:1

**issue** 15:2,14 262:16,17 282:17 304:14 319:13, 24 326:17 360:16,23 372:11 380:6 393:4 396:13 397:6

**issued** 19:8 21:4 39:17 40:4 43:6,24 46:20

**issuing** 50:6 308:6

---

**J**

**James** 233:23

**Jeff** 26:4

**jelly** 283:4,5,6

**job** 51:6

**joint** 18:4 25:8

**Jones** 212:8

**judge** 46:5 263:20

**July** 168:5,13,14 171:12 306:6 331:15 333:4

**June** 106:13 107:19 110:22 306:8 331:14 332:18 333:4,21 352:16

**junior** 51:25

**jurisdiction** 385:9

---

**K**

**K-a-r-a-s-i-c-k** 20:6

**Karasick** 20:6 26:2

**Kid-** 229:6

**Kidder** 19:5 34:21 141:14,20 162:25 177:15,23 190:9 194:15 197:3 200:19 227:1,5,16

228:3,22 229:1,7,16,24 230:22 232:17,20 237:3, 9 238:6 247:6 248:5 250:14 251:21 252:5,9 254:9 257:24 258:8,14, 23 262:9,14 263:14 264:19 265:19 273:5 275:9,24 276:7,19 277:3,5 278:20 282:18 289:2 300:18 303:15 306:4 309:7,10,12,19 310:5,10 311:5,8,19,22, 24 312:10 314:10,16 315:5 316:18 317:10 319:3 325:4,14 326:3 329:3 330:14 331:14 332:1,8 333:15 334:4, 11,16 335:9 337:2 338:17 339:9 341:22 342:1 343:18 344:12 353:25 354:6 355:12 364:23 365:18 366:22 367:14 368:4 369:7 370:15 374:11 378:3 379:2

**Kidder's** 19:7 34:14,15 39:13,14 177:25 180:25 193:12,25 194:14 195:23 201:2 230:21 232:4 253:24 300:4 325:12 326:10 331:10, 13 333:6 343:4 357:6 374:6 393:15

**kids** 190:25 191:1

**kind** 91:14 287:16 308:10

**kinds** 22:9

**knew** 96:23 240:24

**knowing** 183:2 252:20

**knowledge** 7:25 8:4 40:22 300:16 318:6 395:23

**knowledgeable** 40:16

**Knox** 240:11

**Kolin** 253:13

---

**L**

**labeled** 103:12,19

106:11

**labor** 358:19

**Lacks** 211:7,18 243:4

**laid** 138:8

**language** 153:2,20 203:9 207:15 208:13 232:14 254:6

**large** 21:9 113:9,12

**largely** 225:2

**larger** 200:22 297:23 356:10,13

**late** 17:18

**launderer** 215:22,24

**law** 17:23 46:23

**layout** 367:9

**lead** 55:7,22 57:5 60:2 67:18 69:21 70:16,21 71:2,20 84:18 85:19,25 86:16 96:8 105:7,21 107:21,22 111:11,17,22 112:13 122:18 127:13 130:7,12,16 133:17 134:16,24 135:2,14 136:2 140:5,8,20 141:25 147:11 154:13,22,23 162:4,6,7,13 163:2,3,22 164:10 222:10 236:5,6, 9,13 250:23,25 265:12, 19 266:8 272:1,20 273:10 276:3 277:18 278:11,23 279:1,2,6,17, 24 280:12 281:3,18 286:5,14,18 287:6,21 289:15 302:11,17 305:7 310:16,23 314:13 315:9 321:13,15 327:1 328:7,9 334:18,19,21 336:4 338:3,15,16 339:5,10 342:3 343:3 347:16 348:1,2,13 351:17,19 360:12,19 361:14 372:10,17,24 373:14 380:18 381:6,8,9 392:21 396:6,10

**leads** 57:9,16,18,24 58:25 59:1,3 61:10,14 73:7 86:14 94:7 95:6,8, 13,14,21 104:4,5

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

108:13,14 109:18,19 119:1,23 127:5 128:7 129:11,21,22 133:13,15 134:7,14 135:9 136:7 138:16 139:5 141:4 143:9,16,20,24 146:5, 19,24 147:11,12 155:6, 15,24 156:1,8,10 157:6, 8,25 158:23 159:9,22 161:11,15,21 163:14,25 164:5,7,12,20,22 166:2, 3,19 173:2,8 226:14 227:8 230:4 232:19 235:19,20,21,23 237:13 238:9,17 257:12,13 261:19 262:16,20 265:17,22 266:4 267:7, 8,9 268:4,5 271:1 275:13 277:21,23 278:9 280:6,9,22 286:3,16 287:19 289:2,10,17 290:2,15 292:13 293:4, 19 294:3 295:6 304:1, 14,18,21 309:10,11,20, 23 310:4,9,20 311:5 312:11 314:9 315:17 320:9,12 321:9,10 322:15,19 323:7,8 324:21 325:25 326:19, 21 328:25 329:7 330:20 331:9 332:2,5,9,11,16, 17 333:8,20,23,25 334:5,13,14,22 335:2, 10,12 337:25 339:14,24 340:4,6 342:7,10,17,19, 20 345:15 346:20 347:1, 2,4,5,7,13,14 348:8,9, 11,14,18,20,25 349:4,5, 8,9,11,12,16,17,20,23, 25 350:3,4,11,21 351:3, 5,13,14,16,23 352:11, 18,21 353:2,7,15,16,17, 20,21 354:1,18 355:13 356:1,4,10,11,15 372:19 373:11 380:13,21 381:3, 15 388:13,22 389:16,21 392:1 393:2 394:11 396:21 397:3,19 398:3

**learned**  55:15,19

**leave**  94:10 194:6 392:18

**leaving**  13:2 73:18

**ledger**  306:22 307:20 308:10,22 309:2 395:3, 12,18

**left**  61:24 217:21 284:17 285:17

**left-hand**  61:5 68:25 76:13 79:22 81:7 285:11

**legal**  56:12,14 128:19 153:11,22 202:15,16 205:18,21 208:6 214:19 216:4,13,21 221:10 227:11 287:12,16 302:23 384:13

**legitimately**  241:15

**length**  367:24 386:4

**letter**  17:14 18:3

**level**  86:6 137:21 200:20 263:22 364:22

**Lexicon**  123:16

**liability**  19:3 129:5,7,18 156:15 157:15,17,19 189:19

**liable**  202:25

**life**  50:8

**light**  357:6

**limit**  387:10

**limited**  157:21

**limits**  207:16

**line-by-line**  323:18

**line-level**  158:21

**linear**  368:11 369:9,16, 21

**lines**  119:12 121:19 168:4,18 303:2,11

**liquid**  213:4

**list**  27:17 28:12 184:16

**listed**  27:20 80:6 119:2 128:13 305:5 364:3

**litigation**  33:16 35:13 50:19 51:19 52:24 53:21

**live**  6:4

**LLC**  4:17 5:8

**located**  4:11

**logs**  151:13

**long**  307:5

**longer**  154:2,13 274:5 401:2

**looked**  27:25 34:7 76:13 77:10,11 82:23 83:24 91:9 100:22 109:25 129:20 139:22,25 150:7, 12,17 151:6 163:20 165:18 182:7 237:13 273:18 282:15 300:19 357:3 393:14,23 396:10

**lose**  179:23 180:2,7,11

**losing**  183:3

**loss**  179:16 181:17,21

**losses**  178:17 179:2,7 181:8,9 240:5 295:9,11, 15

**lost**  124:21 178:13 179:12 182:6,11,23 183:13,15,19 202:25 203:1 256:1,11,12,16 389:3

**lot**  40:7 188:5 193:1 195:8 212:19 233:2 336:2 364:16 368:16 370:13 374:4 385:18 393:24 396:3

**lots**  180:1

**love**  102:22

**low**  385:8

**lower**  284:18 285:6,10, 12,18 296:24 297:11 330:18 336:9,12,23 337:3,8,11,24 338:1 339:25 341:20 345:5 363:21 373:16

**lowered**  243:25

**LTD'S**  384:20

**lucrative**  148:6

**lump**  113:2

**lunch**  167:2

**Lybrand**  52:2,16

---

## M

**made**  8:24 29:14,15 30:10 32:13 33:7 35:10 38:19 39:6 44:23 50:23 57:3,20 59:20 61:11,18 62:4,20 66:19,21,23 67:16 68:9 73:8 77:19 79:9,11 82:1 84:2 85:10 89:19 102:8 107:14,15, 16 110:11 124:17 129:25 133:22 150:11 155:9 157:13,24 161:9, 20 166:11 169:9 170:11 171:16 178:12 183:13, 15 190:5 207:17 208:8 209:6 245:13 258:21 263:11 281:17 282:3,21 286:20 296:4 299:7 312:21 313:3,4,21 314:22 322:7 340:18 344:2 346:10 359:7 370:6 379:13 381:20,25 382:9 390:12 398:24

**magnitude**  259:5 299:10,25

**major**  320:3

**majority**  27:22 28:1

**make**  31:11 32:4,15 38:5 44:20 59:25 74:25 79:19 80:3 83:18 100:24 102:5 108:9 112:24 130:23 148:4,7,8,22 152:16 157:9 159:8 162:12,14 165:10 169:16 179:23 180:9 181:23 197:18,23 198:20 199:24 200:19 201:10 206:9 210:10,15 213:9 221:12 232:17,23 240:20 246:11,17,23,25 251:5,10,11,13 278:14 300:23,25 301:3,6,9,12 302:2 304:25 315:2 319:19 325:10,13 335:24 345:22 358:25 359:4,5 379:20 398:1

**makes**  199:17 240:20,22 277:5 309:8 314:10 347:11 350:9 358:16

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

360:17 377:6

**making** 108:24 156:14 162:12 169:17 180:23 186:10 189:18 202:16 205:18,23 206:5 207:25 243:15 249:13 254:11 287:14,15 300:14 313:2, 5,13,14 315:15 317:11 319:7 336:14,17 339:9 341:15

**marginal** 189:3 287:20 289:13

**Marinucci** 34:17 38:14 39:5 258:15

**Marinucci's** 31:11 33:9 34:5,9 35:1 36:1,6 38:11,15,17,25 39:11

**mark** 117:20

**marked** 4:1,2 6:7 7:23 9:21 22:5 117:21 215:23

**market** 185:21 211:14 212:5,8 213:6 220:17 285:25 367:23 377:16

**master's** 46:21

**match** 48:3 55:9 56:23 57:10 61:12,16 66:19, 21,23 67:16 79:20 80:4, 8 102:6 104:11,12,19 105:1,2,8 107:6 110:5 121:8 135:5 147:18 148:12,15,17,18 149:21 151:12 160:5,8 162:12 165:11 170:4,14 287:5 289:2,4,10,15,17 290:1 389:16 392:15 393:3,11

**matched** 65:19 79:24 149:2,23 159:24 162:8 286:6 394:8

**matches** 75:5 80:11,16, 22 81:6,13,15,19 105:11,12,14 109:12 110:2 111:6,7 121:11 125:20 148:4,8,11,22 150:3,10,18 161:8,10,20 324:12,16 327:3 328:12 347:20,21 389:21

**matching** 48:2 56:3

**materially** 378:1,25

**materials** 22:6 358:18

**math** 267:22 357:6 360:25

**mathematical** 233:1 297:20 357:16 369:1,7, 19

**matter** 4:16 6:25 16:21, 22 17:1,10 18:8,17 19:16,25 20:5 21:19 22:2 25:4 40:9 47:2 55:12 82:16 224:3 360:16 380:6 393:5

**matters** 15:2,14 16:19 54:11,17

**maximize** 293:13,18

**Mayberry** 154:17 156:7 400:8,17,20,25

**Mayberry's** 153:25 154:12 157:5

**MBA** 46:13 47:4,7

**meaning** 110:17 119:21 150:24 154:20 207:24 231:12 270:25 280:10 281:4 283:3 334:18 337:20 388:5,7

**means** 104:10 121:25 131:14 166:13 338:3,6 381:8,11

**meant** 387:15

**measure** 199:20 200:9, 13 219:3 222:18 279:4

**measured** 211:6 214:10

**measures** 222:21

**measuring** 213:24 214:1

**mechanically** 100:24,25

**media** 4:17 18:1,3,15 122:18 142:17,19 143:3, 23 144:5,6,10,19 145:5, 13 146:1,17 301:25 303:4,10 304:12 305:4 361:12

**members** 20:9 51:2,9

**membership** 51:1,16

**memorize** 177:6

**memorized** 41:24 210:23 318:3 394:17

**memory** 21:9 63:22 124:13 130:25 280:14 307:23

**mention** 325:14

**mentioned** 19:23 176:11 380:25

**metal** 223:2 224:15

**method** 374:6

**methodologies** 47:16, 19,23,25 365:22

**methodology** 163:4 278:4,7,16 299:15 330:15 331:25 332:14 333:2,4,6,14,18 337:2,6, 10,12 365:4 366:22 367:12 377:8,10

**Michael** 5:7

**middle** 4:19 6:17 56:1 58:5 346:20 353:14 358:9

**Mike** 35:21 401:17,25 402:1

**million** 63:8 178:3,4,6 179:5,6 181:7 193:14,15 194:17 196:25 197:1,2, 15,16,20,22 198:8,10, 14,15,18 200:21 211:13 212:8,13,25 213:2,6 215:20,25 216:2,24 220:17,20 227:10 228:5 230:1,3,4,5 237:25 238:1,8,11,18,20 239:3, 5,13,21,23,24 240:1,10, 13,16,20,24 241:1,6,7,9, 10,14,16,20,24 242:2,4, 9,10,14,17,22,23 243:2, 10,13,14,23 244:1,2,17 245:3,6,15,16 247:8,14 248:6,19,20,23,25 249:7,14,19,23,25 250:1,4,5 251:1 257:10 259:3,20 260:8 262:23 263:20 267:2,5,18 268:16 269:22 270:20, 22,23 271:3 291:21,22

292:12,14,15,19,22 293:23,24 294:17,21,22 295:6,7,23 296:2,5,18, 25 297:22,23,24 298:15, 25 299:10,11,14 300:1,2 301:1 374:22 376:6

**millions** 233:21 234:14, 19 235:12

**mind** 130:5

**minimis** 360:15,18 361:6 396:14

**minute** 135:20 151:21 310:13 360:7 401:8

**misanswer** 64:12

**misappropriation** 214:11

**miscalculates** 197:9

**misheard** 350:16

**misleading** 180:21 199:4 201:25 228:16 243:5 256:6 315:22

**misplaced** 315:14 324:19 327:6

**misrelated** 326:3

**missing** 7:4 332:21

**mission** 246:17

**misstate** 267:25

**misstates** 15:4 24:3 36:19 60:7 62:22 69:3, 23 80:14,20 96:16 99:23 101:14 104:23 120:3 126:16 141:7 160:25 165:14 171:22 174:18 192:10 193:19 196:19 203:13,14 214:16 218:9 221:4,23 225:19 248:14 255:10 263:8 268:19 269:16 288:7 290:5 291:1,25 294:24 297:7 299:18 300:7 313:24 317:15 319:10 323:22 325:19,20 327:16 328:21 333:10 341:12 342:12 343:14 344:5,22 345:25 353:11 354:4 355:8 366:1 379:4 382:23,24 386:12

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 123 of 137 PageID 9391

Confidential

**Dana Trexler Smith**

Connectus, LLC vs.
Ampush Media, Inc., et al.

388:25 390:6,24 399:18
400:14,22

**misstating** 15:7 36:22
37:1

**misunderstand** 322:21

**mix** 21:15 53:24 79:7
94:5

**model** 114:18 192:1
196:12 324:2

**moment** 23:22 86:9
116:23 127:22 166:20
194:9 212:7 217:12
220:7,8 240:13 241:8,
11,18 242:7,17,25
289:10 314:16

**moments** 166:25

**Monday** 4:4

**monetary** 136:25

**monetization** 107:25
108:1,4 372:18

**monetize** 373:7 400:12

**monetized** 107:23 133:6
168:7 231:18 267:6,11
268:8 273:21 298:3,7
391:24

**monetizing** 294:19

**money** 133:19 157:20
178:12,13 179:23 180:2,
8,9,12 181:23 182:6,11
183:13,15,19 201:10
215:22,24,25 216:17,23
236:6 246:12 256:14
264:11,18 286:5 296:4
351:23 390:4

**month** 209:6 212:9
219:10,17

**months** 207:18 331:19
352:15

**morning** 5:4,22,23 153:5
156:17 380:20

**move** 37:25 38:7 65:5
68:13 226:10 227:25
251:16 274:1 336:22
346:19 370:17 394:24

**moved** 91:18

**moves** 385:11

**movie** 234:23,25 235:6,
13

**movies** 233:20,21 234:4,
10,13

**moving** 86:8 168:5
382:19

**multiple** 151:2 170:3
271:12 272:14 370:3
371:25 373:17,20
375:21

**multiples** 372:8

**multiplied** 355:23
356:12 374:19 375:16

---

**N**

**names** 53:6 269:7

**narrower** 158:18

**nature** 17:1

**neat** 243:1

**necessarily** 57:14 119:4

**needed** 8:2 368:4

**negatively** 224:5

**nice** 217:2 243:1

**Nicole** 20:3 26:3

**nominator** 349:3

**non-degree** 321:10,13
322:16

**non-edegree** 90:25 94:9
95:9,18,22 110:13
133:22 322:19 323:8
336:5 341:19 380:13,14,
24 381:6 394:7

**non-legal** 56:20 287:7

**non-matched** 286:3
287:19

**non-referring** 372:4,5

**non-responsive** 251:17

**nonsensical** 354:7

**nook** 138:12

**not-for-profit-
universities** 136:5

**notation** 8:12

**notice** 6:9 28:12 168:2

**notwithstanding** 239:21

**noun** 254:25

**November** 7:13 9:23
10:4,6,18 11:3,25 13:5
15:17 17:15,17,19 19:5
20:25 26:15,16 28:7,8
43:14 44:9 55:12 117:12

**number** 4:21 8:15 63:1,
2,3,8 64:8 66:3 71:5
72:21 73:23 74:17,23
76:19 77:3,21 84:16
85:13 89:16,20,24 91:11
92:18 93:3 94:20 96:1,3,
6,11,12 97:1,2,5,8,16,
18,19 101:19 102:9,11,
12 103:6 104:8 110:6,
17,18 111:3 112:20,22
113:10,12 116:22
117:15 122:10,14
123:23 130:24 149:23
168:22 171:12 230:17
259:3 273:17,22 301:11,
17 302:19,20 305:18
309:9,11 310:4,8 311:4
313:10,11,15,17 314:12,
13 315:15,16 316:10,11,
13,20 317:12 318:9,10,
17 319:4,5 321:8,9,24
322:4,6,14,15 323:7
324:9,11,14,16 325:23,
24 326:25 327:2 328:7,
12 329:22 332:15 333:8,
23 334:5 335:9,12
337:25 340:19 341:2
348:17 349:20,23 353:3,
8 354:7,9,13,17 355:17,
18,25 356:1,3,9,11,12,
13,14,18 360:22,24
366:18 395:16

**numbers** 63:21 75:8
77:14 124:25 181:3
210:23 266:23 300:22
303:14,15 334:7 339:25
341:8 342:4 394:16

**Numeral** 19:21

**numerator** 326:22
349:1,22,24

**numerator/denominator**
350:6

**numerous** 292:3

---

**O**

**Oakland** 184:6,14
190:24

**oath** 5:15

**object** 150:14 222:15
228:15 249:5 346:12
370:24

**objected** 12:13

**objection** 10:10 11:6
13:10,15 15:3 19:9 23:4
24:2 25:20 28:24 29:17,
18 31:1,15 32:18 33:21
34:10,23 35:22 36:18
38:22 39:8 41:5 42:5,18
43:8 44:1 45:2,14,22,25
46:6 49:7,15,24 54:12
56:11,18 60:6 62:21
63:17 64:3 68:5 69:2,22
70:17 71:8,13,22 77:4,
23,24 80:13,18,19,23
81:23 82:5 83:10 84:21,
23 86:18 87:7,13 88:7
90:2,8,10,19 91:22
92:10,20 93:6,24 94:15
96:14,15 99:5,22 101:13
104:22 108:5 114:14
115:23 118:8 120:2,21
122:1 123:1 125:22,23
126:4,15 128:9 129:14
130:8 131:7 132:20
133:9 136:16 137:2,23
138:21 139:7 140:9,21
141:6 143:25 144:22
146:6 149:5 150:15
151:4 153:10 154:15
155:21 156:11,12
157:12 158:1,3 159:1,12
160:1,21 161:22 162:18
163:17 164:23 165:13
166:6 169:20 171:21
172:8,17 173:10,23
174:17 175:6,17 177:2
178:20 179:17 180:3,14,
18,20 182:14 183:4,22

**Dana Trexler Smith**                                                    **Connectus, LLC vs.**
                                                                         **Ampush Media, Inc., et al.**

184:19 185:3,9 186:4
187:2 188:2,17,21,22
189:10 191:6,20 192:7,
8,18 193:18 194:22
195:5,6 196:18 197:25
199:1,9,13 200:3,4
201:3,14,23 202:4
203:12,13 204:6,11
205:12,25 206:3,11
207:7 208:24 210:3
211:7,17,22 212:15,16
213:13 214:13,15 215:1
216:3 218:8,18 219:15,
20 220:10 221:3,22
223:4,24 225:18 226:4
229:10,19 231:5,22
232:10 233:10 234:6,16
235:1,25 236:18 237:5
238:22 239:7 241:21
243:3 244:3,5,8 245:21
246:13,21 247:24
248:13 249:9 250:7
253:7 255:9 256:3,19
257:18,19 258:5 259:7,
23 260:14 261:2,5,12
262:4 263:7 264:2,22
267:24 268:18 269:15
272:4,24 273:1 274:17
276:25 279:8,10 281:10
282:10 283:8 284:6,21
286:8,11 287:24,25
288:6 289:18 290:4,25
291:24 292:23 293:6
294:9,23 295:19,25
296:9 297:6 298:11
299:17 300:6 301:4,13
302:12 304:6 305:9
307:12,25 308:14
313:23 315:18,19
316:23 317:14 319:9
320:5 323:10,21 325:18
327:15 328:19 333:9
334:24 337:15 341:11
342:11,22 343:13 344:4,
21 345:23 346:13 348:3
351:7 353:10 354:3
355:7 356:6,16 357:18
359:8 365:25 366:13
367:16 368:1 370:23
371:5,6 375:7,23 377:1,
21 378:4 379:3,17
382:3,22 383:16 384:5
386:11,17 387:23
388:14,24 390:5,23

391:10 392:2 395:20
396:23 397:21 399:17
400:13,21 401:10,15
402:12,22

**objections** 35:8 37:25
38:4,5 188:3 200:6
217:6 224:21 225:5
249:9

**obtain** 98:18 189:7
230:4 238:8 240:2
241:24 292:13

**obtained** 58:24 127:1
147:13 173:21 191:11,
13 196:14 242:1 297:3
298:8 368:8 373:1 380:9

**obtaining** 185:7 189:3

**occur** 313:17

**occurred** 75:4 129:4
150:1,19

**October** 17:18 117:12
176:3,18,23 177:1 306:7
332:3,11,12 333:2,3,15,
16,17 334:8 335:8
352:16

**offer** 9:15,20 10:20,25
12:5,20 13:1 36:14
37:14 161:19 162:15
163:11,15 177:8 186:20
227:20 264:9 299:24
341:6 387:5

**offered** 387:7

**offering** 48:25 204:2
264:14

**old-fashioned** 344:20

**one-time** 371:24 372:4

**ongoing** 27:1

**operate** 181:19

**operates** 134:6

**operating** 50:22 171:17
183:2 287:3 289:12,22

**operation** 183:20

**opine** 146:17

**opinion** 10:4,22 15:16
19:2 34:20 36:9,15
37:15 38:10,13 41:3

56:12,14 129:5,17 141:2
153:11,13,23 163:16
164:2 177:9,14 181:2
186:20 195:19 196:23
201:22 205:10 206:22
214:4 220:8 221:20
227:13,21,23 253:6
264:10,14 271:13,20,23,
24 272:22 273:4,17
289:24 294:11 298:6
299:25 301:16 314:3
322:3 340:22 341:7
373:19 378:22,24
393:21

**opinions** 9:14,19 10:7,
19 11:5 12:2,14 13:4,22
15:1,13 16:2,4,9 36:7
162:16 202:13 292:4,8,
10

**opportunities** 55:8
387:5

**oppressive** 223:14

**opt-in** 55:10

**oranges** 90:6 328:16

**order** 16:24 108:3 128:7
140:6 146:3 193:14
197:1 247:13,20 248:9,
19,24 249:18,25 261:21
262:1 281:22 305:15
315:1 378:21

**orders** 51:13

**ordinary** 293:19

**organic** 144:15,18
145:7,15 147:3,6,9,10
278:22 280:22 302:11,
17 304:21 372:20
397:20

**organically** 139:4,11
140:19 146:4,19 170:12
278:17 279:2,16,23
280:10 305:8 373:1
393:9 397:2

**organization** 51:1,17
58:15

**original** 175:2

**originally** 270:14

**originated** 75:25 380:22

**outbound** 119:15

**outcome** 22:2 379:15

**overestimate** 334:4

**overestimated** 333:7
335:9,11 353:25

**overestimation** 335:15

**overinflated** 365:5

**overseeing** 25:15

**overstate** 265:11 271:25
273:6

**overstated** 143:2 292:17
294:1 339:20

**overstatement** 332:15,
20 374:13,17,25 375:12
377:11

**overstates** 339:20

**overstating** 275:14
276:3

**overwrite** 27:4

**owe** 157:20

**owner** 186:15 187:7

**ownership** 153:8,13
380:4 383:19

**owning** 289:15

**owns** 189:5

---

**P**

**p.m.** 403:7

**Pa** 4:25

**pages** 365:14 366:9
376:16

**paid** 19:15 59:8 69:14,15
75:7,13 84:8,9 94:7
105:9 107:4 108:2,21,
22,23 161:17 187:25
250:25 275:13 276:2
277:23 278:5 288:15
334:12,17 352:22
359:15 374:20 376:3
383:6,23 388:9 390:14

**Pakistan** 149:23 389:20

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

**Pakistani** 131:5 159:24 162:8 165:9 381:25 382:10 386:4 388:20 389:18 390:2,20 391:8, 17,20,23

**paragraph** 142:24

**parallels** 193:5,7 195:20

**pardon** 66:7 311:21

**paren** 310:4

**parent** 302:25

**Parente** 53:3

**parenthetical** 310:8

**parks** 385:7

**part** 47:4 55:25 85:20 86:16 88:1,15 90:5,12 131:9 144:20 149:17 159:10 179:18 190:17 192:16,21 238:21 285:10 316:22 345:20 363:13 382:11,15,16,17

**partially** 104:25 225:1

**parties** 18:6 48:21 92:9, 17 93:2,4 112:20 126:14 132:3 310:22 313:18,22 314:7 321:11,14 322:16, 19 323:9 380:11,13,15, 25 384:4,10 394:7

**party** 56:3 66:11 69:15 85:11 87:6 108:3 112:14 113:15 118:13 203:6 214:8 282:4 310:16 373:2,10 381:9

**past** 93:14

**patent** 17:2 53:13

**patents** 53:17

**path** 35:9 122:18

**pattern** 163:13 294:16

**pause** 62:9

**pay** 105:10 107:24 113:25 114:1,3,6 190:18 191:1,2,3,9 193:13 196:25 198:23 230:3 235:18,23 236:15 242:11,14 275:10,25 276:8,13,15,20 283:3

286:4 287:4 289:16 290:1,8,15 292:12 295:5 383:9 389:25 390:2

**pay-for-conversion** 114:10,23

**pay-for-performance** 114:9

**pay-per-click** 135:13 137:14 141:5 361:4

**payable** 51:10

**paying** 18:7 69:20 185:19 189:4 250:22 276:23 288:4,9 381:5 391:8

**payment** 18:11 57:3,19, 23 58:10,13,14 59:2,15, 19,20,24 60:20 61:11,18 62:4,19 65:12,24 66:6, 12 68:9 70:4,15,20 71:7, 19 72:1,23 74:6,8,14,18 76:2 77:19 81:9,10 82:12,15,18 83:3,7,16, 18,20 84:2,15,17,18 85:10 89:19 100:9 102:14 105:5,17,20,21 107:11,13 109:1,22 110:21 111:4 112:24 114:23 121:12 127:6,8, 17 129:23 134:25 137:20 142:12 168:9 169:9,13,17 170:11 281:16,20,22,23 282:2, 4,20 286:15 334:20 347:6,8,14,15 348:9,15, 19 351:19 359:22 380:23 381:19,20 398:24

**payments** 59:22 73:8 76:16 78:11,15,17,21 79:8,11 86:5,6 90:23 110:11,20 132:16 133:21 168:16,20,22 169:2,7 171:16 190:5 207:17 208:8 209:5 257:11 286:20 339:16 381:25 382:9

**pays** 56:3 113:15 138:6 382:16

**PE** 370:3 374:7 375:20

**pen** 335:23

**pending** 4:18 17:4

**Pennsylvania** 6:4 51:4

**people** 19:23,24 25:1,9 26:18 40:15 204:2 283:2,4 369:25

**percent** 54:15 181:8,9 297:2 298:3,8 350:10 374:12,18,19 375:1,10, 18,20 383:10

**percentage** 54:10,19 98:1,5,6 107:24 265:17, 21 266:1,13,17 268:3 271:2 295:11 317:18,23 319:17,25 325:4 326:12, 18,20 329:2,6 347:1,2 350:2,3,9,20 351:3,4 353:20 354:8 364:2 365:5 375:2

**perfectly** 238:20 386:8

**perform** 19:2 25:7 26:6 50:13 77:22 162:23 170:25 171:3 202:19 339:3 340:20 344:16 378:7,8,13 397:25

**performance** 177:10 238:14

**performed** 25:16 47:1 50:21 86:24 141:15 157:4 160:4 177:15,17 193:24 194:2 227:15 322:5 326:4 340:10 343:5,18 344:13 345:21 363:23 365:18 366:8,20 367:10 370:15 386:6 396:7

**performing** 24:16 30:15 40:12 152:2 282:7 335:14 367:11 368:18 370:14 374:5 376:14 379:8,22

**peril** 223:16

**period** 64:24 103:22 108:18 305:22 306:6 332:2,11 333:21 334:7

**person** 136:24 189:4 211:4 216:17 225:8

**personal** 224:25

**personally** 20:20 27:19, 23 32:3,12 33:8 132:9 224:4

**perspective** 147:4,6 150:13 188:12 195:4 196:12,22 296:7

**Philadelphia** 4:25

**phone** 123:22,23 129:12 151:25 152:3 251:22 324:12,17 327:3 328:13

**phrase** 232:7 291:3 328:16 388:1

**picture** 61:1 100:13

**pie** 351:22,25 352:2,5,8, 10 356:20,23

**piece** 12:10,12 24:18 73:3,4 92:3 94:10 95:5, 17,18 210:12 351:24 352:2,3 356:21,22

**pieces** 23:2 25:7,14 336:3

**ping** 66:16 67:6 271:10 272:13 273:19 289:3 314:13 318:14,15 324:14

**pinged** 60:3 64:22,23 67:12,13,15,22 68:1,7 109:20,21 121:4 128:3 270:14 288:23

**pings** 66:16 270:15,22, 24 301:1,17 313:12,16 316:10,13 319:5 321:24 322:18

**PK** 131:5,17,22,25 133:7 383:12 387:20 388:3 393:18

**place** 160:20 266:25

**places** 79:13 141:23 168:3 169:1

**plaintiff** 5:6 9:8,13 14:8 17:7,8 25:4 60:4 62:17 66:15,25 67:5 76:1,18 79:14 82:24 83:5,8 84:6, 7,9 89:19 107:14,25 113:23,24 122:23

Confidential

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

125:18 128:4,20 134:15
135:1,2 138:19 143:20
149:20 150:25 153:18
162:5 170:22 171:7
173:9,19 174:16 175:5
189:1 191:11,13,25
198:7,22 209:8 222:10
236:12 240:5 255:21,25
256:1,10 257:16,22
258:16,21 259:6,13,22
260:7 261:25 262:2
263:6,13,17,21 264:11,
13,15,21 265:19,23
266:19 267:19 268:16
269:5,13 270:22 271:11
272:13 273:20 278:12
279:7 286:4,25 287:4,9
288:9 289:17 290:14
297:5 301:1 304:19
322:6 334:20 347:18
389:14 393:17 400:3

**plaintiff's** 6:8 28:14,22
30:5,23 36:16 41:19
42:4 258:4 265:3 362:14

**plaintiffs** 40:21 63:13
222:12 231:14,16 232:5
260:21 261:18 286:16
291:12 301:18 335:4

**plan** 14:11,15,17

**planning** 9:10

**play** 162:23 219:7

**Plaza** 4:24

**pleadings** 128:15

**pleasure** 167:4

**pocket** 216:18 220:14
225:10 239:14

**pockets** 382:21

**point** 6:16 17:25 22:25
23:12 27:7 55:22 59:18
83:4 102:17 111:11
112:10 142:20 147:17
151:10 152:25 167:7,14,
16 176:6,12 184:18
211:5 213:10 220:12
223:11 228:2 243:19
244:14,23 251:10
254:12 255:19 272:23
275:19,20 278:23 279:2
294:4 295:11 296:17

299:7 323:5 325:9 335:7
336:14,17 339:8,23
340:9,25 341:14 343:8
345:14 358:8,10 361:22,
24 362:15 366:21
370:12 377:5 381:1
394:21

**pointing** 93:19 237:8
300:18 338:25 346:2

**points** 243:17,21
244:12,19 245:7,9 339:2

**populated** 363:16

**population** 61:22 62:3
65:10 72:22 82:9,20,22
95:11 99:10 115:19
116:5 120:8 127:9
280:4,6,9,21 282:19
345:17 392:7 393:2

**populations** 61:6 76:12

**Port** 184:6,14

**portal** 176:3,11 347:19
392:22

**Porter** 253:13,17

**portion** 21:25 25:12
94:12 97:13 113:7 146:1
202:14

**posit** 184:4,12

**possess** 243:18 244:14,
22 245:1,4

**possessing** 289:14

**possession** 241:13,19
242:8 245:2,18

**possibility** 87:1 203:7

**post** 123:25 124:10
269:12 309:23 310:20
314:3,4 321:13

**posted** 124:6,7 178:16
179:3 320:9,12 326:19,
21

**posting** 139:23 295:9
364:10

**posts** 269:9 270:6
309:11,19 310:1,4,9,15
311:5 312:10 313:17,21
314:14,17 315:6 321:10

322:19 323:8 326:12,13

**potential** 125:20 227:9
324:10 327:1 328:8

**practice** 30:13,16 41:2
52:6 53:4

**practices** 114:13

**pre-qualified** 154:22
155:1,25 266:4,9
348:11,13 353:21

**preceding** 207:18

**precise** 15:24 54:22

**predicated** 273:17

**prefacing** 285:19

**preliminary** 57:16

**premium** 275:12 276:2

**preparation** 147:7

**preparing** 308:11

**presented** 372:19

**pretty** 295:24 296:8
336:16

**previous** 110:16 355:8

**previously** 61:9 109:17
118:1 380:3

**price** 96:22,25 133:17
184:7,16 185:21 213:5
235:21 246:6 278:20,21
281:5,8 283:17 284:4,19
285:1,5,9,23 286:2
287:20,21 338:16 362:9
365:6 367:20 374:8,20
376:11 386:2,5,10
390:1,21

**prices** 77:13 385:23

**pricing** 385:4,19 386:16

**primarily** 57:8

**primary** 107:6 267:8

**principle** 48:2 181:14,
16,22 188:13,14 193:11,
17 194:12 195:3 196:10,
16 197:12 200:16,17
201:1,8 231:4

**principles** 48:9,23
177:17,23 181:15

188:12 193:10 194:1,8
196:7 203:18 246:11
283:15,16,22 284:11,13

**print** 118:3

**prior** 15:5 20:20,24 24:3,
9 42:11,17 52:2 55:11
60:7 96:16 99:23 101:15
120:3 126:17 161:1
165:14 171:23 176:23
196:20 221:4 225:20
294:25 297:8 299:19
300:7 328:22 389:1
399:18 400:23

**privilege** 10:12 12:10,12
13:12,13

**privileged** 11:10 12:17
13:3 18:23 29:2,7 31:3,
21 34:1 131:10

**problem** 95:25 201:1
299:12,13 328:25
351:10 352:7

**problems** 195:9

**process** 27:2,5 60:19,20
83:22 88:2 112:12,19
114:23 135:6,8 137:11,
22 138:1,8,13,14,15
139:3,16,20,21 155:9
165:22 210:1 323:5,20
353:22 397:20

**produce** 26:18,19
101:12,18 233:22 234:5,
14

**produced** 13:24 14:7,23
25:3 26:10,11,12 44:8
163:13 175:16 306:16

**product** 10:13 11:11

**production** 306:18

**professional** 53:11
177:19 194:4 336:19

**proffered** 248:4 258:23
259:11,17 265:5 293:25
341:21

**proffering** 340:22

**proffers** 227:1,6

**profit** 181:19,24 186:10
197:2 225:23 246:17,24,

Case 8:15-cv-02778-VMC-JSS   Document 201-9   Filed 02/01/17   Page 127 of 137 PageID 9395

Confidential

Dana Trexler Smith                                                          Connectus, LLC vs.
                                                                      Ampush Media, Inc., et al.

25 256:13 375:12 376:22 382:11

**profited** 225:23 247:6

**profits** 48:11,12 178:5 203:1 215:11,13 222:20 256:2,11,16 257:8 262:20 263:10 293:13 360:14 368:9 369:10,12 374:15,18 376:11 378:18 385:11

**program** 47:8 55:10 56:24 61:13 85:20 86:17 87:9

**programs** 387:6

**prohibition** 233:1

**project** 18:24

**promotion** 359:25 361:19

**proper** 225:15 278:4,7, 16 369:4 379:8,12,22

**properly** 199:25 222:22

**properties** 134:3

**property** 54:1 385:8

**proportion** 191:3

**prospect** 128:6 140:19 165:10 252:7 255:8 265:21 393:19

**prospective** 55:9 56:1,4, 23 57:11 61:12 72:2 123:16,20 136:3 137:5, 11 148:18 149:2 151:14 170:1 236:13 373:9

**prospects** 166:3

**protective** 16:24

**prove** 182:10

**provide** 22:11 147:18 208:10 307:21,22 402:15

**provided** 22:7 23:11 39:5 51:1 56:25 101:20 113:3 116:21 141:12 158:21 226:12,13 227:7, 8 301:23 306:12 307:7

**provider** 59:3

**providing** 209:2

**provision** 207:23

**proximity** 393:16

**proxy** 281:23

**public** 47:9 51:5

**Pujii** 368:24 369:19

**Pujii's** 368:21

**pulling** 144:5 399:23

**purchase** 51:13 112:23 240:20 281:2 331:22 374:7 376:10

**purchased** 113:1 290:2 291:11,21 376:9

**purchasing** 198:17

**purely** 87:21

**purported** 178:2

**purpose** 73:24 75:23 136:14 154:2,14 302:10

**purposes** 95:20 133:2 302:16 370:3 371:25

**pursuant** 6:14

**put** 10:8 11:21 13:14 20:21 21:19 25:11 80:18 96:6 97:21 101:3 127:20,21 181:7 186:6 213:23 228:11 232:15 251:13 320:20 363:4

**putting** 73:24 254:4 258:24 279:11 320:23

---

## Q

**qual** 352:11

**qualified** 55:22 56:22 57:5,9,16,18 58:25 59:4, 9,12,18 61:10 65:8,21 66:4,5,8 67:17,21 68:15 69:21 70:15,21 71:2 76:8 95:13,14 104:4,9, 15 105:7 106:2,12,15 107:21 109:18 110:7,10, 18,19 111:11,17,21 112:13 127:5,13 130:6, 11,12,15,16 133:13,15 143:9,15 146:23 154:23

156:1 161:11,15 163:25 164:6,21 166:19 169:3, 7,16 173:2 266:8,11,17 267:7,8,9 268:5 271:1 272:19,20 275:13 276:3 279:1 286:6,18 287:5 304:1 305:7 309:11,20, 23 310:4,9 311:5 312:11 314:8,13 315:9,16 321:10,13,15 322:15,18 323:8 324:21 325:24 328:9,24 329:7 330:20 331:9 332:2,5,9,10,16, 17 333:8,20,24 334:5, 12,17,18,19 335:2,10,12 337:25 338:15,16 339:5, 10,13 342:3 343:3 345:15 347:1,5,13 348:1,8,17 349:4,8,12, 16,23 351:13,16,17,23 352:12,17,21 353:16 354:1,18 356:1,4,11,14 372:10,17,24 373:14 380:12 381:3,15 383:11 388:13,22 391:25 394:10 398:20 399:1,6, 13,14

**qualify** 269:6 392:20

**qualifying** 381:18

**quantified** 66:3 164:9 208:8

**quantity** 283:17 284:4, 19 285:12

**queries** 68:1

**query** 80:4 81:5 84:5,10

**question** 10:15 11:14,21 12:6,23,25 13:20 15:7,9, 23,25 25:24 31:6,8 33:2, 7,14,24 35:11,20 36:11, 21 37:4 42:25 43:17,18 44:14,16 45:5,21,24 46:4 49:3,16 63:6 64:12 67:14 68:17 72:18 81:1, 3 92:23 129:7 136:1 137:24 138:9,25 145:18 149:11 152:16 154:9 157:1,18,22 158:19 162:1 163:5 172:14 173:13 179:9,10 184:10 189:21 199:8,23 201:19

202:2 207:12 210:11 211:8 213:14,16,19 223:19 226:23 235:16 244:4 268:13 271:5 272:9 273:25 274:9,24 278:13 291:9 297:18,19, 20 298:19,22 299:4,21 305:15 311:18 312:23 315:1 316:6 331:7 350:17 366:6 370:22 371:1,4 378:20,22 386:14,23 391:4 402:17, 19

**questions** 167:11 220:1 223:13

**quibble** 138:12

**quote** 227:6 250:18

**quoted** 154:17 400:9

**quoting** 226:22 400:20

---

## R

**Radnor** 6:4

**ran** 80:4 81:5

**range** 20:15,23 178:2 251:2 396:14

**ranging** 181:8 228:5

**rate** 19:16 330:9,11,13, 18 336:8,9 337:3,8,11, 20,24 353:1,6,7,18 355:24

**rates** 20:14 21:17 336:16

**ratio** 349:15,16 356:12

**rational** 178:8 186:12 188:15 190:13 193:1 194:1,13 238:16,20 239:6 247:5,19 248:18, 22 249:2 250:3 293:15

**re-articulation** 193:16

**re-did** 209:25

**re-monetize** 191:10,12

**re-monetized** 166:1 266:18 267:21 270:25 271:4,12 272:14

**re-read** 255:2

**Dana Trexler Smith**

re-sold 200:1

read 26:5 28:6,9 30:14 34:15,25 36:1 37:22 38:20,24 39:18,24 40:3, 14,19 43:5 44:21,25 92:23 125:9 151:21 154:5 202:20 203:23 207:19 253:2 257:5 277:13 290:20 321:18 338:22 368:21

reading 40:5 154:6 200:18 252:15 310:13 376:5

ready 27:3

real 224:13 357:2

realities 231:15

reality 232:9

realized 362:11,20

realtime 151:15,18,20

reason 61:16 67:20 91:5 108:23 169:11 181:21 285:16 323:16 357:9,15 386:1

reasonable 177:18 194:3 319:19 336:19

reasonableness 237:15

reasons 297:15 339:4

rebut 394:1

recalculated 209:23

recall 17:13,16 22:23 26:25 27:9,12 30:7 40:25 42:8 81:11 115:6 123:4,9,12 128:12 132:4 171:8 174:2 210:1 313:13 362:21 364:13 384:17,19 391:12 394:15 395:5 400:25

receipt 133:18

receipts 51:14

receive 59:14 66:12 76:2 83:4 84:17 105:5,17 107:1,2,9 109:1 118:15 127:8,16 137:20 142:12 262:2 269:4 339:16 380:23

received 22:20 27:8 30:1 59:17,19 65:12,24 69:12,18 70:4,7,13,20 71:7,16,19 72:12,17,23 74:6,8,13,14,18 77:14 78:10,14,22 79:5,16,18, 25 81:9,10 82:11,15,17, 24 83:3,7,8,15,20 84:14, 18 86:13 87:11,21 88:4 90:23 102:14 105:19 106:4,16,20,21,22 108:15,20 109:22 110:8 116:6 119:7 121:12 127:6 129:23 142:10 163:2,3 164:13,14 174:22 175:1 215:14 236:6 245:16 260:7 265:18 267:18 279:6 304:18 306:17 334:20 340:4 347:6,8,14,15 348:10,19 351:20 363:10,22 378:18 380:21 382:17 391:9 392:8

receives 69:11 268:15 282:3 340:7

receiving 294:21 381:19

Recess 103:1 167:19 230:12 275:2 329:17 371:11

recognition 48:9

recognize 253:11

recollection 145:23 179:1 280:19 362:1 385:1

Recommenced 103:2 167:20 230:13 275:3 329:18 371:12

reconcile 88:14

record 4:4 5:3,25 7:18 15:1,13 16:2,8 46:3 58:7,16 66:11 72:3,14, 16 73:7 74:7 79:18 80:8 82:15 84:10,14 85:12,22 86:6,17 87:5 88:1 89:13 91:15,20 94:13,21,24 99:2,4,8 102:25 103:5 104:19,20,21 110:6 111:5,7 113:14,22 114:1,3 119:13,14,15,

20,23 121:24 122:13,14 124:5 128:6 133:5 150:22,24,25 159:10 160:15,16 162:11 164:13 165:10 167:18, 23 170:13 173:21 175:24 230:8,11,16 236:16 250:16,24 252:2, 23 255:16 275:1,6 278:18 281:21 282:23 287:15 298:17 305:17 314:5,18 315:7 316:12, 21 318:11 319:2 321:25 322:20 323:4 329:16,21 341:16 343:1 347:25 363:12,16 368:16 371:10,15 373:6,7 390:20 399:16 400:4 403:5

record-by-record 72:15 74:20 75:3 85:23 89:1,4, 11 91:7 92:19 93:5,9 98:19 100:3,18,23 101:1,5 267:15 317:2,8 319:21 323:3

record-by-record-level 86:22 87:3

record-level 73:6,9 159:17 161:3,7,13 166:14 271:6

recorded 48:23 65:25

recording 51:8 100:10

records 48:15,16,18 58:7,10,21,22,23 59:13, 16,24 60:14,22 61:2,4,6, 7,8,20,23,25 62:1,5,6, 12,13 63:21 64:7,9,17, 20 65:7,9,11,13,14,17, 18,19,20,21,23 66:1 67:10,24 68:15,18,20,24 69:10,13,16 71:6,15 72:11,21,22 73:3,10,24 74:4,18 75:6,12,16,19, 25 76:9,11,12,17,19,24 77:1,18 78:3,8,10,20,25 79:3,11,13,21,24,25 81:7,8,21 82:1,21,24 83:3,6,13,15,19,24 85:8, 9 86:4 87:17,18 88:12, 15,20 89:7,17 90:13 91:15 92:8,18 93:3,19,

21 95:23 96:2,4,11,12 97:3,16,18,20 98:2,13, 14,16 99:9,10,19 100:4 101:8,19,22 102:9,11,13 103:12,16,20 104:3,12, 13,15 105:13,15,16,18, 22 106:19 107:1,5,7,8, 14,20,24 108:21,25 109:8,14,24 110:2 111:3 112:3,20,22,23 113:1,2, 5,13 114:5,20,21,25 115:19,20 116:4,5,11, 13,14 120:9 121:2,9,14, 15 126:20,25 127:9 129:8,19,23 133:6 142:9 147:13 153:4,14 156:18, 20,22 158:7,9,10,12 160:7,18 161:5,15 164:16 165:2 168:6 169:11 170:6 171:6,14, 18 172:1,12,21 173:19 174:4,6,14,20 175:3,10, 22 176:19,23,25 177:5 236:17,23 250:19 257:9 262:16 263:12 265:25 266:5,9,10,16 267:2,5, 18 268:16,22 269:3,24 270:8,13,17 273:13 282:19 288:15,20 293:22 301:22 305:12, 14 308:25 313:6,10 314:6 318:18,21,24,25 319:6 323:19 339:19 345:4,6,7,10,13 360:16, 23,24 362:9 364:3 372:15,25 381:16 382:5 387:4 388:10,11,12,20 389:14,15 392:7,14 393:9,12 394:8 396:12 397:5,7 398:18,21 399:7,11 401:4 402:20

recovered 219:19

recurring 371:23 373:3, 5,8

red 356:20,23

redline 27:6

redlines 27:11

redo 357:5

reduce 336:4

reduced 218:3 335:15

Case 8:15-cv-02778-VMC-JSS    Document 201-9    Filed 02/01/17    Page 129 of 137 PageID 9397

Confidential

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

356:14

**reduces** 330:13

**refer** 85:14 254:25 289:9

**reference** 8:1,6,8 9:4 86:3 116:16,18 117:23 122:24 123:7 167:12 300:2 310:20

**referenced** 8:14 395:4, 10

**references** 34:16 116:9 125:17

**referencing** 117:2 154:4 291:8 387:19

**referred** 53:3 254:19 255:5,14,15 266:3

**referring** 61:25 85:5 112:21 115:13 117:8 130:24 133:12 134:8 155:25 210:16 269:8 280:16,20 302:21 314:8, 17 321:20 322:9,11 326:8 327:13 335:3 380:17 398:25 401:6

**refers** 64:2

**reflected** 81:21 395:18

**reflecting** 109:10

**reflects** 297:25

**refresh** 145:22 330:16 335:21 361:25 364:15

**Regus** 4:23

**rejected** 155:4 156:4,8 278:24

**relate** 24:14 61:7 70:9,10 75:16 79:4 89:7,25 90:7, 24 91:3 94:25 95:17 97:20 98:2 145:7 319:1 322:10 392:15 393:11 401:5

**related** 73:3 78:17 94:8 143:8,12 145:4,14 203:4 267:16 280:1,3,22 305:5 324:20 335:3 376:20 397:13

**relates** 24:18 79:5 90:22 95:3,5,11,12,19 97:14

100:4 114:12 122:16 161:20 302:18,19 324:22 328:24 329:6

**relating** 36:7 78:22,23 115:1 143:3

**relationship** 109:6 118:21 127:17 132:2,25 148:13 150:4,20 158:14 165:5 286:25 309:9,14, 24 313:9,15 314:11 315:15 316:10,19 317:11 318:9 319:4 321:8,23 322:4,14 323:6,17 325:23 326:5 368:12 369:17,20,21 373:9 383:20 392:20,25

**relationships** 48:21 147:19,21 148:5,23 151:12

**relative** 238:1 296:12

**relevance** 38:14

**relevancy** 37:16

**relevant** 29:11 30:11,17, 19,23,24 31:12 33:9 36:17 40:11,14 43:12 44:4 46:19,25 55:3,4,6 205:5 209:10 238:5 282:7,14 308:18 364:1 370:10 374:2 396:9 398:2

**relied** 116:21 306:14 391:1 392:5

**relies** 147:19 312:2

**rely** 47:6 80:2 102:4 177:24

**relying** 9:9 47:5 301:22

**remainder** 152:1 254:7

**remaining** 67:19 79:3 95:2 360:14 392:13

**remember** 21:12 131:23, 24,25 154:5,11 253:19 303:13,18 327:10 331:4 384:15 391:19,20 395:15 402:21

**remind** 253:9 394:14

**rent** 385:10

**repeat** 15:9 152:15 154:8 299:20

**repeated** 373:5

**rephrase** 10:14 278:13 386:14

**replacement** 192:25

**report** 6:25 7:2,9,22 8:24 9:6,9,20,23,25 10:2,3,9, 25 12:1 13:24 15:21 17:12 18:5 19:4,8,13 20:25 22:4,14 24:1,11, 14,23 25:10,13 26:1,25 27:14 28:20 34:14 38:19 39:13,17 40:4 41:14,20 42:3,11,17 43:7,25 44:9 46:19 47:5,16,23 48:1, 25 49:13 50:7,11 55:1 58:2,3 77:10 111:10,23 117:3 119:23 120:18 127:24 130:2,22 134:1 135:20,21 141:22 142:2, 6 146:15 147:7 150:6 154:4,18 158:15 164:17 168:2 177:16 180:25 181:4 190:9 193:12,21, 23,25 195:24 196:8 197:4,7 200:18 201:2 203:15 206:18 227:1,5, 16 228:3,22 229:1,7,16, 24 230:21,22,23 232:17, 20 237:10 247:6 248:5 250:14 252:5,9 253:2 254:9 262:9,14 263:14 264:19 272:23 273:5 275:8,9,24 276:7 277:9 290:21 291:3,6,19,25 292:3 297:9,16 300:15 303:16 306:4,24 307:2, 24 308:7,11,12 309:5,8, 10,12,19 310:3,5,10,19 311:6,8,20,22,24 312:11 314:10 320:4,16,23 321:2 325:5,19 326:10 330:5 331:1 332:1 336:15 337:5,17,18 338:17 339:9 340:13 341:13,15,22 344:16 354:6,16 355:3,12,16,24 366:2,10 367:8 376:17 378:16 393:15 400:9

**reported** 178:16 352:18

384:22

**reporter** 4:9 5:14 27:15 40:17 50:20 84:20 179:20 183:16 253:15 302:5 374:10 389:9

**Reporting** 4:8,11

**reports** 19:19 25:9

**represent** 58:13 69:9 78:7,21 98:14 119:13 126:22 292:16 398:16

**representation** 249:15

**representative** 251:4 338:15 343:7,12,22 344:12 345:2

**representing** 17:6

**represents** 69:10 90:18 98:15 352:25 353:1,19 401:9,14,20,21 402:11

**reputation** 258:4

**request** 223:6

**requested** 22:10 264:19

**require** 165:24 166:4 230:24 365:13

**required** 153:17 289:16

**requiring** 229:16

**reside** 6:3

**respect** 12:10 14:12,18 112:4 147:12 153:13,23 155:23 157:14 196:1 206:10 224:2 227:13 259:11 260:19 263:11

**respects** 337:13

**responding** 291:14

**response** 36:20,23 37:2 131:8

**responsible** 18:16 51:7, 10 225:1,2

**rest** 253:2 254:15 338:23

**restate** 138:24 339:7

**result** 157:20 181:6 243:15 244:18 257:17 260:13 262:3 265:13 271:21 272:2 273:10

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

274:15 289:3 309:12
342:18 346:11 365:24
366:11 378:1,2 379:1

**resulted** 149:21 168:8
265:22 337:3 388:22

**resulting** 206:25 354:13

**results** 114:6 320:7,10
332:3,14 338:12 378:25
379:7

**resume** 16:15 46:9 53:1

**retained** 17:9 18:21
19:7,12

**return** 137:20 153:18

**returned** 154:1,13 155:5
156:4 347:20

**returning** 153:22

**rev** 117:11

**reveal** 38:18

**revealing** 11:15

**revenue** 48:8 55:23
65:15 66:4 69:12,18,20
70:3,7,13,24 71:16,18,
19,25 72:5,10 73:1,20,
23 75:4,5 77:13,21
78:21 79:18 80:1,9
87:10,20 88:4,23 89:5
91:10,11,13,19 96:25
97:3,14,15,17 98:16,18,
23 99:1,12,14,15,19
100:1,2,7 101:6,23
102:8 106:1,4,11,21,22
107:1,8 108:15 109:4
110:10,19 111:12,17,22,
24 112:5 115:1,4,8
116:20 117:9 121:13
126:22 127:12,15,25
130:6,7,12,16,17,21
132:17,23 139:16 142:8,
11 143:8,15 145:8,15
146:23 150:13 156:21
158:13,17 164:15 165:1,
3,7,19 166:12 168:9
169:3,6 174:8,22 175:1
178:10 196:13 198:24
200:23 229:25 230:6
231:1 232:18 238:5
240:9 247:14 248:25
249:19,23 251:6 257:7

262:15,19 263:3 265:13,
22 272:2 273:11 274:16
275:12 276:1 290:16
291:13 293:3,9 297:3
303:25 305:6 318:22
319:1 338:14 339:5,10,
13,17,25 340:6 341:18,
19 342:3,9,18,19 343:2
345:15 352:6,22 359:16
361:14 369:22 370:2,7
371:18,24 372:4,9,10,
17,24,25 373:6,15,20
374:1,8,14 375:22
380:21 382:17 383:1,2,
3,10 386:2 390:10,11
391:1 394:6 399:6,15
401:9 402:9

**revenues** 48:3,19,22
73:7 100:13 110:8,12
111:4 130:3,5 144:13,
15,18 150:5,8 160:10
181:6 203:1 228:6
237:11 238:2 247:7
248:5 257:8 338:17
342:17 351:23 361:8
364:10 369:5 378:12
380:7,17 392:8 393:6
397:5,14

**review** 7:6 13:25 25:2
26:6 27:19 28:21 42:16
43:22 166:20

**reviewed** 27:22,23 28:20
311:7

**reviewing** 7:1,5,24 19:1
27:21 28:3,16 46:12
48:8 58:4 97:23 116:25
117:6,22 119:16,19
122:3,9 124:1 125:6,25
126:6 135:25 139:22
142:18,23 151:17,23
152:24 154:3,7 166:23
210:5 255:2,4,23 257:6
266:21 267:1,4 272:6
275:18 276:14 277:11,
14 302:1 306:13 310:14
311:11,15 313:7 314:19
315:23 321:17,19
322:23 330:21 331:3,12
336:1 338:24 339:8
360:9 381:2 387:14,22
388:6 392:12 395:5
398:12

**revise** 10:3

**right-hand** 65:6 68:14
70:5,14 71:4 74:4 76:21
77:11 79:8 81:10,21
92:7 96:7 98:11 285:13

**rights** 380:4

**ring** 184:13 185:22

**Roberts** 5:4,5,21 7:20
10:14,16 11:12,23,24
12:6,22,24 13:18 15:6,
10 19:14 23:14 24:6,7
25:23 27:16 29:13 30:3
31:9,25 32:2,5,10,14,25
33:19 34:2,18 35:3,15,
21,25 36:21 37:3,9,23
38:9 39:2,15 40:18
41:17 42:14 43:1,16
44:12 45:7,19 46:2,8
49:11,20 50:3 54:18
56:13,15 57:21 60:11
63:9,23 64:13 68:11
69:6,24 70:25 71:10,17
72:4 77:8 78:4 80:15,21,
25 82:3,19 84:3 85:1
87:2,8,23 88:17 90:4,14
91:2 92:4,14,24 93:11
94:2,19 96:18 99:17
100:19 102:15,16,20
103:8 105:25 108:11
114:19 115:25 118:23
120:12 121:16 122:20
123:5 126:1,9 127:18
128:23 130:4,13 131:19
133:3,24 136:21 137:6
138:10 139:1,13 140:14
141:1,19 143:13 144:16
145:9 146:12 149:10
150:21 151:7 153:15
155:12 156:2,24 157:16
158:16 159:5,20 160:12
161:6 162:2 163:6 164:1
165:6,23 166:16,23
167:3,9,15,24 170:17
172:5,13,24 173:14
174:9,23 175:12,25
177:7 179:8,24 180:10,
16 181:10 182:20
183:10,17 184:2,11,25
185:5,13 186:13 187:6
188:10,18,25 189:22
191:23 192:11,20 194:5
195:1,25 197:10 198:4

199:7,11,21 200:11
201:11,18 202:1,7
203:17 204:8,17 205:20
206:8,16 207:20 209:13
210:7 211:11 212:3,23
213:21 214:20 215:18
216:8 217:25 218:12,25
219:16,25 220:15
221:14 222:5,23 223:15,
17 224:1,22 225:12,24
226:9 228:18,24 229:13,
14 230:7,19 231:8,25
232:21 233:19 234:12,
21 235:8 236:10 237:1,
18 239:1,16 242:5
243:11 244:6,15 245:25
246:18 247:1 248:7,21
249:20 251:16,18,23
252:3 253:12,16 255:17
256:9,24 257:25 258:10
259:14 260:3,22 261:3,
9,20 263:1,18 264:8
265:6 268:12,25 269:20
270:1 272:11 273:14
274:22 275:7 277:4,24
279:19 282:5,24 283:12
284:9 285:15 286:9,23
288:3,8,19 289:23
290:17 291:18 292:7,25
294:5,13 295:13,20
296:1,23 297:17 298:18
299:1,22 300:24 301:7,
10,20 302:9 303:6
304:15 305:16 307:18
308:8 309:4 314:1 316:8
317:5 318:4 320:1,13
321:3 323:14,23 325:21
327:24 329:13,24 334:1
335:5 336:22 337:1,18,
19 341:23 342:16 343:9,
19 344:17,24 346:7,17
348:21 352:9 353:12
354:15 355:22 356:8
357:4,24 359:23 366:3
367:2,18 368:20 370:16,
19 371:2,7,16 374:23
375:13 376:23 377:13,
24 378:19 379:10,24
382:6 383:7,25 384:11
386:13,25 387:25
388:17 389:5,13 390:17
391:5,13 392:9 395:25
397:15 398:8 400:1,18
401:7,12,17,18,22,25

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

402:3,6,18,24

**roll** 145:4

**rolls** 384:21

**Roman** 19:20

**roughly** 63:7 90:22 260:10 266:6 267:20

**Rule** 16:13

**rules** 37:19 385:18

**run** 179:16 181:16,20 208:21

**running** 190:25 212:19

---

**S**

**sale** 66:9,11 74:15,19,21 84:19 85:20 86:17 87:9 88:2,5,16 93:1 114:6 169:16 243:9,15 245:5 305:23 315:7 358:3,14, 19 359:1,5,7 367:24 373:15 381:21 390:12 399:14

**sales** 59:12 66:4,5 72:7, 8,11,17,24 73:2,19,21 76:8 78:12 89:7,12 92:8, 16 94:13,21,25 96:8,10 97:21 98:18 99:16,21 100:5,15 101:2,6 104:9 106:2,5,12,15 110:7,10, 18,19 126:13 127:4 158:25 159:4,7,11,19 160:19 169:4,7 267:16 268:8 271:2,7,13,17 272:21 305:7 314:5,6,18 316:12,22 317:4,9,13 318:11,17 321:25 322:7, 10,20 324:23 328:17 358:23 360:11 365:6 372:9,17 375:17 380:10, 12 383:11 394:10 399:6, 13

**San** 4:12

**Santos** 4:10

**saving** 289:14

**scenario** 162:22 202:13, 14,19,21 203:19,20 204:21,22 206:10,24

207:1 208:7 209:12,14 240:7

**schedule** 41:24 312:2

**scope** 18:24 37:8,10,12

**scoring** 139:24 360:20 396:11

**scrap** 154:24 155:8 223:2 224:15

**scrub** 353:1,6,17 355:24 401:6

**scrubbed** 353:2

**search** 84:5,10 124:8,15 128:3 129:10 134:17 135:3 137:12 140:16 141:24 142:16 143:4,23 144:19 145:6,18 146:2, 18 149:19,20 151:9,11 254:19,22,23,24 255:8 269:12 303:4 304:12 305:4 324:10 327:1 328:7

**searched** 62:18 63:13 65:17 109:21 152:6,12, 20 153:8 281:21 389:15

**searches** 152:2 275:11, 25 276:9,11 309:10 313:10 314:12 315:16 316:11,13,20 317:12 318:10,13 321:9,24 322:5,9,15,18 323:7 325:24 347:19

**searching** 125:19

**second-to-last** 265:9

**secondary** 59:12 66:3,5, 8 95:12 104:9 105:7 106:2,11,14 110:7,10, 18,19 127:12,13 130:12, 15 133:14 163:25 164:6, 21 169:3,7,16 267:9 271:1 272:20 286:18 366:23 380:18 381:15 383:11 388:13,22 391:25 394:10

**secret** 54:11,16

**section** 19:21 46:11 61:20 202:20 254:7,15 338:23 364:21 370:13

**sections** 25:10,13

**seek** 334:13 400:12

**self-constitutes** 135:14

**sell** 86:14,16 140:6 150:24 151:2 186:25 188:1 190:19 192:6 193:14 194:17,21 211:14 212:10 213:7,9 215:21 217:4,14,17,18 219:9 220:5,7,21 224:14,16 233:7,16 234:24 235:6 238:19 239:4 242:22 250:5 292:19

**selling** 140:1 185:20,25 189:6 190:16,17,23,25 191:2 218:2 233:3 235:13

**sells** 184:6,15

**send** 215:23

**senior** 20:6

**sense** 50:5 128:19 199:17 200:19 232:17, 23 235:10 237:20 240:21,22 251:6,10,13 290:20 300:23,25 301:3, 9,12 304:25 350:9

**sentence** 247:21 248:2, 11 257:3 262:25 309:6 310:7 311:3 321:6 322:13 324:8,18,19 325:1 327:5,14 328:1,6 358:11 380:15 387:13 388:5,8

**sentences** 325:13

**separate** 18:13 80:5 86:1 88:24 157:18

**September** 331:16 332:18 333:5,22

**sequence** 134:18

**served** 52:9,20

**services** 17:22 50:24 51:2 52:1,16 53:4 302:8 367:8 385:20,21

**session** 122:15

**set** 18:9 61:3 66:2 82:10 116:10,13 121:10 180:24 203:20 206:17 242:19 305:19 355:15 365:13 366:9 397:13

**sets** 68:24 110:16 355:11

**setting** 204:23 207:13

**seventh** 168:21

**shaking** 288:17

**shaped** 284:2

**share** 384:13

**shared** 18:11

**sheer** 299:9,25

**short** 35:23

**show** 39:6 46:3 87:4,10 101:10 117:18 170:21 173:20 175:4 178:15 206:19 232:15 257:7 275:17 314:6 340:3 394:18

**showing** 85:18 117:24 323:3 333:13 393:15

**shown** 16:18 43:7 89:25 120:1 353:14 356:4

**shows** 87:25 91:20,21 92:7 129:9 163:13 229:24 350:6

**sic** 24:12,24 25:19 43:7 46:20 58:6

**side** 30:14 40:2 41:3 61:5 65:6 68:14,25 70:5, 14 71:4 74:4 76:14,21 79:8,22 81:7,10,21 90:1 91:10,19 92:8 96:7 98:11 127:20,22 285:11, 13

**side's** 39:19 256:13

**sign** 7:12 27:3

**signature** 7:9

**signed** 12:1 26:15 307:24

**significant** 295:9

**Dana Trexler Smith**

**Connectus, LLC vs.**
**Ampush Media, Inc., et al.**

**significantly** 178:8

**signify** 270:3

**similar** 189:16 217:8

**simple** 201:20,24 402:5

**simply** 110:15 254:10

**single** 27:24 77:18
182:11 271:10 272:13

**sir** 12:7,22 223:16

**sit** 8:25 14:19,24 15:11
18:18 23:1 36:4 41:16
42:20 43:3,20 44:17,23
45:6,9,12 63:12 64:1
65:20 126:7 149:15
163:19 303:9 312:23
327:10,14 346:9 357:14
359:3 373:14 386:22
391:7 394:2,4 395:7

**sits** 73:10

**sitting** 7:21 8:17,20 23:7
27:25 79:21 105:14
149:13,16 171:8 172:19
175:14,20 253:20 255:7
259:1 266:13 303:13
316:14 362:21 364:5
378:23

**situation** 149:18 185:6
189:15 193:6 194:19
226:1 231:13 241:4

**situations** 153:16 189:8
193:8

**slight** 179:2

**slightly** 156:25 306:3

**slope** 284:17

**slopes** 285:17

**small** 178:9

**smaller** 196:15 198:25
266:1 280:17 356:12

**Smith** 4:15 5:17 6:1,2,5,
10 13:19 103:9 329:25

**Smith's** 103:7 230:18
329:23

**sold** 50:23 84:11 85:19
87:18 89:17 93:3 96:11,
13 112:13 128:8 143:1,

22 144:21 159:10
160:16 161:9,16 165:11
171:15 186:9 195:12
197:15,22 198:18 214:3,
25 216:23 217:24
218:15 219:13,18 221:1,
19 223:1 231:17 239:22
243:23 245:14 246:3,5
292:20 296:5 306:6
314:6 318:25 319:7
323:4,19 324:6,14
358:1,13,17 361:20
367:19 380:11 387:3

**solely** 102:12 323:25
376:19,21

**solution** 369:2

**somebody's** 335:23

**sophomore** 51:25

**sort** 113:2 163:1 169:24
174:7 210:14 231:11
370:12

**sorts** 79:13

**sound** 41:1 177:16
191:16,18,22 200:15

**sounds** 85:6 184:22
195:13 208:6 251:24,25
282:2

**source** 61:21 62:6 71:7
83:7,16 98:22 100:16
109:13 170:6,24 171:20
173:1,2,21 175:5 325:8
351:18 399:22

**sourced** 170:7,12 174:4

**sources** 61:3 105:3
119:25 131:14 173:7
175:2 336:5 372:18
373:20

**Spacex** 182:22,24 183:1,
9

**speaking** 10:6 37:25
138:16 141:20 151:25
284:18 308:17 340:5

**special** 203:3

**specialized** 204:4

**specific** 8:7 47:3 81:16
87:10 124:3 132:1

142:17 170:25 212:20
385:17 388:18 391:21

**specifically** 18:20 23:19,
21 30:7 46:10 49:18
121:18 122:11,16 151:6
159:6 162:21 164:11
306:21 310:6 330:5
380:6

**specifics** 132:4 384:17

**speculate** 123:2 126:5
133:10 137:3 138:22
140:10,22 165:16,25
166:5 173:24 182:15
183:5,23 185:10 186:5
189:12 192:9 198:1
199:3 201:15 202:6
210:4 215:2 229:12
233:12 234:7,17 235:3
236:1,19 238:24 239:9
246:14 248:1 250:8
256:4,20 259:24 260:16
262:5 264:4,25 274:19
277:2 282:12 283:9
284:7,23 301:5 316:25

**speculation** 178:21
179:18 180:4,19 308:15
345:19

**spelled** 6:17

**spend** 28:3 178:8 179:5
181:5 241:13,16 310:12

**spending** 242:2

**spent** 23:24,25 24:9,10
316:2 318:7 393:24

**split** 24:18 73:4

**splits** 76:10

**spoils** 274:14

**sponsored** 137:14

**spreadsheet** 87:25
88:20 115:10,14 117:1
118:25 120:24 209:25
363:19 384:25

**spreadsheets** 116:20
120:20 158:22 384:22

**stack** 243:2

**staff** 8:13,19 40:19

**stand** 6:21

**Standards** 367:7

**standing** 163:9

**start** 20:20 27:2 52:13
235:17 273:23

**started** 51:19 393:18

**starting** 167:6,7 275:19
324:24

**state** 5:2,24 6:3 366:5

**statement** 41:8 56:10
157:6 180:6,23 286:22
302:14 304:4 311:8
367:7 387:11,21 391:21

**statements** 48:13,17
141:9 300:15 303:1
308:23 352:19 384:21
399:25

**states** 285:23 385:12

**stating** 205:3 254:6

**steal** 211:12 212:6,7,25
213:2,3 215:20 217:1
220:19 222:25 224:11
238:18 239:3 240:10
241:4 248:23 250:4
274:12,20 292:18

**stealing** 185:17 186:16
187:9,16 198:16 238:17
239:25 250:6

**steals** 184:5,13

**step** 74:24 82:8 298:20,
23

**stepped** 251:4 300:19

**steps** 138:7

**Steven** 5:9

**stock** 211:12 213:1
220:16,18

**stole** 186:18 197:14
220:17 221:1 222:11
225:8

**stolen** 185:8 186:24
187:8 188:20 189:2,25
198:7 200:1

**stop** 37:23,24 401:17

**stopping** 167:14,16

**storing** 287:21 289:14

**straighten** 85:2

**Strandberg** 227:15

**strategy** 33:17 35:14

**streams** 370:8 374:1

**street** 184:7,15 190:24

**strike** 50:16 71:2 96:9 134:4 145:11 173:4 251:16 273:24 278:5 293:2 297:1 298:1 336:22 370:17

**strip** 95:1,3,16 370:11 372:3

**structural** 248:10

**structure** 247:22

**struggling** 91:6

**student** 56:24 57:11 61:13 123:16 137:5,12 138:3,6 149:3 151:24,25 152:4 170:2 348:2 373:10

**student's** 56:4 57:2 72:3 123:20 151:15

**students** 55:9 56:2 57:15 136:4 139:9 148:19

**study** 139:18

**stuff** 242:10,14

**subcontracting** 361:18

**subject** 13:11 15:14 158:25 163:16 227:22, 24

**submission** 60:2 66:24 67:4,15 84:7 109:2 286:6 289:5

**submissions** 84:1

**submit** 66:24 124:9 134:18 135:4 400:3

**submits** 347:23 353:3,9 355:25

**submitted** 60:13 61:8 62:2 65:8,17,20 66:1

67:22 68:2,8,15 72:2 76:11 83:24 84:9,18 85:19 86:14,16 103:12, 15,20 104:13,15 107:20 111:5 149:22 152:6,13, 21 156:19 158:9 160:7 164:12,20 165:2 166:2 288:16,21,24 310:24 347:22 349:11,12,16,20 350:4,11,15,21 351:5,14 352:20 356:10 398:21

**submitting** 125:18

**subpoena** 6:15

**subsequent** 15:20 41:13 42:12 44:8 106:3 150:3, 18 176:20

**subsequently** 26:22 272:18 400:5

**subset** 69:16 280:3,17, 21,23 345:14 346:6 347:7 354:11 396:12 397:5,6 398:18 399:2

**substantially** 230:25

**subtract** 76:22

**succeed** 246:19

**sue** 186:16 187:8 191:25

**sued** 219:12,17 239:18

**suffered** 259:22 261:25 263:17 264:13,15,21

**suggest** 91:12 228:3,9 229:7 236:24 257:13 262:21 292:21 293:4 339:23 344:11,19 346:9 368:15 369:16 376:25 379:12

**suggested** 295:3 356:2

**suggesting** 85:18 238:6 343:1

**suggests** 129:9 178:4 228:23 229:1 230:2,23 292:15 293:23 295:8 296:13 339:15 341:17 345:2 386:16

**Suite** 4:12

**Sullivan** 5:7,8 10:10 11:6,20 12:4,15 15:3

19:9 23:4 24:2 25:20 28:24 29:17 30:25 31:14 32:17 33:10 34:10,23 35:7,18 36:18,24 37:5, 20 41:5 42:5,18 43:8 44:1 45:2,14,22,25 46:6 49:7,24 54:12 56:11,18 60:6 62:21 63:17 64:3 68:5 69:2,22 70:17 71:8, 13,22 77:24 80:13,17,23 81:23 82:5 84:21 86:18 88:7 90:2,8,19 91:22 92:10,20 93:24 94:15 96:15 99:5,22 101:13 102:15 104:22 114:14 115:23 118:8 120:2,21 122:1 123:1 125:23 126:4,15 128:9 129:14 130:8 131:7 132:20 133:9 136:16 137:2,23 138:20 139:7 140:9,21 141:6 143:11,25 144:22 146:6 149:5 150:14 153:10 155:21 156:12 158:1 159:1,12 160:1, 21,25 161:22 163:17 164:23 165:13 166:6,22 169:20 171:21 172:8,17 173:10,23 174:17 175:6, 17 177:2 178:20 179:17 180:3,14,18 182:14 183:4,22 185:3,9 186:4 188:17,22 189:10 192:8, 18 193:18 194:22 195:5 196:18 197:25 199:9,13 200:3,5 201:3,14 202:4 203:12 204:6,11 205:12, 25 206:3,11 207:7 208:24 210:3 211:21 212:16 214:13,16 215:1 218:8,18 220:10 221:3, 7,22 223:24 224:20 225:4,18 226:4 229:10, 19 231:5,22 232:10 233:10 234:6,16 235:1, 25 236:18 237:5 238:22 239:7 244:3,8 245:21 246:13,21 247:24 248:13 249:8 250:7 253:7 255:9 256:3,19 257:18 258:5 259:7,23 260:14 261:2,5,12 262:4 263:7 264:2,22,24 267:24 268:18 269:15

272:4 273:1 274:17 276:25 279:8 281:10 282:10 283:8 284:6,21 286:8,11 287:24 288:6 289:18 290:4,25 291:24 292:23 293:6 294:9,23 295:25 296:9 297:6 299:17 300:6 301:4,13 302:12 304:6 305:9 307:12,25 308:3,14 313:23 315:18,20 316:23 317:14 319:9 320:5,22 323:21 325:18 327:15 328:19 333:9 334:24 337:15 341:11 342:11,22 343:13 344:4, 21 345:23 346:12 348:3 351:7 353:10 354:3 355:7 357:18 359:8 365:25 366:13 367:16 368:1 370:23 371:5 375:7,23 377:1,21 378:4 379:3,17 382:3,22 383:16 384:5 386:11,17 387:23 388:14,24 390:5, 23 391:10 392:2 395:20 396:23 397:21 399:17 400:13,21 401:10,15,22 402:12,22

**Sullivan's** 13:10

**sum** 110:23

**summarized** 206:21,23 394:8

**summary** 172:23 202:13

**summation** 110:25

**sums** 110:15

**supply** 283:22

**support** 48:15

**suppose** 347:18,20,21, 22

**sustained** 259:12

**sworn** 5:18

**system** 63:14 64:24 66:17 109:22 121:6 124:6 125:20 134:17 151:14 152:7,12,20 153:9 154:20,21 155:11 363:4

Dana Trexler Smith

Connectus, LLC vs.
Ampush Media, Inc., et al.

## T

**T-r-e-x-l-e-r** 6:20

**table** 122:19 123:7,11
303:8,24 305:5 306:2
330:6 331:8,11,23
338:13 339:4

**taking** 42:23 102:18
231:2 233:1 236:14
279:6 286:5 287:21
294:21 326:17 339:9
348:7 351:22 381:16

**talk** 181:11 185:2 194:10
196:5,7 352:24 370:21
399:10

**talked** 27:10 61:9 78:13
109:16 115:3 127:14
153:4 156:16 158:7
159:16 267:9 380:20
393:7 396:16 398:22

**talking** 60:14 82:10 85:7,
8 86:2 87:25 93:13
112:2 120:25 131:3
135:24 144:14 146:24
181:14 193:9 194:7
195:22 196:2,9 244:23
250:12,13 262:10,11
267:3 268:7,22 269:7,
10,18 286:24 288:23
289:1 297:21 315:6
324:21 325:11,16,17
326:10 328:8 399:21,24

**talks** 153:21 315:5

**Tampa** 4:20

**tangled** 311:13

**Tangri** 5:5

**tax** 385:8

**taxation** 385:18

**taxes** 385:13

**team** 19:24,25 20:9
24:21,22 25:17

**telephone** 129:25

**telling** 172:22 240:25
301:8

**tells** 171:5 349:15 350:2

**temporal** 393:16

**ten** 96:19 190:18 219:13,
14

**tend** 179:22 181:18
285:1

**tended** 334:4

**tendency** 336:9

**term** 49:10,22 50:2,5,8
111:21 114:8 128:17
142:17 169:4 208:6
236:8 256:18 257:2,7
266:8 294:3 310:19
313:12 318:13

**termed** 383:5

**terminated** 176:2,10,13,
17 177:10

**terminology** 57:7 58:17
134:9

**terms** 155:7,16 156:10
214:1 281:23 284:16
322:12 375:20

**terrible** 235:16 249:24

**Tesla** 183:11,12,14,19,
20

**test** 47:12 344:20

**testified** 16:19 37:21
81:4 283:14

**testifies** 5:18

**testify** 29:1 31:2 131:20
160:13

**testifying** 4:16 204:1

**testimony** 15:5 16:14
24:4 33:9 36:16 37:13,
14,17 38:18 39:12,14
60:7 62:22 69:23 80:20
89:16 96:17 99:24
101:15 103:2 104:23
120:4 126:17 141:7
153:25 154:12 161:1,19
163:11 165:15 167:20
171:11,23 174:18
192:10 193:20 196:20
203:14 204:3 214:17
218:9 221:5,24 225:20
230:13 248:15 255:11
263:8 268:1,20 269:17

275:3 279:22,25 280:2,
11,19 288:7 290:6,8,11,
22 291:1 294:25 297:8
299:19 300:8 313:24
317:15 319:11 323:22
325:20 327:17 328:22
329:18 333:11 341:12
342:13 343:15 344:6,23
345:25 353:11 354:4
355:9 366:2,5 371:12
379:5 382:24 384:13
386:12 389:1 391:15
394:2 399:19 400:8,15,
23 403:6

**testing** 338:13

**Tex** 230:18

**theft** 54:16

**theory** 285:22 293:14

**thieves** 184:13 185:22
186:24 187:9,14,25
197:14 201:12

**thing** 114:2,4 199:25
213:25 267:19

**things** 27:10 39:4 195:3
233:1 237:19 238:4
249:24 326:2 349:10

**thinking** 219:11 306:21
382:7

**third-party** 59:25 65:13
69:13 88:21 113:3
115:16,22 116:10
118:11 134:3 281:4,6
372:20 381:7 383:24
387:4 388:2,4 396:21

**third-to-last** 76:8

**thought** 29:24 30:11
99:18 179:13 295:16
365:8 389:7,10

**thoughts** 26:7

**thousand** 211:15
212:11,13 213:10 217:3,
10,13,16 218:5,14,21
219:19 220:22,23

**thousands** 295:10

**thrown** 54:5

**tie** 329:8

**time** 4:3 9:19 10:24 28:2
43:6,24 48:6 52:7,19,23
53:7,16 54:10,15,19
59:18 64:24 68:2 96:2
102:18 103:22 108:18
110:4 124:18,19 162:5,6
170:4 176:11 198:3
211:5 214:11,23,25
217:12 220:13 221:19
223:11 224:15 236:12
243:13,17,19,21 244:12,
14,19 245:7,10 272:10
305:21,22 307:5,6 316:2
323:3 332:23 344:15
352:13 364:17 393:16,
18,25 402:7

**times** 54:1 62:19 63:13
64:8 125:20 150:23
151:2 271:12 272:15
296:14 309:1 324:10,14
327:1 328:7 346:16

**timing** 160:14 161:19
162:21,22 163:21 164:4

**tired** 364:18

**Titanic** 234:2

**titled** 65:8

**today** 4:9 6:14 7:21 8:18,
21,25 11:4 12:1 13:5
14:19,25 15:12 16:3,6,7,
9 18:18 21:18 22:14
23:1 24:9 27:25 36:4
41:16 43:3,21 44:18,23
45:6,9,12 63:12 64:1
126:7 158:8 163:20
171:9 175:14,21 259:2
260:13 303:14 318:6
327:11,14 357:14 364:5
373:14 378:24 391:8
393:8 394:3,4 395:7
402:25

**today's** 16:1 20:20

**told** 96:2 207:6 369:18
399:11

**tomorrow** 45:11

**top** 20:16 55:23 61:7,20
68:20 111:22 247:4
285:4,8 362:7 380:2

**topic** 202:9

Dana Trexler Smith                                                                                    Connectus, LLC vs.
                                                                                                     Ampush Media, Inc., et al.

**topside** 178:24

**tort** 208:4

**total** 21:1,10,13,20 54:10
62:13 68:18 71:5,15
73:1 74:3 76:7,16,19
81:18,19 98:13 110:15
111:2,3,4 270:24 313:6
320:8,9,11 326:13,19
330:20 331:9 332:1,5,9,
10,15 333:8,20,24 334:5
335:15 337:4,11,25
340:18 345:19 346:20
348:7 349:20,22 351:13,
14,15 353:3,8 354:17
355:13,25 356:1,9,10
360:24 364:9 375:16
394:6

**totaled** 224:17

**totally** 238:15

**totals** 111:2

**track** 122:12

**trade** 54:11,16

**trademarks** 53:17

**traffic** 136:8,13

**trailed** 389:12

**train** 38:3 179:12

**training** 47:4,7

**tran** 96:9

**transaction** 243:25
245:17 363:13 370:10

**transactions** 93:23 97:6,
9

**transcript** 31:12 34:6,9,
12,16 35:2 36:2,6 38:11,
15 39:1 253:4,18 368:22

**transcripts** 14:13,21
28:13 30:5,14,19 39:18,
23 40:2,10,20,24 41:2,
11 43:5,23 44:6 45:1
252:16

**transfer** 87:11 88:1
111:14,17,24 112:1
113:22 385:4,19 386:9,
16 390:22

**transferred** 88:21
114:22 115:21 385:23
386:3

**transfers** 112:6 115:16

**transmission** 272:17
310:15 317:9 381:8

**transmissions** 316:21

**transmit** 134:24 137:19

**transmitted** 67:5 87:5
135:15 155:2 310:21,23

**transmitting** 132:18

**treat** 370:1 371:18,23

**tree** 223:1 224:14

**Trexler** 4:15 5:17 6:1,9
103:7 230:18 329:23,25

**trial** 9:10,20 10:20 11:1
12:20 36:14 160:14
161:18 163:10 227:20
264:10 299:25 309:3
362:4

**trier** 204:15,20,23

**trigger** 281:22

**triggers** 281:19

**truck** 185:18

**trucks** 184:5,14 186:16

**true** 56:8 176:21 264:1
271:22 283:1 298:3,8
304:4 330:11,12 350:8
358:22

**turn** 7:8 54:25 55:21
58:1,18 111:9 177:13
192:5 206:24 209:14
212:10 213:8 217:3,17
219:9 220:21 233:7
234:24 247:2 251:19
255:18 320:17 328:5
330:4 338:10 362:6
364:19 379:25 381:5
387:1 394:5,25

**turned** 128:4 151:1
214:2 218:15 296:5

**turning** 103:9 127:23
151:8 168:1 185:19
218:2 233:2 396:1

**turns** 250:23,24 363:15

**tweak** 106:24

**type** 22:15 25:3 69:11
212:21 319:20 365:20
396:14,20 398:5

**types** 71:18 367:9 370:1,
2 371:18 378:14 397:24
398:3

**typical** 373:17,21,23

**typically** 214:6 215:7
362:10,19 363:9 367:10
372:3

---

**U**

**U.S.** 4:19

**ultimate** 379:15

**ultimately** 142:10
154:21 161:16 396:4

**un** 149:9 313:3

**unable** 16:23 23:3,9
27:24 28:4 36:10 147:18
148:7,22 172:22 183:8
306:25 318:3 325:7
329:10 363:13 366:16
379:6,20

**unavailable** 22:24
159:18 317:3,10 319:22

**unaware** 39:10 175:20
260:1,5

**unconcerned** 95:21

**uncouple** 197:5

**underlied** 305:25

**underlying** 24:15,20
46:24 48:14,18 50:10,14
62:25 63:20 64:6,11
73:5 95:15 100:17
145:17,22 159:17
169:11 171:2 172:1,11,
21 175:22 303:17,21
305:12,14 311:16 312:6,
21 314:21,25 315:25
316:4 317:2,8,22
318:20,23 319:21 325:8
327:22 339:12 345:13
357:12,21 372:14,25

377:4 384:25 399:9
401:4,24

**underneath** 61:22

**understand** 6:13 9:8,12,
23 12:8 13:9 14:21 18:4,
24 25:2 29:9 33:5,20
34:21 35:4 38:4 44:19
49:18 50:6 51:12 54:21
55:7 56:9 57:6 59:21
60:19 64:17 67:11,20
68:19 72:13 73:16 75:21
77:10 87:24 89:15,20
91:6,18 93:15 98:24
100:24 107:18 109:20
112:18 114:17 116:1
118:6,20 119:22 124:10
125:10 129:1,3,6
136:10,15 138:11 143:7
146:10 151:18 157:17
158:17 170:1 172:1
173:13 176:16 184:17
192:16,22 196:10
200:18 203:25 218:6
231:4 232:24 235:15
252:7 254:1,2,13,17
260:24 261:15 269:14
281:14,24 284:25 287:3,
11 299:8 302:22 312:13
321:7 322:17 324:9
326:20,25 327:13 328:6
335:6 362:8 368:5 376:4
380:3,7 383:19 385:17
387:2 392:6,13 393:1
395:14 396:8

**understanding** 9:14
48:10,12,20 49:21 55:17
56:21 57:24,25 63:11,
15,25 67:8,25 71:3,24
72:9 85:23 86:21 87:15,
22 94:18 100:6 101:2,6
112:4,25 114:21,24
118:11,17,22,25 120:6
121:23 123:21,24 124:1,
4 126:11,21 128:25
132:14,16 136:1,18,24
141:17 146:21 148:1,3,
14 151:23 153:6 159:15
160:24 161:2,25 174:13
204:13 252:13,24 253:3
254:5 255:13 257:1,20
259:9 268:14 269:4
270:5 278:14 285:20

Dana Trexler Smith                                                                     Connectus, LLC vs.
                                                                                    Ampush Media, Inc., et al.

287:8 290:12 304:9 309:18 318:19 321:22 322:24 324:13 325:3 372:22 386:9 390:3 400:7,19

**understood** 33:21 73:17 193:10 194:12 363:25

**unique** 122:13

**United** 385:12

**units** 285:13

**universe** 102:2

**universities** 55:10 73:8 76:17 79:10 89:8,12,17 90:24 94:7 95:8 99:15 128:8 134:25 147:22 148:16,20 149:3 159:25 161:9,16,17 310:22 381:1,4

**university** 56:3,24 57:1, 12,13 61:11,13,17 67:17 69:14,20 70:15,20 71:20 72:1 73:19 74:7,8 75:4, 6,13 76:3 85:11 86:15 94:10 95:7 101:5 105:9 109:3 133:19 135:15 137:19 138:5 140:7 147:19 148:5,13,23 151:12 155:2,3,4 156:3, 4 165:12 236:7 278:25 279:3 281:18 310:17,23 321:16 381:10,18 387:6 389:23,25 390:12 398:23

**unjust** 197:19 209:19 211:1,3 213:24 214:7,22 215:8 219:4 220:24 222:19,21 225:15 226:2, 7 239:18 240:6 242:8,24 243:12,16,25 244:11,16 245:8 255:24 256:14 261:24 360:11 366:23 382:8 383:13 394:10 397:8

**unjustifiable** 261:10

**unjustified** 261:1 319:8

**unjustly** 187:14 211:16 213:11 214:8 216:1 217:5,15,20 218:4,16,23 220:9,19,23 223:3

224:19 242:16 245:20 369:13 378:11,18

**unrelated** 95:14 143:12, 14 144:10,12 146:22 303:25 304:13,17,19 313:4 319:17 325:5 326:2,21 329:7 361:8,13 363:12 373:22 397:4

**unsound** 177:22 178:7 181:16 187:24 191:19 192:4 196:11,23 197:18 198:22

**unsubmitted** 58:6,10,16, 20 59:13 60:14,21 61:25 62:12 64:17 67:10,24 76:11 109:8,24 111:6 116:4,5 120:9 121:2 153:3 156:20 158:10 160:6 164:13

**unsure** 14:10 18:10 31:7 40:6 88:12 126:8 149:13 151:5 176:16 199:6 302:18,23 323:25 362:25 363:2 391:3

**update** 10:2 312:19

**updated** 8:2,7,8

**upper** 284:17 285:17

**usage** 380:5

**user** 324:12,16 327:3 328:12

**usual** 30:13

**utilizing** 215:15 339:11 341:3 342:3 344:14

___

**V**

**vague** 54:13 80:24 88:8 208:25 273:2 284:8 317:16

**Vaguely** 385:5

**valid** 249:14

**validity** 37:15

**valuable** 233:6,16 342:8

**valuation** 52:25 367:7 368:5,18,25 370:6,14 371:21,23 372:15

373:17,22,25 374:3,5 376:15,20 378:8,10

**values** 300:12,16

**valuing** 222:1 376:18

**variance** 332:4

**varies** 53:20 54:6

**varying** 21:16

**vast** 28:1

**vehicle** 224:6

**vendor** 202:25

**verb** 232:7 254:22,23

**verbal** 27:10

**verification** 139:24 360:21 396:11

**verify** 303:21

**versus** 4:17 24:19

**vertical** 285:2,8,10

**vetted** 193:3

**video** 4:14

**view** 36:4,5 177:23 180:17 189:9 212:12 219:10 225:13 226:1 244:7 245:10 247:11 278:8 313:19 319:8 320:3,6,10 383:12

**Virginia** 17:5

**volume** 271:17

___

**W**

**walk** 60:18,22 121:21 292:5 330:17

**wanted** 23:3,19 79:19,23 81:15 82:13 102:1,7 236:15 241:14 249:22 250:3

**warm** 111:14,16,24 112:1,6

**warranted** 43:15

**watch** 217:2,9 218:3,13, 17,20,23 219:3,18 220:5,7

**ways** 63:4 136:6 165:7 380:9

**web** 134:2 138:17 176:2, 11 311:14 392:22

**website** 136:13,23 137:17,18 139:11

**websites** 134:6 135:10, 12 136:7,9 170:3,9

**week** 16:20 21:8 39:23 307:1,23 308:6

**weeks** 17:11 307:9,15

**Weiss-calhoun** 4:7

**West** 4:11

**whack** 320:21

**Wharton** 46:13,19 205:9

**whatnot** 87:6

**whatsoever** 340:18

**Whitner** 5:11,12

**William** 5:11

**wind** 137:16

**windfall** 255:21,25 256:17 257:2 260:9,25 261:10,22 262:3,11

**window** 163:1

**withdraw** 235:16 274:23 362:5

**withhold** 10:7,17

**witness's** 15:4 36:19,22 37:1,16 62:22 69:23 80:14,20 96:16 99:23 101:15 104:23 120:3 126:16 141:7 161:1 165:14 167:3 171:22 174:18 192:10 193:19, 20 196:20 203:14 214:17 218:9 221:4,23 225:20 248:14 255:10 263:8 267:25 268:19 269:16 288:7 290:5 291:1 294:24 297:7,8 299:19 300:7 313:24 317:15 319:10 323:22 325:20 327:16 328:22 333:10 341:12 342:12 343:15 344:5,23 345:25

353:11 354:4 355:8
366:1 379:5 382:23
388:25 399:18 400:14,
22

**witnesses** 28:14,23
30:6,23 39:19 41:19
42:9 52:11

**wondering** 76:25 91:17
301:11 381:7

**word** 52:24 60:10,12
64:23 66:16 275:21
312:18 314:17 332:21

**words** 108:9 279:12

**work** 10:13 11:11 14:11,
15 18:7 21:10 25:16
40:11 47:1 50:22 51:11
53:13,21,22 191:1 374:4

**worked** 20:5 21:16 39:22
40:7 50:15,18,25 51:15
52:8,10 55:12 119:6,9

**working** 19:25 23:24
52:18 54:16 55:20 95:6,
7

**works** 24:23 112:19
118:15

**worksheet** 117:10

**worksheets** 117:10

**world** 135:11 143:21
231:12 233:5,14,18
276:18

**worried** 215:22

**worth** 197:15 198:8,9
211:13 212:11,25 213:2
217:2,9,12,19 218:14,20
220:18 224:16 233:2,17
235:12 239:3 241:10
242:10,22 245:15
248:24,25 249:7 257:13
292:18,22 294:17
296:13 344:3 361:1
375:19

**wound** 173:3

**write** 25:9 196:8

**writing** 24:19 27:2

**written** 26:1,2

**wrong** 38:20 115:13
197:8 226:17,18 253:24
254:13 326:4 351:2
352:8 356:24,25 376:25

**wrongfully** 368:8

**wrote** 25:18 226:12
327:20

---

**Y**

**year** 51:25 168:13 182:5,
6,11,12 183:3,19 269:18

**years** 40:8 54:9 246:6

**yell** 371:8

**yellow** 356:22

---

**Z**

**Z-a-k-o-w-i-c-z** 20:4

**Zakowicz** 20:3 26:3

**zeroes** 363:1