# EXHIBIT D-2
Smith Dep Ex. 151



**HIGHLY CONFIDENTIAL**

**ATTORNEYS' EYES ONLY**

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| CONNECTUS LLC d/b/a EDEGREE ADVISOR | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 8:15-cv-02778-VMC-JSS |
| | ) | |
| AMPUSH MEDIA, INC., and DGS EDU, LLC. | ) | |
| | ) | |
| Defendants. | ) | |

EXPERT REPORT OF DANA TREXLER SMITH, CPA/CFF

November 22, 2016

**EXHIBIT 151**
D. T. Smith, CPA
12/5/16
S. Arielle Santos, RPR, CSR
**Aptus Reporting**

## I.    INTRODUCTION

On December 3, 2015, Connectus LLC d/b/a eDegree Advisor ("eDegree" or "Plaintiff") filed a complaint (the "Complaint") against Ampush Media, Inc. ("Ampush") alleging, among other things, "civil theft, conversion, violations of the Florida Uniform Trade Secrets Act, unfair competition, violation of the Florida Deceptive and Unfair Trade Practices Act, violation of the Federal Wiretap Act, unjust enrichment, breach of contract and injunctive relief."[1] eDegree amended the Complaint on December 11, 2015 to include DGS EDU, LLC ("DGS EDU" or, collectively with Ampush, "Defendants") as a defendant (the "Amended Complaint").[2]

I have prepared this report of my opinions to be expressed at trial, along with the bases for these opinions and certain observations, concerning the economic damages claimed by eDegree as set forth in the November 8, 2016 expert report of Douglas Kidder (the "Kidder Report"), in connection with eDegree's claims against Defendants. I have also provided alternate opinions of damages, should liability be found. I understand that under a joint defense agreement, both Ampush and DGS EDU will be relying on this report.

My analyses are based on an assumption that the Defendants will be found liable for the alleged acts, although I understand that the Defendants dispute liability. I have not been engaged to provide opinions on liability issues and, as such, offer no opinions on liability in this report and do not intend to express any such opinions at trial.

## II.   BASIS FOR ANALYSIS

The analysis and opinions expressed in this report are based upon the information and documentation identified to date, my education, my experience in performing similar financial analyses and economic damage calculations, documents and testimony in the record, and accepted damages methodologies and approaches. I am a Partner at EisnerAmper LLP, a full-

---

[1] Complaint, ¶1.
[2] Amended Complaint.

service advisory and accounting firm that, among other services, provides business, economic, financial, and damages consulting to clients in a variety of industries. I am a Certified Public Accountant and Certified in Financial Forensics. My education includes a Master in Business Administration from The Wharton School of the University of Pennsylvania and a Bachelor of Science degree in Accounting from Bucknell University. My curriculum vitae is attached as Exhibit A.

I was provided with access to and considered various financial documents and data, correspondence, and depositions. In forming my opinion, I relied upon the documents specifically identified throughout this report and the accompanying exhibits. A list of the documents which I considered in forming my opinions is provided in Exhibit B. The documents and information utilized in my analysis and report are the types of documents and information upon which experts in my field typically rely when performing such an analysis.

In addition to the documents produced by the parties, I considered deposition testimony and publicly available information relevant to this matter, which is also typical of the type of information upon which experts in this field rely. I read the deposition testimony of the following Ampush/DGS EDU witnesses:

- Michael Darwal, President of DGS EDU;[3]
- Matthew Mayberry, Vice President of Finance of Ampush; and
- Jasmit Pujji, Chief Executive Officer of Ampush.

I also read the deposition testimony of the following third party witness:

- Kolin Porter, Director of Product Innovation at Higher Ed Growth.[4]

This report was prepared in accordance with the American Institute of Certified Public Accountants ("AICPA") Consulting Services Standards. The work performed does not include

_____
[3] November 3, 2016 and November 4, 2016 deposition transcripts.
[4] I was provided with the rough deposition transcript.

the performance of an audit, review, or compilation of financial statements in accordance with Generally Accepted Auditing Standards ("GAAS") or with standards established by the AICPA.

Additional information, which may affect my analysis, may come to my attention during this matter. Furthermore, I reserve the right to prepare supplemental materials such as summaries, graphical exhibits or charts for trial, as well as to provide opinions and other materials in response to any additional expert opinions.

My firm is being compensated at a rate of $460 per hour for my time in this matter. My firm's compensation is not contingent upon the outcome of this litigation.

## III.    BACKGROUND

### A.    PARTIES

#### *1.    eDegree*

eDegree, headquartered in Clearwater, Florida, "operates as an online marketplace which serves as an informational service that seeks to connect prospective students ("Prospective Student") with educational opportunities ("University" or "Universities").[5] I understand that eDegree's various websites generate "opt-in data of Prospective Students interested in furthering their education."[6]

#### *2.    Ampush/DGS EDU*

Ampush, headquartered in San Francisco, California, provides its customers with "in-feed, native advertising on Facebook, Twitter, Instagram and Pinterest. [Its] fully-managed advertising

---

[5] Amended Complaint, ¶12.
[6] Amended Complaint, ¶13.

solutions combine powerful software with human insights and execution to achieve business goals across the entire customer lifecycle."[7]

In 2013, Ampush sold its educational business, which became a new entity, DGS EDU. I understand that DGS EDU is a defendant in this matter, and is in the "lead generation business for prospective students of for-profit and not-for profit universities and educational institutions."[8]

B.    RELEVANT INDUSTRY

I understand that both eDegree and Ampush/DGS EDU participate in lead[9] generation in education. I understand that the purpose of the industry is to match prospective students to universities through an opt-in program based on demographic and geographic information, as well as degree interests.[10] I understand that, after completing an opt-in form on the Internet, prospective students are contacted by a call center where a representative collects specific information about the prospective student.[11] The call center representative then runs a query of potential universities that match the prospective student's information.[12] If a match is identified and the prospective student expresses interest in that university, the prospective student's information is provided to the university.[13] I understand that the university accepts or denies the match and, if the student is a match, the university pays the company providing the prospective student's information.[14]

I understand that revenue is typically generated through this exchange of information as follows:[15]

---

[7] http://www.ampush.com/company/ (Accessed November 2016).
[8] Digital Globe Services, Ltd. ("DGS") Annual Report for the year ended 30 June 2016, pg. 31.
[9] Commonly defined as: "a person's information who has declared interest in some kind of a good or service." *See* Deposition of Jasmit Pujji, dated October 25, 2016 ("Pujji Deposition"), pg. 25.
[10] Deposition of Matthew Mayberry dated October 24, 2016 ("Mayberry Deposition"), pgs. 42, 85-86.
[11] Mayberry Deposition, pgs. 41-44 and 46. *See also:* Deposition of Kolin Porter (rough transcript), dated October 13, 2016 ("Porter Deposition"), pgs. 8-10.
[12] Mayberry Deposition, pgs. 46-47. *See also:* Porter Deposition, pgs. 9, 12.
[13] Mayberry Deposition, pgs. 47-48. *See also:* Porter Deposition, pgs. 11-12, 22.
[14] Mayberry Deposition, pg. 48. *See also:* Porter Deposition, pgs. 24-25.
[15] Mayberry Deposition, pgs. 48-49.

- **Qualified Lead Revenue** – when prospective student information is searched and matched with a third party university, and the prospective student agrees to be contacted by the university, then the matching party pays for the prospective student's contact information; and/or

- **Ancillary Revenue** – when data, which is generated and exchanged during the process of trying to identify a Qualified Lead, is sold, in bulk, to a third party.

I understand both of these revenue models are at issue in this matter.

C.       SERVICE LEVEL AGREEMENT

On May 31, 2013, Ampush and eDegree entered into the Ampush Media Service Level Agreement (the "Agreement").[16]   Under the Agreement, Ampush engaged eDegree to "make outbound telephone calls in an effort to generate leads on behalf of AMPUSH."[17]   The Agreement included certain metrics by which eDegree's performance under the agreement was to be measured.[18]

I understand the process of generating included, but was not limited to, the following:

- A prospective student interested in furthering his/her education completes an online opt-in form through one of eDegree's various websites.[19]

- eDegree's call center contacts a prospective student to verify his/her information and attempts to match the student with a university.[20]   eDegree representatives collect information[21] about a prospective student who is interested in obtaining a degree from a university.

---

[16] CONN 001333 to 1341 at CONN 001333 (Mayberry Deposition Exhibit 7).
[17] CONN 001333 to 1341 at CONN 001334 (Mayberry Deposition Exhibit 7).
[18] CONN 001333 to 1341 at CONN 001335 (Mayberry Deposition Exhibit 7).
[19] Mayberry Deposition, pgs. 41-42. *See also:* Amended Complaint, ¶13.
[20] Mayberry Deposition, pg. 42, 46.
[21] Defined as:  a collection of information that includes a prospective student's identifying information (e.g., name) and contact information. *See* Mayberry Deposition, pgs. 40-41.

---

- eDegree had direct relationships with certain universities and conducts a search of its university relationships in order to match the prospective students with a university program.[22] If a successful match is made, the university pays eDegree for the match.

- If eDegree is unable to provide a match based on its own university relationships, it relies on aggregators,[23] such as Ampush/DGS EDU, who have relationships with other universities.

- To search the Defendants' university relationships for a match, eDegree logs directly into Defendants' system and enters all of the prospective student's data "real time".[24]

- eDegree then "run[s] a query to see if there were matches from programs which Ampush had preexisting relationships...."[25]

After the eDegree data is submitted and searched in the Defendants' system, the information falls into one of the following categories.[26]

- **Qualified Leads** – all required input fields were completed, a match was made between a prospect and at least one university, and the prospective student expressed interest in the university or universities. The Qualified Leads were then either accepted by a university,[27] whereby, the university paid the Defendants for each Qualified Lead, and the Defendants paid eDegree,[28] or the university ultimately rejected the Qualified Lead.[29] Ampush marked each prequalified and rejected lead as "returned" in its system, and posted each result for eDegree to review.[30] Mr. Mayberry testified that these leads were not physically returned to eDegree, but instead marked as returned and no longer accessed.[31]

---

[22] Mayberry Deposition, pgs. 45-46.
[23] Defined as: a "business entity that has preestablished [sic] relationships with various universities." *See* Mayberry Deposition, pg. 42.
[24] Mayberry Deposition, pg. 46.
[25] Mayberry Deposition, pg. 46-47.
[26] Mayberry Deposition, pg. 112.
[27] Mayberry Deposition, pg. 101.
[28] Mayberry Deposition, pg. 138.
[29] Mayberry Deposition, pg. 101. .
[30] Mayberry Deposition, pgs. 72, 76-77.
[31] Mayberry Deposition, pgs. 76-77

- **Ancillary Data** – eDegree submitted information into the Defendants' web portal and a search was conducted, and there was either no match with a university, or a prospective student was uninterested in the match(es) that resulted. This data is also referred to as "abandoned," "scrap," or "bulk" data.

Again, I understand that when there was no Qualified Lead generated by the submission of information and resulting search, the data would be maintained in the Defendants' system and eligible for re-monetization as Ancillary Data.[32]

> Any data that was entered in the [Defendants'] system that did not ultimately go on to be a prequalified lead or a qualified lead became Ampush's scrap data. Any data that had a prequalified connection that was transmitted to a university and was either accepted by that university or was rejected by that university and returned to [eDegree], nothing further was done with those leads, per the terms of this contract. All other scrap data never made it through any of that process and therefore was abandoned data in the system.[33]

## D.    DAMAGES PERIOD

Consistent with the Kidder Report, I have assumed that the damages period in this matter is from June 1, 2013 to October 31, 2015.[34] My assumption is based on:

- The Agreement was executed on May 31, 2013;[35]

- The causes of action are alleged to have begun at or around the execution of the Agreement;[36] and

- DGS EDU terminated eDegree's access to its web portal on or about October 30, 2015.[37]

I am informed that Section 13 of the Agreement may limit the damages amount and period, as follows:

---

[32] Mayberry Deposition, pg. 49.
[33] Mayberry Deposition, pg. 70-71.
[34] Kidder Report, ¶22, Exhibits 3.1 – 3.5 and 6.
[35] CONN 001333 to 1341 at CONN 001333 (Mayberry Deposition Exhibit 7)
[36] Kidder Report, pg. 10, ¶22.
[37] Darwal November 4, 2016 Deposition, pgs. 338-339.

### 13. LIABILITY

> IN NO EVENT SHALL EITHER VENDOR OR AMPUSH BE LIABLE FOR ANY LOST PROFITS, LOST REVENUES OR FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT, EVEN IF SUCH DAMAGES ARE FORESEEABLE AND WHETHER OR NOT THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL EITHER PARTY'S LIABILITY HEREUNDER EXCEED THE PAYMENTS MADE BY AMPUSH TO VENDOR IN THE TWELVE (12) MONTHS PRECEDING THE EVENT GIVING RISE TO THE CLAIM.[38]

To the extent that the Court finds that the damages are limited to the payments made by Ampush to eDegree in the preceding 12 months, I limit the damages to those amounts and time period, as discussed in the Summary of Opinions section below.

## IV.   SUMMARY OF OPINIONS

Based on my analysis, it is my opinion that the damages in the Kidder Report are incorrect, misleading, unreliable, speculative, untethered to the facts in this matter, and, if awarded, would provide eDegree with an economic windfall. Further, it is my opinion that the analyses performed in the Kidder Report are neither based on sound economic principles, nor are they performed within a reasonable degree of professional certainty.

I have also been asked to form my opinion of damages in this matter, in consideration of the language in Section 13 of the Agreement. I have determined damages under the following scenarios, which depend on the Court's interpretation of the contractual language as it applies to the facts in this matter:

---

[38] CONN 001333 to 1341 at CONN 001339 (Mayberry Deposition Exhibit 7).

- Scenario I – Damages are $0, if the Court finds that the following clause of Section 13 applies and interprets it to mean that the parties have waived damages,

    > IN NO EVENT SHALL EITHER VENDOR OR AMPUSH BE LIABLE FOR ANY LOST PROFITS, LOST REVENUES OR FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT, EVEN IF SUCH DAMAGES ARE FORESEEABLE AND WHETHER OR NOT THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.[39] ("Damages Waiver")

- Scenario II – Damages are limited to the payments made to eDegree in the 12 months preceding the event giving rise to the claim, if the Court determines that the Damages Waiver in Scenario I is inapplicable to this matter, but the damages limitation from Section 13 of the Agreement applies. The resulting damages under Scenario II depend on the date at which the Court determines the causes of action to have begun. I considered the following:

    o Scenario II-A: If the Court finds that the alleged causes of action began at or around the execution of the Agreement, as alleged by the Plaintiff,[40] then damages are $0 because there were no payments made in the preceding months.

    o Scenario II-B: If the Court finds that the alleged causes of action began at a certain point during the Agreement, then the damages will be limited to payments made during the previous 12 months, if any. To assist the Court under this scenario, I have provided the payments made by the Defendants to eDegree, by month, throughout the course of the contract.[41]

- Scenario III – If the Court applies an unjust enrichment damages methodology in the form of Defendants' profits, then the damages are $909,035,[42] as summarized in the following table:

---

[39] CONN 001333 to 001341 at CONN 001339 (Mayberry Deposition Exhibit 7).
[40] Darwal November 4, 2016 Deposition, pgs. 338-339.
[41] Exhibit 5.
[42] Exhibit 2.

TABLE 1: SUMMARY OF UNJUST ENRICHMENT DAMAGES- DEFENDANTS' PROFITS[43]

| Defendant | Amount |
|-----------|--------|
| Ampush | $101,221 |
| DGS EDU | 807,814 |
| Total | $909,035 |

The bases for my opinions are discussed in the Analysis section of this report.

## V.    ANALYSIS

The Kidder Report quantifies damages, as summarized in the following table:

TABLE 2: SUMMARY OF DAMAGES
KIDDER REPORT[44]

| Damages | Amount |
|---------|--------|
| *Primary Unjust Enrichment Damages:* | |
| eDegree Searches & Ampush/DGS EDU Cost/Lead | $5,855,304 |
| Ampush/DGS EDU Posts & Ampush/DGS EDU Cost/Lead | 3,812,481 |
| eDegree Searches & eDegree Price/Lead | 19,075,428 |
| Ampush/DGS EDU Posts & eDegree Price/Lead | 12,485,500 |
| | |
| Defendants' Profits | 1,127,724 |
| | |
| *Secondary Unjust Enrichment Damages* | |
| Inflated Sales Price | $367,231 |
| | |
| Potential Legal Fees[45] | $900,000 to $6,000,000 |

I have been asked by Counsel for DGS EDU to analyze the Kidder Report's damages methodology and opinions, and to prepare my calculation of the Defendants' profits, assuming

---

[43] Exhibit 2.
[44] Kidder Report, pgs. 15 and 34.
[45] The Kidder Report also references the Brita Strandberg opinion, that "it is likely to cost at least $75,000 to $125,000 in legal fees for eDegree to defend itself through discovery and summary judgment...against each of the almost-certain class action lawsuits in which it expects to be named as a defendant as a result of Ampush/DGS EDU's contravention of the TCPA." (at pgs. 16, ¶41) The Kidder Report then proffers, "Since the evidence provided by Ampush/DGS EDU indicates that it provided Leads to at least twelve Affiliates, eDegree is facing a potential exposure of between $900,000 and $6 million in legal fees." (at pgs. 16, ¶41) I have neither formed an opinion with respect to the amounts expressed by Brita Strandberg, nor the extrapolation performed in the Kidder Report.

liability and that the Court finds that Damages Scenario III applies, based on the information available to date.

I discuss my analysis in the following sections:

A. Fundamental Flaws in the Kidder Report's Primary Unjust Enrichment Analysis;

B. Fundamental Flaws in the Kidder Report's Secondary Unjust Enrichment Analysis; and

C. Calculation of Defendants' Profits Under Damages Scenario III.

## A.   FUNDAMENTAL FLAWS IN THE KIDDER REPORT'S PRIMARY UNJUST ENRICHMENT ANALYSIS

The Kidder Report proffers that eDegree is entitled to damages in the form of unjust enrichment.[46]   I understand that the purpose of calculating unjust enrichment is to take any benefits (ill-gotten gains) received by the Defendant as a result of the alleged "bad acts".   The Kidder Report does not quantify eDegree's actual losses, if any.

The Kidder Report proffers the following theories of primary unjust enrichment damages:

1.     Avoided Cost Damages; and

2.     Defendants' Profits.

The Kidder report opines that actual losses are "difficult to quantify with any precision" and offers no calculation of alleged actual damages.[47]   Each of these is discussed in the sections that follow.

---

[46] Kidder Report, pgs. 14-16.
[47] Kidder Report, pg. 12, ¶29.

*1.      Avoided Cost Damages*

The Kidder Report states,

> Ampush/DGS EDU's unjust enrichment can be quantified by its avoided costs.
> Under this methodology, damages are calculated by determining how much it
> would have cost Ampush/DGS to have legitimately obtained a quantity of Leads
> equal to the number it wrongfully took from eDegree. As a conceptual matter,
> these are not thought of as being the same Leads – but rather a quantity of Leads[48]
> equal to the quantity of wrongfully-obtained Leads.[49]

The Kidder Report's "Unjust Enrichment based on Avoided Cost" damages ("Avoided Cost
Damages") are incorrect, unreliable, speculative, and are not within a reasonable degree of
professional certainty. For the following reasons:

- Avoided Cost Damages in the Kidder Report suggests that the Defendants would have
  been willing to incur costs ranging between $3,812,481 to $19,075,500 to generate
  revenues of $1,127,724,[50] as proffered in the Kidder Report's disgorged profit
  calculation, which would place the Defendants in a significant loss position, as follows:

**TABLE 3: REASONABLENESS OF KIDDER REPORT PRIMARY UNJUST ENRICHMENT DAMAGES**

| Damage Scenario | Kidder Report Damages Amount[51] | Actual Ampush/DGS EDU Ancillary Revenue[52] | Suggested Loss | Percent Loss |
|---|---|---|---|---|
| eDegree Searches & Ampush/DGS EDU Cost/Lead | $5,855,304 | $1,127,724 | $4,727,580 | 419% |
| Ampush/DGS EDU Posts & Ampush/DGS Cost/Lead | 3,812,481 | 1,127,724 | 2,684,757 | 238% |
| eDegree Searches & eDegree Price/Lead | 19,075,428 | 1,127,724 | 17,947,704 | 1,591% |
| Ampush/DGS EDU Posts & eDegree Price/Lead | 12,485,500 | 1,127,724 | 11,357,776 | 1,007% |

---

[48] A Lead is defined in the Kidder Report as, "a collection of contact and other information for a Prospect." (at pg. 5, ¶ 15.) I understand that the definition used for a lead in the Kidder Report is different from what the industry considers a lead. I understand that in the industry, this data is referred to as a "search". For consistency, I utilize the terms as defined in the Kidder Report in the remainder of this section, unless otherwise noted.

[49] Kidder Report, pg. 22, ¶ 56.

[50] Kidder Report, Exhibit 6.

[51] Kidder Report, Exhibit 3.

[52] Kidder Report, Exhibit 6.

No rational economic actor would incur the costs proffered in the Kidder Report to generate revenues of approximately $1.1 million. Thus, the Avoided Cost Damages proffered are nonsensical, speculative, and would result in a windfall to eDegree; and

- The analyses and calculations performed to arrive at the Avoided Cost Damages are fraught with multiple and compounding flaws and errors, thus rendering the Kidder Report's Avoided Cost Damages incorrect, misleading, and misrepresentative of avoided costs, if any.

- Awarding these "avoided costs" would create a windfall to the Plaintiff, as the as the alleged "avoided costs" calculated in the Kidder are greater than the $900,300 payments made by the Defendants to eDegree throughout the entire duration of the Agreement.[53]

- The "avoided costs" overstate the actual value of the data because it assumes that each lead will result in revenue generation, which is contrary to actual experience.

- The analysis assumes that the revenue generated on records is at the premium price of a Qualified Lead and ignores that ancillary data records are sold at much lower prices in the range of one dollar or less.

In its quantification of the costs the Defendants allegedly avoided, the Kidder Report calculates the purported "Cost per Lead", which it defines as "the amount spent to get Leads from sources other than eDegree since those are the channels that would have been available to Ampush/DGS EDU without the allegedly-wrongful acts."[54] The Kidder Report employs two ways in which to estimate the "Cost per Lead":

a. Price Per Lead – based on "the price at which eDegree was willing to sell a Lead to Ampush/DGS EDU. That price varied from $18 to $24 over the course of the damages period."[55] Essentially, the price at which eDegree was willing to pay for a lead was used as a proxy for the amount that all parties would pay for a

---

[53] Exhibit 6.
[54] Kidder Report, pg. 22, ¶ 57.
[55] Kidder Report, pg. 24, ¶ 60.

qualified lead. The Kidder Report estimates damages ranging from $12,485,500[56] to $19,075,428[57] using this methodology; and

b. Cost per Lead – which is "inferred by dividing the cost of goods sold by the total number of Leads – Qualified, Disqualified and NonConverts – for the same period."[58] Essentially, a calculation is performed to estimate the cost that goes into generating a qualified lead. The Kidder Report estimates damages ranging from $3,812,481[59] to $5,855,304[60] using this methodology; and

It is my opinion that the Avoided Cost Damages based on both methodologies of determining "Avoided Cost" result in incorrect and unreliable damage amounts that are not within a reasonable degree of professional certainty, due to fundamental flaws in the methodologies employed and calculations that are fraught with errors. I discuss my analysis of the Avoided Cost Damages calculated based on "Price per Lead" and "Cost per Lead" in the remainder of this section.

*a. Price Per Lead*

The damages calculated in the Kidder Report for the Defendants' avoided costs uses eDegree's average price per Qualified Lead[61] as a proxy for Defendants' non-eDegree affiliates' price per qualified lead, and then multiplies this cost by the total searches for which eDegree was not compensated ("Total Leads Not Paid"), as follows:

Total Leads Not Paid

X  eDegree Price Per Qualified Lead

=  Avoided Cost[62]

---

[56] Kidder Report, Exhibit 3.4.
[57] Kidder Report, Exhibit 3.3.
[58] Kidder Report, pg. 22, ¶ 57.
[59] Kidder Report, Exhibit 3.2.
[60] Kidder Report, Exhibit 3.1.
[61] CONN 002943 - 002946.
[62] See Kidder Report, Exhibits 3.3 and 3.4.

This methodology is fundamentally flawed because it:

- Inherently assumes that <u>every</u> "Lead Not Paid" (e.g. search) will result in a Qualified Lead for which payment is received. The assumption ignores that only approximately 6.7 percent of eDegree Leads provided to Ampush/DGS EDU result in Qualified Leads (i.e., searches for which a payment is received).[63] Essentially, the Kidder Report assumes that the Defendants will pay for all searches, even those which will not generate revenue, at the premium amount that is paid for a Qualified Lead, thus, overstating the damage amounts proffered in the Kidder Report;

- Ignores that certain of the "Leads Not Paid" were previously contacted and went through the matching process, yet these searches did not result in Qualified Leads;

- Assumes, without evidence, that the average amount paid by non-eDegree third parties for qualified leads approximates that of an eDegree Qualified Lead.

As a result of these errors, the Kidder Report has overstated its Primary Unjust Enrichment Damages based on Price per Lead.

### b. Cost per Lead

The Kidder Report "Cost per Lead" damages scenario is calculated in the same way as the "Price per Lead" calculation previously described; however, instead of using eDegree's price per Qualified Lead as a proxy for the Defendants' avoided cost, it calculates the Defendants' purported cost per lead.[64] This methodology suffers from the same fundamental flaws as the calculation of the "Price per Lead" scenario previously discussed in that it:

- Assumes that <u>every</u> "Lead Not Paid" will result in a qualified lead for which payment is received; and

---

[63] 6.7% = 39,980 / 598,870, based on the information provided in the Defendant DGS, EDU, LLC's Notice of Serving Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories, Supplemental Response to Interrogatory No. 5, which is the data upon which the Kidder Report relies.

[64] Interestingly, the Kidder Report does not consider eDegree's cost to create a lead.

---

- Fails to acknowledge that not all searches which do, in fact, result in a payment will be at the premium prices of a Qualified Lead.

In addition to these fundamental conceptual flaws in the Kidder Report's Avoided Cost Damages based on Cost per Lead, the Kidder Report's calculation of the "Cost per Lead from Non eDegree Sources"[65] is fraught with errors, which renders its overall calculation incorrect and unreliable. Thus, the damages calculated therefrom are unreliable, speculative and misleading. I discuss the errors included in the Kidder Report's Cost per Lead in the remainder of this section.

The Kidder Report calculates the purported "Cost per Lead from Non eDegree Sources", as follows:

$$\text{Cost per Lead from Non eDegree Sources} = \frac{\text{Cost of Goods Sold for Non eDegree Sources}}{\text{Total Leads from Non eDegree Sources}}$$

The way in which the Kidder Report computes both inputs into the calculation of "Cost per Lead from Non eDegree Sources" is fraught with multiple errors and relies on calculations of unrelated data, which compound throughout the calculation such that the "Cost per Lead from non eDegree Sources" is rendered unreliable, speculative and irrelevant. As a result, use of the erroneously calculated "Cost per Lead from Non eDegree Sources" renders the resulting damages amounts, incorrect, unreliable, misleading, and speculative due to errors in the calculation of the following:

    i.     Cost of Goods Sold for Non eDegree Sources; and

    ii.    Calculation of Total Leads from Non eDegree Sources

I discuss these errors in the remainder of this section.

---

[65] Kidder Report, Exhibit 3.5.

i.    *Errors in the Calculation of Cost of Goods Sold for Non eDegree Sources*

"Cost of Goods Sold for Non eDegree Sources" is calculated as:

Cost of Goods Sold
Less:    Cost of Goods Sold eDegree
Equals: Cost of Goods Sold for non eDegree

The fundamental flaw in this calculation is that the "Cost of Goods Sold" is overstated because it includes costs relating to Actions Cost of Media (June 2013 to September 2013)[66] and Search Engine Expense (November 2013 to October 2015)[67] which, I understand, are unrelated to generating revenue for qualified or ancillary leads:

TABLE 4: COST OF GOODS SOLD CATEGORIES[68]

| Category by Time Period | Overstated Amount |
|---|---|
| Actions Cost of Media[69] | $1,653,221 |
| Search Engine Expenses[70] | 3,898,131 |
| Total | $5,551,352 |

Based on the above, the Kidder Report overstates "Cost of Goods Sold" in the calculation by $5,551,352. This overstatement ultimately overstates the Kidder Report's Unjust Enrichment damages resulting from Avoided Costs, as this input is a key component of the damages calculation.

---

[66] DGS000199.

[67] DGS EDU Ancillary Revenue-COS-Nov'13-Oct'15.xls.

[68] Exhibit 7. The amounts in Table 4 are slightly different than the amounts in Exhibit 3.5 to the Kidder Report because he does not use the actual cost of goods sold for the period July 2015 through October 2015, but approximates them using June 2015 data.

[69] Actions Cost of Media - the cost of ads placed on services like Google and Facebook (Darwal November 4, 2016 Deposition, pg. 123.)

[70] Search Engine Expense – online advertising to drive traffic to one of the Plaintiffs' websites. (Darwal November 4, 2016 Deposition, pg. 169).

*ii.    Errors in the Calculation of Total Leads from Non eDegree Sources*

"Total Leads from Non eDegree Sources" is calculated as follows:

| eDegree Total Leads from Non eDegree Sources | = | Total Leads Posted<br>+ Total Qualified Leads<br>+ Total DisQualified Leads | Less: | eDegree Leads Posted by Ampush/DGS EDU<br>+ eDegree Qualified Leads<br>+ eDegree DisQualified Leads |
|---|---|---|---|---|

The following inputs into the calculation of "eDegree Total Leads from non eDegree Sources" are improperly calculated:

- "Total Leads Posted";
- "Total Qualified Leads"; and
- "Total DisQualified Leads".

I discuss the flaws and errors in each of these calculations below:

### *Total Leads Posted*

"Total Leads Posted" is erroneously calculated because the Kidder Report divides total "eDegree *Leads* Posted by Ampush/DGS EDU" by the unrelated percentage of "eDegree Leads Posted by Ampush/DGS EDU as a percent of Total *Posts*,"[71] as follows:

$$\text{Total Leads Posted} = \frac{\text{eDegree } Leads \text{ posted}}{\text{eDegree } Posts \text{ as a Percent of Total } Posts}$$

Essentially, the Kidder Report makes the assumption that there is a relationship between the number of searches (Leads in the Kidder Report), and the number of qualified leads (Posts in the

---

[71] I understand a post is when a lead received from eDegree or another source is transmitted to a third party in an effort to identify a match and qualified leads. For example, a lead can be posted numerous times to numerous third parties.

Kidder Report), that result, without any analysis to demonstrate this relationship. To the contrary, I understand that there is no relationship between the number of searches ("Leads") and the number of qualified leads ("Posts") to non-eDegree parties. I understand that the number of times a search ("Lead") is sent to a potential buyer is determined entirely by the number of matches a user accepts on the phone, which is unrelated to the percentage of total eDegree posts to total posts. Because there is no relationship, the formula employed to calculate "Total Leads Posted" in the Kidder Report is a comparison of "apples and oranges" and results in an irrelevant number.

*Total Qualified Leads*

Actual information is available for "Total Qualified Leads" from June 2013 through September 2013,[72] and the Kidder Report estimates "Total Qualified Leads" for the periods subsequent to September 2013, as follows:

$$\text{Total Qualified Leads} = \frac{\text{Total Revenue}}{\text{Revenue per Qualified Lead}}$$

The Kidder Report's estimation of Total Qualified Leads is incorrect due to errors in both the "Total Revenue" and "Revenue per Qualified Lead" amounts used in the calculation. The Kidder Report failed to test its methodology for reasonableness. The flaws in the analysis are apparent when actual "Total Qualified Leads"[73] are compared to calculated "Total Qualified Leads", as illustrated below:

---

[72] DGS000199.
[73] Actual Total Qualified Leads is available for the months June 2013 through September 2013 (DGS000199).

**TABLE 5: ERRORS IN THE TOTAL QUALIFIED LEADS CALCULATION IN THE KIDDER REPORT[74]**

| Date | Revenue/ Qualified Lead | Total Revenue | Estimated Total Qualified Leads | Actual Total Qualified Leads | Difference | Error Rate |
|------|------|------|------|------|------|------|
| June 2013 | $25.66 | $973,100 | 37,923 | 26,600 | 11,323 | 30% |
| July 2013 | 28.26 | 1,047,700 | 37,074 | 28,500 | 8,574 | 23% |
| August 2013 | 28.17 | 1,108,900 | 39,365 | 30,800 | 8,565 | 22% |
| September 2013 | 27.56 | 969,800 | 35,189 | 29,600 | 5,589 | 16% |

As illustrated above, application of the methodology by which the Kidder Report estimates "Total Qualified Leads" for the period from October 2013 through October 2015 results in variances between actual and estimated "Total Qualified Leads" of between 16 percent and 30 percent, which are unacceptably high error rates.

The high error rates in the application of the Kidder Report's methodology results from the following:

- For the period June 2013 through September 2013, the revenue amount included in the Kidder Report includes "Actions Revenue" but the Kidder Report fails to reduce the "Actions Revenue" by the "Sales Deductions – DQ Scrubs",[75] as a result, the revenue amount in the calculation is overstated;

- The "Total Revenue" included in the Kidder Report's calculation represents total revenue for the business, which includes both ancillary revenue and click revenue.[76] The click revenue is unrelated to the issues in this matter; therefore, the revenue amounts in the Kidder Report's calculation are overstated;

- "Revenue per Qualified Lead" in the Kidder Report is based only on the revenue generated from qualified leads for non-eDegree parties.[77] This represents a sub-set of the qualified leads generated by the Defendants' business. To the extent that the "Revenue per Qualified Lead" does not represent the average per qualified lead price for the entire population of revenues included in the Kidder Report's analysis, the calculated "Total

---

[74] Kidder Report, Exhibit 3.5.
[75] I understand that DQ Scrubs are preliminarily qualified leads, which were ultimately rejected (disqualified) by the university. (see DGS000199).
[76] DGS EDU Ancillary Revenue-COS-Nov'13-Oct'15.
[77] DGS000202.

Qualified Leads" will be (and are) inaccurate. The results of the testing in Table 5 above demonstrate that the "Revenue per Qualified Lead" is not representative of the average qualified lead price for all of the revenues included in the Kidder Reports calculation. As a result, the "Total Qualified Leads" amount calculated in the Kidder Report is rendered incorrect, unreliable, and speculative.

Taken as a whole, the errors in each of the components used to calculate "Total Qualified Leads" renders the entire calculation incorrect, speculative and unreliable.

## Total DisQualified Leads

"Total DisQualified Leads" is estimated as follows:

$$\text{Total DisQualified Leads} = \text{Total Qualified Leads} \times \frac{\text{eDegree DisQualified Leads}}{(\text{eDegree Qualified Leads} + \text{eDegree DisQualified Leads})}$$

This calculation assumes that a percentage of Qualified Leads includes a percentage of Disqualified Leads, which is a fundamentally flawed and incorrect concept. It is impossible for leads that are qualified (i.e., leads for which payment has been received) to include a subset of disqualified leads for which payment has not been received. The methodology is fundamentally flawed and incorrect, which renders the calculated "Total DisQualified Leads" irrelevant. Further, the calculation is also inherently incorrect due the fact that "Total Qualified Leads" is unreliable and incorrect, as previously discussed.

## Conclusion on Errors in the Calculation of Total Leads from Non eDegree Sources

Based on the above errors, the "Cost per Lead from Non eDegree Sources" are irrelevant and do not represent these costs, or even a reasonable approximation of the costs. As a result, the Kidder Report's entire "Unjust Enrichment damages from Avoided Cost based on Cost per Lead" is incorrect, unreliable, misleading, speculative, and cannot be relied upon within a reasonable degree of professional certainty.

2.    *Defendant's Profits*

In its simplest form, unjust enrichment of the defendants' profits is calculated as defendants' revenue generated as a result of the alleged wrong-doing ("Unjust Sales") less defendants' costs associated with achieving the Unjust Sales, the formula for which is:

> Unjust Sales
> Less:    Incremental Costs
> Equals:  Defendants' Profits

Unjust Sales and Incremental Cost are described as follows:

- "Unjust Sales" represent the revenues generated by the Defendants' alleged actions; and
- "Incremental Costs" represent the defendants' costs which would have been necessary to make the Unjust Sales. These costs tend to vary with the level of sales. For example, cost of goods sold is an incremental cost because it increases with each additional sale.

The Kidder Report calculates Defendants' Profits of $1,127,724[78] as an alternate calculation of primary unjust enrichment damages. The Kidder Report concludes,

> There are no identified costs that are incremental in nature – in other words, DGS EDU has not identified any costs that would not have been required absent the allegedly-wrongful behavior. Thus, in my opinion, there is no distinction between unjustly obtained revenues and unjustly obtained profits.[79]

The remainder of this section addresses my opinions on the analysis of the Defendants' Profits as calculated in the Kidder Report:

a.  Unjust Sales

---

[78] Kidder Report, Exhibit 6.
[79] Kidder Report, pg. 15, ¶39.

b. Incremental Costs

*a. Unjust Sales*

To calculate the Unjust Sales, the Kidder Report performs the following:

- Quantifies Unjust Sales by categorizing them into the following groups, and then identifying the ways in which these leads were monetized, if at all:[80]
  - o Ever-Qualified Leads;
  - o Never-Qualified Leads; and
  - o Non-Converts Leads.

Table 9 in the Kidder Report summarizes its methodology by which to determine whether Unjust Sales result, as follows:[81]

| Table 9: Actions Giving Rise to Damages | | | |
|---|---|---|---|
| | **Primary University** | **Secondary University** | **Post to Affiliate** |
| **Ever-Qualified** | No Damages | Yes | Yes |
| **Never-Qualified** | N/A | Yes | Yes |
| **NonConverted** | N/A | Yes | Yes |

I have identified the following fundamental flaws in the calculation of Unjust Sales performed in Exhibit 6 to the Kidder Report:

- The Kidder Report calculated "Revenues from Posts", which I understand are the Ancillary Data Sales, based on the dollar amounts included in the various databases as "Affiliate Price". The Kidder Report ignored Mr. Darwal's deposition testimony that the "Affiliate Price" for these sales are estimates, rather than actual, because record-level

---

[80] Kidder Report, pgs. 24 to 25, ¶62 to 64.
[81] Kidder Report, pg. 25, ¶64.

detail does not exist for the ancillary (bulk) data sales.[82]  Further, I understand that the estimated "Affiliate Price" for the individual records is an estimate, which is typically higher than the actual amounts realized.[83]


### b.  Incremental Costs

The Kidder Report performs a high-level analysis of the following costs of the Defendants and determines that the Defendants incurred no incremental costs:[84]

- Data Posting Costs – as these costs are "largely fixed in nature";[85]
- Data Scoring/Verification Costs – as these costs "increase for part of the damages period and then start declining even while the total 'Prospective Record' posts is steadily increasing";[86] and
- Selling, General & Administrative Costs, excluding depreciation and amortization – as these costs are "by their very nature, fixed."[87].


The Kidder Report erroneously excludes incremental expenses in this analysis by ignoring deposition testimony and failing to understand the nature of each of these costs.  I discuss my analysis and understanding of the costs related to generating the "Calculation of Defendants' Profits Under Damages Scenario III" section of this report.

---

[82] Darwal Deposition, pgs. 203-204.
[83] Based on conversations with Mr. Darwal.
[84] Kidder Report, pgs. 31-33, ¶74 to 78.
[85] Kidder Report, ¶75.
[86] Kidder Report, ¶76.
[87] Kidder Report, ¶77.

## B. FUNDAMENTAL FLAWS IN THE KIDDER REPORT'S SECONDARY UNJUST ENRICHMENT ANALYSIS

In addition to primary unjust enrichment damages, the Kidder Report also quantifies secondary unjust enrichment damages related to an allegedly "inflated sales price".[88] The Kidder Report states, "[t]he amount by which the sales price was inflated is reasonably estimated by calculating the amount by which Ampush Edu was able to inflate its profits through the allegedly-wrongful acts."[89] Simply put, the Kidder Report assumes that all profits derived from the alleged bad acts directly and linearly affected its sale price to DGS EDU. To estimate the alleged inflated sales price, the Kidder Report performs the following analyses:

- Estimates that, during the five months leading up to Ampush's sale of its educational business, approximately 15 percent of Ampush's educational business profits related to the alleged wrongful acts.[90]
- Applies 15 percent to the sales price of $2.4 million as shown in the following table.

TABLE 6: SECONDARY UNJUST ENRICHMENT PER THE KIDDER REPORT[91]

| Description | Amount |
|---|---|
| Price Paid to Ampush for its Educational Business | $2,473,021 |
| Percent of Ampush's Educational Business' Profits Attributable to the Alleged Wrongful Acts | 15% |
| Secondary Unjust Enrichment[92] | $367,231 |

Based on my analysis of the underlying documentation, my understanding of standard valuation practices, and the facts and circumstances of this matter, it is my opinion that secondary unjust enrichment damages, as quantified in the Kidder Report, are based on an untested and unaccepted methodology, and are, therefore, speculative, unreliable, and unsupported. Specifically, the Kidder Report assumed, without any basis or analysis, that there is a one-to-one

---

[88] Kidder Report, pgs. 33-35, ¶¶79-83.
[89] Kidder Report, pgs. 33-34, ¶80.
[90] Kidder Report, Exhibit 7.
[91] Kidder Report, Exhibit 7.
[92] There appears to be variances due to rounding.

linear ratio between Ampush's educational business' profits and the ultimately negotiated sales price between Ampush and DGS.

To determine if, and to what extent, the alleged wrongful acts likely inflated the sales price of Ampush's educational business to DGS EDU, I would have expected the Kidder Report to perform a valuation of Ampush's educational business both with and without the profits related to the alleged wrongful acts using accepted valuation methods, which include:

- Income Approach – this method estimates the value of the business based on its income producing capacity and risk based on either historical performance or expected future performance;
- Market Approach – this method estimates the value of a business by comparing the recent selling prices of comparable business to the business being valued; and
- Cost Approach – this method estimates the value of the business based on the cost to develop a similar business with similar products and customers.[93]

Typically when performing the valuation of a business, multiple valuation methods are employed to compare and analyze the results of the various methods which are considered to form an opinion of value. The Kidder Report failed to perform any of these valuation methods to support its proffered secondary unjust enrichment damages amount.

Further, there is no evidence that the Kidder Report performed any of the following procedures, of which any industry-accepted valuation would have included some, if not all:

1. An analysis of 2009 to 2013 financial statements and income tax returns, which would provide trends in financial metrics to include, but not be limited to, assets, liabilities, income, revenue, and gross and operating profit margins.

2. A comparison of the financial metrics of Ampush's educational business to those of its peers obtained through a search of public companies or databases with transactions of comparative companies. This analysis would help to determine the financial performance

---

[93] Statement on Standards for Valuation Services 1, "Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset, June 2007 – pgs. 16-19.

and health of Ampush's educational business at the time of the negotiations in comparison to its peers.

3. An analysis of Ampush's educational business' competitors and any comparable sales. This would require analysis of public companies and similar companies based on a SIC code.

4. An understanding of any and all debt agreements to which the seller is a party to determine any covenants, restrictions, and/or warrants that may preclude the seller from selling the business and/or preclude the buyer from buying the business.

5. An analysis of Ampush's educational business' actual income to determine a value based on the Income Approach.

6. A due diligence of Ampush's educational business' competitors, market share, affiliates and contracts, and product offerings to determine any risk factors such as affiliate concentration and lack of marketability, which would require a discount in the valuation.

7. A discussion about Ampush's educational business' plan for future growth and the means to achieve that growth. Specifically, I would expect an analysis of any projections and the means to achieve those projections, which may include hiring more consultants and increasing sales and marketing activity.

Based on my analysis of the documents produced in this matter to date, it is my opinion that the Kidder Report failed to perform the analysis necessary to value Ampush's educational business at the time of the sale of the educational business to DGS EDU.

## C.    CALCULATION OF DEFENDANTS' PROFITS UNDER DAMAGES SCENARIO III

In this section, I have also been asked to prepare an alternate calculation of unjust enrichment damages based on the Defendants' profits resulting from allegedly Unjust Sales. I discuss my analysis of unjust enrichment damages as follows:

1.    Unjust Sales; and
2.    Incremental Costs.

*1.    Unjust Sales*

As previously discussed, I understand that the ownership rights and the Defendants' usage of ancillary data are at issue in this matter. Specifically, I understand that revenues were generated by the Defendants using the ancillary data obtained from eDegree in one of two ways:

- Through ancillary (bulk) sales, where the data was sold to third parties ("Ancillary Data Sales"); and
- By generating qualified leads to non-eDegree third parties ("Secondary Qualified Leads").

I discuss each of these revenue sources in the sections which follow:

> a.   Ancillary Data Sales; and
>
> b.   Secondary Qualified Leads.

*a.    Ancillary Data Sales*

I understand that ancillary data sales are data records that are packaged and sold to third parties ("Ancillary Data Sales"). I also understand that the Defendants do not have record-level data reporting for Ancillary Data Sales; the only information available is the total monthly Ancillary Sales Data revenue, including records from all sources, including eDegree. As a result, I have estimated the revenues generated from Ancillary Data Sales of eDegree records as follows:

- Obtained the total monthly Ancillary Data Sales revenue;[94]
- Calculated the percentage of eDegree record posts to total record posts for each month ("Percentage of eDegree Record Posts"); and
- Multiplied the Percentage of eDegree Record Posts by the total monthly Ancillary Data Sales revenue.

---

[94] "DGS EDU Ancillary Rev-COS-Nov'13-Oct'15.xls."

For the period from November 2013 through October 2015, I calculated total Ancillary Data Sales related to eDegree records of $847,425 ("Unjust Ancillary Data Sales").[95]

### b. Secondary Qualified Leads

I understand that Ampush sold some, but not all,[96] of eDegree's records to third party call centers,[97] which would offer "other opportunities that were available through university programs offered by Ampush."[98] If a match was made between an individual and a university, Ampush would be paid for that match ("Secondary Qualified Leads").[99]

To quantify the revenue generated from Secondary Qualified Leads, I performed the following two sets of queries:

- Matches of eDegree Unsubmitted Records
  - o Identified email addresses which appear in both DGS000200, which I understand is a database that includes revenues generated from non-eDegree third parties, and DGS000164-192, which I understand are monthly Excel files containing all eDegree records that were not submitted. In the remainder of this section, I refer to the emails which match between these two data sets as the "Matched Email List";
  - o Isolated the records in DGS000200 where the affiliate was cited as "educationmatch", as I understand Education Match is DGS EDU's call center ("EducationMatch");[100]
  - o Created a query to identify records which include the following attributes:

---

[95] Exhibit 4.
[96] Mayberry Deposition, pgs. 177-178.
[97] Mayberry Deposition, pg. 49, 93.
[98] Mayberry Deposition, pg. 51.
[99] Mayberry Deposition, pgs. 51-52, 56.
[100] I understand that for remaining records in DGS200 (i.e., those without the affiliate "educationmatch") relate to DGS EDU's call center which was in contact with an individual independently from the eDegree relationship and qualified that individual as a lead through the Defendants' web portal. I understand that this frequently occurs, as individuals searching for jobs or education opportunities go through several different channels or sites when doing so, and as such could come to the Defendants from multiple sources.

- Email addresses that appeared in both the Matched Email List and EducationMatch;

- The earliest 'Lead_Date' date/time each email address appeared in DGS000164-192 ("Lead Date/Time");

- The earliest 'Received' date/time each email address appeared in EducationMatch ("Received Date/Time");

- A calculated field for the difference between Lead Date/Time and Received Date/Time;

- An indicator displaying if the Lead Date/Time was between 0 and 24 hours prior to the Received Date/Time; and

- The 'Lead Price' taken from EducationMatch.

Because this query captured some email addresses that were later submitted by eDegree (DGS000193), these records needed to be removed as they would appear in the query for eDegree submissions.

- o Totaled the data by month and year to summarize the number of matches as well as the total Lead Price for each period.

- Matches of eDegree Submitted Records
  - o Identified email addresses which appear in both DGS000200, which I understand is a database that includes revenues generated from non-eDegree third parties, and DGS000193, which I understand is a file displaying all leads submitted by eDegree to DGS EDU. In the remainder of this section, I refer to the emails which match between these two data sets as the "Matched eDegree Submissions";
  - o Isolated the records in DGS000200 where the affiliate name did not contain edegreeadvisor, as I understand such records would reflect Lead Price data that was not disputed ("Other Affiliates");[101]
  - o Created a query for records which include the following attributes:

---

[101] I understand that for remaining records in DGS200 (i.e., those without the affiliate "educationmatch") relate to DGS EDU's call center which was in contact with an individual independently from the eDegree relationship and qualified that individual as a lead through the Defendants' web portal. I understand that this frequently occurs, as individuals searching for jobs or education opportunities go through several different channels or sites when doing so, and as such could come to the Defendants from multiple sources.

- ▪ Email addresses that appeared in both the Matched eDegree Submissions and Other Affiliates;

- ▪ The earliest Received date/time each email address appeared in DGS000193 ("eDegree Date/Time");

- ▪ The earliest 'Received' date/time each email address appeared in Education Match ("Received Date/Time");

- ▪ A calculated field for the difference between eDegree Date/Time and Received Date/Time;

- ▪ An indicator displaying if the eDegree Date/Time was between 0 and 24 hours prior to the Received Date/Time; and

- ▪ The 'Lead Price' taken from Matched eDegree Submissions.

- o Totaled the data by month and year to summarize the number of matches as well as the total Lead Price for each period.

The total revenues generated by non-eDegree third parties on the matched eDegree records are summarized in Exhibit 5 and are included in my analysis of Unjust Sales of Secondary Qualified Leads.[102]

*2.    Incremental Costs*

To understand and analyze costs incurred by Ampush/DGS EDU related to Unjust Sales, I performed the following steps:

- • Obtained and analyzed Ampush's Action business unit profit and loss statements for the period June 2013 to October 2013[103] and DGS EDU's general ledgers for the period of November 2013 to October 2015;[104]

---

[102] Exhibit 5.
[103] ampush edu - Ancillary Data Revenue - Allocated to eDegree - ATTORNEY CLIENT PRIVILEDGED CONFIDENTIAL WORK PRODUCT.xlsx (Actions P&L tab).
[104] DGS EDU Ancillary Revenue – COS – NOV '13-Oct'15.xlsx (BS DGS EDU-FY-14, BS DGS EDU-FY-15, BS DGS EDU-FY-16 tabs).

- Held discussions with Mr. Darwal to understand each expense category incurred by Ampush/DGS EDU related to both Ancillary Data Sales and Secondary Qualified Lead Sales;

- Determined that only the following costs are incremental, based on conversations with Mr. Darwal and my analysis of the supporting financial records:

   o **Lead generation** costs relate to the fee Ampush/DGS EDU paid its affiliates, such as eDegree, for Qualified Leads.[105]

   o **Data scoring/verification** costs relate to third party providers who Ampush/DGS EDU engaged to validate name and address combinations to determine if a lead is an actual individual or a made-up person.[106] This process was completed through an application programming interface against a national database.[107] I understand that Ampush/DGS EDU used several third parties to provide this service throughout its various businesses, but only Neustar/Targus and eBureau relate, in part, to Ancillary Data Sales and Secondary Qualified Lead Sales.[108] Based on conversations with Mr. Darwal, Ampush/DGS EDU paid its vendors on a per validation basis until approximately January 2015, which suggests the incremental nature of this cost. At that time, DGS EDU began to reduce its costs by conducting some validation services through in-house resources, which ultimately reduced this cost. This appears consistent with DGS EDU's expense trend.[109]

   o **Data hosting** costs relate to the system that maintains data records.[110] Mr. Darwal testified that hosting costs were "semi-fixed or semi-variable"[111] costs, which typically ran between $2,000 and $3,000 per month.[112] Based on conversations with Mr. Darwal, it is my understanding that Ampush/DGS EDU

---

[105] Based on conversations with Mr. Darwal.
[106] Mayberry Deposition, pg. 153.
[107] Mayberry Deposition, pgs. 153-154.
[108] Based on conversations with Mr. Darwal. *See also*: DGS000229 (Cost of Sales – Detail tab).
[109] DGS000229.
[110] Mayberry Deposition, pg. 154.
[111] Defined as: having a fixed component with varying aspects. *See* Darwal November 4, 2016 Deposition, pgs. 174-175.
[112] Darwal November 4, 2016 Deposition, pg. 174.

pays a flat fee for a certain amount of data and then pays an incremental amount when it exceeds its data limit. Mr. Darwal explained that Ampush/DGS EDU:

- Paid a flat fee of $2,250 per month through August 2014;
- Exceeded its hosting capacity from September 2014 through March 2015 and, therefore, paid a flat fee of $2,250 per month plus additional fees for overages;
- Renegotiated its contract to expand data capacity and increased its flat fee to $3,000 per month from April 2015 through June 2015; and
- Renegotiated its contract again to reduce data capacity and decrease its flat fee to $2,250 beginning in July 2015.

- Determined the costs related to Ancillary Data Sales and Secondary Qualified Lead Sales, respectively, by allocating certain of these costs to the Unjust Sales at issue in this matter.

Although all of the above costs are incremental to generating Unjust Sales, I have only applied the Lead Generation costs in my analysis of Defendants' profits, because the remaining costs are de minimis when allocated to the records at issue in this matter.

### 3. Adjusted Calculation of Defendants' Profits

Based on the above, I have quantified Defendants' Profits totaling $909,035 during the damages period, as follows:

TABLE 7: SCENARIO III: DEFENDANTS' PROFITS[113]

| Defendant | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|
| Ampush | $101,221 | $ - | $ - | $101,221 |
| DGS EDU | 35,954 | 360,462 | 411,398 | 807,814 |
| Total Defendants' Profits | $137,175 | $360,462 | $411,398 | $909,035 |

---

[113] Exhibit 2.

## VI.    CONCLUSION

In summary, it is my opinion that the Kidder Report:

- Failed to calculate damages based on sound economic principles;

- Presented damages that are economically irrational;

- Performed calculations and analyses which are fraught with errors; and

- Proffered damage amounts which are misleading, unreliable, and unrelated to the damage amounts which were intended to be calculated; and

- Failed to present damages within a reasonable degree of professional certainty.

Based on the analyses I performed herein, it is my opinion that the damages are as set forth in Exhibit 1 to this report.

I understand that Plaintiff may be entitled to recover prejudgment interest on a damages award. In the event the Court requests a calculation of prejudgment interest, or other amounts, I reserve my right to provide additional calculations at a later date.

\*    \*    \*    \*    \*    \*

The procedures performed were limited to those described herein based on the documents provided to date and other information obtained. Information obtained subsequent to the date of this report may affect this analysis and this effect may be material. If requested, I will update my analysis.

My procedures were performed solely with respect to the above referenced litigation. This report is not to be reproduced, distributed, disclosed or used for any other purpose.

**EISNERAMPER LLP**

*Dana Trexler Smith*

Dana Trexler Smith, CPA/CFF                                 November 22, 2016

EXHIBIT A



EisnerAmper LLP
One Logan Square, Suite 3000
130 North 18th Street
Philadelphia, PA 19103-2757
T 215.881.8800
F 215.881.8801

www.eisneramper.com

## Dana Trexler Smith, CPA, CFF

Partner
dana.smith@eisneramper.com
D: 215.881.8147
C: 215.205.0098

### EDUCATION AND CERTIFICATIONS:

- Master's in Business Administration, University of Pennsylvania, The Wharton School (2001)
- Bachelors of Science, Accounting, and completed the requirements for a French major, Bucknell University (1994)
- Certified Public Accountant, Licensed in the Commonwealth of Pennsylvania (Certificate #CA-034551-L)
- Certified in Financial Forensics

### RANGE OF EXPERIENCE:

Dana Trexler Smith is EisnerAmper's Philadelphia Forensics, Litigation & Valuation Services practice leader where she specializes in providing expert testimony on damages in complex commercial and intellectual property disputes, performing forensic investigations, and conducting contract compliance engagements.

Ms. Trexler Smith's dispute experience includes assessing damages in litigation and arbitration matters for both plaintiffs and defendants in disputes involving alleged patent infringement, theft of trade secrets, breach of contract, post-acquisition earn-out and payment calculations, breach of employment agreements, business interruption losses, and insurance claim negotiations. Ms. Trexler Smith has evaluated and prepared economic damages in the form of lost profits, price erosion, unjust enrichment, reasonable royalties, diminution in value, and cost recovery in a variety of industries including: technology, pharmaceutical, biotechnology, medical devices, professional services, financial services, and manufacturing. Ms. Trexler Smith has also provided economic analysis utilized in injunction hearings.

Ms. Trexler Smith's forensic investigation experience includes leading and participating in both investigative and forensic accounting projects related to allegations of financial reporting fraud; management and/or employee embezzlement schemes; health care fraud and abuse; and violations of anti-corruption regulations, including the Foreign Corrupt Practices Act (FCPA) and UK Bribery Act. Ms. Trexler Smith is also experienced in performing integrity due diligence in connection with various acquisitions, investigations, and vetting potential business partners to identify risk relevant information related to the activities, background, reputation, relationships, and incidences of corruption.

Ms. Trexler Smith's contract compliance experience includes examining the underlying records supporting payments made under licensing agreements, supply agreements, manufacturing agreements, tolling agreements, and profit-sharing arrangements, where the payment terms are based on a metric under the control of one party in the agreement (e.g. net sales, net units shipped, actual manufacturing costs, etc.), to assess compliance with the payment terms under the agreement. Representative industries in which Ms. Trexler Smith has performed contract compliance examinations include: technology, pharmaceutical, biotechnology, medical device, security services, and manufacturing.



<u>**EMPLOYMENT HISTORY**</u>

**EisnerAmper LLP** – Forensics, Litigation and Valuation Services, Partner (August 2012 - Present)

**ParenteBeard LLC** – Forensics, Litigation and Valuation Services, Principal (February 2012- August 2012)

**PricewaterhouseCoopers, LLP** – Forensic Services, Director (2004 to February 2012)

**PricewaterhouseCoopers, LLP** – Forensic Services, Manager (1999 to 2004)

**Coopers & Lybrand / PricewaterhouseCoopers LLP** – Forensic Services Senior Associate, (1997 to 1999)

**Coopers & Lybrand** – Assurance, Senior Associate (1996 to 1997)

**Coopers & Lybrand** – Assurance, Associate, (1994 to 1996)


<u>**PROFESSIONAL EXPERIENCE:**</u>

- **Intellectual Property Dispute Experience**
  - Provided expert testimony on the reasonable royalty damages on behalf of a retail bank in an intellectual property dispute over method patents. The work included analysis of multiple settlement agreements related to the patents-in-suit and multiple non-disputed patents; apportionment of licensing fees to the patents in suit; and assessment of the economic impact of wide-spread licensing of the patents on the value of the technology in the marketplace.
  - Provided expert testimony relating to both lost profit and reasonable royalty damages on behalf of a food and beverages packaging company in a patent dispute.
  - Provided expert testimony in a design patent infringement matter on behalf of a medical device company. Key damage issues included the calculation of reasonable royalty and unjust enrichment damages.
  - Provided expert testimony on behalf of a medical device company in a theft of trade secrets matter. The analysis and opinions included utilizing certain documents maintained in the ordinary course of business to trace the movement of allegedly misappropriated product from the defendant's to the plaintiff's possession.
  - Led an engagement to quantify damages resulting from the alleged theft of trade secrets on behalf of a flavoring and fragrance company. Damage analyses included unjust enrichment, lost profits, future lost profits, quantification of development costs, and valuation of the alleged trade secrets.
  - Quantified reasonable royalty damages on behalf of a large chemicals conglomerate in an intellectual property dispute involving four method patents relating to fraction collection software. Key analyses involved evaluating the cost to design around the patents and available non-infringing alternatives.
  - Quantified the reasonable royalty damages on behalf of a large internet and cable service provider in an intellectual property dispute involving network traffic. The analysis involved evaluating the cost of design around, and profitability derived from use of the patented technology.
  - Quantified reasonable royalty damages on behalf of a multinational software and hardware corporation in an intellectual property dispute involving method patents involving relational databases. The key analyses included evaluating the economic circumstances of both parties at the hypothetical negotiation date, analysis of over 30 settlement agreements for the patents-in-suit, and evaluating the cost to design around the patents and available non-infringing alternatives.



- Quantified reasonable royalty damages in a patent dispute on behalf of an email marketing company. Damage issues included analysis of the cost to develop non-infringing design around alternatives and apportionment of the damages between for patents-at-issue, in the event that one or more of the patents were excluded from the case.
- Quantified reasonable royalty damages in a patent dispute on behalf of a household solutions company. Key damage issues included analysis of the total design cost for the product, non-infringing design around alternatives, analysis of the competitive relationship between the parties, and non-infringing contributions made by the allegedly infringing party to promote the success of the product.
- Determined the reasonable royalty rate and royalty base in a patent dispute involving web-site related technology. Key analyses included researching available information to estimate a reasonable royalty rate and calculate the associated damages.
- Quantified lost profits and determined the reasonable royalty rate and royalty base in a patent dispute involving an over-the-counter cold remedy product. Key analyses included determining and supporting the incremental profit for the product and researching the associated reasonable royalty rate.
- Calculated damages in the form of a reasonable royalty on behalf of a biotechnology patent owner asserting infringement claims against its largest competitor. Analysis centered on royalty damages, with particular focus on established royalties, licensing policies and history and industry profit trends.
- Determined the reasonable royalty rate in an intellectual property dispute involving the technology used in the production of lasers. Issues addressed were available non-infringing substitutes; past and future price erosion; and apportionment issues.
- Assisted Plaintiff Corporation in a claim for patent infringement claims for reasonable royalties in the semi-conductor industry.
- Provided a rebuttal report on behalf of a laser diode manufacturer on royalty damages claimed by patent owner. Analysis included database development of infringing sales, established royalty and reasonable royalty rate determination.
- Assisted counsel in settlement discussions by issuing an expert report in a patent infringement matter on behalf of a plaintiff in the septic system management industry.
- Calculated damages in the form of a reasonable royalty in a patent infringement matter on behalf of a medical device manufacturer. Issues included apportionment of the royalty base to product components covered by the patented technology.
- Calculated damages in the form of disgorged profits for a particular product line on behalf of a manufacturing company in connection with its defense in a theft of trade secrets matter. Analysis also included provision of rebuttal testimony to the plaintiff's lost profits claim.
- Assisted counsel in performing an analysis to determine the lost profits at issue in a patent infringement matter on behalf of a manufacturer of products designed to control contamination in pharmaceutical and biotechnology operations.
- Determined damages in the form of a reasonable royalty rate in a patent infringement matter on behalf of a manufacturer of medical devices. Issues included assessment of effective royalty rates and licensing terms in existing licensing agreements of the parties.
- Determined the damages in a matter of alleged theft of confidential information. Analysis included disgorged profits, apportionment, analysis of reasonable royalty rates, and lost profits.

- **Commercial Dispute Experience**
  - Provided expert testimony in an arbitration relating to a breach of contract dispute on behalf of an information solutions provider in the health care industry. Key issues included responding to the opposing expert's analysis of alleged lost profits, out-of-pocket costs, and mitigated damages.



- Provided expert testimony relating to the calculation of lost profit resulting from the Court's finding of a civil conspiracy between a financial institution and an employee at a collection agency.
- Opined on the earn-out amounts due in a post-acquisition dispute on behalf of a cable and satellite installation and support services company. The analysis included an assessment of the financial books and records pre-and post-acquisition, assessing market conditions, analysis of past accounting practices and whether they were in accordance with generally accepted accounting principles, and comparison of pre-acquisition financial targets and post-acquisition actual results, after adjusting for changes in the business.
- Opined on the alleged damages resulting from an employment dispute on behalf of a large chemicals company. Damage analyses included the assessment of alleged lost licensing revenues, lost profits and lost salary.
- Opined on the damages resulting from the alleged breach of a development agreement on behalf of a flavors and fragrance company. The damage analysis included responding to the opposing expert's damage opinion which included alleged lost profits and alleged lost opportunity costs.
- Provided a declaration on the financial aspects relating to irreparable harm contentions in an injunction hearing on behalf of a government contractor. The analysis centered around loss of market share, price erosion and suppressed contract value, loss of future sales, reputational damage, and the defendant's capacity to pay damages.
- Opined on the damages associated with the alleged breach of a partnership employment contract and discrimination and retaliation allegations on behalf of a law firm. Key damage issues included a critique of the opposing expert's damage model, analysis of the contractual payment terms, analysis of the plaintiff's business generation as compared to the benchmarking metrics which drive compensation, analysis of lost compensation and fringe benefits, and mitigation of damages.
- Opined on the damages allegedly suffered by a physician as a result of alleged defamation by an insurance company on behalf of the insurance company. Damage analyses included an assessment of the alleged decline in the number of patients, revenue per patient, and denied medical claims subsequent to the alleged defamation. The analyses also included lost new patient income, and an analysis of the physicians and practice tax returns.
- Opined on the lost earnings suffered as a result of a medical malpractice matter on behalf of a young woman. Analysis included an assessment of future earnings potential and analysis of out-of-pocket medical expenses.
- Opined on the lost earnings suffered as a result of a debilitating injury on behalf of a career woman. Analysis included an assessment of future earnings potential, lost benefits, lost investment income, and an analysis of out-of-pocket medical expenses.
- Responded to an opposing expert's damage calculation in a false advertising, unfair competition, and trade libel matter on behalf of a developer of monitoring technologies and products in the health care industry. Damage issues included an analysis of lost profits and assessment of the establishment of a causal link between the alleged bad acts and the alleged damages.
- Led the determination of the methodology by which to allocate a damage award between two plaintiffs, which resulted from the successful litigation of an intellectual property dispute. The analysis included analyzing the agreements in place between the parties, and analysis of litigation costs borne by each of the parties.
- Responded to an opposing expert's damage calculation in a contract dispute over royalties paid for access to mineral rights. Issues included interpretation of contract provisions, recalculation of royalties paid to the land owner, and evaluation of transportation costs.



- Prepared the submissions and responses to the arbitrator on the working capital adjustment required under a purchase agreement on behalf of a multinational pharmaceutical company. Key areas of disputed items related to accounts receivable reserves, inventory reserves, write-off of fixed assets, and analysis of the priority of past practices and generally accepted accounting principles.
- Prepared the submissions and responses to the arbitrator on the working capital adjustment required under a purchase agreement on behalf of a medical devices company. Key areas of disputed items related to accounts receivable reserves, inventory reserves, and analysis of the priority of past practices and generally accepted accounting principles.
- Prepared an expert opinion concerning the purchase price due based on an earn-out calculation formula for the sale of a pharmacy operation. Analysis included preparation of pro forma results in order to complete the earn-out analysis.
- Calculated the damages in a contract dispute involving a third party health care claims administrator and one of its clients. Our analysis included reconstructing the claims billed and the various components comprising each invoice over a six year period.

- **Contract Compliance Examinations**
  - Led a contract compliance examination engagement relating to the royalties paid under an agreement between a specialty pharmaceutical company and the licensor. Underpayments identified included missed payments, failure to pay annual minimum payments, and failure to pay licensing fees on royalty income obtained through sublicensing arrangements.
  - Led a contract compliance examination relating to a manufacturing agreement for a large medical device company where payments were based on the use of actual manufacturing cost. Non-compliance in the calculation of actual manufacturing cost was identified, as estimated costs were included in the calculation.
  - Led a pilot licensing compliance examination program for a large international software company. User access non-compliance was identified for several customers. The company is in the process of rolling out the licensing compliance initiative on a larger scale for its US based operations, based on PwC's findings and with PwC's assistance.
  - Assisted a medical device company to prepare its documentation for an independent examination of its books and records under the audit clause in a licensing agreement. Consultation included, but was not limited to: an evaluation of the available documentation, identification of any information gaps, identification of potential findings and issues, analysis of the agreement to identify any language where there was potential for interpretation issues.
  - Represented a US based biotech company in its contract compliance review of a worldwide seller of pharmaceuticals. Specific non-compliance was identified related to governmental pricing allowances and discounts.
  - On behalf of a European University, led a licensing engagement that focused on a multi-national pharmaceutical company's compliance with a complex compound license. Record keeping and interpretation issues led to anticipated license fees.
  - Assisted an entrepreneurial health care client position itself to maximize the value of its intellectual property. Our work included preparing a model for use in the business plan, assisting in writing the business plan and providing introductions to individuals in the health care industry.

- **Corporate Forensic Investigations & Business Interruption**
  - Testified in a matter on behalf of a local government, wherein the methodology employed to distribute taxes collected among the various municipalities and school districts was in dispute. The



engagement included opining on the reasonableness of the allocation methodology employed, based on the information available, recognizing inherent data limitations.

- Led the calculation of a business interruption claim for a retail security and loss prevention company after a hurricane damaged its factories in Puerto Rico and The Dominican Republic. The analysis involved determining the number of its radio frequency ("RF") tags which would have been produced during the period when the factories were not operational. This product was not maintained in inventory by retail chains and the insured did not have an inventory sufficient to meet customer demand during the factory shut-downs. As a result, if a retailer sold a product without a RF tag, the insured experienced a lost sale. The analysis required estimating the lost sales and a determination of operating profit for both facilities.
- Led an investigation on behalf of a U.S.-based company into the intentional misappropriation of assets by an employee in South America. The analysis included investigating the nature of expenses submitted by this employee, reviewing e-mail and voice mail communications for certain individuals, interviewing company personnel, obtaining an understanding of the control environment, and performing an analysis into the financial statements of the company.
- Analyzed the appropriateness of certain accounting transactions between related companies. The analysis involved investigating the transfer of obligations and appropriate accounting treatment of those transactions.
- Led an investigation of a paper and cardboard manufacturer who was experiencing missing inventory. The analysis involved tracing the flow of inventory through the manufacturing facility into the production of the final goods.
- Led an investigation into the intentional misconduct of an employee at an insurance company resulting in improper accounting transactions. Issues included illegal underwriting of insurance policies, gaps in insurance coverage, and misstated receivable and reserve balances.

- **Health Care Fraud & Abuse and Other Health Care Experience**
  - Performed calculations of the potential financial exposure relating to government investigations of Average Wholesale Prices and Best Prices used by Medicaid and Medicare to reimburse for pharmaceutical drugs. The work performed on behalf of the pharmaceutical companies included utilizing knowledge of the Medicaid and Medicare billing regulations, analyzing financial trends and source data, and developing models to calculate the potential financial exposure utilizing various assumptions.
  - Calculated a large pharmaceutical company's Medicaid rebate exposure resulting from changes in its best price determination for a cold and allergy remedy product.
  - Calculated a large generic pharmaceutical company's Medicaid rebate exposure resulting from changes in its reported average wholesale price for a respiratory product.
  - Assisted a health care provider with its investigation into and defense of alleged criminal violations of the False Claims Act. Analysis included reviewing documents and conducting interviews to obtain an understanding of the processes by which the business operated. A written report was submitted to the client and other constituents, including the Department of Justice.
  - Participated in an investigatory defense engagement surrounding a national physician billing service whose billing, coding and credit balance practices were challenged by the Department of Justice.
  - Assisted in the due diligence of a health care provider and a provider of durable medical equipment who were acquisition targets. Work performed involved evaluating the compliance procedures in place, evaluating the overall control environment, and conducting interviews of company personnel.



- Managed a "self-audit" of an ambulance carrier who was requested by its intermediary to perform a review of its submitted claims within a certain time period. Work performed entailed reviewing the billing records of the ambulance carrier, the Explanation of Medical Benefits ("EOMB") from the intermediary, and assessing medical necessity and general compliance with Medicare Regulations.
- Assisted in the development and writing of a compliance program for a large hospital system.
- Conducted compliance audits relating to Corporate Integrity Agreements.
- Performed financial audits of healthcare providers, including teaching hospitals and pharmaceutical companies.

- **Corporate Intelligence**
  - Led multiple corporate intelligence engagements on behalf of an oilfield products and services company, a global financial services company, an offshore oil and gas company, a large investment company, a large telecommunications company, water treatment products and services company, pharmaceutical companies, an aerospace engineering company, and retails companies. Analysis involved identifying risk relevant information available in the public domain to assist executives and organizations mitigate third party corruption risk.

PROFESSIONAL AND BUSINESS AFFILIATIONS:
- American Institute of Certified Public Accountants – Member (1996 to the present)
- Pennsylvania Institute of Certified Public Accountants – Member (1995 to the present)
- American Bar Association – Associate Member (2010 to the present)
- Pennsylvania Bar Association – Associate member (2010 to the present)
- Intellectual Property Owners Association – Member (2016)
- Licensing Executive Society – Member (2013 to the present)
- Women of EisnerAmper Committee – Philadelphia Chairperson (2014 to present)
- Bucknell University Alumni Association of Philadelphia – Member (1994 to the present); Co-President (2005 to 2007)
- Philabundance – Finance Committee Member (2005 to 2009)
- Philabundance – Board of Directors (2006 to 2009)
- PricewaterhouseCoopers' Great Place to Work Leadership Committee - Chair of People Development & Coaching Committee (2002 to 2011)

FOREIGN LANGUAGE CAPABILITIES:
- French – Proficiently read, speak, and write

PRESENTATIONS:
- "Show Me the Money – A Primer on Lanham Act Damages" – New York Intellectual Property Lawyers, Association, Uniondale, New York
- "How to Effectively Explain Damages to a Jury" – DRI Business Litigation Seminar, Nashville, Tennessee, May 5, 2016
- "The Yates Memo – What You and Your Audit Committee Need to Know" – The Institute of Internal Auditors Philadelphia Chapter, Philadelphia, Pennsylvania, April 29, 2016



- "Effective Uses of Financial Experts" - Legal Intelligencer Litigation Summit, Philadelphia, April 6, 2016
- "Forensic Accounting & Litigation: Hot Buttons in 2016 LIVE Webcast" – The Knowledge Group, March 17, 2016
- "Threat and Fraud Analytics" – The Institute of Internal Auditors Philadelphia Chapter, Philadelphia, PA, November 23, 2015
- "Accountant's Role in Forensic Investigations and Disputes" – Brindisi Tax Academy, Radnor, PA, November 19, 2015
- "Effective Uses of Financial Experts" – Pennsylvania Bar Institute 9th Annual Intellectual Property Law Institute, Philadelphia, PA, April 29, 2015
- "Hot Topics in Corporate Internal Investigations" – Legal Intelligencer Litigation Summit, Philadelphia, April 10, 2015
- "Trends in IP Damages" – CenterForce IP Strategy Summit: Enforcement – NYC, March 26, 2015
- "Foreign Corrupt Practices Act: The Law, Current Trends, and Compliance" – New Jersey Legal Journal – In House Counsel Seminar, September 16, 2014
- "Management 101 Concepts and Applications: Building a Successful Company in Today's World" – Bucknell Professional Network, September 9, 2014
- "Deal Valuation & Maximizing Potential" – Boston Patent Law Association - License Committee Seminar, May 1, 2014
- "Deposing Financial Experts" – Pennsylvania Bar Association, April 23, 2014
- "Trends and Considerations in Intellectual Property Damage Calculations", Philadelphia Bar Association, Intellectual Property Committee, October 9, 2013
- "Vetting and Screening Third Parties: How to Uncover Corrupt Behavior and Prevent Vicarious Liability" – American Conference Institute Foreign Corrupt Practices Association Boot Camp, San Francisco, CA, September 27, 2011
- "Dana Trexler Smith on Third-Party Risks in an Era of Increased Anti-corruption Enforcement", Bulletproof Blog™, February 3, 2011
- "Raising Awareness of Fraud & Integrity Issues", PricewaterhouseCoopers' Year-end Alumni Event, December 3, 2010
- "Hot Topics in Bribery and Foreign Corruption Panel Session" – PricewaterhouseCoopers' Year-end Alumni Event, December 7, 2009
- "Proving Damages in Commercial Disputes – Perspectives for Counsel from the Expert" – Pennsylvania Bar Institute Conference, July 22, 2005
- "Understanding Financial Statements" – Association of Corporate Counsel Conference in Washington, D.C., November 13, 1998

<u>**PUBLICATIONS:**</u>

- "The Benefits of Game Theory in Negotiations and Mediations", co-authored with Gary H. Levin of BakerHostetler, *The Legal Intelligencer*, October 6, 2015
- "Compliance Monitoring Just Makes Good Business Sense", *Pennsylvania Institute of Certified Public Accountants Journal*, Spring 2013
- "Expert Discusses Contract Audit and IP Damages Calculation", *Metropolitan Corporate Counsel*, Volume 21, No. 2, February 2013
- "Franchisors: Exercise Your Contractual Rights", *E-Commerce Law & Strategy*, Volume 24, Number 11,



March 2008



| Date | Jurisdiction | Type | Matter |
|------|-------------|------|--------|
| 2016 | United States District Court District of Delaware | Deposition | TL of Florida, Inc. v. Terex Corporation, d/b/a Terex Construction Americas |
| 2016 | United States Court of Chancery of the State of Delaware | Trial | inTEAM Associates, LLC, as successor-in-interest to School-Link Technologies, Inc. v. Heartland Payment Systems, Inc. (11523-VCN) |
| 2016 | United States Court of Chancery of the State of Delaware | Deposition | inTEAM Associates, LLC, as successor-in-interest to School-Link Technologies, Inc. v. Heartland Payment Systems, Inc. (11523-VCN) |
| 2015 | American Arbitration Association Porter County, Indiana | Arbitration | Metal Services LLC, d/b/a Phoenix Services LLC v. ArcelorMittal Burns Harbor LLC |
| 2015 | American Arbitration Association Porter County, Indiana | Deposition | Metal Services LLC, d/b/a Phoenix Services LLC v. ArcelorMittal Burns Harbor LLC |
| 2015 | Court of Common Pleas Lebanon County, Pennsylvania | Trial | City of Lebanon, Jonestown Borough, North Cornwall Township, North Lebanon Township, North Londonderry Township, Northern Lebanon School District, Palmyra Area School District, South Lebanon Township, South Londonderry Township, Swatara Township, Union Township, and West Lebanon Township vs. Cornwall Borough, Heidelberg Township, North Annville Township, West Cornwall Township, and Bethel Township (2012-01222) |
| 2015 | United States Court of Chancery of the State of Delaware | Trial | Revolution Retail Systems, LLC v. Sentinel Technologies, Inc., Tidel, Inc., Tidel Engineering, LP (10605-VCP) |



ACCOUNTANTS & ADVISORS

## Dana Smith, CPA, CFF

**Federal Rule 26 Disclosures - Testimony**

| **Date** | **Jurisdiction** | **Type** | **Matter** |
|---|---|---|---|
| 2015 | United States Court of Chancery of the State of Delaware | Deposition | Revolution Retail Systems, LLC v. Sentinel Technologies, Inc., Tidel, Inc., Tidel Engineering, LP (10605-VCP) |
| 2014 | United States District Court Eastern District of Pennsylvania | Deposition | Branch Banking and Trust Company v. Maxim Integrated Products, Inc. (2:12-cv-00945-JFC) |
| 2014 | Court of Common Pleas Lebanon County, Pennsylvania | Deposition | City of Lebanon, Jonestown Borough, North Cornwall Township, North Lebanon Township, North Londonderry Township, Northern Lebanon School District, Palmyra Area School District, South Lebanon Township, South Londonderry Township, Swatara Township, Union Township, and West Lebanon Township vs. Cornwall Borough, Heidelberg Township, North Annville Township, West Cornwall Township, and Bethel Township (2012-01222) |
| 2014 | American Arbitration Association | Arbitration | Allscripts Healthcare, LLC v. Etransmedia Technology, Inc. (31 117 00223 13) |
| 2013 | United States District Court Eastern District of Pennsylvania | Deposition | Synthes, Inc., Synthes USA HQ, Inc., Synthes USA, LLC, Synthes USA Sales, LLC, and Synthes USA Products, LLC v. Emerge Medical, Inc., f/k/a Emerge Surgical, Inc., John P. Marotta, Zachary W. Stassen, Eric W. Brown, Charles Q. Powell, and John Does 1-10 (2:11-cv-01566-RB) |
| 2006 | Superior Court for the State of Delaware | Deposition | Empire Financial Services, Inc. v. The Bank of New York (00C-09-235 SCD) |
| 2007 | Superior Court for the State of Delaware | Deposition | Empire Financial Services, Inc. v. The Bank of New York (00C-09-235 SCD) |

EisnerAmper LLP
www.eisneramper.com



**Dana Smith, CPA, CFF**

**Federal Rule 26 Disclosures - Testimony**

| *Date* | *Jurisdiction* | *Type* | *Matter* |
|---|---|---|---|
| 2001 | United States District Court Western District of Pennsylvania | Arbitration | National Roll Company v. United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union |

# EXHIBIT B

**Documents Considered**

| Bates Range | Document Description |
|---|---|
| | **Documents Filed with the Court** |
| | Complaint and related Exhibit A, dated December 3, 2015 |
| | Amended Complaint, dated December 11, 2015 |
| | Answer and Affirmative Defenses in Response to Plaintiff's First Amended Complaint, dated March 11, 2016 |
| | Defendant Ampush Media, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories, dated March 24, 2016 |
| | Defendant's Response to Plaintiff's First Set of Interrogatories to Defendant, DGS Media, Inc., updated March 30, 2016 |
| | Defendant's Response to Plaintiff's Second Set of Interrogatories to Defendant, DGS EDU, LLC, dated March 30, 2016 |
| | Defendant's Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories to Defendant, DGS Media, Inc., dated March 30, 2016 |
| | Plaintiff Connectus LLC d/b/a Degree Advisor's Notice of Deposition, dated September 19, 2016 |
| | Defendant DGS EDU, LLC's Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories, dated October 14, 2016 |
| | Defendant's Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories to Defendant, DGS EDU, LLC, dated October 14, 2016 |
| | Defendant DGS EDU, LLC's Responses and Objections to Plaintiff's First Request of Admissions, dated October 19, 2016 |
| | Defendant's Responses and Objections to Plaintiff's Third Set of Interrogatories to Defendant, DGS EDU, LLC, dated October 19, 2015 |
| | Defendant's Responses and Objections to Plaintiff's Third Request for Production of Documents, dated October 19, 2016 |
| | Answer and Affirmative Defenses in Response to Amended Complaint, dated January 29, 2016 |
| | Case Management and Scheduling Order, dated February 12, 2016 |
| | |
| | **Expert Reports** |
| | Expert Report of Douglas Kidder and related Exhibits 1-10, dated November 8, 2016 |
| | Questions related to source documents for Kidder Exhibit 3.5 |

**Documents Considered**

| Bates Range | Document Description |
|---|---|
| | **Depositions** |
| | Depositions of Michael Darval, dated November 3 and 4, 2016 |
| | Deposition of Matthew Mayberry, Volume 1, dated October 24, 2016 |
| | Deposition (Rough Transcript) of Kolin Porter, dated October 13, 2016 |
| | Deposition of Jesse Puji, dated October 25, 2016 |
| | **Plaintiff Bates Labeled Documents** |
| CONN 002926  CONN 002929 | |
| CONN 002930  CONN 002933 | |
| CONN 002933  CONN 002942 | |
| CONN 002943  CONN 002948 | |
| CONN 002947  CONN 002948 | |
| CONN 002949 | |
| CONN 002980  CONN 002984 | |
| CONN 002985 | |
| CONN 003053  CONN 003064 | |
| CONN 003065  CONN 003068 | |
| CONN 003392  CONN 003396 | |
| CONN 003397  CONN 003458 | |
| | **Defendant Bates Labeled Documents** |
| AMP000123 | |
| AMP000124 | |
| AMP000125 | |
| AMP000126 | |
| AMP000127 | |
| AMP000128 | |
| AMP000129 | |
| AMP000130 | |
| AMP000131 | |
| AMP000132 | |
| AMP000133 | |
| AMP000134 | |

Highly Confidential – Attorneys Eyes Only

Documents Considered

| Bates Range | Document Description |
|---|---|
| AMP000135 | |
| AMP000136 | |
| AMP000137 | |
| AMP000138 | |
| AMP000139 | |
| AMP000140 | |
| AMP000141 | |
| AMP000142 | |
| AMP000143 | |
| AMP000144 | |
| AMP000145 | |
| AMP000146 | |
| AMP000147 | |
| AMP000148 | |
| AMP000149 | |
| AMP000153 | |
| AMP000154 | |
| AMP000155 | |
| AMP000156 | |
| AMP000157 | |
| AMP000158 | |
| AMP000159 | |
| AMP000160 | |
| AMP000161 | |
| AMP000162 | |
| AMP000163 | |
| AMP000164 | |
| AMP000167 | |
| AMP000168 | |
| AMP000169 | |
| AMP000170 | |
| AMP000171 | |
| AMP000172 | |
| AMP000173 | |
| AMP000174 | |

Highly Confidential – Attorneys Eyes Only

**Documents Considered**

| Bates Range | Document Description |
|---|---|
| AMP000175 | |
| AMP000176 | |
| AMP000177 | |
| AMP000178 | |
| AMP000179 | |
| AMP000180 | |
| AMP000181 | |
| AMP000182 | |
| AMP000183 | |
| AMP000184 | |
| AMP000185 | |
| AMP000186 | |
| AMP000187 | |
| AMP000330 | |
| AMP000331 | |
| AMP000332 | |
| DGS000027 | |
| DGS000028 | |
| DGS000035 | |
| DGS000038 | |
| DGS000039 – DGS000040 | |
| DGS000049 – DGS000050 | |
| DGS000058 | |
| DGS000059 – DGS000060 | |
| DGS000074 | |
| DGS000100 | |
| DGS000101 | |
| DGS000102 | |
| DGS000112 – DGS000113 | |
| DGS000163 | |
| DGS000164 | |
| DGS000165 | |
| DGS000166 | |
| DGS000167 | |
| DGS000168 | |

Highly Confidential – Attorneys Eyes Only

**Documents Considered**

| Bates Range | Document Description |
|---|---|
| DGS000169 | |
| DGS000170 | |
| DGS000171 | |
| DGS000172 | |
| DGS000173 | |
| DGS000174 | |
| DGS000175 | |
| DGS000176 | |
| DGS000177 | |
| DGS000178 | |
| DGS000179 | |
| DGS000180 | |
| DGS000181 | |
| DGS000182 | |
| DGS000183 | |
| DGS000184 | |
| DGS000185 | |
| DGS000186 | |
| DGS000187 | |
| DGS000188 | |
| DGS000189 | |
| DGS000190 | |
| DGS000191 | |
| DGS000192 | |
| DGS000193 | |
| DGS000194 | |
| DGS000195 | |
| DGS000196 | |
| DGS000197 | |
| DGS000198 | |
| DGS000199 | |
| DGS000200 | |
| DGS000201 | |
| DGS000202 | |
| DGS000203 –<br>DGS000211 | |

Highly Confidential – Attorneys Eyes Only

## Documents Considered

| Bates Range | Document Description |
|---|---|
| DGS000212 | |
| DGS000222 | |
| DGS000226 | |
| DGS000229 | |
| DGS000230 | |
| DGS000250 | |
| DGS000274 | |
| DGS000281 | |
| DGS000221 | |
| DGS000225 | |
| DGS000227 | |
| DGS000249 | |
| DGS000273 | |
| DGS000280 | |
| DGS000287 | |

**Defendant Non-Bates Labeled Documents**
DGS EDU Ancillary Revenue-COS-Nov '13-Oct '15.xlsx
Ancillary Data Records Posted Count.xlsx
ampush.edu - Ancillary Data Revenue - Allocated to eDegree - ATTORNEY CLIENT PRIVILEGED
CONFIDENTIAL WORK PRODUCT.xlsx

**Correspondence**
Letter from Tom Long, counsel for Plaintiff to Ashcroft Law Firm, counsel for Defendant, dated April 6, 2016
Plaintiff Mediation Statement, dated April 18, 2016
Letter from Duric Tangri to Ashcroft Law Firm regarding Deposition Notice and Protective Order, dated September 16, 2016
Letter from Ashcroft Law Firm to Duric Tangri regarding Discovery, dated October 10, 2016
Letter from Duric Tangri to Ashcroft Law Firm regarding Plaintiff's production Bates labeled CONN 003069 - CONN 003203, dated October 10, 2016
Letter from Ashcroft Law Firm to Duric Tangri regarding Discovery Dispute, dated October 11, 2016

**Research**
Digital Globe Services, Ltd. Annual Report, dated June 30, 2016
Digital Globe Services, Ltd. Annual Report FY 2015, dated June 30, 2015
http://www.ampush.com/
Statement on Standards for Valuation Services 1, "Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset, June 2007

Highly Confidential – Attorneys Eyes Only

# EXHIBIT 1

Exhibit 1

# Connectus LLC d/b/a eDegree Advisor v. Ampush Media, Inc., and DGS EDU, LLC
## Summary of Damages

**Scenario I**

If the Court finds that Section 13 applies and interprets it to mean that the parties have waived damages, then damages for each of the Defendants is as follows:

| | |
|---|---|
| Ampush | $0 |
| DGS EDU | $0 |

**Scenario II**

Damages are limited to the payments made to eDegree in the 12 months preceding the event giving rise to the claim, if the Court determines that the Damages Waiver in Scenario I is inapplicable to this matter, but the damages limitation from Section 13 of the Agreement applies. The resulting damages under Scenario II depend on the date at which the Court determines the causes of action to have begun. I have provided the payments received by eDegree during the course of the agreement in Exhibit 6, which can be used to calculate damages based on the date of the cause of action as determined by the court.

**Scenario III**

If the Court applies an unjust enrichment damages methodology in the form of Defendants' profits, then the damages are as summarized below:

| | Defendants' Profits | |
|---|---|---|
| Ampush | $ | 101,221 |
| DGS EDU | | 807,814 |
| Total | $ | 909,035 |

Amounts subject to rounding.

Highly Confidential
Attorneys Eyes Only

# EXHIBIT 2

Exhibit 2

# Connectus LLC d/b/a eDegree Advisor v. Ampush Media, Inc., and DGS EDU, LLC
## Summary of Defendants' Profits

| Notes | Category | | 2013 | | 2014 | | 2015 | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | **Ampush** | | | | | | | | |
| 1 | Ancillary Data Sales | $ | 77,769 | $ | - | $ | - | $ | 77,769 |
| 1 | Secondary Qualified Leads | | 23,452 | | - | | - | | 23,452 |
| | Subtotal | $ | 101,221 | $ | - | $ | - | $ | 101,221 |
| | **DGS EDU** | | | | | | | | |
| 1 | Ancillary Data Sales | $ | 31,122 | $ | 339,395 | $ | 399,139 | $ | 769,656 |
| 1 | Secondary Qualified Leads | | 4,832 | | 21,067 | | 12,259 | | 38,158 |
| | Subtotal | $ | 35,954 | $ | 360,462 | $ | 411,398 | $ | 807,814 |
| | **Combined** | | | | | | | | |
| 1 | Ancillary Data Sales | $ | 108,891 | $ | 339,395 | $ | 399,139 | $ | 847,425 |
| 1 | Secondary Qualified Leads | | 28,284 | | 21,067 | | 12,259 | | 61,609 |
| | **Combined Total** | $ | 137,175 | $ | 360,462 | $ | 411,398 | $ | 909,035 |

**Notes:**

1 - See Exhibit 3.

Amounts subject to rounding.

Highly Confidential
Attorneys Eyes Only

# EXHIBIT 3

Exhibit 3

Page 1 of 1

# Connectus LLC d/b/a eDegree Advisor v. Ampush Media, Inc., and DGS EDU, LLC
## Damages Scenario III - Defendants' Profits

| Notes | Ancillary Data Sales | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|
| 1 | Ampush Unjust Sales | $ 77,769 | $ - | $ - | $ 77,769 |
| 1 | DGS EDU Unjust Sales | 31,122 | 339,395 | 399,139 | 769,656 |
| 2 | (Incremental Costs) | - | - | - | - |
| | **Defendants' Profits Subtotal** | $ 108,891 | $ 339,395 | $ 399,139 | $ 847,425 |

| Notes | Secondary Qualified Leads | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|
| | **Ampush** | | | | |
| 3 | Secondary Qualified Leads Unjust Sales | $ 37,570 | $ - | $ - | $ 37,570 |
| 3 | (Incremental Costs) | (14,118) | - | - | (14,118) |
| | **Ampush Profits** | $ 23,452 | $ - | $ - | $ 23,452 |
| | **DGS EDU Profits** | | | | |
| 3 | Secondary Qualified Leads Unjust Sales | $ 6,878 | $ 37,516 | $ 37,059 | $ 81,453 |
| 3 | (Incremental Costs) | (2,046) | (16,449) | (24,800) | (43,295) |
| | **DGS EDU Profits** | $ 4,832 | $ 21,067 | $ 12,259 | $ 38,158 |
| | **Combined** | | | | |
| | Secondary Qualified Leads Unjust Sales | $ 44,448 | $ 37,516 | $ 37,059 | $ 119,023 |
| | (Incremental Costs) | (16,164) | (16,449) | (24,800) | (57,414) |
| | **Defendants' Profits on Secondary Qualified Leads** | $ 28,284 | $ 21,067 | $ 12,259 | $ 61,609 |

**Notes:**

1 - Exhibit 4. June to October 2013 relates to Ampush and November 2013 to October 2015 relates to DGS EDU.

2 - While there are incremental costs related to ancillary data sales, they are de minimis when allocated only to the records at issue.

3 - Exhibit 5. June to October 2013 relates to Ampush and November 2013 to October 2015 relates to DGS EDU.

Amounts subject to rounding.

Highly Confidential
Attorneys Eyes Only

# EXHIBIT 4

Exhibit 4

## Connectus LLC d/b/a eDegree Advisor v. Ampush Media, Inc., and DGS EDU, LLC
### Defendants' Profits - Ancillary Data Sales

| Time Period | Total Posts[1] | eDegree Record Posts[2] | Percentage of eDegree Posts to Total Posts[3] | Total Ancillary Data Sales Revenue[4] | Allocated eDegree Ancillary Data Sales Revenue[5] |
|---|---|---|---|---|---|
| Jun 2013 | 212,130 | 22,995 | 10.8% | $ 68,525 | $ 7,401 |
| Jul 2013 | 241,373 | 48,069 | 19.9% | 72,100 | 14,348 |
| Aug 2013 | 249,444 | 61,934 | 24.8% | 60,059 | 14,895 |
| Sep 2013 | 241,421 | 65,112 | 27.0% | 85,285 | 23,027 |
| Oct 2013 | 231,504 | 73,496 | 31.7% | 57,091 | 18,098 |
| Nov 2013 | 135,056 | 41,592 | 30.8% | 51,158 | 15,757 |
| Dec 2013 | 138,115 | 43,667 | 31.6% | 48,623 | 15,365 |
| Jan 2014 | 169,193 | 58,631 | 34.7% | 62,819 | 21,798 |
| Feb 2014 | 144,745 | 53,570 | 37.0% | 59,011 | 21,834 |
| Mar 2014 | 138,961 | 40,388 | 31.2% | 55,711 | 17,382 |
| Apr 2014 | 179,479 | 58,492 | 32.6% | 65,157 | 21,241 |
| May 2014 | 224,616 | 74,712 | 33.3% | 78,342 | 26,088 |
| Jun 2014 | 213,580 | 65,785 | 30.8% | 67,081 | 20,661 |
| Jul 2014 | 271,762 | 97,479 | 35.9% | 79,766 | 28,636 |
| Aug 2014 | 299,170 | 97,337 | 32.5% | 90,611 | 29,449 |
| Sep 2014 | 339,197 | 106,251 | 31.3% | 136,204 | 42,632 |
| Oct 2014 | 382,171 | 136,801 | 35.8% | 128,410 | 45,971 |
| Nov 2014 | 367,983 | 147,541 | 40.1% | 75,337 | 30,210 |
| Dec 2014 | 422,828 | 162,196 | 38.4% | 87,221 | 33,493 |
| Jan 2015 | 525,389 | 219,245 | 41.7% | 102,943 | 42,927 |
| Feb 2015 | 480,947 | 214,101 | 44.5% | 90,487 | 40,267 |
| Mar 2015 | 506,149 | 200,619 | 39.6% | 99,098 | 39,243 |
| Apr 2015 | 494,863 | 188,678 | 38.1% | 94,619 | 36,050 |
| May 2015 | 493,572 | 183,322 | 37.1% | 90,174 | 33,455 |
| Jun 2015 | 552,714 | 203,139 | 36.8% | 99,333 | 36,555 |
| Jul 2015 | 621,164 | 211,981 | 34.1% | 126,068 | 42,989 |
| Aug 2015 | 600,537 | 209,191 | 34.8% | 141,113 | 49,107 |
| Sep 2015 | 554,647 | 194,000 | 35.0% | 114,175 | 39,961 |
| Oct 2015 | 536,483 | 179,379 | 33.4% | 115,524 | 38,585 |
| Total | 9,959,193 | 3,459,593 | 34.7% | $ 2,502,045 | $ 847,425 |
| | | | | | |
| Ampush Total | 1,175,872 | 271,606 | | $ 343,060 | $ 77,769 |
| DGS EDU Total | 8,783,321 | 3,187,987 | | $ 2,158,985 | $ 769,656 |

Notes:

1 - "Ampush edu - Ancillary Data Revenue - Allocated to eDegree" for the period June 2013 to October 2013; and DGS000229 for the period from November 2013 through October 2015.

2 - "Ampush edu - Ancillary Data Revenue - Allocated to eDegree" and DGS000164-168 for the period June 2013 to October 2013; and DGS000229 and DGS000165-192 for the period from November 2013 through October 2015.

3 - [3] = [2] / [1].

4 - "Ampush edu - Ancillary Data Revenue - Allocated to eDegree" for the period June 2013 to October 2013; and "DGS EDU Ancillary Rev-COS-Nov13-Oct15".

5 - [5] = [3] x [4].

Amounts subject to rounding.

Highly Confidential
Attorneys Eyes Only

# EXHIBIT 5

Exhibit 5

Page 1 of 1

**Connetta LLC d/b/a eDegree Advisor v. Ampush Media, Inc., and DGS EDU, LLC**
**Analysis of Secondary Qualified Leads**

| Time Period | eDegree Submitted Records [10] | | | eDegree Unsubmitted Records | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number of Secondary Qualified Sales [1] | Revenue from Secondary Qualified Sales [7] | Payment to Affiliate [2] | Number of Secondary Qualified Sales [5] | Revenues from Secondary Qualified Sales [8] | Payment to Affiliate [6] | Number of Secondary Qualified Sales [9] | Revenues from Secondary Qualified Sales [9] | Payment to Affiliate [9] |
| Jun 2013 | 22 $ | 638 $ | 316 $ | 124 $ | 3,229 $ | 1,302 $ | 146 $ | 3,867 $ | 1,618 |
| Jul 2013 | 31 | 817 | 596 | 188 | 5,210 | 1,974 | 219 | 6,027 | 2,480 |
| Aug 2013 | 35 | 1,025 | 466 | 279 | 8,194 | 2,930 | 314 | 9,219 | 3,396 |
| Sep 2013 | 37 | 1,112 | 521 | 307 | 8,384 | 3,224 | 344 | 9,496 | 3,744 |
| Oct 2013 | 24 | 736 | 372 | 239 | 8,225 | 2,510 | 263 | 8,961 | 2,881 |
| Nov 2013 | 6 | 278 | 83 | 122 | 4,651 | 1,280 | 128 | 4,929 | 1,364 |
| Dec 2013 | 1 | 20 | 11 | 65 | 1,929 | 672 | 66 | 1,949 | 683 |
| Jan 2014 | 4 | 77 | 43 | 70 | 1,828 | 735 | 74 | 1,905 | 778 |
| Feb 2014 | 3 | 104 | 20 | 55 | 1,807 | - | 58 | 1,911 | 20 |
| Mar 2014 | 3 | 115 | 20 | 28 | 907 | - | 31 | 1,022 | 20 |
| Apr 2014 | 0 | - | - | 50 | 1,191 | - | 50 | 1,191 | - |
| May 2014 | 3 | 113 | - | 53 | 1,415 | - | 56 | 1,528 | - |
| Jun 2014 | 3 | 125 | 22 | 106 | 2,990 | - | 109 | 3,115 | 22 |
| Jul 2014 | 3 | 91 | - | 205 | 5,510 | - | 208 | 5,601 | - |
| Aug 2014 | 4 | 139 | 108 | 172 | 4,511 | 4,158 | 176 | 4,650 | 4,266 |
| Sep 2014 | 3 | 91 | 76 | 106 | 3,960 | 2,862 | 109 | 4,051 | 2,938 |
| Oct 2014 | 2 | 115 | 49 | 111 | 4,741 | 2,997 | 113 | 4,856 | 3,046 |
| Nov 2014 | 2 | 180 | 54 | 84 | 3,713 | 2,268 | 86 | 3,893 | 2,322 |
| Dec 2014 | 6 | 266 | 148 | 107 | 3,527 | 2,889 | 113 | 3,793 | 3,037 |
| Jan 2015 | 3 | 158 | 81 | 160 | 5,316 | 4,320 | 163 | 5,474 | 4,401 |
| Feb 2015 | 6 | 206 | 175 | 108 | 4,441 | 2,916 | 114 | 4,647 | 3,091 |
| Mar 2015 | 5 | 185 | 130 | 87 | 3,805 | 2,349 | 92 | 3,994 | 2,479 |
| Apr 2015 | 3 | 151 | 109 | 119 | 5,009 | 3,213 | 122 | 5,160 | 3,322 |
| May 2015 | 3 | 160 | 109 | 51 | 2,095 | 1,377 | 54 | 2,255 | 1,486 |
| Jun 2015 | 6 | 230 | 153 | 49 | 2,389 | 1,323 | 55 | 2,619 | 1,476 |
| Jul 2015 | 3 | 97 | 67 | 151 | 5,977 | 4,077 | 154 | 6,074 | 4,144 |
| Aug 2015 | 1 | 35 | 27 | 55 | 2,167 | 1,431 | 56 | 2,202 | 1,458 |
| Sep 2015 | 1 | 32 | 27 | 55 | 2,436 | 1,593 | 60 | 2,468 | 1,620 |
| Oct 2015 | 0 | - | - | 49 | 1,323 | 1,323 | 49 | 2,166 | 1,323 |
| **Total** | 223 $ | 7,501 $ | 3,691 | 3,359 $ | 111,722 $ | 53,723 | 3,582 $ | 119,023 $ | 57,414 |
| | | | | | | | | | |
| **Ampush Total** | 149 $ | 4,329 $ | 2,180 | 1,137 $ | 33,241 $ | 11,939 | 1,286 $ | 37,570 $ | 14,118 |
| **DGS EDU Total** | 74 $ | 2,972 $ | 1,511 | 2,222 $ | 78,481 $ | 41,784 | 2,296 $ | 81,453 $ | 43,295 |

Notes:

1 - Email addresses from Submitted eDegree Records (DGS000193) matched with DGS000200 where date received on DGS000193 was between 0-24 hours prior to date received on DGS000200, and affiliate on DGS000200 was not like edegreeadvisor. Submitted Records are those that were preliminary qualified that resulted in either qualified leads or unqualified leads. DGS000200 includes revenues on qualified, submitted records relating to all third-party affiliates, including eDegree.

2 - Corresponding Revenue from Secondary Qualified Sales received by defendants for the records identified in [1] as they appeared on DGS000200.

3 - Corresponding Payment to Affiliate for the records identified in [1] as they appeared on DGS000200.

4 - Email addresses from Unsubmitted eDegree Records (DGS000164-192) matched with DGS000200 where date received on DGS000164-192 was between 0-24 hours prior to date received in the Submitted eDegree Records (DGS000193).

5 - Corresponding Revenue from Secondary Qualified Sales received by defendants for the records identified in [4] as they appeared on DGS000200.

6 - Corresponding Payment to Affiliate for the records identified in [4] as they appeared on DGS000200.

7 - [1] + [4].

8 - [2] + [5].

9 - [3] + [6].

10 - Matches results from comparison of DGS000200 to DGS000193.

Amounts subject to rounding.

Highly Confidential
Attorneys Eyes Only

# EXHIBIT 6

Exhibit 6

## Connectus LLC d/b/a eDegree Advisor v. Ampush Media, Inc., and DGS EDU, LLC
### Summary of eDegree Submitted Leads [1]

| Time Period | eDegree Submitted Records | | | | Qualified, Submitted Records for All Affiliates | |
| --- | --- | --- | --- | --- | --- | --- |
| | eDegree, Qualified | | eDegree, Disqualified | | | |
| | Qualified Sales Revenue | Payment to eDegree | Qualified Sales Revenue | Payment to eDegree | Qualified Sales Revenue | Payment to eDegree |
| Jun 2013 | $15,753 | $9,756 | $3,265 | $2,088 | $15,753 | $9,756 |
| Jul 2013 | 23,398 | 14,517 | 6,946 | 4,286 | 23,398 | 14,517 |
| Aug 2013 | 47,510 | 27,231 | 13,786 | 8,032 | 47,510 | 27,231 |
| Sep 2013 | 37,300 | 24,078 | 9,693 | 6,198 | 37,300 | 24,078 |
| Oct 2013 | 41,260 | 26,640 | 11,952 | 7,580 | 41,260 | 26,640 |
| Nov 2013 | 31,056 | 22,140 | 7,346 | 5,180 | 31,056 | 22,140 |
| Dec 2013 | 21,812 | 17,080 | 5,279 | 4,120 | 21,812 | 17,080 |
| Jan 2014 | 37,123 | 30,492 | 8,450 | 6,952 | 37,123 | 30,492 |
| Feb 2014 | 25,284 | 19,470 | 6,344 | 4,774 | 25,284 | 19,470 |
| Mar 2014 | 19,384 | 15,862 | 6,029 | 4,752 | 19,384 | 15,862 |
| Apr 2014 | 27,902 | 23,496 | 6,499 | 5,280 | 27,902 | 23,496 |
| May 2014 | 30,972 | 25,124 | 7,763 | 6,154 | 30,972 | 25,124 |
| Jun 2014 | 29,943 | 24,178 | 6,898 | 5,500 | 29,943 | 24,178 |
| Jul 2014 | 22,372 | 14,762 | 8,113 | 5,302 | 22,372 | 14,762 |
| Aug 2014 | 19,521 | 12,936 | 7,749 | 5,478 | 19,521 | 12,936 |
| Sep 2014 | 29,824 | 19,404 | 12,439 | 8,360 | 29,824 | 19,404 |
| Oct 2014 | 32,889 | 20,856 | 9,845 | 6,358 | 32,889 | 20,856 |
| Nov 2014 | 60,826 | 47,478 | 13,108 | 9,066 | 60,826 | 47,478 |
| Dec 2014 | 56,022 | 44,756 | 15,014 | 12,120 | 56,022 | 44,756 |
| Jan 2015 | 68,199 | 53,316 | 20,446 | 16,368 | 68,199 | 53,316 |
| Feb 2015 | 70,854 | 56,136 | 24,030 | 18,552 | 70,854 | 56,136 |
| Mar 2015 | 44,620 | 35,808 | 11,268 | 9,096 | 44,620 | 35,808 |
| Apr 2015 | 48,489 | 38,760 | 9,496 | 7,656 | 48,489 | 38,760 |
| May 2015 | 52,861 | 40,536 | 10,366 | 7,968 | 52,861 | 40,536 |
| Jun 2015 | 61,672 | 47,376 | 12,420 | 9,360 | 61,672 | 47,376 |
| Jul 2015 | 53,016 | 40,800 | 11,213 | 8,232 | 53,016 | 40,800 |
| Aug 2015 | 58,704 | 47,424 | 11,706 | 9,048 | 58,704 | 47,424 |
| Sep 2015 | 55,856 | 44,208 | 13,745 | 10,344 | 55,856 | 44,208 |
| Oct 2015 | $66,416 | $55,680 | $18,876 | $14,640 | $66,416 | $55,680 |
| Total | $1,190,836 | $900,300 | $310,083 | $228,844 | $1,190,836 | $900,300 |
| | | | | | | |
| Ampush | $165,221 | $102,222 | $45,642 | $28,184 | $165,221 | $102,222 |
| DGS EDU | 1,025,615 | 798,078 | 264,441 | 200,660 | 1,025,615 | 798,078 |

**Notes:**

1 - In order to test the completeness of the data, we aligned DGS000193 (the eDegree Submitted Records) with DGS000200 (revenues on qualified, submitted records relating to all third-party affiliates, including eDegree). Where the records on DGS000193 were marked as qualified, we confirmed that the same Revenue and Payments to eDegree matched by month in DGS000200.

Amounts subject to rounding.

Highly Confidential
Attorneys Eyes Only

# EXHIBIT 7

Exhibit 7

## Connectus LLC d/b/a eDegree Advisor v. Ampush Media, Inc., and DGS EDU, LLC
## Avoided Cost per Lead from Non eDegree Sources Calculation
## Overstatement of Kidder Cost of Goods Sold

| Time Period | Actions Cost of Media[1] | Search Engine Expenses[2] | Total Overstatement | Total Kidder Cost of Goods Sold[3] | Difference | Percentage Overstatement |
|---|---|---|---|---|---|---|
| Jun 2013 | $ 310,651 | $ - | 310,651 | $ 680,000 | $ 369,349 | 54% |
| Jul 2013 | 336,012 | - | 336,012 | 742,900 | 406,888 | 55% |
| Aug 2013 | 372,555 | - | 372,555 | 784,000 | 411,445 | 52% |
| Sep 2013 | 346,364 | - | 346,364 | 694,300 | 347,936 | 50% |
| Oct 2013 | 287,639 | - | 287,639 | - | (287,639) | N/A |
| Nov 2013 | - | 299,874 | 299,874 | 527,617 | 227,743 | 43% |
| Dec 2013 | - | 259,901 | 259,901 | 485,756 | 225,855 | 46% |
| Jan 2014 | - | 353,980 | 353,980 | 637,389 | 283,409 | 44% |
| Feb 2014 | - | 283,951 | 283,951 | 545,888 | 261,937 | 48% |
| Mar 2014 | - | 248,878 | 248,878 | 545,106 | 296,228 | 54% |
| Apr 2014 | - | 233,307 | 233,307 | 556,989 | 323,682 | 58% |
| May 2014 | - | 259,167 | 259,167 | 551,418 | 292,251 | 53% |
| Jun 2014 | - | 177,637 | 177,637 | 433,589 | 255,952 | 59% |
| Jul 2014 | - | 191,511 | 191,511 | 483,358 | 291,847 | 60% |
| Aug 2014 | - | 179,844 | 179,844 | 468,246 | 288,402 | 62% |
| Sep 2014 | - | 134,171 | 134,171 | 406,930 | 272,759 | 67% |
| Oct 2014 | - | 94,702 | 94,702 | 337,521 | 242,819 | 72% |
| Nov 2014 | - | 57,382 | 57,382 | 270,478 | 213,096 | 79% |
| Dec 2014 | - | 66,950 | 66,950 | 357,695 | 290,745 | 81% |
| Jan 2015 | - | 116,284 | 116,284 | 401,821 | 285,537 | 71% |
| Feb 2015 | - | 117,632 | 117,632 | 350,629 | 232,997 | 66% |
| Mar 2015 | - | 100,810 | 100,810 | 337,544 | 236,734 | 70% |
| Apr 2015 | - | 95,095 | 95,095 | 315,702 | 220,607 | 70% |
| May 2015 | - | 86,552 | 86,552 | 311,316 | 224,764 | 72% |
| Jun 2015 | - | 112,312 | 112,312 | 340,183 | 227,871 | 67% |
| Jul 2015 | - | 116,679 | 116,679 | N/A | N/A | N/A |
| Aug 2015 | - | 99,167 | 99,167 | N/A | N/A | N/A |
| Sep 2015 | - | 111,955 | 111,955 | N/A | N/A | N/A |
| Oct 2015 | - | 100,390 | 100,390 | N/A | N/A | N/A |
| Total | $ 1,653,221 | $ 3,898,131 | 5,551,352 | $ 11,566,375 | $ 6,443,214 | 56% |

Notes:

1 - DGS000199.
2 - DGS EDU Ancillary Revenue-COS-Nov'13-Oct'15.xls.
3 - Kidder Report, Exhibit 3.5.

Amounts subject to rounding.

Highly Confidential
Attorneys Eyes Only