UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CONNECTUS LLC,

      Plaintiff,

v.                                    Case No. 8:15-cv-2778-T-33JSS

AMPUSH MEDIA, INC., et al.,

      Defendants.
_____/

**ORDER**

This matter comes before the Court upon consideration of
Defendants DGS Edu, LLC and Ampush Media, Inc.'s Joint Motion
to Strike/Exclude the Report, Opinions, and Testimony of
Plaintiff's Designated Expert Witness Brita D. Strandberg
(Doc. # 109), filed on November 18, 2016; Defendants' Joint
Motion to Strike/Exclude the Report, Opinions, and Testimony
of Plaintiff's Designated Expert Witness Douglas Kidder (Doc.
# 143), filed on December 19, 2016; and Plaintiff Connectus
LLC's Motion to Strike the Expert Report of Thomas P. Moroney
(Doc. # 147), filed on December 20, 2016. Connectus filed its
responses in opposition to the Motions relating to Strandberg
and Kidder on December 19, 2016, and January 19, 2017,
respectively. (Doc. ## 145, 187). Defendants filed their
response to Connectus's Motion regarding Moroney on January

19, 2017. (Doc. # 186). Defendants filed replies in support of their Motions relating to Strandberg and Kidder on January 3, 2017, and February 1, 2017, respectively. (Doc. ## 174, 203). Connectus filed its reply in support of its Motion relating to Moroney on January 26, 2017. (Doc. # 197). All three Motions are ripe for review.

I.   **Background**

Connectus provides an informational service that seeks to connect prospective students with post-high school educational institutions, such as universities. (Doc. # 200 at ¶ 12). To do so, Connectus engages in lead generation, a process which generates data on prospective students through the use of opt-in websites. (Id. at ¶ 13). The data generated during lead generation is "extraordinarily proprietary." (Id.). If, during the lead generation process, a prospective student agrees to be contacted, a Connectus representative from its call center contacts the prospective student to collect more information. (Id. at ¶ 14). The goal is to match a prospective student to a university or universities and then sell that "lead" to the matched university or universities. (Id. at ¶¶ 14, 18).

Connectus has its own list of universities with which it directly does business; however, if a prospective student

does not match with one of the universities that directly do business with Connectus, Connectus turns to an aggregator. (Id. at ¶ 15). An aggregator is an intermediary that has business relationships with one or several universities; Ampush is one such aggregator. (Id.). Each aggregator maintains its own database, or portal, detailing the programs offered by its affiliate universities. (Id. at ¶ 16). Connectus will "ping," i.e., search, an aggregator's portal to determine if that aggregator has a business relationship with a university that is a potential match for the prospective student. (Id. at ¶ 17). If a potential match is found, Connectus gathers more information from the prospective student, confirms the match, obtains the prospective student's consent to "various disclosures," and then sells the lead to the aggregator, which in turn sells the lead to the matched university. (Id. at ¶¶ 17–18). "Under no circumstances does [Connectus] submit or sell Leads to Aggregators at the Ping/Search Stage." (Id. at ¶ 19).

To govern the sale of its leads to aggregators, Connectus enters into contracts with its aggregators. (Id. at ¶ 20). Connectus entered into one such contract with Ampush. In relevant part, the contract stated:

3

## 1.1  Scope

This Service Level Agreement (this "Agreement"), entered into on May 31, 2013, by and between Ampush Media, Inc. ("AMPUSH") and EDegreeAdvisor, LLC[1]("VENDOR") governs the rights and responsibilities of the foregoing parties with respect to the call center services provided by VENDOR to AMPUSH at all times throughout the course of their business relationship (the "Service Period").

. . . .

## 1.4  Definitions

. . . .

Confidential Information:  Means any confidential or proprietary information, source code, software tools, designs, schematics, plans or any other information relating to any research project, work in process, future development, scientific, engineering, manufacturing, marketing or business plan or financial or personnel matter relating to either party, its present or future products, sales, supplies, clients, client lists or other client information, employees, investors or business, disclosed by one party to the other party, whether in oral, written, graphic or electronic form, and whose confidential or proprietary nature is identified at the time of such disclosure or by the nature of the circumstances surrounding disclosure should reasonably be understood to be confidential.

. . . .

## 2.1  Service Description

During the Service Period, VENDOR shall make outbound telephone calls in an effort to generate leads on behalf of AMPUSH.

---

[1] Connectus does business as EDegreeAdvisor.

. . . .

5.1  Non-Disclosure

Each party agrees that it will not make use of, disseminate or in any way disclose the other party's Confidential Information to any person, firm or business, except as authorized in this Agreement and to the extent necessary for performance of this Agreement. Each party agrees that it will disclose Confidential Information only to those of its employees and contractors who need to know such information and who have previously agreed to be bound by the terms and conditions of this Agreement. Each party agrees that it will treat all Confidential Information of the other party with the same degree of care as it accords its own confidential information; each party represents that it exercises reasonable care to protect its own confidential information.

. . . .

6.   GOVERNING LAW & ATTORNEYS' FEES

The interpretation and construction of this Agreement and all matters relating hereto shall be governed by the laws of the State of California. . . . Each of the parties agrees that it shall not seek a jury trial in any proceeding based upon or arising out of or otherwise related to this Agreement or any of the other documents and instruments contemplated hereby and each of the parties hereto waives any and all right to such jury trial. . . .

. . . .

13.  LIABILITY

IN NO EVENT SHALL EITHER VENDOR OR AMPUSH BE LIABLE FOR ANY LOST PROFITS, LOST REVENUES OR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THIS

> AGREEMENT, EVEN IF SUCH DAMAGES ARE FORESEEABLE AND
> WHETHER OR NOT THE OTHER PARTY HAS BEEN ADVISED OF
> THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL
> EITHER PARTY'S LIABILITY HEREUNDER EXCEED THE
> PAYMENTS MADE BY AMPUSH TO VENDOR IN THE TWELVE
> (12) MONTHS PRECEEDING THE EVENT GIVING RISE TO THE
> CLAIM.

(Doc. # 200-1 at ¶¶ 1.1, 1.4, 2.1, 5.1, 6, 13).

On October 31, 2013, DGS Edu acquired Ampush's education business, including the agreement entered into by Connectus and Ampush. (Doc. # 200 at ¶ 21). After DGS Edu acquired Ampush's education business, Connectus began receiving complaints from its universities and other aggregators that the leads being sold to them had been called multiple times before the lead could be utilized by the purchaser. (Id. at ¶ 22). As such, Connectus began to investigate what was causing the complaints. (Id. at ¶ 23). Connectus's

> investigation revealed that rather than purchasing
> the Leads at the end of the client verification
> process, [Ampush and DGS Edu] had been scraping,
> digitally copying or otherwise misappropriating
> [Connectus's] proprietary Lead generation data
> early in [Connectus's] Lead generation process, at
> the Ping/Search Stage, but before [Connectus] had
> submitted or sold the Lead to [Ampush or DGS Edu].

(Id. at ¶ 25). The investigation also "revealed that [Ampush and DGS Edu] . . . sold the misappropriated Lead generation data to several of [their] third party partners"; Ampush and DGS Edu, "and entities to which [they] sold . . . Lead

generation data, had been calling every Prospective Student whose information [Connectus] had utilized to conduct a Ping/Search on [Ampush and DGS Edu's] portal, regardless of whether the Lead had ultimately been submitted or sold to [Ampush or DGS Edu]"; and Ampush and DGS Edu, along with the entities to which they sold the lead generation data, "have called as many as 838,853 Prospective Students after improperly obtaining [Connectus's] proprietary Lead generation data . . . ." (Id. at ¶¶ 27-29).

While Ampush and DGS Edu paid Connectus for "approximately 39,975" leads, they did not pay Connectus for any of the 838,853 leads alleged to have been misappropriated. (Id. at ¶ 31). Furthermore, Connectus values each lead as being worth between $18 and $24 and calculates its damages as "exceed[ing] $19,000,000.00, without taking into account the damage to [its] reputation and goodwill." (Id.).

Connectus instituted this action against Ampush on December 3, 2015, (Doc. # 1), and shortly thereafter amended its Complaint to include DGS Edu (Doc. # 9). With leave of Court, Connectus filed its Second Amended Complaint on November 11, 2016. (Doc. ## 105, 106). The Second Amended Complaint brought claims for conversion (Count I), misappropriation of trade secrets under Florida law (Count

II), unfair competition (Count III), unjust enrichment (Count IV), breach of contract (Count V), and injunctive relief (Count VI) against both Ampush and DGS Edu. (Doc. # 106).

Then, on November 22, 2016, DGS Edu and Ampush filed Rule 12(c) motions. (Doc. ## 114, 115). Connectus shortly thereafter filed a conditional motion, seeking leave to amend its trade-secrets claim (switching it from one based on Florida law to one based on California law) in the event the Court determined that California law governed. (Doc. # 167). After extensive briefing, the Court granted the Rule 12(c) motions in part and granted Connectus leave to file a third amended complaint. (Doc. # 188). In particular, the Court held that, in light of the plain language of the choice-of-law provision in the parties' agreement, California law governed this action; that Connectus's common-law claims (Counts I, III, and IV) were preempted and therefore dismissed; that any damages awarded for breach of contract must be limited in accordance with the agreement's limitation-of-liability clause; and that Connectus's stand-alone claim for injunctive relief was dismissed, but Connectus could seek injunctive relief with respect to its breach-of-contract claim. (Id. at 31-32).

Connectus filed its Third Amended Complaint on January 30, 2017. (Doc. # 200). The Third Amended Complaint asserts a claim under California's Uniform Trade Secrets Act, Cal Civ. Code § 3426.1(d), (CUTSA) (Count I), and breach of contract (Count II). (Id.). Prior to the Court's disposition of the Rule 12(c) motions, the parties filed the three pending Motions, seeking to exclude certain expert testimony. And, although Defendants assert grounds for striking Connectus's experts' reports that are not based on Rule 702 and Daubert, the Motions should be treated as Daubert motions. Indeed, all three Motions contain arguments for why this Court should exclude the particular expert's testimony under Federal Rule of Evidence 702 and the progeny of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). (Doc. ## 109 at 11, 143 at 9, 147 at 5). The Court turns to those Motions now.

## II.  **Standard**

Federal Rule of Evidence 702 allows "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education [to] . . . testify in the form of an opinion or otherwise," if certain criteria are satisfied; namely,

> (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact
> to understand the evidence or to determine a fact
> in issue;
> (b) the testimony is based on sufficient facts or
> data;
> (c) the testimony is the product of reliable
> principles and methods; and
> (d) the expert has reliably applied the principles
> and methods to the facts of the case.

Fed. R. Evid. 702. "Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert" testimony. United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004). "This function 'inherently require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." Id. (quoting McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002)) (emphasis in original).

"[I]n determining the admissibility of expert testimony under Rule 702, [a court] engage[s] in a rigorous three-part inquiry." Id. The district court must consider whether:

> (1) the expert is qualified to testify competently
> regarding the matters he intends to address; (2)
> the methodology by which the expert reaches his
> conclusions is sufficiently reliable as determined
> by the sort of inquiry mandated in *Daubert*; and (3)
> the testimony assists the trier of fact, through
> the application of scientific, technical, or
> specialized expertise, to understand the evidence
> or to determine a fact in issue.

City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998). "[A]lthough there is some overlap among the inquiries into an expert's qualifications, the reliability of his proffered opinion[,] and the helpfulness of that opinion, these are distinct concepts that courts and litigants must take care not to conflate." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). "The proponent of expert testimony always bears 'the burden . . .'" of satisfying the Court's three-part inquiry, Frazier, 387 F.3d at 1260, by a preponderance of the evidence. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

As to the qualification inquiry, an expert can be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; see also Frazier, 387 F.3d at 1260 ("we observe that experts may be qualified in various ways"). But, "[i]f the [expert] witness is relying solely or primarily on experience, then," in establishing reliability, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citation and internal quotation marks omitted). "Exactly how reliability is evaluated may vary from case to case, but what remains

constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." Id. at 1262 (citing Fed. R. Evid. 702 advisory committee's note (2000 amends.) ("The trial judge in *all* cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.")) (emphasis in original).

There are four recognized, yet non-exhaustive, considerations—

> "(1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community"

—a district court may use in evaluating reliability. Seamon v. Remington Arms Co., LLC, 813 F.3d 983, 988 (11th Cir. 2016) (citations omitted). A district court can take other relevant factors into account as well. Id. (citations omitted). The Court's analysis as to reliability "focus[es] 'solely on principles and methodology, not on the conclusions that they generate.'" Id. (citation omitted).

Expert testimony must also assist the trier of fact. Fed. R. Evid. 702. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the

understanding of the average lay person." Frazier, 387 F.3d at 1262 (citation omitted). "[T]he court must 'ensure that the proposed expert testimony is "relevant to the task at hand," . . . i.e., that it logically advances a material aspect of the proposing party's case.'" Allison, 184 F.3d at 1312 (citation omitted). So, while "[t]he 'basic standard of relevance . . . is a liberal one,' Daubert, 509 U.S. at 587, . . .[,] if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry[,]' it should be excluded because there is no 'fit.'" Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp., 582 F.3d 1227, 1232 (11th Cir. 2009) (citations omitted).

Moreover, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63 (citation omitted). Similarly, pure questions of law are "not a matter subject to expert testimony." Myers v. Bowman, 713 F.3d 1319, 1328 (11th Cir. 2013) (citing Freund v. Butterworth, 165 F.3d 839, 863 n.34 (11th Cir. 1999) (en banc)).

III. **Analysis**

   A.   **Preliminary Matters**

      1.   **Trier of Fact: A Jury or the Bench?**

   In their response to Connectus's Motion, Defendants note
that "[t]he Court has not yet stated whether this matter, if
it goes to trial, will be a bench trial as set forth in the
Parties' contract . . . or a jury trial as requested by
Plaintiff . . . ." (Doc. # 186 at 2 n.1). The parties'
agreement does contain a clause addressing demands for a jury
trial (Doc. # 200-1 at ¶ 6), and, based on the Court's
recollection (as neither party provided the transcript of the
Case Management Hearing), the issue of this waiver provision
did come up at the Case Management Hearing. The Court
indicated at the hearing that it would address the issue if
and when the Court was squarely faced with the issue by way
of motion, as required under Local Rule 3.01(f). Because
neither of the Defendants have moved to strike Connectus's
jury demand, the Court declines to opine as to the
enforceability of the agreement's jury-waiver provision
without the benefit of a proper motion and sufficiently
focused briefing.

## 2. __New Arguments__

In their reply in support of the Motion seeking to exclude Kidder's testimony, Defendants raise a new argument. In particular, Defendants argue the agreement's limitation-of-liability clause should cap any damages awarded under Connectus's CUTSA claim. (Doc. # 203 at 6). While the Court did rule in favor of Ampush with respect to the enforceability of the agreement's limitation-of-liability clause in its January 20, 2017, Order, that ruling was made in the context of Ampush's argument. Notably, Ampush's argument only addressed the applicability of the limitation-of-liability clause as to the the breach-of-contract claim. (Doc. ## 115 at 12; 188 at 23-25).

This Court ordinarily does not consider arguments asserted for the first time on reply, Grasso v. Grasso, 131 F. Supp. 3d 1303, 1309 (M.D. Fla. 2015), and sees no reason why it should handle this matter any differently. To be sure, case law requires as much. Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly admonished, '[a]rguments raised for the first time in a reply brief are not properly before a reviewing court.'" (quoting United States v. Coy, 19 F.3d 629, 632 n.7 (11th Cir. 1994); citing United States v. Whitesell, 314 F.3d 1251, 1256 (11th

15

Cir. 2002); <u>United States v. Dicter</u>, 198 F.3d 1284, 1289 (11th Cir. 1999); <u>United States v. Martinez</u>, 83 F.3d 371, 377 n.6 (11th Cir. 1996))).

### 3.   <u>Violations of Local Rules</u>

Connectus argues that Defendants' Motion seeking the exclusion of Strandberg's testimony should be summarily denied for failure to comply with Local Rule 3.01(g). (Doc. # 145 at 24). In their reply, Defendants admit their opening brief does not comply with Local Rule 3.01(g). (Doc. # 174 at 8 n.8). But, Connectus also violated the Local Rules. Specifically, Connectus violated Local Rule 3.01(b), which limits a response in opposition to a motion to twenty pages. Connectus's response is twenty-six pages long. (Doc. # 145). The parties also dispute whether Connectus timely filed its response to Defendants' Motion seeking to exclude Kidder's testimony. (Doc. ## 203, 204). Faced with parties that have not complied with the Local Rules, but all of which have had an opportunity to be fully heard on the merits, the Court declines to summarily deny Defendants' Motion seeking to exclude Strandberg's testimony and declines to strike Connectus's response to the Motion seeking to exclude Kidder's testimony. M.D. Fla. L.R. 1.01(c).

The Court takes this opportunity to remind counsel they must comply with all Rules, including the Local Rules. Notably, the Local Rules require attorneys admitted to practice before this Court to have read and be familiar with the Local Rules. M.D. Fla. L.R. 2.01(b), 2.02(c).

### 4.   Mooted Issues and Arguments

The Court's January 20, 2017, Order dismissed Counts I, III, and IV of the Second Amended Complaint; dismissed Count II of the Second Amended Complaint, but granted Connectus leave to refile the trade-secrets claim under California law; and dismissed Count VI of the Second Amended Complaint insofar as Connectus sought to plead a stand-alone claim for injunctive relief. (Doc. # 188 at 31-32). As such, only two claims remain, a claim under CUTSA (Count I) and a claim for breach of contract (Count II). (Doc. # 200). Arguments made in the instant Motions addressing issues beyond the boundaries set by the Third Amended Complaint are consequently irrelevant and denied as moot.[2]

---

[2] The remaining, now irrelevant arguments are a by-product of the parties' declination of the Court's invitation to refile the instant Motions, which has shifted the burden of culling these irrelevancies from the parties to the Court.

B.   __Motion to Exclude the Testimony of Strandberg__

Strandberg was retained by Connectus to opine on how the Telephone Consumer Protection Act, 47 U.S.C. § 227, _et_ _seq._, pertains to

> *First*, whether Ampush Media, Inc. and DGS Edu, LLC's ("defendants") took reasonable and commonly employed steps to prevent data, which it allegedly unlawfully acquired from eDegree ("disputed data"), from being used in a manner that violates the TCPA[;]
>
> *Second*, whether defendants should have understood eDegree lead information to be confidential[;]
>
> *Third*, whether eDegree may incur costs related to TCPA violations involving the disputed data[;]
>
> *Fourth*, whether eDegree is an intended beneficiary of the TCPA[; and]
>
> *Fifth*, whether defendants' actions with respect to the disputed data interfered with eDegree's ability to benefit from the TCPA.

(Doc. # 109-1 at 4). As stated in her report, Strandberg's "analysis and conclusions are based on [her] experience as a lawyer in private practice representing technology and communications companies before the Federal Communications Commission . . . and federal courts in the area of telecommunications regulation and policy." (Id.). For the past eleven years, Strandberg's practice has included "regularly counsel[ing] companies that provide call center and similar services . . . and other entities subject to TCPA

requirements." (Id.). In addition, Strandberg's practice includes "assist[ing] in contractual and compliance matters concerning the protection of confidential information." (Id.).

Furthermore, Strandberg received her law degree in 1995 and received her undergraduate degree, although she does not specify her major or any minors, magna cum laude in 1990. (Id.). Although she has not testified as an expert in the last four years, she has co-authored nine publications relating to telecommunications, seven of which were articles relating to regulations of telecommunications. (Id. at 5, 21).

### 1.   Subject-Matter Jurisdiction Argument

Rather than bringing a 12(b)(1) or 12(b)(6) motion, Defendants embed a jurisdictional challenge within their Daubert Motion pertaining to Strandberg. (Doc. # 109 at 7 n.4 (citing Nicklaw v. Citimortgage, Inc., No. 15-14216, 2016 WL 5845682, at *2 (11th Cir. Oct. 6, 2016)). In particular, Defendants argue this Court lacks subject-matter jurisdiction to adjudicate claims involving or leading to damages incurred by Connectus in defending against TCPA suits because Connectus lacks Article III standing to seek such damages. (Id. at 7-11). Defendants also argue prudential standing

19

concerns militate against the exercise of jurisdiction with respect to any TCPA claim or a damages award arising from a TCPA violation. (Id.).

The Court need not expound upon the requirements of Article III standing or the doctrine of prudential standing in order to dispose of Defendants' arguments for an elementary reason: Connectus's pleading neither asserts a TCPA claim, nor seeks damages arising from liability under the TCPA. Strandberg's proffered expert report does discuss the TCPA and the damages Connectus might incur from forecasted TCPA suits; however, as discussed below, such opinion testimony is irrelevant to this action. Had Connectus's pleading asserted a TCPA claim or a claim for indemnification, vicarious liability, or the like, for damages arising from a TCPA violation, then perhaps standing concerns would arise. As pled, though, no such damages are involved and therefore Defendants' standing arguments are inapposite.

In an abundance of caution, the Court addresses subject-matter jurisdiction. Indeed, a federal court is obligated to ensure jurisdiction exists at all stages of a proceeding. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94, 101 (1998); In re Bayou Shore SNF, LLC, 828 F.3d 1297, 1328

20

(11th Cir. 2016); Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co., 68 F.3d 409, 414 (11th Cir. 1995).

Connectus relies on 28 U.S.C. § 1332 to establish subject-matter jurisdiction. (Doc. # 200 at ¶ 10). Section 1332 requires complete diversity of citizenship and the amount in controversy to exceed $75,000. 28 U.S.C. § 1332; Univ. of S. Ala. v. Am Tobacco Co., 168 F.3d 405, 412 (11th Cir. 1999). The party invoking jurisdiction bears the burden of establishing that the Court's exercise of jurisdiction is proper. Bishop v. Reno, 210 F.3d 1295, 1298 (11th Cir. 2000).

Connectus is a limited liability company. (Doc. # 200 at ¶ 2). Connectus's sole member is Digital Media Solutions, LLC. (Id. at ¶ 4). The members of Digital Media Solutions are "an individual who is domiciled[3] in Florida, and Prism Data, LLC." (Id. at ¶ 5). Prism Data, in turn, is composed of three members; two members are domiciled in Florida and one is domiciled in Pennsylvania. (Id. at ¶ 6). Accordingly, Connectus is a citizen of Florida and Pennsylvania. Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C., 627 Fed. Appx. 755, 757-58 (11th Cir. 2015).

---

[3] Citizenship of a natural person is determined by domicile. McCormick v. Aderholt, 239 F.3d 1254, 1257-58 (11th Cir. 2002).

DGS Edu is also a limited liability company. (Id. at ¶ 9). DGS Edu is wholly owned by Digital Globe Services, Inc., which is a Delaware corporation with its principal place of business in California. (Id.). Therefore, DGS Edu is a citizen of Delaware and California. 28 U.S.C. § 1332(c)(1); Rolling Greens MHP, 627 Fed. Appx. at 757–58.

For its part, Ampush is a Delaware corporation with its principal place of business in California. (Doc. # 200 at ¶ 8). Thus, Ampush is a citizen of Delaware and California. 28 U.S.C. § 1332(c)(1).

As to the amount in controversy, Connectus alleges it has been damaged by Defendants' misappropriation of 838,853 leads and each lead is worth between $18 and $24. (Id. at ¶ 31). In addition, Connectus pleads damages in excess of $19,000,000, "without taking into account the damage to Plaintiff's reputation and goodwill." (Id.). The amount in controversy therefore exceeds $75,000.

In summation, Connectus is completely diverse from Defendants and the amount in controversy exceeds $75,000. As such, the Court has subject-matter jurisdiction to hear the claims brought in this diversity action, which are a CUTSA claim (Count I) and a breach-of-contract claim (Count II). Defendants' arguments that the Court lacks jurisdiction on

the theory that Connectus does not have standing with respect to a TCPA claim or TCPA damages lack merit because Connectus is not asserting a TCPA claim. (Doc. # 200).

## 2. Exclusion of Strandberg's Testimony

Keeping in mind that Connectus bears the burden of persuasion by a preponderance of the evidence, the Court summarizes Connectus's arguments for why Strandberg should be allowed to opine as an expert. And, those two reasons[4] are (1) her opinions as to TCPA compliance and Defendants' putative noncompliance with the TCPA show that Defendants should have known the scrap data was confidential and (2) her opinions on Defendants' alleged noncompliance with the TCPA are "relevant to show the damages that Plaintiff is entitled to for its existing claims." (Doc. # 145 at 19).

With respect to the first reason—i.e., that noncompliance with the TCPA can be used to show Defendants should have known the scrapped data was confidential— Defendants argue Strandberg is not qualified to opine on the educational lead-generation industry's customs or practices and that her proffered testimony is unreliable, unhelpful,

---

[4] Connectus also argues Strandberg's opinions are relevant in support of its (now dismissed) unfair competition claim. (Doc. # 145 at 16-19). But, that claim has been dismissed and so the argument is irrelevant.

and irrelevant. Moreover, Defendants correctly point out that the agreement governing the parties' relationship was signed in May of 2013, whereas the current version of the TCPA was not in force until October 16, 2013. (Doc. # 174 at 6-7); see also Murphy v. DCI Biologicals Orlando, LLC, No. 6:12-cv-1459-Orl-36KRS, 2013 WL 6865772, at 6 n.7 (M.D. Fla. Dec. 31, 2013).

The Court agrees with Defendants that Strandberg satisfies neither Rule 702, nor Daubert and its progeny. In particular, Connectus failed to show by a preponderance of the evidence that Strandberg is qualified to opine as to whether Defendants should have known the scrapped data was confidential, a term defined by the parties' agreement. The only evidence in the record concerning Strandberg's qualifications to testify on the educational lead-generation industry's customs or practices is that she "assist[s] in contractual and compliance matters concerning the protection of confidential information." (Doc. # 109-1 at 4).

That vague statement, however, does not explain the extent of her experience. Furthermore, Connectus failed to respond with additional evidence showing Strandberg is qualified by experience, e.g., the number of clients she has advised, whether those clients were in the educational lead-

generation industry, and the extent to which she assisted those clients. In addition, the reliability of her opinions on the industry's customs and practices has not been adequately established because Strandberg does not explain why her experience is a sufficient basis for her opinion and how her experience is reliably applied to the facts of this case. Rather, Strandberg's opinion on whether Defendants should have known the scrapped data was confidential consists of single paragraph totaling two conclusory sentences in length. (Doc. # 109-1 at 12) ("Based on my experience working with call center providers and other entities engaged in telemarketing and customer resource management, it is important to maintain the confidentiality of leads in order to maintain their value, and lead information is not shared in the absence of compensation for that information. Similarly, in my experience entities in this industry understand information derived from leads and potential leads to be proprietary information that should be accorded confidential treatment.").

Moreover, the Court agrees with Defendants that Strandberg's proffered testimony regarding Defendants' supposed noncompliance with the TCPA would not be helpful to the trier of fact. In particular, Conntecus failed to

demonstrate by a preponderance of the evidence that showing a violation of the TCPA would help the trier of fact determine whether scrapped lead data is confidential. In addition, the Court agrees that whether Defendants violated the TCPA or failed to implement a compliance program for the TCPA is irrelevant to whether Defendants violated CUTSA or breached the parties' agreement.

The elements for a CUTSA claim are "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." Language Line Servs., Inc. v. Language Servs. Assocs., Inc., 944 F. Supp. 2d 775, 779 (N.D. Cal. 2013) (citations omitted); see also Cal. Civ. Code § 3426.1 (defining trade secret and improper means). And the elements for a breach-of-contract claim are "(1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff." Neal v. Quality Loan Serv. Corp., 301 Fed. Appx. 679, 680 (9th Cir. 2008) (citing Walsh v. W. Valley Mission Cmty. Coll. Dist., 78 Cal. Rptr. 2d 725, 733 (Cal. Dist. Ct. App. 1998)).

As can be seen, none of the elements for the causes of action at issue in this suit are advanced by showing a

violation of the TCPA. The putative misconduct in this case is not calling third parties, it is allegedly taking proprietary information—the lead data—without paying for it. Thus, when answering the questions of whether scrapped lead data is confidential and whether CUTSA was violated, what happened with the information after it was supposedly misappropriated is inconsequential.

Furthermore, Strandberg's report does not just tangentially touch upon the TCPA, it is centered entirely on the TCPA. Introducing evidence of whether Defendants violated the TCPA, which would require an in-depth discussion of the TCPA's requirements, is substantially likely to confuse the issues in this case. The TCPA regulates when a telemarketer or other entity may contact a person and there is nothing in Strandberg's report explaining how those regulations affect what information the parties agreed by private contract to keep confidential.

As for Connectus's argument that Strandberg's opinions on Defendants' alleged noncompliance with the TCPA are relevant to show the damages to which Connectus is entitled, the Court disagrees. To begin, the Court is cognizant that a plaintiff only needs to place a defendant on notice of the claim being brought against it. Fed. R. Civ. P. 8. To be sure,

"[a] complaint need not specify in detail the precise theory giving rise to recovery, . . . all that is required is that the defendant be on notice as to the claim . . . and the grounds on which it rests." Brisk v. Shoreline Found., Inc., 654 Fed. Appx. 415, 417 (11th Cir. 2016) (citing Sams v. United Food & Commercial Workers Int'l Union, AFL-CIO, CLC, 866 F.2d 1380, 1384 (11th Cir. 1989)). At the same time though, "a defendant is not required to infer all possible claims that could arise out of the facts set forth in the complaint . . . ." Id. (citing Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)).

Here, not a single iteration of Connectus's pleadings (and there have been four at this point) contain even the most oblique reference to the TCPA. (Doc. # 1, 9, 106, 200). Rather, a fair reading of each complaint is that Connectus alleges Defendants did not pay for 838,853 leads and breached the parties' agreement by selling scrap data generated when Connectus searched Defendants' portal. Further, to the extent Connectus could have used its claim for unfair competition to seek damages resulting from costs incurred in defending against TCPA suits caused by Defendants' alleged actions, that avenue has been foreclosed by the Court's January 20, 2017, Order, which dismissed the unfair competition claim as

28

preempted. In short, Connectus's pleadings have never once even implied that damages rested on yet-to-have-occurred TCPA suits caused by Defendants' alleged actions.

On the basis of the foregoing, Strandberg's proffered testimony as to damages Connectus might incur from defending against TCPA suits caused by Defendants' alleged misconduct would not help the trier of fact in determining if liability has been established and, if so, what amount should be awarded in damages. There is simply no fit between Strandberg's TCPA-damages theory and the issues in this case. Furthermore, allowing Strandberg to testify on such irrelevant and unripe damages would confuse the issues.

In sum, the Court finds that it should exercise its gatekeeper function and exclude Strandberg's proffered testimony. Connectus has not demonstrated by a preponderance of the evidence that Strandberg is qualified to opine on the educational lead-generation industry's customs and practices. Connectus also failed to demonstrate that Strandberg's opinions are reliable because Strandberg failed to explain why her experience is a sufficient basis for her opinion and how her experience is reliably applied to the facts of this case. Additionally, Connectus failed to sufficiently establish that Strandberg's testimony would be helpful and

failed to show that her testimony would not confuse the trier of fact.

### C. <u>Motion to Exclude the Testimony of Kidder</u>

Defendants seek to exclude the testimony of Kidder, Connectus's designated damages expert. (Doc. # 143). Kidder was retained by Connectus to "quantify damages arising from" Defendants' "alleged misappropriation of leads . . . ." (Doc. # 201-1 at 4). In particular, Kidder's report indicates he exclusively calculated damages in the form of unjust enrichment. (<u>Id.</u> at 19-38; Doc. # 201-2 (noting the supplemental report did not alter Kidder's methodology or his conclusions)).

Of course, Connectus's stand-alone claim for unjust enrichment was dismissed as preempted by the Court's January 20, 2017, Order. (Doc. # 188). That then leaves only the possibility of using unjust enrichment as a theory of liability attached to some viable cause of action. Under California law, a party may recover damages in the form of unjust enrichment under CUTSA. Cal. Civ. Code § 3426.3(a); <u>Cellular Accessories for Less, Inc. v. Trinitas LLC</u>, No. CV 12-06736, 2014 WL 4627090, at *2 (C.D. Cal. Sept. 16, 2014); <u>Digital Envoy, Inc. v. Google, Inc.</u>, No. 5:04-cv-1497 RS, 2005 WL 2999364, at *5 (N.D. Cal. Nov. 8, 2005). But, CUTSA

"does not affect . . . contractual remedies, whether or not based upon misappropriation of a trade secret . . . ." Cal. Civ. Code § 3426.7(b)(1).

In its January 20, 2017, Order, the Court found the agreement's limitation-of-liability clause enforceable with respect to the breach-of-contract claim. (Doc. # 188). In reaching that decision, the Court was only faced with the argument of enforceability of the limitation-of-liability clause vis-à-vis the breach-of-contract claim, ostensibly because Defendants were focused on having the trade-secrets claim dismissed for being improperly brought under Florida law. Now, in the context of a <u>Daubert</u> motion, the question of enforceability has returned, this time with respect to the CUTSA claim.

While the Court will not entertain arguments raised for the first time in a reply brief, Defendants are free to argue the applicability of the limitation-of-liability clause to the CUTSA claim at summary judgment. Accordingly, addressing the Motion seeking exclusion of Kidder's testimony would be premature at this juncture. The Motion seeking to exclude Kidder's testimony is therefore denied without prejudice. If it becomes necessary, after the disposition of Defendants' motions for summary judgment, to hear arguments as to why

Kidder's testimony should be excluded, the Court will entertain those arguments at the appropriate juncture.

### D.   <u>Motion to Exclude the Testimony of Moroney</u>

Defendants proffer the testimony of Moroney as an expert in the call center industry to opine on the customs and practices applicable to this case. (Doc. # 186). Accordingly, it is Defendants that bear the burden of persuasion by a preponderance of the evidence. In sum, Defendants argue Moroney is qualified to offer his opinion on the customs and practices of the educational lead-generation industry based on his experience and his opinions are not impermissible legal conclusions. (<u>Id.</u> at 11-18). Connectus disagrees and argues that Moroney is not qualified to testify as an expert because there is a distinction between the educational lead-generation industry and the call center industry. (Doc. # 147 at 9-13). Connectus further argues that Moroney should not be permitted to opine as to matters of contract interpretation. (<u>Id.</u> at 7-9).

As to qualifications, Moroney has twenty-five years' experience in the "Contact Center industry," with the first twelve years focused on operations management and the following thirteen years focused on business development activities. (Doc. # 147-3 at 4). Furthermore, Moroney

attended Christian Brothers College, Co. in Dublin, Ireland. (Id. at 5).

Connectus's argument for why Moroney is not qualified to provide expert testimony boils down to its assertion that a sufficiently large difference exists between the educational lead-generation industry and the "Contact Center" or call center industry such that opinions as to one industry are inapplicable to the other industry.

Moroney's report notes that "the subject matter of this contract involves the generation of leads, which is, in and of itself, a unique industry," and as such he "review[ed] several articles related specifically to the Lead Generation Industry, to determine" if his opinions based on experience in the call center industry "should substantively be modified by the particularity of the industry." (Id. at 5). While Moroney's preceding statement gives the Court pause, Defendants' response is well-taken.

Citing to the parties' agreement, Defendants point out that the agreement explicitly states in the first paragraph that it "governs the rights and responsibilities of the foregoing parties with respect to the **call center services** provided by VENDOR to AMPUSH . . . ." (Doc. # 200-1 at ¶ 1.1) (emphasis added). Moreover, section two of the agreement,

labeled "Services and Service Levels," lays out a detailed framework indicating, among other things, that Connectus was obligated to "make outbound calls in an effort to generate leads on behalf of AMPUSH." (Id. at ¶ 2.1).

When viewed against the agreement's terms, Moroney's statement that the engagement models with which he is familiar, "i.e., a vendor provid[ing] call center services on behalf of a client to offer services or products to existing or potential consumer/customers," (Doc. # 147-3 at 5), is, to be sure, a match. In light of the agreement's terms and Moroney's experience, the Court finds exclusion under Daubert is not warranted. Instead, a thorough and vigorous cross-examination will afford Connectus the proper and sufficient means of challenging the weight and certainty of Moroney's opinions. Health & Sun Research, Inc. v. Australian Gold, LLC, No. 8:12-cv-2319-T-33MAP, 2013 WL 6086457, at *4 (M.D. Fla. Nov. 19, 2013) ("The certainty and correctness of [the expert's] opinion will be tested through cross-examination and presentation of contrary evidence and not by a Daubert challenge. Indeed the Court's role as gatekeeper is not intended to supplant the adversary system or the role of the jury." (quoting Taylor, Bean & Whitaker Mortg. Corp. v. GMAC

<u>Mortg. Corp.</u>, No. 5:05-cv-260-Oc-GRJ, 2008 WL 3819752, at *5 (M.D. Fla. Aug. 12, 2008))).

Connectus also argues that Moroney should not be allowed to opine as to matters relating to contract interpretation. The Court agrees. <u>Myers</u>, 713 F.3d at 1328. Moroney may not opine, for example, as to his opinion that Connectus has, for the most part, ignored the plain terms of the agreement. However, that does not mean Moroney may not rely on the agreement to form his opinions. Likewise, that does not mean Moroney is barred from mentioning the agreement. Fed. R. Evid. 703, 704. Connectus is free to raise specific objections at trial, if this case should proceed that far.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendants DGS Edu, LLC and Ampush Media, Inc.'s Joint Motion to Strike/Exclude the Report, Opinions, and Testimony of Plaintiff's Designated Expert Witness Brita D. Strandberg (Doc. # 109), is **GRANTED.**

(2) Defendants' Joint Motion to Strike/Exclude the Report, Opinions, and Testimony of Plaintiff's Designated Expert Witness Douglas Kidder (Doc. # 143), is **DENIED WITHOUT PREJUDICE**. Defendants may reassert arguments as to why Kidder's report should be excluded if it becomes

35

necessary after the disposition of summary judgment motions.

(3) Plaintiff Connectus LLC's Motion to Strike the Expert Report of Thomas P. Moroney (Doc. # 147), is **GRANTED IN PART AND DENIED IN PART** to the extent set forth herein.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 13th day of February, 2017.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE