UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CONNECTUS LLC,

     Plaintiff,

v.                                    Case No. 8:15-cv-2778-T-33JSS

AMPUSH MEDIA, INC.,

     Defendant.

_____/

**ORDER**

    This matter comes before the Court upon consideration of Defendant Ampush Media, Inc.'s Motion for Summary Judgment (Doc. # 212), filed on February 22, 2017. Plaintiff Connectus LLC filed its response on March 24, 2017. (Doc. # 220). Ampush replied on April 7, 2017. (Doc. # 227). The Motion is denied.

**I.   Background**

    Connectus brought suit against Ampush on December 3, 2015. (Doc. # 1). Connectus then amended its Complaint on December 11, 2015, to assert claims against DGS Edu, LLC and Ampush. (Doc. # 9). Litigation proceeded and, after extensive briefing, Ampush's and DGS Edu's Rule 12(c) motions were granted in part, which resulted in Connectus filing its Third Amended Complaint on January 30, 2017. (Doc. # 188); (Doc. # 200). The Third Amended Complaint asserts claims under

California's Uniform Trade Secrets Act, Cal. Civ. Code § 3426, et seq., and for breach of contract against Ampush and DGS Edu. (Id.).

After the parties fully briefed summary judgment, DGS Edu reached a settlement with Connectus. (Doc. # 229). Upon Connectus's motion, the Court dismissed the claims against DGS Edu with prejudice. (Doc. # 230). Ampush is now the sole defendant.

Connectus and Ampush agree on very little. But what is evident is Ampush and Connectus entered into an agreement on May 31, 2013. (Doc. # 200-1). The agreement stated, in part:

1.1  Scope

This Service Level Agreement (this "Agreement"), entered into on May 31, 2013, by and between Ampush Media, Inc. ("AMPUSH") and EDegreeAdvisor, LLC[1]("VENDOR") governs the rights and responsibilities of the foregoing parties with respect to the call center services provided by VENDOR to AMPUSH at all times throughout the course of their business relationship (the "Service Period").

. . . .

1.4  Definitions

Qualified Lead: All leads submitted to Ampush must contain the following:

    i.    Campus Name;
    ii.   Last Name of Lead;

_____

[1] Connectus does business as EDegreeAdvisor LLC.

      iii.   First Name of Lead;
      iv.    Lead IP Address;
      v.     Lead Address;
      vi.    Lead City;
      vii.   Lead State;
      viii. Lead Zip Code;
      ix.    Lead Country;
      x.     Lead Phone Number;
      xi.    Lead Phone Number Designation;
      xii.   Lead Email Address;
      xiii. Program/Area of Interest Requested;
      xiv.  Date/Time Company generates the Lead;
      xv.   Level of Education; [and]
      xvi.  GED/High School Graduation Year[.]

. . . .

Confidential Information: Means any confidential or proprietary information, source code, software tools, designs, schematics, plans or any other information relating to any research project, work in process, future development, scientific, engineering, manufacturing, marketing or business plan or financial or personnel matter relating to either party, its present or future products, sales, supplies, clients, client lists or other client information, employees, investors or business, disclosed by one party to the other party, whether in oral, written, graphic or electronic form, and whose confidential or proprietary nature is identified at the time of such disclosure or by the nature of the circumstances surrounding disclosure should reasonably be understood to be confidential.

. . . .

2.3 Service Level Indications

. . . .

Any lead(s) generated for which there is no accompanying audio within forty-eight (48) hours shall be considered unqualified and will not be billable.

. . . .

AMPUSH shall only pay for Qualified Leads as defined above. . . . Any leads . . . submitted to more than three (3) schools will be considered unqualified and will not be paid.

. . . .

AMPUSH will not accept leads generated from "cold calls" . . . .

. . . .

AMPUSH will NOT accept Leads generated from third party lists, i.e., rented lists. Leads generated in this manner will be deemed Unqualified Leads.

. . . .

A CCR must always attempt to match the consumer to the program and/or school preference indicated by the consumer's responses to the pre-qualification questions. If the consumer is unqualified for their preferred school or program, or if such school or program is unavailable, then the CCR may suggest alternative schools or programs . . . . If the consumer is unqualified, or will not accept a match to, the school or programs available, the call must be terminated . . . without submitting any lead form(s).

. . . .

3.4 Reporting of Qualified Leads; Returns

A Qualified Lead is generated when an individual that is interested in one or more of the educational opportunities offered by AMPUSH or its clients and accurately completes a program lead form via a call center agent. AMPUSH shall provide [Connectus] with preliminary Qualified Lead counts on a daily basis. Accordingly, leads that are not Qualified shall be reviewed and returned to [Connectus] thirty (30)

days following the end of the calendar month in which such Lead was generated. It is understood and agreed that AMPUSH's records in determining the number of Qualified Leads shall control and be binding upon the parties.

. . . .

5.1  Non-Disclosure

Each party agrees that it will not make use of, disseminate or in any way disclose the other party's Confidential Information to any person, firm or business, except as authorized in this Agreement and to the extent necessary for performance of this Agreement. Each party agrees that it will disclose Confidential Information only to those of its employees and contractors who need to know such information and who have previously agreed to be bound by the terms and conditions of this Agreement. Each party agrees that it will treat all Confidential Information of the other party with the same degree of care as it accords its own confidential information; each party represents that it exercises reasonable care to protect its own confidential information.

. . . .

6.  GOVERNING LAW & ATTORNEYS' FEES

The interpretation and construction of this Agreement and all matters relating hereto shall be governed by the laws . . . of California. . . .

(Doc. # 200-1 at ¶¶ 1.1, 1.4, 2.3, 3.4, 5.1, 6).

The crux of the parties' dispute—how Connectus input data into Ampush's portal and what Ampush did with that data—arises from the parties' differing readings of the agreement. For its part, Ampush maintains Connectus was to contact

prospective students and submit lead information into Ampush's portal after collecting the data from the prospective student. (Doc. # 212-6, Mayberry Depo. at 46:4-47:09). Ampush would use that data to determine whether the prospective student matched with a university. (Id. at 47:10-16). If the student matched with a university, it was considered a "Prequalified Lead," which would be submitted to the university. (Id. at 47:17-23). The university would either reject the lead, causing the Prequalified Lead to become an Unqualified Lead, or accept the lead, causing the Prequalified Lead to become a Qualified Lead. (Id. at 47:25-48:17). Ampush was contractually bound to only pay for Qualified Leads. (Doc. # 200-1 at ¶ 2.3).

Furthermore, Ampush indicates all the data entered into its portal would be stored in its database (Doc. # 212-2 at ¶¶ 4, 7), which was automatically swept every seven minutes to filter out "ancillary data," (Id. at ¶ 7). Ancillary data is defined by Ampush as data that was entered into the portal for which no match was found or which otherwise failed to become a Prequalified Lead. (Id. at ¶ 4). But, Connectus disputes the use of that term within the industry. (Doc. # 220-1 at ¶ 15); (Doc. # 220-4, Einhaus Depo. at 65:4-11).

Ampush also maintains it never developed software enabling Connectus to ping or search Ampush's portal. (Doc. # 212-2 at ¶¶ 8, 9). Rather, according to Ampush, Connectus developed its own software and would mass-ping data into the portal, which resulted in a large amount of ancillary data. (Id. at ¶¶ 10, 11). Ampush sold the ancillary data in bulk. (Doc. # 212-2 at ¶ 4); (Doc. # 212-6, Mayberry Depo. at 49:13-50:2).

On the other hand, Connectus points out the terms ancillary data and Prequalified Lead do not show up in the agreement. (Doc. # 200-1). In addition, Connectus notes acceptance of a lead by a university is not a component of a Qualified Lead, as the term is defined under the agreement. (Id. at ¶ 1.4). Connectus further cites evidence that Ampush did, in fact, allow Connectus to ping leads into the portal, and even helped to troubleshoot when issues arose with pinging the portal. (Doc. # 220-1 at ¶¶ 7, 8); (Doc. # 220-7).

Connectus also presents a different understanding of how the process of submitting leads into Ampush's portal was to function. According to Connectus, its call center representative would call prospective students and gather lead information. (Doc. # 220-1 at ¶ 4). The representative was allowed, but not required, to use Ampush's portal to

attempt to find a match for the prospective student. (<u>Id.</u> at ¶ 5). If the representative used Ampush's portal, the lead information was prepopulated into the data fields and then the representative would click a "search" button, resulting in a search of Ampush's database. (<u>Id.</u> at ¶¶ 7, 8). If the search yielded a match, the representative would seek the prospective student's permission for the university to contact him or her. (<u>Id.</u> at ¶ 10). If the prospective student consented, the representative would click the "submit" button and formally submit the lead to Ampush. (<u>Id.</u>).

In addition, the parties dispute whether lead information is considered confidential. Connectus maintains lead information is confidential information, and Ampush knew or should have known as much, based on the agreement and industry standardized practice. (Doc. # 200-1 at ¶¶ 1.4, 5.1); (Doc. # 212-11, Marinucci Depo. at 113:19-114:6); (Doc. # 220-1 at ¶ 9); (Doc. # 220-4, Einhaus Depo. at 72:23-74:3, 88:2-15). Moreover, Connectus took efforts to ensure its lead data remained confidential. (Doc. # 212-19, Goodman Depo. at 19:2-20:24). In contrast, Ampush asserts lead information was not identified by Connectus as confidential and therefore the information was not protected under the agreement. (Doc. # 212 at 3, ¶¶ 18-20).

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the

pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

As a preliminary matter, the parties have each objected to the other's use of certain evidence at summary judgment. (Doc. ## 221, 224, 225, 226, 231, 232). Even assuming, without deciding, that all of Ampush's proffered evidence is admissible, summary judgment still would not be appropriate.

Ampush objects to the declaration testimony of Naomi Barbeau, Connectus's executive vice president of call center operations. (Doc. # 231). Ampush argues Barbeau lacks personal knowledge because she was not employed by Connectus while Ampush and Connectus were in business with each other. (Id.). The Court finds Ampush's objection to be well-taken and excludes from its consideration Barbeau's testimony to the extent Connectus proffered such testimony to show the practices of Ampush while it was in business with Connectus.

Ampush further objects to Barbeau's declaration testimony on the grounds that it constitutes improper opinion testimony and it is irrelevant. However, as vice president of call center operations, her particularized knowledge is proper lay witness testimony. United States v. Hill, 643 F.3d 807, 841-42 (11th Cir. 2001) ("Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences"). Furthermore, as

Barbeau is an executive within the educational lead generation industry, her testimony with respect to industry standards as a whole is not irrelevant. Thus, the objections are overruled.

In addition, Ampush objects to the deposition testimony of Brian Einhaus and Kolin Porter, corporate representatives for non-party companies that also operate within the educational lead generation industry. (Doc. # 232). In relevant part, Ampush argues the testimony is irrelevant and impermissible opinion testimony. But the experience Einhaus and Porter have gained through their respective particularized experiences in the educational lead generation industry are proper topics for their lay testimony, <u>Hill</u>, 643 F.3d at 841-42, and such testimony is relevant to this action in that it goes towards industry standards and provides a basis for inferring consequences of Ampush's alleged actions. The objections to the testimony cited herein are therefore overruled.

### A.    <u>Breach of Contract Claim</u>

California law has four elements to a claim for breach of contract: "(1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff." <u>Walsh v. W. Valley Mission Cmty. Coll.</u>

<u>Dist.</u>, 78 Cal. Rptr. 2d 725, 733 (Cal. Dist. Ct. App. 1998).

Ampush argues Connectus cannot establish the second, third,

or fourth elements.

### 1.   The Second Element: Performance or Excuse

Ampush asserts Connectus itself breached "several

express provisions of the" agreement. (Doc. # 212 at 19).

According to Ampush, Connectus violated the agreement by

pinging data into Ampush's portal rather than formally

submitting a Qualified Lead. Connectus, however, has

presented evidence that its practice of pinging data into the

portal was enabled and supported by Ampush. (Doc. ## 220-5,

220-7). Thus, a genuine issue of material fact exists and

summary judgment is not appropriate.

Ampush's additional arguments as to how Connectus

putatively breached the agreement also fail to persuade the

Court. The agreement does not obligate Connectus to solely

make calls on behalf of Ampush (Doc. # 200-1) and Connectus

presented evidence it used the script developed by Ampush

(Doc. # 212-4, Borghese Depo. at 60:17-61:3); (Doc. # 212-

20, Marinucci Depo. at 170:23-171:23).

### 2.   The Third Element: Defendant's Breach

"Under California law, the interpretation of a contract

is a question of law." <u>In re Bennett</u>, 298 F.3d 1059, 1064

(9th Cir. 2002) (citation omitted). "'The fundamental goal of contract[] interpretation is to give effect to the mutual intention of the parties. If contractual language is clear and explicit, it governs.'" Id. (citations omitted). "Although the intent of the parties determines the meaning of the contract . . ., the relevant intent is 'objective'—that is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent." Shaw v. Regents of Univ. of Cal., 67 Cal. Rptr. 2d 850, 856 (Cal. Dist. Ct. App. 1997). Moreover,

> particular expressions may, by trade usage, acquire a different meaning in reference to the subject matter of a contract. If both parties are engaged in that trade, the parties to the contract are deemed to have used them according to their different and peculiar sense as shown by such trade usage and parol evidence is admissible to establish the trade usage even though the words in their ordinary or legal meaning are entirely unambiguous.

Hayter Trucking, Inc. v. Shell W. E&P, Inc., 22 Cal. Rptr. 2d 229, 238 (Cal. Dist. Ct. App. 1993).

Furthermore, "the Court may consider extrinsic evidence of the parties' intent when the contract is ambiguous." Mattel, Inc. v. MGA Entm't, Inc., 782 F. Supp. 2d 911, 943 (C.D. Cal. 2011) (citation omitted). "Admissible extrinsic evidence includes 'surrounding circumstances under which the parties negotiated or entered into the contract; the object,

nature, and subject matter of the contract; and the subsequent conduct of the parties.'" Id. (citation omitted). "[W]hen . . . ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury." City of Hope Nat'l Med. Ctr. v. Genentech, Inc., 181 P.3d 142, 156 (Cal. 2008).

### a.  Non-disclosure provisions

Paragraph 1.4 defines three terms, two of which are relevant here. The first is "Qualified Lead," defined as a lead containing sixteen specific data points. (Doc. # 200-1 at ¶ 1.4). The second is "Confidential Information," which contains three elements.

The first element of Confidential Information lists twenty-five categories of information that fall within its ambit, two of which are confidential information and proprietary information. (Id.). The second element requires that the information be disclosed by one party to the other. (Id.). And the third element requires that the information's confidential or proprietary nature be "identified at the time of . . . disclosure or by the nature of the circumstances

surrounding disclosure should reasonably be understood to be confidential." (Id.).

Although the parties dispute whether leads constitute confidential or proprietary information, as those terms are used in their agreement, it is undisputed both parties are engaged in the same industry of generating leads to sell to universities. As such, Connectus may rely on trade usage to show its construction of the agreement is proper, see Hayter Trucking, 22 Cal. Rptr. 2d at 238, which it has done (Doc. # 145-7, Porter Depo. at 33:3-13); (Doc. # 212-11, Marinucci Depo. at 113:19-114:6); (Doc. # 220-1 at ¶ 9); (Doc. # 220-4, Einhaus Depo. at 72:23-74:3, 88:2-15). Ampush, for its part, disputes that leads are considered confidential within the trade. (Doc. # 227 at 4, ¶ 21). Therefore, a genuine dispute exists regarding trade usage and, under City of Hope National Medical Center, Connectus has presented sufficient evidence to survive summary judgment.

### b. **Return provision**

Paragraph 3.4 of the parties' agreement states:

A Qualified Lead is generated when an individual that is interested in one or more of the educational opportunities offered by AMPUSH or its clients and accurately completes a program lead form via a call center agent. **AMPUSH shall provide [Connectus] with preliminary Qualified Lead counts on a daily basis. Accordingly, leads that are not Qualified shall be**

> **reviewed and returned to [Connectus]** thirty (30) days following the end of the calendar month in which such Lead was generated. It is understood and agreed that AMPUSH's records in determining the number of Qualified Leads shall control and be binding upon the parties.

(Doc. # 200-1 at ¶ 3.4) (emphasis added). A Qualified Lead is a lead that contains sixteen specific data points: viz., campus name; the lead's last name, first name, IP Address, address, city, state, zip code, country, phone number, phone number designation, email address, level of education, and year of graduating high school or obtaining a GED; the program/area of interest requested; and the date and time Connectus generated the lead. (Id. at ¶ 1.4).

Ampush argues paragraph 3.4 "only applies to Prequalified Leads that [were] ultimately rejected by a school." (Doc. # 212 at 14). But, paragraph 3.4 does not once use or define "Prequalified Lead." Rather, "Prequalified Lead" comes from Ampush's reading of the phrase "preliminary Qualified Lead counts." Thus, Ampush's interpretation is not supported by the agreement's plain language or the agreement as a whole.

As to plain language, "Prequalified Lead" is not a term defined or used by the agreement. Moreover, the parties were well aware of how to affix the prefix "pre" to the word

"qualification"; indeed, they did just that when they used "pre-qualification questions." (Id. at ¶ 2.3). That the parties modified "questions" with the adjective "pre-qualification," yet did not do so for "Lead" demonstrates that "preliminary Qualified Lead counts" does not signify "Prequalified Lead."

In addition, the structure of the agreement does not support Ampush's proffered reading of paragraph 3.4. The agreement "governs . . . with respect to the call center services provided by [Connectus] to AMPUSH . . . ." (Id. at ¶ 1.1). Under the agreement, Ampush was to pay only for Qualified Leads. (Id. at ¶ 2.3). "A Qualified Lead is generated when an individual [(1)] that is interested in one or more of the educational opportunities offered by AMPUSH . . . [(2)] accurately completes a program lead form via a call center agent." (Id. at ¶ 3.4). Prior to submitting the lead form, the call center agent asks the prospective student "pre-qualification questions." (Id. at ¶ 2.3).

Furthermore, there are three enumerated instances that result in a lead being considered or deemed unqualified. In particular, "[a]ny lead[] generated for which there is no accompanying audio within forty-eight . . . hours shall be considered unqualified"; "Any lead[] on which a consumer's

personal information is submitted to more than three . . .
schools will be considered unqualified"; and "Leads generated
[from third party lists] shall be deemed Unqualified leads."
(Id.). "[L]eads that are not Qualified shall be reviewed and
returned to" Connectus within thirty days. (Id. at ¶ 3.4).
Importantly, there is nothing in the agreement that makes
rejection of a lead by a school a cause for finding a lead
unqualified.

In light of the foregoing, the Court accepts Connectus's
invitation and "reject[s] Ampush's . . . reading" (Doc. # 220
at 12), of paragraph 3.4 as only applying to leads that are
ultimately rejected by universities. Accordingly, Ampush's
Motion is denied.

### 3.   The Fourth Element: Damage to Plaintiff

Ampush argues Connectus's breach-of-contract claim fails
because Connectus has not produced evidence of damages. But,
Connectus has presented evidence allowing for the inference
of damages. (Doc. # 212-20, Marinucci Depo. at 78:23-80:10)
(stating disengagement rate for prospective students whose
information was pinged to Ampush was four times higher than
rate for prospective students whose information was not
pinged to Ampush); (Doc. # 145-7 at 10, Porter Depo., at
40:13-41:11). In addition, because Ampush challenges

Connectus's showing of damages for the action as a whole, the Court further notes that "[u]nder the CUTSA, [a plaintiff] [i]s entitled to recover damages for its actual loss caused by the misappropriation and also for [a defendant's] unjust enrichment not taken into account in computing . . . actual loss." Ajaxo Inc. v. E*Trade Fin. Corp., 115 Cal. Rptr. 3d 168, 172 (Cal. Dist. Ct. App. 2010) (citation omitted). There is no dispute that Connectus is seeking damages in the form of unjust enrichment. (Doc. # 200). Ampush's argument therefore fails to persuade the Court.

### B.   CUTSA Claim

To prevail on its CUTSA claim, Connectus "must 'demonstrate: (1) [it] owned a trade secret, (2) [Ampush] acquired, disclosed, or used [Connectus's] trade secret through improper means, and (3) [Ampush's] actions damaged [Connectus].'" Language Line Servs., Inc. v. Language Servs. Assocs., Inc., 944 F. Supp. 2d 775, 799 (N.D. Cal. 2013). "Trade secret" means information that "(1) [d]erives independent economic value . . . from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use[,] and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code §

3426.1(d). "'Improper means' includes theft, bribery, misrepresentation, breach . . . of a duty to maintain secrecy, or espionage through electronic or other means." Cal. Civ. Code § 3426.1(a).

Ampush argues Connectus failed to maintain the secrecy of the lead data. "The determination of whether 'reasonable efforts' have been taken is quintessentially fact-specific. . . . Only in extreme cases is it appropriate to take the issue away from the jury." Mattel, Inc. v. MGA Entm't, Inc., No. CV 04-9049 DOC(RNBx), 2011 WL 3420571, at *2 (C.D. Cal. Aug. 4, 2011) (citations omitted); see also In re Providian Credit Card Cases, 116 Cal. Rptr. 2d 833, 844 (Cal. Dist. Ct. App. 2002) (stating "whether a party claiming a trade secret undertook reasonable efforts to maintain secrecy is a question of fact"). "Reasonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required." Allergan, Inc. v. Merz Pharm., LLC, No. SACV 11-446 AG(EX), 2012 WL 781705, at *11 (C.D. Cal. Mar. 9, 2012) (citation and internal quotation marks omitted). The reasonable-efforts requirement may even be met by a showing of an implied confidential relationship. Direct Techs., LLC v. Elec. Arts, Inc., 836 F.3d 1059, 1070-71 (9th Cir. 2016).

After review of the record, the Court cannot say this is one of those "extreme cases" where it is appropriate to take the issue—i.e., whether Connectus took reasonable steps under the circumstances—from the jury. See, e.g., (Doc. # 212-19, Goodman Depo. at 19:2-20:24).

Ampush further argues Connectus cannot show that Ampush committed an act of misappropriation. Misappropriation is defined as:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[, which includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means"]; or
>
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (A) Used improper means to acquire knowledge of the trade secret; or
>>
>> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
>>
>>> (i) Derived from or through a person who had utilized improper means to acquire it;
>>>
>>> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>>
>>> (iii) Derived from or through a person who owed a duty to the person seeking

> relief to maintain its secrecy or limit
> its use; or
>
> (C) Before a material change of his or her
> position, knew or had reason to know that it
> was a trade secret and that knowledge of it
> had been acquired by accident or mistake.

Cal. Civ. Code § 3426.1(b).

With regard to use, "'[e]mploying the confidential information in manufacturing, production, research or development, marketing goods that embody the trade secret, or soliciting customers through the use of trade secret information, all constitute use.'" AgencySolutions.com, LLC v. TriZetto Grp., Inc., 819 F. Supp. 2d 1001, 1028 (E.D. Cal. 2011) (citation omitted). "'One clearly engages in the "use" of a secret, in the ordinary sense, when one directly exploits it for his own advantage . . . .'" Id. (citation omitted).

Connectus has presented sufficient evidence to create a genuine issue of material fact as to whether Ampush used Connectus's trade secret (Doc. # 212-6, Mayberry Depo. at 50:3-22) (explaining that Ampush would sell unmatched lead information or call those leads that were not matched to a university), and whether Ampush knew or had reason to know the lead information was confidential, i.e., that it had a duty to maintain the secrecy of the information or limit its use (Doc. # 200-1 at ¶¶ 1.4, 5.1); (Doc. # 212-11, Marinucci

Depo. at 113:19-114:6); (Doc. # 220-1 at ¶ 9); (Doc. # 220-4, Einhaus Depo. at 72:23-74:3, 88:2-15). Therefore, Ampush's Motion is denied.

### C. **Joint and Severally Liable**

Ampush argues Connectus may not seek joint and several liability. But a case cited by Ampush undercuts that very argument. Brocade Communications Systems, Inc. v. A10 Networks, Inc., 873 F. Supp. 2d 1192, 1217-18 (N.D. Cal. 2012). To be sure, the court in Brocade concluded that liability on claims under CUTSA is generally joint and several. Id. Furthermore, Ampush's argument that it did not have sufficient notice of Connectus's intention to seek joint and several liability is belied by its own statement that Connectus identified the theory during discovery. (Doc. # 212 at 23).

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant Ampush Media, Inc.'s Motion for Summary Judgment (Doc. # 212) is **DENIED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 4th day of May, 2017.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE